IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| R. RUDNICK & CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08 cv 1856 |
| | ) | |
| G.F. PROTECTION, INC., | ) | Hon. Judge Gottshall |
| d/b/a GUARDIAN FALL PROTECTION | ) | |
| and, JOHN DOES 1-10, | ) | Magistrate Judge Brown |
| | ) | |
| Defendants. | ) | |

**DEFENDANT G.F. PROTECTION, INC.'S MEMORANDUM IN SUPPORT OF
ITS MOTION TO DISMISS COUNTS II AND III OF PLAINTIFF'S CLASS
ACTION COMPLAINT**

Defendant G.F. Protection, Inc. d/b/a Guardian Fall Protection ("G.F."), by its
attorneys, pursuant to Fed.R.Civ.P. 12(b)(6), hereby submits this memorandum of law in
support of its Motion to Dismiss Counts II and III of Plaintiff R. Rudnick & Co.'s
("Rudnick") Class Action Complaint.

**INTRODUCTION**

Plaintiff filed a three count Class Action Complaint against Defendant alleging
that it violated federal and state statutory and common law by sending Plaintiff three
unsolicited fax advertisements. In Count I, Plaintiff alleges that Defendant's purported
sending of these facsimile advertisements violated the federal Telephone Consumer
Protection Act ("TCPA"), 47 U.S.C. § 227. In Count II, Plaintiff contends that Defendant
violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"),

815 ILCS 505/2, by engaging in the unfair practice of sending unsolicited fax advertisements.  In Count III, Plaintiff attempts to state a claim for conversion on the theory that the sending of unsolicited faxes misappropriated its fax paper, ink and toner to Defendant's own use.

Plaintiff's state law claim for violation of the ICFA in Count II is subject to dismissal for a number of independent reasons.  First, fax advertising does not constitute an unfair trade practice for purposes of the ICFA as that term has been defined by the Illinois Supreme Court.  Second, Plaintiff does not and cannot alleged that Defendant intended that the transmission of the facsimiles to be unfair to it.  Third, the ICFA simply does not apply to this case because Plaintiff is unable to allege that the facsimile transmissions at issue occurred primarily and substantially in Illinois.

Plaintiff's claim for common law conversion in Count III should also be dismissed because it is unable to allege any facts demonstrating that Defendant ever exercised dominion and control over its property which is an essential element of its claim.  Further, the basis for Plaintiff's conversion claim is loss of a few sheets of paper and negligible amount of ink or toner.  Such an alleged loss is *de minimus* which the law does not recognize as a "serious interference" with property rights necessary to give rise to a conversion.

## ALLEGATIONS IN THE COMPLAINT

The factual allegations contained in the Complaint are scarce.  Plaintiff alleges that it received three unsolicited faxes on its facsimile machine.  (See Cmplt., ¶¶ 7-9).  The first such fax was allegedly received on February 12, 2007, the second on April 9,

2007 and the third on September 26, 2007.  (See Cmplt., ¶¶ 7-9).  Each fax that was sent provided Plaintiff with a number to contact if it did not wish to receive faxes in the future.  (See Cmplt., Ex. A-C).

The printing of the faxes at issue allegedly caused Plaintiff to lose a few sheets of paper and some unidentifiable amount of ink and toner.  (See Cmplt., ¶ 50).  Plaintiff also alleges that "discovery may reveal the transmission of additional faxes." And "[o]n information and belief defendants have transmitted similar unsolicited fax advertisements to at least 40 other persons in Illinois."  (See Cmplt., ¶¶ 10, 17).  Plaintiff requests certification of a class of all persons -- regardless of the location from which or to which the fax was allegedly sent  -- who received faxes by or on behalf of Defendant with whom Defendant cannot provide evidence of express consent or an establish business relationship. (See Cmplt., ¶ 29).

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12 (b)(6) tests the legal sufficiency of the complaint.  Fed.R.Civ.P. 12(b)(6); Fries v. Helsper, 146 F.3d 452, 457 (7th Cir. 1998).  The purpose of such a motion is to "streamline litigation by dispensing with needless discovery and fact finding," Neitzke v. Williams, 490 U.S. 319, 326-27 (1989), and to allow the court to determine "at the outset of the litigation, before costly discovery is undertaken, whether the plaintiff has any tenable theory or basis of suit, so that if it does not, the case can be got rid of immediately without clogging the court's docket and imposing needless expense on the defendant."  Ryan v. Mary Immaculate Queen Center, 188 F.3d 857, 860 (7th Cir. 1999).

As recently explained by the United States Supreme Court, in order to withstand a motion to dismiss, a complaint must provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action" will not suffice. Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007). In other words, a complaint must include enough factual allegations to "raise a right to relief above a speculative level." Id. at 1965. Further, the court may properly dismiss a complaint under Fed. R. Civ. P. 12 (b)(6) where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Cushing v. City of Chicago, 3 F.3d 1156, 1159 (7th Cir. 1993). Application of these standards in the instant case mandates dismissal of Counts II and III of Plaintiff's Complaint with prejudice.

## I.    PLAINTIFF'S ICFA CLAIM IN COUNT II SHOULD BE DISMISSED WITH PREJUDICE.

In Count II, Plaintiff alleges Defendant's alleged sending of an unsolicited fax amounted to an "unfair practice" in violation of the ICFA, 815 ILCS 505/2. In order to state a cause of action under the ICFA, the Plaintiff must allege: (1) an unfair or deceptive act or practice by Defendant; (2) Defendant's intent that Plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade and commerce. See Connick v. Suzuki Motor Company, 174 I11.2d 482, 501, 675 N.E.2d 584 (1996).

As set forth below, Plaintiff cannot state a cause of action under the ICFA for a number of reasons. First, as a number of decisions have held, the alleged sending of a facsimile advertisement is not an "unfair practice" within the meaning of the ICFA. Second, Plaintiff does not and cannot allege that Defendant intended that the sending of the facsimiles at issue to be an unfair practice. Third, Plaintiff does not and cannot allege

that Defendant's conduct occurred "primarily and substantially" in Illinois which is a necessary element of its ICFA claim.

### A.    The Transmission Of Facsimile Advertisements Does Not Constitute An "Unfair Practice" Under the ICFA.

In support of its ICFA claim, Plaintiff alleges that "[u]nsolicited fax advertising is contrary to the TCPA and Illinois law, 720 ILCS 5/26-3(b), [which] makes it a petty offense to transmit unsolicited fax advertisements to Illinois residents." (Cmplt., ¶ 36). However, neither of these statutes are listed among those in the ICFA that are considered per se violations of the Act.  See, 815 ILCS § 505/2Z (listing a variety of offenses that are considered *per se* violations of ICFA).[1]  Because the TCPA and § 26-3 of the Illinois Criminal Code are not listed as *per se* violations of the ICFA, the Plaintiff is required to independently state a claim that unsolicited fax advertising constitutes an unfair practice under the Act. Western Railway Devices Corp. v. Lusida Rubber Products, Inc., 2006 WL 1697119, * 3 (N.D. Ill.).[2]  This, it is unable to do.

Determination of whether conduct is an unfair practice for purposes of the ICFA is governed by the test set forth in the Illinois Supreme Court's decision of Robinson v. Toyota Motor Credit Corp., 201 Ill. 2d 403, 775 N.E.2d 951 (2002). Under Robinson, whether a trade practice is unfair depends on three factors: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive or unscrupulous; and (3) whether it causes substantial injury to consumers. See Id. at 417-18.

---

[1] If the Illinois legislature intended that violations of 720 ILCS 5/26-3 or any other statutory provision prohibiting unsolicited fax advertising constitute a *per se* unlawful practice under the ICFA, it would have explicitly provided so in § 505/2Z. See, McCabe v. Crawford & Company, 210 F.R.D. 631, 640 (N.D. Ill. 2002). In this regard, it is significant that, in contrast to unsolicited fax advertising, Illinois' prohibition on *telephone* solicitation *is* specifically listed as a *per se* violation of ICFA. See, 815 ILCS 505/2Z, citing, 815 ILCS 413/1 (the Telephone Solicitations Act).
[2] Copies of all Westlaw and Slip Opinions cited herein are indexed and attached in this brief's Appendix.

A practice may be considered immoral, unethical, oppressive or unscrupulous only if it imposes a lack of meaningful choice or an unreasonable burden on the consumer. See Robinson, 201 I11.2d at 419-20. Here, Plaintiff's Complaint alleges no facts that the sending of fax advertisements is "immoral, unethical, oppressive or unscrupulous." Further, the documents that were sent to the Plaintiff demonstrate on their face that recipients had a reasonable alternative to the receipt of additional messages. Each of the faxes at issue request that the recipient contact Defendant at a specified phone number to opt out of receipt of future faxes. (See Exs. A-C to Cmplt.). This conduct cannot possibly rise to the level of oppression envisioned by the Illinois legislature when it drafted the ICFA.

Further, Plaintiff's Complaint contains no allegations that it sustained substantial injury as a result of receiving Defendant's faxes. In fact, the Complaint does not allege the amount of Plaintiff's actual damages at all. Indeed, the only actual damages alleged are the loss of few sheets of paper, a minuscule amount of ink or toner. (Cmplt., ¶38). As discussed in more detail in section III of this brief, infra, such "damages" amount to mere pennies; they are not "significant." Likewise, Plaintiff's allegation that fax advertising provided Defendant with "an unfair competitive advantage over businesses that. advertise lawfully", (see id.), is also insufficient to state a cause of action under the "unfairness" prong of the ICFA. A private cause of action brought under the ICFA for an allegedly "unfair" act requires that the *Plaintiff* suffer actual, substantial injury as a result of the act complained of. Western Railway Devices Corp., 2006 WL 1697119 at * 6 (emphasis added). Whatever injury, if any, Defendant's competitors suffered as a result of Plaintiff s

receipt of the facsimiles at issue is irrelevant to whether Plaintiff can state an ICFA claim in this case.

Courts in this district to consider the issue have held that the transmission of unsolicited faxes does not amount to an "unfair practice" under the ICFA because there is nothing about an unsolicited fax advertisement that is inherently "oppressive" or that causes "substantial injury" to consumers. See, Western Railway Devices Corp., 2006 WL 1697119 at * 4-6; Rossario's Fine Jewelry, Inc. v. Paddock Publications, 443 F. Supp.2d 976, 978-79 (N.D. Ill. 2006). A number of Illinois state court decisions have held the same way. See, e.g., INSPE Associates, Ltd. v. Charter One Bank, No. 02 CH 10965, slip op. at 19 (Ill. Cir. Ct., May 7, 2004); Zoes v. North American Bancard, Inc., No. 03 CH 17879, slip op. at 9, n. 6 (Ill. Cir. Ct., Oct. 6, 2004); Whiting Corp. v. MSI Mktg., No. 02 CH 6332, slip op. at 17-18 (Ill. Cir. Ct., April 3, 2003). Since the sending of unsolicited faxes is not an unfair practice for purposes of the ICFA, Count II should be dismissed with prejudice.

**B.    Plaintiff Has Failed To Allege That Defendant Intended The Transmission Of The Faxes Be Unfair To The Plaintiff.**

In addition to alleging that the transmission of the facsimiles at issue constitute an "unfair practice," Plaintiff must also allege that Defendant intended that the transmission of those faxes be unfair to it. See, Garrett v. Rentgrow, Inc., 2005 WL 1563162, * 4 (N.D. Ill.) (dismissing Plaintiff's ICFA claim because, among other things, Plaintiff failed to allege that the Defendant intended that its actions be unfair to the Plaintiff). Here, there are no allegations in Plaintiff's Complaint that Defendant intended that the transmission of faxes be "unfair" to the Plaintiff. To the contrary, Plaintiff's allegations and the facsimiles attached to the Complaint suggest nothing more than a

good faith attempt by Defendant to promote services offered by the company and provide discounts off of those services to the Plaintiff .

### C.     Plaintiff Has Failed To Allege That The Alleged Fraudulent Transaction Occurred "Primarily And Substantially" In Illinois.

The Illinois Supreme Court has held that the ICFA does not apply to fraudulent transactions which take place outside the state of Illinois. Avery v. State Farm Mutual Automobile Insurance Company, 216 Il1.2d 100, 185, 835 N.E.2d 801(2005). In Avery, the Court held that a Plaintiff may pursue a private cause of action under the ICFA if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois. Id. In doing so, the Court rejected the notion that a transaction should be deemed to have occurred in Illinois simply because it is the place that the fraudulent communication was received. It stated:

> The place of injury or deception is only one of the circumstances that make up a fraudulent transaction and focusing solely on that fact can create questionable results. If, for example, the bulk of the circumstances that make up a fraudulent transaction occur within Illinois, and the only thing that occurs out-of-state is the injury or deception, it seems to make little sense to say that the fraudulent transaction has occurred outside Illinois.

Id.

Here, the only thing that is alleged to have occurred in Illinois is Plaintiff 's receipt of the facsimiles at issue. However, Defendant is not alleged to have sent the fax from any location in Illinois, nor is any other part of the "fraudulent transaction" at issue alleged to have occurred in Illinois.   To the contrary, Defendant is alleged to be a Washington corporation that has offices in Seattle, Washington. (Cmplt., ¶ 4).  Further, Plaintiff does not allege, even in conclusory fashion, that Defendant was the sender of the

faxes to the Plaintiff in Illinois.  The closest Plaintiff comes is to ambiguously assert that Defendant "is responsible for sending or causing the sending of the faxes" and that "Defendant, as the entity whose products or services were advertised in the faxes, derived economic benefit from the sending of the faxes" -- a benefit, of course, that Defendant would receive in its home state of Washington; not Illinois. (Cmplt., ¶¶ 11, 12). Plaintiff has not satisfied <u>Avery's</u> requirements for stating an actionable ICFA claim, and for this reason as well, Count II should be dismissed with prejudice.

## II.    PLAINTIFF'S CONVERSION CLAIM IN COUNT III SHOULD BE DISMISSED WITH PREJUDICE.

In order to state a claim for conversion, Plaintiff must allege: (1) the Defendant's unauthorized and wrongful assumption of control, dominion or ownership over the Plaintiff's personal property; (2) the Plaintiff's right in the property; (3) the Plaintiff's right to immediate possession of the property, absolutely and unconditionally; and (4) the Plaintiff's demand for possession of the property. <u>General Motors Corporation v. Douglass</u>, 206 Ill. App.3d 881, 886, 565 N.E.2d 93 (1st Dist. 1990). These elements are not satisfied by the mere receipt of unwanted or even illegal facsimile transmissions, and the sending of such faxes does not constitute a "conversion" under Illinois law.

### A.    Plaintiff Is Unable To Allege That Defendant Ever Exercised Dominion Or Control Over His Property.

Under Illinois law, the Defendant's wrongful assumption of control, dominion or ownership over the Plaintiff's property is an essential element of a conversion claim. <u>Craig v. Citicorp Savings</u>, 219 Ill. App.3d 142, 148, 578 N.E.2d 1331 (5th Dist. 1991). For example, in <u>Craig</u>, the Illinois Appellate Court concluded that the Plaintiff did not have a cognizable conversion claim against a bank for non-payment of principal and

interest on a certificate of deposit because the Plaintiff did not allege that she ever *delivered* the monies to the bank -- *i.e.*, deposited the certificate. Craig, 219 Ill.App.3d at 148. The Court concluded that in the absence of such allegations, the element of "defendant's control over [Plaintiff's] property" was lacking. Id.

More specifically, in a recently decided case in this district, Judge Shadur held that the sending of an unauthorized fax does not constitute a conversion of property because the fax recipient's paper, ink or toner "never came into [defendant's] possession at all," and thus, Defendant could not be said to have "assumed control, dominion or ownership over the property." Rossario's Fine Jewelry, Inc., 443 F. Supp.2d at 980. The court explained that to hold otherwise would stretch the legal requirement of a Defendant's wrongful assumption of control, dominion or ownership over the Plaintiff's property "beyond its normal meaning." Id.

Here, the gist of Plaintiff's conversion claim is that "by sending the unsolicited faxes, defendants appropriated to their own use the paper and ink or toner used to print the faxes." (Cmplt., ¶ 52). However, even assuming Defendant sent the faxes, the sender of a fax never gains possession of Plaintiff's property in any way, shape, or form. The paper, toner and any functions of the recipient's fax machine utilized in the transmission process at all times remain in the possession and control of the recipient. A conversion requires some assumption of control over the Plaintiff's property by the Defendant. Here there is none. The mere act of sending a fax, no matter how unauthorized or illegal, is not a conversion of property. Indeed, Plaintiff cannot seriously contend that Defendant or any other fax sender has any control over a fax once it is sent. The transmission may not

even be completed due to a variety of circumstances entirely out of the sender's control such as a busy signal or the recipient's machine being unplugged or turned off.

Further, whatever validity there may be to Plaintiff's TCPA claim, which is based on an express statutory prohibition against unsolicited fax advertisements, the common law tort of conversion is separate and distinct from that statute. The tort of conversion was intended to remedy the taking or complete destruction of tangible property, not other injuries, and certainly not the distribution of information that the recipient does not desire to receive. See, In re Star/ink Corn Products Liability Litigation, 212 F. Supp.2d 828, 844 (N.D. Ill. 2002) (dismissing conversion claim based on alleged contamination of Plaintiff s' corn crop by genetically engineered corn seed). There is no authority for the proposition that liability for common law conversion can turn on the message or content printed on a piece of paper, and Plaintiff cannot import the content of the TCPA and the Illinois Criminal Code into the common law of conversion to create a cause of action for conversion based exclusively on the message appearing on a fax.

Under Plaintiff 's theory, almost any conduct that results in unwanted use of ones own property constitutes a conversion. For example, a caller who deliberately "prank calls" a wireless phone would be liable for conversion of the call recipient's free minutes consumed by the call.[3] This would indeed be an absurd result. For conversion to lie, a Defendant has to have taken possession, or at least exercised some control over Plaintiff 's property, and here, Plaintiff cannot allege that by merely sending a fax, Defendant did so. Accordingly, Count III should be dismissed with prejudice.

---

[3] To take another example offered by Judge Shadur, "[u]nder the plaintiff's approach this Court could well charge it and its counsel with `conversion' for the Court's having had to waste paper and ink in the just-completed analysis [that dismissed plaintiff's conversion claim]." Rossario's Fine Jewelry, Inc., 443 F. Supp.2d at 980.

**B.    Plaintiff's Conversion Claim Fails Because He Is Unable To Allege That He Suffered Anything More Than Trivial Inconvenience Or Expense.**

Illinois follows the <u>Restatement (Second) of Torts</u>, § 222A (1965) in determining what constitutes a conversion. <u>See</u>, <u>South Central Bank and Trust Company, v. Citicorp Credit Services, Inc.</u>, 811 F. Supp. 348, 353 (N.D. Ill. 1992); <u>In re Thebus</u>, 108 I11.2d 255, 259, 483 N.E.2d 1258, 1260 (1985); <u>De Kalb Bank v. Purdy</u>, 205 Ill. App.3d 62, 77, 562 N.E.2d. 1223 (2nd Dist. 1990). Under § 222A of the Restatement, not only must there be the intentional exercise of dominion or control over a chattel in order for conversion to lie, but that dominion or control must "so seriously interfere with the right of another to control [its property] that the actor may be justly required to pay the other the full value of the chattel." <u>Id.</u>

In determining the "seriousness" of the interference that is the subject of a conversion claim, the following factors are considered: (1) the extent and duration of the actor's exercise of dominion or control; (2) the actor's intent to assert a right inconsistent with the other's right of control; (3) the actor's good faith; (4) the extent and duration of the resulting interference with the other's right to control; (5) the harm done to the chattel; and most significantly for this case; (6) the inconvenience and expense caused to the other. <u>Restatement (Second) of Torts</u>, § 222A(2). As explained by the Restatement:

> The question [of whether there has been a conversion] is nearly always one of degree, and no fixed line can be drawn. There is probably no type of conduct with respect to a chattel which is always and under all circumstances sufficiently important to amount to a conversion, since the interference with the right of the plaintiff may in each case be either trivial or serious. Not only the conduct of the defendant, but also its consequences, are to be taken into account.

Id. at § 222A, cmt. d.

In Rosario's Fine Jewelry, Inc., Judge Shadur was quick to note the *de minimis* inconvenience and expense caused by receipt of an unauthorized fax. Rosario's Fine Jewelry, Inc., 443 F.Supp.2d at 980. Specifically, he stated:

> As modern a development as the fax may be, [plaintiffs] contention [i.e., that consumption of ink, toner and paper constitutes a conversion] reconfirms the teaching of Ecclesiastes 1:9 that "there is no new thing under the sun," for the ancient maxim "*de minimis non curat lex*" might well have been coined for this occasion.

Id.

For this same reason, the Supreme Court of Nevada has also held that the sending of an unsolicited fax advertisement does not constitute a conversion of property. Edwards v. Emperor's Garden Restaurant, 130 P.3d 1280, 1287-88 (Nev. 2006). Relying on § 222A of the Restatement, the Nevada High Court held that "conversion generally is limited to those severe, major, and important interferences with the right to control personal property that justify requiring the actor to pay the property's full value." Id. at 1287. The court explained that the sending of a fax, even if unauthorized, to the Plaintiff did not constitute a conversion of Plaintiff's paper and toner because "any damage to [Plaintiff's] paper and toner that occurred from a single facsimile advertisement was merely technical and so inconsiderable as to require the application of the common-law doctrine *de minimis non curat lex*." Id. at 1288.

Rossario's Fine Jewelry and Edwards are instructive here. The consequences of Defendant's alleged conduct was trivial. Plaintiff merely claims that it lost a few sheets of paper and some ink or toner. (Cmplt., ¶52). His total damages could not possibly amount to more than a few pennies, at most. In other words, Plaintiff was caused virtually no

inconvenience or expense.[4] Receipt of an unwanted fax is simply not a conversion of property, and therefore, Count III should be dismissed with prejudice.

## **CONCLUSION**

For each of the foregoing reasons, Counts II and III of Plaintiff's Complaint should be dismissed with prejudice.

Dated: May 7, 2008                                    /s/ Stephanie W. Tipton

                                                                By:  An Attorney for Defendant

Alan I. Becker (00147524)
Stephanie W. Tipton (06270738)
LITCHFIELD CAVO, LLP
303 West Madison Street, Suite 300
Chicago, IL  60606
312-781-6622 (Becker)
312-781-6636 (Tipton)
312-781-6630 (fax)

---

[4] The Court may take judicial notice of the *de minimus* cost of a trace amount of toner and a sheet of paper because this fact is not subject to reasonable dispute and well known. See, Fed.R.Evid. 201(b); Missouri ex. rel. Nixon v. American Blast Fax, Inc., 196 F. Supp.2d 920, 923 (ED. Mo. 2002) (concluding that even the most liberal estimate of damages resulting from the receipt of unsolicited faxes would amount to 17 cents per page), overruled on other grounds by, 323 F.3d 649 (8th Cir. 2003); Kim v. Sussman, 2004 WL 3135348, * 3 (Ill. Cir. Ct., Oct. 19, 2004) (describing actual damages for conversion claim in the form of loss of paper and toner as "minuscule, *i.e.*, pennies per plaintiff.").

# APPENDIX

*Pollack v. Cunningham Financial Group LLC and John Does 1-10*
Court No.

## INDEX OF CASES TO DEFENDANT, CFG's MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS COUNTS II AND III OF PLAINTIFF'S COMPLAINT

**Case Name**                                                                   **Tab #**

*Western Railway Devices Corp. v. Lusida Rubber Products, Inc.,*
    2006 WL 1697119, * 3 (N.D. Ill.)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*INSPE Associates, Ltd. v. Charter One Bank,*
    No. 02 CH 10965, slip op. at 19 (Ill. Cir. Ct., May 7, 2004) . . . . . . . . . . . . . . . . . . . . . . . 2

*Zoes v. NorthAmerican Bancard, Inc.,*
    No. 03 CH 17879, slip op. at 9, n. 6 (Ill. Cir. Ct., Oct. 6, 2004) . . . . . . . . . . . . . . . . . . . 3

*Whiting Corp. v. MSI Mktg.,*
    No. 02 CH 6332, slip op. at 17-18 (Ill. Cir. Ct., April 3, 2003) . . . . . . . . . . . . . . . . . . . . . 4

*Garrett v. Rentgrow, Inc.,*
    2005 WL 1563162, * 4 (N.D. Ill.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Kim v. Sussman,*
    2004 WL 3135348, * 3 (Ill. Cir. Ct., Oct. 19, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# TAB 1

Westlaw

Slip Copy
Slip Copy, 2006 WL 1697119 (N.D.Ill.)
**(Cite as: Slip Copy)**

Western Ry. Devices Corp. v. Lusida Rubber Products, Inc.
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
WESTERN RAILWAY DEVICES CORP., Plaintiff,
v.
LUSIDA RUBBER PRODUCTS, INC., and John Does 1-10, Defendants.
No. 06 C 0052.

June 13, 2006.

Cathleen M. Combs, Daniel A. Edelman, Dulijaza Clark, James O. Latturner, Edelman, Combs, Latturner & Goodwin, LLC, Chicago, IL, for Plaintiff.
Robert R. Cohen, Scott Jay Frankel, Frankel & Cohen, Chicago, IL, for Defendants.

## MEMORANDUM OPINION

GRADY, J.

*1 Before the court is defendant's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, defendant's motion is granted in part and denied in part.

## BACKGROUND

The following relevant facts, drawn from the complaint, are taken as true for purposes of this motion. On September 25, 2004, plaintiff Western Railway Devices Corp. ("Western Railway") received an unsolicited fax advertisement on its facsimile machine from defendant Lusida Rubber

Products, Inc. ("Lusida"). The fax advertisement, a copy of which is attached to the complaint, promotes the services of Lusida. It also includes a fax number for Western Railway to contact to be removed from future distributions of advertisements. Western Railway had no prior relationship with Lusida, and had not authorized the sending of fax advertisements to it. Western Railway claims that the fax was sent as part of a mass broadcasting of faxes. Western Railway does not allege that it received any subsequent facsimiles from Lusida.

On November 8, 2005, Western Railway filed a three count complaint against defendant Lusida in Illinois state court. Count I is for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"); Count II is for violation of the Illinois Consumer Fraud Act, 815 ILCS 505/2 ("ICFA"); and Count III asserts a claim for common law conversion. The Complaint also contains class allegations. On January 5, 2006, Lusida filed a Notice of Removal to this Court.

On February 2, 2006, the same day it filed the present motion to dismiss, Lusida submitted a Fed.R.Civ.P. Rule 68 Offer of Judgment to Western Railway in which it offered an amount greater than the statutory damages available to Western Railway individually under the TCPA. Western Railway rejected the offer, and four days later, on February 6, 2006, it filed a motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## DISCUSSION

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 2
Slip Copy, 2006 WL 1697119 (N.D.Ill.)
**(Cite as: Slip Copy)**

complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356, at 354 (3d ed.2004). When evaluating such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Hentosh v. Herman M. Finch Univ. of Health Sciences,* 167 F.3d 1170, 1173 (7th Cir.1999); *Jang v. A.M. Miller & Assocs.,* 122 F.3d 480, 483 (7th Cir.1997). Dismissal is appropriate only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir.1997) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *Jones v. General Elec. Co.,* 87 F.3d 209, 211 (7th Cir.), *cert. denied,*519 U.S. 1008, 117 S.Ct. 510, 136 L.Ed.2d 400 (1996).

Lusida asserts two separate arguments in its motion. First, it argues that all counts should be dismissed in light of its offer of judgment under Rule 68. Second, it argues that Western Railway's ICFA claim should be dismissed for failure to state a claim for relief. These arguments will be discussed in turn.

*A. Rule 68 Offer of Judgment*

**\*2** Lusida first argues that all counts should be dismissed for lack of subject matter jurisdiction because there is no remaining case or controversy as a result of its offer of judgment pursuant to Fed.R.Civ.P. Rule 68. Western Railway counters that its claims are not rendered moot by the offer of judgment because the offer only addresses its individual claims, and not those of the putative class. It contends that a motion to certify a class filed

within the Rule 68 ten day offer period will avoid mootness.

A case becomes moot when the dispute between the parties no longer exists, or when one of the parties loses his personal interest in the outcome of the suit. *Holstein v. City of Chicago,* 29 F.3d 1145, 1147 (7th Cir.1994)."Once the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate, and a plaintiff who refuses to acknowledge this loses outright, under Fed.R.Civ.P. 12(b)(1), because he has no remaining stake."*Id.* (quoting *Rand v. Monsanto Co.,* 926 F.2d 596, 598 (7th Cir.1991)). However, mootness requirements differ somewhat in cases such as this one where a plaintiff attempts to represent a class. If the district court has certified the class before the expiration of the plaintiff's claims, mootness is avoided. *Id.*"The tactic is precluded by the fact that before the class is certified, which is to say at a time when there are many potential party plaintiffs to the suit, an offer to one is not an offer of the *entire* relief sought by the suit, unless the offer comes before class certification is sought, and so before the existence of other potential plaintiffs has been announced."*Greisz v. Household Bank (Illinois), N.A.,* 176 F.3d 1012, 1015 (7th Cir.1999) (citations omitted).

The Seventh Circuit has not addressed the question of the effect of a motion to certify a class filed during the pendency of a Rule 68 offer of judgment. However, a number of judges in this district have addressed this issue and uniformly concluded that the filing of a motion to certify a class during the ten day period after a defendant makes an offer of judgment prevents mootness of a plaintiff's claim. *See Parker v. Risk Mgmt. Alternatives, Inc.,* 204 F.R.D. 113, 115 (N.D.Ill.2001) (claim not mooted

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 3
Slip Copy, 2006 WL 1697119 (N.D.Ill.)
**(Cite as: Slip Copy)**

where class certification motion filed before expiration of ten day period); *Kremnitzer v. Cabrera & Rephen, P.C.,* 202 F.R.D. 239, 244 (N.D.Ill.2001) (case not mooted where plaintiff "sought class certification during the ten days following the Rule 68 offer of judgment" because class certification motion "suspend[s] the Rule 68 offer of judgment directed toward him, due to the possibility that the 'adverse party' would change materially upon certification"); *Asch v. Teller, Levit & Silvertrust, P.C.,* 200 F.R.D. 399, 400-01 (N.D.Ill.2000) (same); *Wilson v. Collecto, Inc.,* No. 03 C 4673, 2003 WL 22299022, at *2 (N.D.Ill. Oct.6, 2003) (same). The court agrees with the reasoning of these decisions and holds that Western Railway's motion for class certification, filed four days after Lusida's Rule 68 offer, avoids mootness.

*3 Lusida argues that the Seventh Circuit's decisions in *Holstein* and *Griesz* support its argument that a defendant can moot a potential class action by offering full relief to the named plaintiff if the offer is made before class certification is sought. However, both decisions are distinguishable, as neither addresses the issue of the effect of a motion to certify a class filed during the pendency of a Rule 68 offer of judgment. In *Holstein,* the plaintiff never moved for class certification. In *Griesz,* the defendant's motion was filed after class certification had been denied. "Although both of these cases make some distinction between settlement offers prior and subsequent to class certification, neither addresses the issue at hand, namely the effect of a motion to certify a class filed during the pendency of a Rule 68 offer of judgment."*Kremnitzer,* 202 F.R.D. at 243.

Because Western Railway filed its mo-

tion for class certification during the ten days following Lusida's Rule 68 offer of judgment, Lusida's motion to dismiss based upon its Rule 68 offer of judgment is denied.

B. *Illinois Consumer Fraud and Deceptive Practices Act*

Lusida also moves for dismissal of Count II, Western Railway's ICFA claim. In support of this motion Lusida asserts two arguments. First, it contends that Western Railway's ICFA claim fails because the ICFA does not expressly prohibit unsolicited fax advertising, nor does it state that a violation of the TCPA or any other statute that prohibits fax advertising constitutes a violation of the ICFA. Second, Lusida contends that its conduct does not constitute a violation of the ICFA.

In support of its first argument, Lusida cites *People ex rel. Daley v. Grady,* 192 Ill.App.3d 330, 139 Ill.Dec. 379, 548 N.E.2d 764 (1st Dist.1989), which held that, under the doctrine of *expressio unius est exclusio alterius,* a violation of the Real Estate Licensing Act did not constitute a violation of the ICFA. The court stated that "when certain things are enumerated in a statute, that enumeration implies the exclusion of all other things even if there are no negative words of prohibition."*Id.* at 333, 139 Ill.Dec. 379, 548 N.E.2d 764,548 N.E.2d at 766.Because the ICFA provides a list of "other acts" which if violated would automatically violate the ICFA, and because a violation of the Real Estate Licensing Act was absent from the list, the Court dismissed the plaintiff's ICFA claim. Lusida argues that the same reasoning applies in this case to Western Railway's ICFA claim because the statute does not list the TCPA or any other statute that pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1697119 (N.D.Ill.)
(Cite as: Slip Copy)

Page 4

hibits fax advertising among its "other acts."

Although a TCPA violation is not a listed violation of the ICFA, this by itself merely requires that Western Railway independently state a claim under the Act. *See Chapman v. Ontra, Inc.,* No. 96 C 0019, 1997 WL 321681, at *5 (N.D.Ill. June 6, 1997); *Perperas v. United Recovery Sys., Inc.,* No, 96 C 7693, 1997 WL 136326, at *4 (N.D.Ill. Mar.19, 1997). Therefore, Western Railway's ICFA claim will survive if the allegations set forth in the complaint support such a claim.

*4 The ICFA is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices. It is to be liberally construed to effectuate its purpose. *Robinson v. Toyota Motor Credit Corp.,* 201 Ill.2d 403, 416-17, 266 Ill.Dec. 879, 775 N.E.2d 951, 960 (2002). The elements of a claim under the ICFA are: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; and (3) the occurrence of the deception during a course of conduct involving trade or commerce. *Id.* at 417, 266 Ill.Dec. 879, 775 N.E.2d at 961.

Recovery may be had for unfair as well as deceptive conduct. *Id.* In determining whether a given course of conduct is unfair, the factors to be considered are (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers. *Id.* at 417-18, 266 Ill.Dec. 879, 775 N.E.2d at 961 (citing *Fed. Trade Comm'n v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972)). All

three factors do not need to be satisfied to support a finding of unfairness. Rather, a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. *Id.* at 418,266 Ill.Dec. 879, 775 N.E.2d 951, 266 Ill.Dec. 879, 775 N.E.2d at 961. We will discuss each of the factors to determine whether Western Railway has successfully pleaded an ICFA claim.

### 1. *Offends Public Policy*

A practice which has not previously been held to be unlawful can offend public policy if it violates a standard of conduct set out by an existing statute or common law doctrine that typically governs such situations. *Garrett v. RentGrow, Inc.,* No. 04 C 8309, 2005 WL 1563162, at *3 (N.D.Ill. July 1, 2005); *Elder v. Coronet Ins. Co.,* 201 Ill.App.3d 733,742, 558 N.E.2d 1312, 1316 (1 st Dist.1990). Here, Lusida offers no rebuttal to Western Railway's argument that Lusida's conduct offends public policy. At least one Illinois court also has found that the practice of sending unsolicited facsimile advertisements offends public policy. *See Whiting Corp. V. MSI Mktg., Inc.,* No. 02 CH 6332, at *17 (Ill.Cir.Ct. Apr. 3, 2003) (Pl.'s Resp., Ex. I; Def.'s Reply, Ex. D). This factor, therefore, favors Western Railway.

### 2. *Oppressive Practice*

With regard to the second *Robinson* factor, Western Railway argues that Lusida's conduct is oppressive because the "fax recipients are left with no alternative, but to pay the charges associated with receiving unwanted faxes."It further argues that Lusida's conduct was oppressive with regard to the putative class as a whole.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1697119 (N.D.Ill.)
(Cite as: Slip Copy)

Page 5

Lusida counters that the alleged fax at issue in this case had a "remove" number on it, allowing Western Railway to ensure that it did not receive any additional faxes if it did not want them. It also argues that Western Railway's failure to establish its individual claim bars its class action claims.

**\*5** A practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer. *Garrett,* 2005 WL 1563162, at \*3 (citing *Robinson,* 201 Ill.2d at 419-20, 266 Ill.Dec. 879, 775 N.E.2d at 962). Western Railway alleges in its complaint that Lusida sent to it one unsolicited facsimile advertisement. This facsimile included a "remove" number which Western Railway could contact to avoid receiving further facsimiles from Lusida. We conclude that the conduct alleged in this case does not constitute oppressive behavior under *Robinson.* The burden imposed by Lusida's practice can hardly be characterized as unreasonable, nor does it deprive Western Railway of a meaningful choice.

Both Western Railway and Lusida rely on *Whiting Corp. v. MSI Marketing, Inc.,* No. 02 CH 6332 (Ill.Cir.Ct. Apr. 3, 2003). *See* Pl.'s Resp., Ex. I; Def.'s Reply, Ex. D. *Whiting* involved a claim under the ICFA involving facts highly similar to those alleged in the present case. The court reviewed each of the *Robinson* factors and found that the plaintiff had failed to state a claim under the ICFA. With regard to the issue of oppressive conduct, the court stated as follows:

The Plaintiffs allege the conduct is oppressive, yet they allege only one or two facsimile transactions to each Plaintiff. This, by inference, suggests minimal disruption of one's business or occupation.

The exhibits to the complaint show each plaintiff had a reasonable alternative to the receipt of additional messages. They could call to remove themselves from the list. This conduct does not rise to the level of oppression envisioned by the drafters of ICFA.

*Whiting Corp. V. MSI Marketing, Inc.,* No. 02 CH 6332, at \*17-18 (Cir.Ct. Apr. 3, 2003). We find the *Whiting* court's discussion of this issue to be persuasive. As in *Whiting,* Lusida's transmission of one single page facsimile that included a "remove" number does not amount to oppressive conduct.

Western Railway contends that practices that inflict unavoidable injury are oppressive and unfair. In support of this argument, Western Railway cites *Elder v. Coronet Ins. Co.,* 201 Ill.App.3d 733, 146 Ill.Dec. 978, 558 N.E.2d 1312 (1st Dist.1990) and *People ex rel. Fahner v. Hedrich,* 108 Ill.App.3d 83, 63 Ill.Dec. 782, 438 N.E.2d 924 (2d Dist.1982). However, both of these cases are distinguishable. In *Elder,* the court found the defendant insurance company's act of relying solely on polygraph tests in denying insurance claims to be an unfair practice because it required its insureds to file suit or forego recovery even though the defendant possessed no admissible evidence that would create a triable issue in court. *Elder,* 201 Ill.App.3d at 746, 146 Ill.Dec. 978, 558 N.E.2d at 1318. In *Fahner* the defendant, owner of a mobile home park, required park tenants who sold their mobile homes to pay a transfer fee if the mobile home was to remain in his park after sale. The court found that tenants had no reasonable alternative to paying the "unconscionably large" fee. *Fahner,* 108 Ill.App.3d at 90, 63 Ill.Dec. 782, 438 N.E.2d at 929. In each

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case the court reviewed the specific facts to find conduct that was both oppressive and unavoidable. Neither court set forth a per se standard that any practice that inflicts an unavoidable injury is oppressive and unfair. These cases are further distinguishable in that, unlike the *Elder* and *Fahner* plaintiffs, Western Railway's injury is avoidable. Lusida's advertisement fax included a "remove" number that Western Railway could use to avoid future facsimiles.

**\*6** The court holds that Western Railway has failed to allege conduct that satisfies the second *Robinson* factor.

### 3. *Substantial Injury*

With regard to the third *Robinson* factor, Lusida argues that Western Railway did not suffer substantial injury and thus lacks standing under the statute. Western Railway counters that "plaintiff had no reasonable alternative but to receive the unwanted faxes and pay the charges associated with receiving the faxes."Western Railway contends that the receipt of the fax consumed its paper and toner and "compromised the use of her [sic] fax machine for the sake of the receipt of defendants' unsolicited advertising material."

A practice causes substantial injury to consumers if it causes significant harm to the plaintiff and has the potential to cause injury to a large number of consumers. *Garrett,* 2005 WL 1563162, at \*4. In this case, Western Railway alleges in Paragraph 26 of its complaint that it "suffered damages as a result of receipt of the unsolicited faxes, in the form of paper and ink or toner consumed as a result."However, Western Railway also alleges that Lusida sent to it only one single page facsimile advertise-

ment, on September 25, 2004. The cost of receiving and printing a single page facsimile advertisement cannot be characterized as "significant harm." *See Kim v. Sussman,* No. 03 CH 07663, 2004 WL 3135348, at \*3 (Ill.Cir.Ct. Oct.19, 2004) (damages resulting from conversion of the paper and toner necessary to print unsolicited facsimile "are minuscule, *i.e.,* pennies per plaintiff.") *Accord Whiting* at \*18.

In support of its claim, Western Railway points to *People ex rel. Hartigan v. Stianos,* 131 Ill.App.3d 575, 86 Ill.Dec. 645, 475 N.E.2d 1024 (2d Dist.1985). In *Stianos,* the Court held that a retailer's practice of charging consumers sales tax in an amount slightly greater than that authorized by law was both deceptive and unfair, even though the overcharge was a few pennies per transaction. However, this holding is inapplicable to the present dispute, as the case was brought by the Illinois Attorney General. An action brought by the Attorney General under Section 2 of the ICFA does not require that "any person has been misled, deceived or damaged."*Oliveira v. Amoco Oil Co.,* 201 Ill.2d 134, 149, 267 Ill.Dec. 14, 776 N.E.2d 151, 160 (2002) (quoting 815 ILCS 505/2). In contrast, a private cause of action must be brought under Section 10a(a) of the ICFA, which requires proof of actual damage. *Id.* Furthermore, such injury must be substantial. *Robinso,* 201 Ill.2d at 418, 266 Ill.Dec. 879, 775 N.E.2d at 961. *Stianos,* therefore, is inapposite to the present case.

Plaintiff also contends that the sending of the faxes inflicts substantial injury upon the proposed class as a whole, pointing out that it has alleged that the fax sent by Lusida was part of a "fax broadcasting" campaign of "junk faxes." However, where a putative class representative has no valid

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1697119 (N.D.Ill.)
**(Cite as: Slip Copy)**

Page 7

claim in his own right, he cannot bring such a claim on behalf of a putative class.*Bunting v. Progressive Corp.,* 348 Ill.App.3d 575, 581, 284 Ill.Dec. 103, 809 N.E.2d 225, 231 (1st Dist.2004). Because Western Railway has failed to allege that it personally suffered substantial injury under the ICFA, its class allegations have no bearing on this motion.

*7 For these reasons, we conclude that Western Railway has failed to allege that it has suffered substantial injury in this case.

4. *Summary*

In light of the foregoing, the court concludes that Western Railway has failed to state a claim under the ICFA. Although the alleged practice of Lusida may offend public policy, it is not sufficient to support a finding of unfairness in light of the lack of oppressiveness or substantial injury. Therefore, Lusida's motion to dismiss Count II is granted.

*CONCLUSION*

Defendant's motion to dismiss the complaint for lack of subject matter jurisdiction is denied. Defendant's motion to dismiss Count II is granted. The dismissal is without prejudice to the filing of an amended Count II by July 5, 2006 if plaintiff can state a cognizable ICFA claim against defendant. If plaintiff does not amend its complaint within that time period, Count II will be dismissed with prejudice.

N.D.Ill.,2006.
Western Ry. Devices Corp. v. Lusida Rubber Products, Inc.
Slip Copy, 2006 WL 1697119 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| WHITING CORPORATION, ) | |
| ) | |
| Plaintiff ) | No. 02 CH 6332 |
| ) | |
| v. ) | Judge Patrick E. McGann |
| ) | |
| MSI MARKETING, INC., ) | |
| ) | |
| Defendant. ) | |

| | |
|---|---|
| INSPE ASSOCIATES, LTD., ) | |
| ) | 03 CH 10965 |
| Plaintiff, ) | and related cases as indicated on |
| ) | Exhibit "A" attached |
| v. ) | |
| ) | |
| CHARTER ONE BANK, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OPINION AND ORDER

This matter comes on for hearing on the Motion of Charter One Bank to dismiss the amended complaint of Inspe Associates, Ltd. seeking relief for alleged violations of the Telephone Consumers Protection Act of 1991, 47 USC 227 ("TCPA"); the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/2 ("ICFA"); common law conversion and property damage.   This case is one of a number, now exceeding seventy, of related cases assigned to this Calendar by the Presiding Judge of the Chancery Division of this Court. This motion has been joined in by the parties in the cases listed in Exhibit "A" attached hereto as the motion raises issues that are common to those parties. This Court has allowed all Defendants who have participated in this motion to present motions that raise individual legal defenses to the claim of their respective Plaintiff. This Court has or will issue rulings on each of those individual motions.

Charter One Bank ("Charter One" or "the Bank") seeks to dismiss Count I seeking relief for violation of the TCPA by asserting affirmative matter that seeks to avoid the legal effect of or defeating the claim. 735 ILCS 5/2-619. The Bank asserts that

the statutory scheme envisioned by the Congress in enacting the TCPA requires a state to create, by affirmative legislative action, a state cause of action for violation of the TCPA. As an alternative position, Charter One suggests that legislative conduct subsequent to the passage of the TCPA clearly shows that Illinois has opted out of the TCPA's private right of action scheme.

The Bank also argues that the $500.00 per fax statutory penalty is so radically disproportionate to the actual damage suffered by a recipient of an unsolicited telephone facsimile message that it violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

Finally, Charter One posits that the TCPA's total ban on commercial fax advertising discriminates against speech based on its content when a less restrictive approach would satisfy the governmental interest sought to be protected by the regulation. Hence, the TCPA violates the freedom of speech rights guaranteed by the First Amendment to the United States Constitution.

As to the remaining counts, the Bank contests the legal sufficiency of each claim. 735 ILCS 5/2-615. The conversion claim must fail, it argues, because the Plaintiff does not assert that the mere fact of sending a telephone facsimile message is illegal. Hence, the Plaintiff can claim no greater interest in the paper and toner consumed by the message than the sender.

Charter One posits that the ICFA claim must fail because it fails to enumerate a violation of the Illinois statute prohibiting commercial telephone facsimile messages[1] as a per se ICFA violation. In addition, the Defendant argues that the mere sending of a commercial telephone facsimile message does not rise to the level of an unfair or deceptive act as defined by Illinois law.

Finally, the Bank suggests that, because the paper and toner consumed by the message has no residual value, a claim for property damage will not lie.

## I. LEGAL STANDARD

### A. 2-619 MOTION

Section 2-619 affords a means of obtaining a summary disposition of issues of law

---

[1] 720 ILCS 5/23-3

2

or easily proven issues of fact. Subsection (a)(9) permits dismissal where "the claim asserted is barred by other affirmative matter avoiding the legal effect of or defeating a claim."

The phrase affirmative matter encompasses any defense other than a negation of the essential allegations of the plaintiff's cause of action. For that reason, it is recognized that a 2-619(a)(9) motion to dismiss admits the legal sufficiency of the plaintiff's cause of action much in the same way that a 2-615 motion to dismiss admits a complaint's well-pleaded facts. Kedzie & 103rd Currency Exchange v. Hodge, 156 Ill. 2d 112, 115 (1993).

In making that last statement, the Illinois Supreme Court cited with approval the discussion of this issue in Barber-Coleman v. A & K Midwest Insurance Co., 236 Ill. App. 3d 1065 (1993). There, the court reasoned that affidavits in support of a 2-619 (a)(9) motion cannot be used to attack the factual sufficiency of a claim because the defendant admitted, for the purpose of the motion, those facts which are necessary to the plaintiff's claim.

A 2-619(a)(9) motion contrasts with a summary judgment motion in that the latter allows the movant to contest by affidavit the truth of the allegations made. In other words, by the use of affidavits the opposing party states that the material facts alleged in support of the claim or defense are not true. To the contrary, a 2-619(a)(9) motion asserts there exists other affirmative matter avoiding the legal effect or defeating the claim. Hence, a 2-619(a)(9) motion admits all well pled facts that are essential to the claim, but not any of the facts that may touch on the affirmative matters raised in the motion.

### B.    2-615 MOTION

A section 2-615 motion attacks the legal sufficiency of the Plaintiff's claim. The motion does not raise affirmative factual defenses, but rather alleges defects only on the face of the complaint. The question presented by a section 2-615 motion to dismiss is whether the allegations of the complaint, when viewed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. A cause of action will not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved which will entitle the plaintiff to recover. Vernon v. Schuster, 179 Ill. 2d 338, 344 (1997); Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 86-87 (1996).

3

## II.    DISCUSSION

The facts alleged in the Amended Complaint are rather straightforward and will be discussed in the context of the analysis of the Defendant's grounds for dismissal.

### A.    COUNT I – TCPA

### 1.  NECESSITY OF STATE ACTION

The initial argument raised by Charter One involves a discussion of the legislative intent expressed by the United States Congress in the language used in the TCPA as well as the intent of the legislators who debated or discussed the bill during the deliberative process leading to its passage.

The TCPA, in pertinent part, prohibits the transmission of an unsolicited advertisement to a telephone facsimile machine.[2] An unsolicited advertisement is defined in the statute as any material advertising the commercial availability or quality of any property, goods or services...[3] The statute also states that "any person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State...an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater..."[4] It is the language, "if otherwise permitted by the laws or rules of court of a State," that is the focus of the Bank's first argument.

This text, it suggests, requires an affirmative authorization by a state before such private litigation may be brought in state court. No other conclusion, the Defendant asserts, can be culled from this language. Hence, in the Bank's view, a State must opt in before its courts may entertain a TCPA action.

This position is also buttressed, the Bank posits, by statements made by Senator Ernest Hollings, one of the TCPA's sponsors. On November 7, 1991, Senator Hollings discussion of the Bill's creation of a private right of action is quoted in the Congressional Record. After stating that the bill allows a private right of action in state courts, he recognizes the federal principle of state sovereignty by recognizing that the Federal Government cannot, because of constitutional restraints, dictate to the States "which court in each State shall be the proper venue for such an action. Nevertheless, it is my

---

[2] 47 U.S.C. 227 (6)(1)(c)
[3] 47 U.S.C. 227 (a)(4)
[4] 47 U.S.C. 227 (6)(3)(B)

4

hope that States will make it as easy as possible for consumers to bring such actions, preferably in small claims courts..."[5] The Senator then suggests these matters should not involve attorneys and the neutral fairness of the amount of damages allowed. Finally, he stated: "I thus expect that the States will act reasonably in permitting their citizens to go to court to enforce this bill."[6]

Finally, Charter One points to the decision of the Court of Appeals in International Science & Technology Institute, Inc. v. Inacom Communications, Inc., 106 F.3d 1146 (4th Cir. 1997). It argues that many courts have misinterpreted the Court's reasoning. The Bank suggests that the opening paragraph of the opinion states the true result of the ruling. Judge Niemeyer, writing for the Court, stated "[Today this Court decides] that states have been given, subject to their consent, exclusive subject matter jurisdiction over private actions authorized by the [TCPA]."[7]

In order to determine Congress' intent in any law or statute, Court's must first analyze the text of the Act. New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Insurance Co., 514 U.S. 645, 656 (1995). Only if the intent cannot be determined by the language of the Act should a court move on to analyze the structure and purpose of the Act in which it occurs. Id.

The language of the TCPA statute "if otherwise permitted" seemingly supports Charter One's argument that Congress envisioned a series of positive actions by state governments incorporating this new regulatory remedy into state law. However, such a reading ignores the context of the federal/state relationship created by the United States Constitution as well as the essential distinction between federal and state courts. When these factors are considered, it is clear that Congress created a remedy for a wrong, but recognized the rights of the several states to apportion their limited resources to address issues deemed important by the local electorate.

In 1944, Alfred Testa purchased an automobile in Providence, Rhode Island, for $210 above the ceiling price set under the then existing Emergency Price Control Act. After learning of the auto dealer's misfeasance, he filed suit in state court to recover "penal" damages for this wrong. Congress had, in creating the law, conferred concurrent

---

[5] 137 Cong. Rec. S16205-06 (emphasis added)
[6] Id.
[7] 106 F3d 1150

jurisdiction on federal and state courts for claims arising from any alleged violation. The Rhode Island Supreme Court reversed the award of damages obtained by Mr. Testa on the basis that, absent Rhode Island's consent, the Congress could not require its courts to entertain such claims. The Supreme Court unanimously reversed the Rhode Island Court. Testa v. Katt, 330 U.S. 386 (1947). The Court noted that Article VI, Section 2 of the Constitution provides:

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, and anything in the Constitution or Law of any State to the Contrary not withstanding." (capitalization in original)

This "supremacy clause" has, since the first Congress convened, thereafter been interpreted as conferring jurisdiction on state courts to enforce federal civil laws. Subsequent Congresses expanded such jurisdiction to federal crimes and actions for penalties and forfeitures. Testa, 330 U.S. at 390-391. The Court went on to observe that this view was the subject of much controversy, some violent, until the end of the Civil War. Indeed, since Claflin v. Houseman, 93 U.S. 130 (1876), a principle of constitutional law has been that wherever Congress creates a remedy there is no valid reason why it should not be enforced in a proper action in state court. Id. at 137. Hence, in this Court's judgment, not only were private claims under the TCPA permitted in all states, but all states from the date of enactment are required, except as discussed below, to entertain such claims. This principle may also explain Senator Hollings' precise use of the word venue instead of jurisdiction.

This view is also supported by the distinction between the federal district courts and the trial courts of Illinois. The former are created by Acts of Congress which has the authority to limit the jurisdiction of such courts in accordance with Article III of the United States Constitution. As observed by the Court in International Science, the Congress has used this power to direct certain justiciable matters to the Federal Court of Claims, Court of International Trade or to strip district courts of original jurisdiction. International Science, 106 F.3d at 1155-1156.

6

The trial courts of Illinois are constitutional courts vested with jurisdiction over all justiciable matters. Article 6 Sections 1 and 9 of the Constitution of 1970. The only exception is the constitutionally recognized right of the legislature to create administrative bodies. Hence, under our federal system, the trial courts of Illinois, in accordance with the supremacy clause of the United States Constitution, have original jurisdiction to hear claims seeking a remedy granted by the laws of the United States.

In addition, one issue not discussed by the parties is the disjunctive language used by the Congress. The words selected are "permitted by the laws or rules of court." Courts do not have the authority to limit by rule their jurisdiction over cases that are properly brought before them. Admittedly, in some circumstances, Courts for good reason may decline to exercise jurisdiction over a particular case; .e.g. interstate *forum non conviens*. Rules of Court are used to prescribe procedures or determine assignment of cases properly before the Court. This disjunctive language also suggests that the Congress was attempting to facilitate the prosecution of these claims while, as will be discussed, acknowledging the sovereignty of the individual state. This determination is borne by the comments of Senator Hollings who strongly urged these matters be handled efficiently, without the participation of lawyers, in a small claims court. As discussed during argument, the distinguished gentleman form South Carolina probably never envisioned the use of class action procedures in an effort to remedy what appears to have been perceived by the Congress as a pervasive, but highly individualized, issue adversely affecting commerce.

It is important to observe that the Court in <u>Testa v. Katt</u>, *supra*, did not discuss the implication of the 10th amendment to the United States Constitution. That amendment reserves to the states all power not delegated to the United States by the Constitution or prohibited to the states by that compact. While one could argue that the supremacy clause resolves any issue in favor of the constitutionality of the TCPA, recent court decisions cast some doubt upon that perspective. *See e.g.* <u>New York v. United States</u>, 505 U.S.144 (1992). A more modern approach to this issue is found in the court's reasoning in <u>International Science</u>. Congress cannot, consistent with the 10th Amendment, invade the province of state sovereignty. Thus, unless a state has affirmatively enacted a similar regulatory scheme, Congress cannot direct a state to enforce a federal claim. Here,

Congress did not so act. The Congress, in choosing the language of the TCPA, encouraged the several states to enforce a national and uniform policy on this issue but gave each state the unfettered right to direct its judicial resources in response to the needs of its electorate by refusing to allow private claims under the TCPA. As stated by the Court in International Science:

> "Congress enacted the TCPA to assist states where they lacked jurisdiction; it empowered states themselves to enforce the TCPA in federal court; it authorized private enforcement exclusively in state courts; and it recognized state power to reject Congress' authorization." 106 F.3d at 1159. (emphasis added)

Hence, this Court concludes that the TCPA created an "opt out" scheme which allows claims for the federally created remedy absent affirmative legislative action limiting or eliminating said claim.

This rationale is also consistent with the constitutional principle that states have great latitude in establishing the structure and jurisdiction of their own courts. Howlett ex rel. Howlett v. Rose, 496 U.S. 356, 372 (1990). Thus, states are under no obligation to create special courts or change procedural rules to facilitate prosecution of claims arising under federal law. However, consistent with the supremacy clause and absent any explicit state statutory directive, an unmistakable implication from legislative history, or by a clear incompatibility between state court jurisdiction and federal interests, there is a presumption of state court jurisdiction over federal claims. Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 478 (1981).

This determination also resolves the second issue raised by Charter One. The Bank suggests the failure of the legislature to include a private state right of action for the transmission of a commercial fax in 2000, when it created such a claim for unsolicited telephone advertising, [8] evidences an intent to reject Congress' authorization or "opt out" of the TCPA private right of action regulatory scheme. This intent, it is urged, can also be determined from the legislature's rejection, on two occasions, of attempts to include a TCPA type violation as part of consumer protection laws under ICFA.

Although Gulf Offshore Co., supra., dealt with the question of concurrent jurisdiction over a federal claim, in the absence of contrary authority, its analysis, with a

---

[8] 815 ILCS 413/25

8

slight modification, of this issue is most helpful. There, the Court held that a legislative body's intent to limit a court's jurisdiction over a claim could be determined by an explicit statutory directive, unmistakable implication from legislative history or by a clear incompatibility between state court jurisdiction and federal interests. Gulf Offshore Co., 453 U.S. at 478.

There is no explicit action by the state legislature declining to accept jurisdiction over these claims. The third Gulf Offshore factor should best be modified to determine if there is any incompatibility between state interests and this federal remedy. The answer again is in the negative. Indeed, one of the central purposes of the TCPA was to enable states to have jurisdiction over an issue that largely affected interstate commerce.

The final issue to be resolved under this analysis is the implications found in the actions of the state legislature. The failure to include a remedy for TCPA prohibited conduct can hardly be conclusive evidence of the legislature's intent to reject Congress' authorization for such claims. First, the remedy of attorney's fees found under ICFA is not available under the TCPA. The legislature could have determined that such a remedy exceeded the congressional authorization to assist in the regulation of interstate commerce by expanding what was designed to be a *pro se* claim into a much more complex and expensive litigation process.

The second argument by the Bank is the failure to include a private right of action in state court for unsolicited telephone facsimiles in the Telephone Solicitations Act. First of all, the statute had a specific focus, regulating telephone solicitations. There is nothing in this Court's or the legislative record that telephone facsimile advertising was even considered in the Bill or any proposed amendments. The lack of such historical information would result not in an unmistakable understanding of legislative action but guess and conjecture as to legislative intent.

Finally on this point, the Bank asserts that the failure of the legislature to amend the Illinois penal statute relating to the transmission of unsolicited telephone facsimile messages[9] which predate the TCPA expresses a legislative decision to reject the Congressional authorization of private rights of action. In support of their position they cite to R.A. Ponte Architects Ltd. v. Investor's Alert, Inc., 815 A.2d 816 (C.S.A. MD.

---

[9] 720 ILCS 5/26-3

2003), *cert gr'td* 822 A.2d 1224 (2003). There, the Maryland Special Court of Appeals found that the failure of the Maryland legislature to amend its pre-TCPA statute to grant a private cause of action for money damages, and the failure to enact three bills dealing with issues somewhat related to the use of facsimile machines demonstrated an intent to prohibit a private cause of action in state court for violation of state or comparable federal law. 815 A.2d at 828.

Initially, it must be noted that this decision has been found to express a minority position on the issue. Condon v. Office Depot, Inc., 855 So.2d 644, 648 (Fla. Dist. Ct. App. 2003). A clear reading of the decision indicates that contrary to its pronouncement that Court adopted the "opt in" position rejected by this Court. Finally, it appears the Ponte Court failed to use the proper standard in reaching its conclusion that the failure of the Maryland legislature to create a cause of action it never considered or to so act when it considered other issues meant there was no private right of action. Thus, the decision in R. A. Ponte is not persuasive.

## 2.  DUE PROCESS CLAUSE VIOLATION

Charter One urges this Court to conclude that the statutory penalty of $500 or $1,500 (if knowing or willful) per fax for a violation of the TCPA  (47 U.S.C. 227 (b)(3)) constitutes an unconstitutional taking of property without due process of law.  This conclusion is easily reached, the Bank asserts, when one considers that the damage to the consumer is but a few pennies but the remedy in the context of this class action could result in an award in the tens of millions of dollars.  They suggest by example that a class may consist of a defendant who has sent 100,000 facsimile messages in violation of the statute.  This may have cost consumers $10,000.   The penalty for such conduct is $50 million with a potential multiplier to reach $150 million.  This gross disproportionality violates the due process clause and must be struck down.  The Bank points to the recent decision of the United States Supreme Court in State Farm Mutual Automobile Insurance Co. v. Campbell, 123 S.Ct. 1513 (2003), as the most recent pronouncement by the Court on this issue.

In State Farm, its insured, Mr. Campbell, attempted to pass six vehicles on a two laned road; his judgment in this regard proved to be poor and resulted in the death of one person and the total permanent disability of another.  Mr. Campbell was sued for

10

damages by the injured parties. The Plaintiffs offered to settle the matter for the $50,000 policy, but State Farm declined. Despite strong counsel to the contrary, State Farm took the case to trial assuring Mr. Campbell his assets were secure. The jury found that he was 100% at fault and awarded damages in the amount of $185,849. State Farm refused to pay this amount, filed an appeal bond and advised Mr. Campbell to place his home for sale to satisfy the amount of the claim. Ultimately, State Farm paid the judgment after the Utah Supreme Court affirmed the jury's verdict.

Mr. Campbell and the injured parties joined forces to bring a bad faith action against State Farm. During discovery it was learned that State Farm had a national policy to cap losses that Mr. Campbell claimed, and apparently the jury agreed, were tortious. A verdict of $145 million in punitive damages was returned against State Farm.

In reversing the judgment of the Utah Supreme Court, the Court acknowledged the legal principle that the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. State Farm, 123 S. Ct. 1520-1521. This concern, the Court noted, dates back to the Magna Carta. The common law procedure for imposition of punitive damages, the Court believes, poses an acute danger of the arbitrary deprivation of property. The reason is that elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also the severity of the penalty that a state may impose. BMW of North America v. Gore, 517 U.S. 558, 574 (1996). The State Farm Court found that the defendant was impermissibly called to answer for unrelated incidents in states other than Utah. The Court reasoned, in part, that conduct lawful in one State cannot be used to aggravate a penalty in a State where such conduct is illegal. This defeats the Due Process requirement of notice. Here, the TCPA claim is a statutory remedy that clearly announces the proscribed conduct and defines the potential penalties. Moreover, the TCPA regulations existed for many years before the allegations of wrongdoing made by the Plaintiff herein. The decisions of the Supreme Court in State Farm and its rather recent ancestors, see State Farm, 123 S. Ct. 1528 (Ginsburg, J. dissenting), simply have no application to the matter before the Court.

11

As suggested by this Court in its earlier decision rejecting a similar argument, the standard to be applied here is found in St. Louis Iron Mountain and Southern Railway v. Williams, 251 U.S. 63 (1919). In Williams, the Court was called upon to determine the constitutionality of an Arkansas statute which created a private right of action for railroad passengers who were charged more than the rate set by regulation. An aggrieved passenger was entitled to recover a penalty of "not less than fifty dollars nor more than three hundred dollars" for each offense as well as costs of suit and attorneys fees. Williams recovered a seventy-five dollar penalty and twenty-five dollars in attorney's fees after successfully prosecuting such a claim. The standard to be applied is whether the penalty is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." Williams, 251 U.S. at 67. This determination of validity is not to be made merely by contrasting the penalty with the possible overcharge in an individual case. The court must consider the interest of the public, the numberless opportunities for committing the offense and the need for securing uniform adherence to the law. Williams, 251 U.S. at 68. The focus of the Court at this point in the proceedings is to determine the facial constitutionality of the TCPA remedy. In doing so, there must be given recognition to the wide latitude a government is given in protecting public interest. This Court should not be anxious to substitute its judgment for that of the Congress. As suggested in this Court's prior decision in Whiting Corporation v. MSI Marketing, Inc., 02 CH 6332, this decision as to the constitutionality of the remedy as applied may best be resolved once a class is certified. Subsequent research by the Court indicates this issue may impact on the very issue of class certification. See Foreman v. Data Transfer, Inc., 164 F.R.D. 400 (E.D. Pa. 1995) and Kenro v. Fax Daily, Inc., 962 F. Supp 1162 (S.D. Ind. 1997).

The Court cannot conclude that the remedy provided by Congress in the TCPA is an unconstitutional deprivation of property without Due Process of Law on this record.

### 3. FIRST AMENDMENT ISSUES

The Defendant asserts that the TCPA scheme unconstitutionally impacts on its right of free speech in the commercial setting of advertising. The main thrust of its argument is that the statute fails to withstand scrutiny under the test set out in Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557 (1980). The

12

Bank posits that the content based restriction on commercial speech is not based upon a constitutionally sufficient rationale; to wit, that assuming a governmental interest is present, the prohibitions set out in the TCPA do not directly advance that interest. The Defendant also urges this Court to conclude that less restrictive alternatives could satisfy any interest identified by the Congress.

Prior to analyzing the arguments of Charter One, it is important to note that there are no allegations that any of the "unsolicited advertisements" were false, misleading or promoted illegal conduct. Hence, analysis under the Central Hudson test is proper.

Charter One's brief suggests there are two prongs to determining whether there is sufficient rationale to justify this Congressional restriction on speech. The first prong is a determination that the governmental restriction is substantial. The burden falls upon the Government to establish this factor. Edenfield v. Fane, 507 U.S. 761 (1993).

Charter One contends the legislative record consists of such anecdotal evidence that, in reality, no governmental interest was identified by the Congress. The Defendant acknowledges that the TCPA scheme was designed to prohibit the cost shifting effect of commercial advertising by telephone facsimile messages as well as the time and expense incurred when a fax machine is being used to accept and print these unsolicited transmissions. However, the Bank argues that there was insufficient evidence in the record to allow Congress to make that determination.

In support of their position, the Defendant points to Turner Broadcasting, Inc. v. FCC, 520 U.S. 180 (1997). However, it appears to this Court that a careful reading of Turner actually supports the Congressional determination of the policy espoused by the TCPA. In that decision, the Court upheld the "must carry" commercial non-cable broadcast provisions of statutes regulating the cable television industry. There, the Court analyzed the materials submitted to Congress and its determinations. The Court noted that the question to be answered by a court in making a determination of constitutionality is not an objective determination of whether the legislative policy was the correct approach to the issue. Rather, the Court stated, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record. Turner, 520 U.S. at 212. The Court will now turn to a discussion of the Congressional deliberations.

During the deliberations on the TCPA legislation, the Congress entertained testimony from many sources. In addition, Members related personal as well as constituent experiences and complaints concerning this practice. For example, as to the cost shifting issue, the Congress heard testimony that, in 1989, California's consumers lost between $250,000-375,000 per year in printing these unsolicited materials. Hearing before the Subcommittee on Telecomm. And Fina. Of the House Committee on Energy and Commerce, 101st Cong., 56 (1989) (statement of Prof. Ellis). This testimony also related that one company engaged in this activity had by that time assembled a database of 500,000 fax numbers and was routinely sending out 60,000 fax messages per week.

The Congress also heard testimony that this industry would steadily increase its technological capabilities and its attendant ability to transmit massive volumes of fax messages. The intervenor's brief cites to a website of a defendant in another related case to support the Congress' predictive judgment. It boasts, in 2004, of being one of more than 400 entities engaged in transmitting facsimile advertisements. The site claims that its sponsor personally sends more than one million such messages per week. (Int. Br. pp 16-17).

Finally, the Congress heard significant testimony on the disruption of business by the "seizure" effect such messages have on telephone lines and facsimile machines.

In contrast, Charter One advances no evidence as to the accuracy of the information presented to the Congressional subcommittee and presented to the Congress. Given the substantial deference that Courts must give to the predictive judgments of Congress, indeed the Court's role is limited to assuring that, in formulating its policy, Congress has drawn reasonable inferences based on substantial evidence. Turner Broadcasting Systems, Inc. v. FCC, 512 U.S. 622, 666 (1994), this Court can reach no other conclusion but that unsolicited telephone facsimile messages disrupt business by interrupting its orderly flow and unfairly shifts advertising costs from the merchant to the consumer. These are substantial interests that Congress in its constitutional responsibility to regulate commerce can protect. Moreover, the material submitted by the Intervenor validates Congress' predictive judgment.

The Defendant next posits that, assuming protectable interests exists, the total ban of unsolicited facsimile advertisements does not directly advance the government interest

14

asserted. Rubin v. Coors Brewing Co., 514 U.S. 476 (1995). The Bank acknowledges that Congress need not make progress on every front before it can make progress on any front. United States v. Edge Broadcasting Co., 509 U.S. 418 (1993). Nevertheless, Charter One posits there is not the reasonable fit required between the TCPA total ban on unsolicited telephone facsimile advertising and the interests advanced. The main thrust of their position focuses on the failure of Congress to ban facsimile messages that contain political, "junk" or charitable messages. These messages consume the same amount of paper and ink as the banned messages. This permitted form of speech also disrupts business by "seizing" control of the recipients business equipment.

To support its position, the Defendant cites to cases in this area such as Edenfield v. Fane, supra, and City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410 (1993). In Edenfield, the Court struck down as violative of the First Amendment Florida's total ban on client solicitation by Certified Public Accountants. The Court began its analysis by acknowledging that "solicitation is a recognized form of speech protected by the First Amendment." International Society for Krishnar Consciousness v. Lee, 501 U.S. 672, 677 (1992). It then examined the two asserted interests the regulation was designed to protect; i.e. eliminating fraud or overreaching by CPA'S and maintaining the independence of the audit process. Each, the governing board advanced, would be compromised as competitors would be increasingly called upon to cut prices or be more compliant to a client's needs to obtain or retain business. The Court acknowledged the substantial nature of the governmental interest.

However, the Court found that a total ban on such solicitation did not directly advance the interests involved. In making that determination, the Court noted that 21 States place no restrictions on solicitations by CPA's, only three States besides Florida have enacted a total ban. The Court also observed the ban was enacted without any evidence, study or even anecdotes to suggest the stated interest would be served by the ban. Edenfield, 507 U.S. at 772. Indeed, the Court found the one report proffered in support of the ban actually undermined the regulator's position. Id. at 772-773. Nor could the ban, the Court found, be justified as prophylactic in nature. In rejecting the position that the setting of such solicitations, i.e., private offices or conversations were prone to abuse and difficult to regulate, the Court emphasized the training of members of

the accounting profession, and the absence of any threat of overreaching due to the emotional status of the party being solicited. The Court noted that decisions to hire an accountant are deliberate in nature and any potential for harm is minimal. This, the Court found was different from the partial ban approved on lawyer solicitations of accident victims. Ohralik v. Ohio State Bar Assn., 436 U.S. 447 (1978). In the later situation the Court acknowledges a prophylactic ban was appropriate because the harm sought to be avoided would have occurred at the outset of the solicitation. Id. at 777.

In Discovery Network, the Court struck down the application of an existing ordinance prohibiting the distribution of handbills to limit the placement of dispensing racks to distribute the defendant's commercial paper. In making this determination, the Court noted that the ordinance had long been in existence before the City determined that it was a potential tool to ease the perceived blight and promote traffic safety. The Court also observed that only 62 of the offending racks were being removed while between 1, 500 and 2,000 remained in place unaffected by enforcement efforts. These racks were used to distribute "newspapers," a category not defined by the ordinance but by executive fiat. It was significant, the Court observed, what is patent to anyone who peruses our daily "newspapers," that 70% of their content is devoted to advertising the availability of goods or services. Discovery Network, 507 U.S. at 420 (fn.16). This fact, the Court determined, eliminated any distinction between the publications that were banned or permitted. In its opinion, the Court reminded the litigants that speech proposing a commercial transaction was entitled to lesser protection than other constitutionally protected expression. See Ohralik v. Ohio State Bar Assn., 436 at, 455-456. Thus, the Court recognized that a distinction has historically been drawn between commercial and non-commercial speech, but found that on the record there was no appreciable difference in content between the Defendant Discovery Network's publication and those classified as "newspapers." The Court reasoned that as a result the distinction drawn by Cincinnati bore no appreciable relationship to the restrictions imposed. The Court specifically declined to determine whether, given certain facts and under certain circumstances, differential treatment of commercial and non-commercial speech is justified. Discovery Network, 507 U.S. at 429.

16

It is clear to the Court that the definition of "unsolicited advertisement" found in the TCPA is consistent with the definition of a commercial transaction as defined by the Supreme Court; *i.e.*, proposal for a commercial transaction. Board of Trustees of the State University of N.Y. v. Fox, 492 U.S. 469, 473-474 (1989). The TCPA's ban on commercial speech does have a prophylactic effect on unsolicited telephone facsimile advertising. This can be justified under Ohralik, *supra.*, because the harm sought to be prevented occurs at the time the transmission is made. In addition, unlike the total ban on solicitation in Edenfield, Congress recognized a significant negative impact on commerce and enacted a closely tailored statute. In contrast to the glaring absence at the state level of regulation of solicitation by CPA's, the Congress received evidence that efforts by an increasing number of states to regulate in this area were thwarted by the interstate nature of the telephone facsimile issue. Hence, this Court finds that the restriction directly advances the valid regulatory concerns identified by Congress.

Moreover, there is a clear relationship between banning commercial speech and allowing charitable and political use of this medium of communication. First, Congress received evidence that only a small number of unsolicited messages were non-commercial. In addition, the public had no serious objection to receiving such information. The Congress, as noted above, pointed to the actual damage to business owners by way of additional costs of doing business as a result of receiving commercial messages. In addition, evidence suggested the additional burdens, not easily calculable, imposed by a lack of timely access to necessary business equipment during the increasingly frequent times the unsolicited commercial telephone facsimiles are sent was adversely affecting commerce.

The cases relied on by the Defendant have for the most part, in subsequent proceedings, followed the Eighth Circuit Court of Appeals decision in Missouri ex.rel. Nixon v. American Blast Fax, Inc., 323 F3d 649 (C.A. 8th 2003), cert. den. 124 S.Ct. 1043 (2004). *See* Rudgayzner & Grath v. Enine, Inc., 204 N.Y. Misc. Lexis 420 (4/14/04).

Finally, the restriction chosen by the Congress is not more extensive than necessary to advance the interest at stake. The Bank recognizes that there must be a reasonable "fit" between the regulation and the interest sought to be protected. Board of

17

Trustees v. Fox, *supra*. Charter One argues that at least two alternatives are less restrictive and hence a better "fit." First, the Defendant points to the California "opt out" scheme. This allows the sender of the message to furnish the recipient with a toll free number which will prevent the recipient from receiving further facsimiles. The second is a national "do not fax" list. Anyone who does not desire to receive this type message can sign up and be placed on a list and will not receive these communications. The Defendant suggests this would better identify those individuals who welcome this information and separate those persons from consumers who desire to receive only certain types of unsolicited messages or no messages at all.

The analysis of this issue does not permit the Court to substitute its judgment for that of the Congress. Rather, the Court must examine the existing regulations on their own merit and determine whether they achieve a reasonable fit. Rubin v. Coors Brewing Co., 514 U.S. 476 (1995). The TCPA scheme does act to prevent the cost shifting goal set forth by the Congress. Moreover, the Defendant suggests an affirmative duty should be imposed upon businesses and private persons in order to protect their property and be free to conduct their businesses. Those persons who desire to enter into commercial transactions have numerous and cost effective ways of reaching customers. They can conduct direct mailings, purchase advertising in "newspapers" or other media. Indeed, they can create low cost websites that can be easily "googled." There is no reason to suggest the TCPA fails to pass muster on the fourth prong of the Central Hudson test.

Hence, the Court can find no First Amendment infirmities in the TCPA regulatory scheme.

### 4. COUNT II – CONVERSION

The Defendant correctly sets out the elements of the tort of conversion. The gist of the Bank's argument appears to be that, by placing paper in a fax machine, an owner is parting with control, dominion or ownership of that property. By analogy, the Court surmises, if one were to leave their bicycle on the front porch for friends to see and the newspaper delivery person decided that it would be handy and takes it, there would be no theft. The Bank's argument ignores the plain fact that the sending of unsolicited advertisements is illegal. Everyone has the right to rely on others obeying the law. Hence, the Plaintiff has made out a claim.

18

5.  **COUNT III ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT (ICFA)**

In Count three of the Plaintiff's complaint, it is alleged that the sending of one telephone facsimile message is a violation of the Illinois Consumer Fraud and Deceptive Practices Act. In Whiting Corporation v. MSI Marketing, 02 CH 6332, this Court extensively analyzed the requirements for a valid complaint under the Act. As the ICFA does not list a violation of the Illinois fax statute as a *per se* violation, the Plaintiff must satisfy the requirements set forth in Robinson v. Toyota Motor Credit Corporation, 201 Ill. 2d 403 (2002). A plain reading of the Plaintiff's complaint yields that the Count alleging a violation of the ICFA is legally insufficient. However, as indicated in the Whiting opinion, the Plaintiff may be able to set out a valid claim in individual cases. Finally, the Plaintiff should analyze this issue in terms of the right of Congress to regulate interstate commerce. Therefore, the Plaintiff is given leave to file amended Counts alleging an ICFA violation in those Class B and C category cases that are subject to the ruling entered today.

6.  **COUNT IV – PROPERTY DAMAGE**

Property damage is to this Court's understanding an element of a form of intentional or negligent tortius conduct. It is not an independent tort. This Count will be dismissed with prejudice.

IV.   **ORDER**

A. The Defendant's Motion to Dismiss Counts I & II are denied;

B. The Defendant's Motion to Dismiss Counts III & IV are granted, the Plaintiff is given leave to file amended complaints alleging violations of ICFA consistent with this Memorandum of Opinion and Order against any individual defendant;

C. The Class A and B cases are set for case management on July 13, 2004 at 1:00 P.M;

D. Any discovery stay order in Class B cases is hereby lifted.

**ENTERED**

ENTER:     MAY - 7 2004

Judge _____    JUDGE    1510

PATRICK McGANN • 1510

19

## EXHIBIT A

| | |
|---|---|
| 03 CH 10966 | INSPE v. CBSK |
| 03 CH 9912 | Trout Grouse, LLC v. CBSK |
| 03 CH 10844 | Rawson v. Levin |
| 03 CH 10667 | Damas & Block v. Erogtron |
| 03 CH 12538 | Travel 100 v. Mediterranean Shping Co. |
| 03 CH 0955 | Novak v. Hotels.com |
| 03 CH 1540 | Travel 100 Grp v. Oceania Cruises, Inc. |
| 03 CH 8921 | Rawson v. McLeod USA |
| 03 CH 8477 | Telecommunications v. McLeod USA |
| 03 CH 10967 | Jos. Younes v. Impact Networking |
| 03 CH 10725 | Flexicorps v. Impact Networking |
| 03 CH 11321 | Flexicorps v. Bridge 21 |
| 03 CH 11650 | Kaufman v. Bridge 21 |
| 03 CH 10818 | Block v. Advanced Environmental Systems, Inc. |
| 03 CH 11297 | Catherine Elliott-Dunne v. Tracy's Treasures, Inc. |
| 03 CH 7666 | Brill v. Aramak Services |
| 03 CH 10667 | Damas v. Ergotron |
| 03 CH 13062 | Rawson v. Brin |
| 03 CH 14511 | Travel 100 Grp v. Bebon Office Machines |
| 03 CH 11114 | Lustig v. First Priority Funding |
| 03 CH 12434 | Creative Fun v. Systems Management |

# TAB 3

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT; CHANCERY DIVISION

JAMES C. ZOES     )
          )
    Plaintiff,   )  03 CH 17879
          ) Judge Patrick E. McGann
  vs.      )  Calendar 6
          )
NORTHAMERICAN BANCARD, INC., ) **This Order Applies**
     et al.   ) **to all cases on the Attached**
    Defendants  ) **Exhibit 1**

### MEMORANDUM OPINION AND ORDER

  This matter comes before the Court of the Defendant, North American Bancard to Dismiss the complaint filed by James C. Zoes. The Plaintiff's and Defendants in the cases listed the attached Exhibit 1 have agreed that the Motions and Briefs filed in this case will stand as Motions and Responses on the common issues in their respective cases and that this Court's ruling will apply to those issues. The Defendant's Motion is brought under 735 ILCS 5/2-619 1 and raises challenges to the legal sufficiency of Plaintiff's claim, as well as, asserts affirmative matter that either defeats the Plaintiff's claim or avoids its legal effect

  **1.**  **Legal Standard**

  A section 2-615 motion attacks the legal sufficiency of the Plaintiff's claim. The motion does not raise affirmative factual defenses, but rather alleges defects only on the face of the complaint. The question presented by a section 2-615 motion to dismiss is whether the allegations of the complaint, when viewed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. A cause of action will not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved which will entitle the plaintiff to recover. Vernon v Schuster 179 Ill. 2d 338, 344 (1997); Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 86-87 (1996). This basis is only asserted as a challenge to Count III of the Complaint.

Section 2-619 affords a means of obtaining a summary disposition of issues of law or easily proven issues of fact  Subsection (a) (9) permits dismissal where "the claim asserted is barred by other affirmative matter avoiding the legal effect of or defeating a claim."

The phrase affirmative matter encompasses any defense other than a negation of the essential allegations of the plaintiff's cause of action. For that reason, it is recognized that a 2-619 (a) (9) motion to dismiss admits the legal sufficiency of the plaintiff's cause of action much in the same way that a 2-615 motion to dismiss admits a complaint's well-pleaded facts. Kedzie & 103rd Currency Exchange v Hodge, 156 Ill. 2d 112, 115 (1993).

This basis revolves around the Defendant's challenge to the constitutionality of the Telephone Consumer Protection Act of 1991.[1] ("TCPA).

**II.    Discussion**

The Defendant initially adopts the arguments made by the Defendant, Charter One Bank, in its Motion to Dismiss filed in 03 CH 10965. The Court accepts that position and enters as part of the reasoning for the ultimate ruling in this matter the Memorandum Opinion and Order entered in that case. The full text of that ruling is attached as Exhibit B to this ruling. To the extent that that ruling responds to the issues raised in this Motion, the Court will endeavor to merely reference the opinion without repeating its language.

**A.  Commercial Speech Protection of the First Amendment**

The Defendant asserts that the TCPA scheme results in a blanket prohibition on this form of commercial speech. Hence, it is more extensive than necessary to achieve the asserted government interest. As a result, the rights of individuals to receive unsolicited fax advertising is restricted. The Defendant points to the importance of maintaining a free and open market place of ideas so that consumers can receive as much information as desired in order to make private economic decisions. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976).

The Defendant seeks to analogize this prong of their argument to the line of decisions that prohibit restrictions on door-to-door distribution of advertising material of either a religious or commercial nature., See, e.g. *Martin v City of Strothers, Ohio,* 319 U.S. 141, 148 (1943).

---

[1] 27 USC 227 et seq

2

The Court recognizes that it is constitutionally improper to restrain an advertiser's access to those consumers who wish to learn about the product. This is not the goal or effect of the TCPA. The TCPA has two stated goals. The primary goal is to prevent the advertiser from shifting the cost of speech to the recipient. The TCPA also is designed to avoid the disruption to the orderly function of business because someone has co-opted the use of another's fax machine.

It appears to this Court that if the government can ban littering under its police power, *Turner Broadcasting v FCC*, 512 U.S. 622,682-683 (1994), it surely can prevent the speaker's use and destruction of the listener's property without permission. Recovery under the TCPA is limited to those persons who did not permit or invite the facsimile message.

This unlawful taking also undermines the second prong of the Defendant's argument of this issue. The argument suggests that the "do not call" list created by Congress for telephone marketers would be a "less restrictive" and equally effective approach to the issue. As such, the TCPA is constitutionally infirm. The Court would suggest that if Mr. Martin, the protagonist in *Martin v City of Strother*, had entered that property in Ohio and in order to proselytize, instead of ringing a door bell and speaking to the inhabitants, he wrote a message of faith on the side of their home, a successful claim for property damage would lie.

The Defendant cites to three cases in support of their argument, each is inapposite. In *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), the Court struck down a ban on advertising the availability of compound drugs.[2] The Court found that the Government could ban the use or sale of the equipment necessary to make large scale drug compounding economically feasible, prohibit the wholesale distribution of such drugs, or prevent the inventorying of such drugs in anticipation of orders. There the harm sought to be prevented was the large scale use and distribution of drugs that were not FDA approved. The practice had traditionally been done on a patient by patient basis and created no regulatory issues. The concern was that the widespread use of advertising would create a demand for drugs that were unnecessary or unsafe. This would create public safety issues. The Court found that the other readily available alternatives

---

[2] Drug compounding is the practice of altering a FDA approved drug to meet a patient's particular need.

3

would lessen the potential danger but also give physicians and their patients access to what may have been an unknown source of treatment. Here, the governmental interest is in the promotion of commerce by preventing the shifting of advertising costs to an unwary or unwilling consumer as well as, the improper disruption of commercial activity. Congress is not regulating speech by use of the TCPA. Advertisers are free to use any other available medium to reach its potential customers and can obtain permission to send facsimile advertisements.

In *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995), the Court struck down a prohibition against advertising the alcohol content of beer on the product's label. However, brewers were free to use this information in other forms of advertising. This was found to be an irrational approach to promoting the suggested government interests. Here, the Congress was aware of the fact that technology would allow blast faxers to have a significantly greater impact on cost shifting and business disruption.

Finally, in *Lorillard Tobacco Co. v Reilly*, 533 U.S. 535 (2001), the Court struck down an almost complete ban on truthful advertising of smokeless tobacco. This deprived tobacco merchants access to an inexpensive mode of advertising. The cost of which would be borne by the seller and not the customer.

The TCPA is a regulatory scheme that is consistent with the guarantees of the First Amendment to the United States Constitution.

**B. Strict Liability**

Here, the Defendant asserts that the TCPA imposes strict liability on senders of unsolicited telephone facsimile messages. The imposition of strict liability chills the exercise of First Amendment rights. *Video Software Dealers Association v. Webster*, 968 F. 2d 684 (8th Cir. 1992). This *scienter* requirement is usually limited to criminal and quasi-criminal prosecutions in non-commercial settings. *Waters v. Churchill*, 511 U.S. 661 (1994). Here, as stated at argument *scienter* is an element of the claim. The sender must consciously make a decision to send the facsimile to an identified recipient. This act requires conscious and intentional action. The message must be selected, the recipient's number put in the machine and the message sent. Assuming the fax number is contained on a list purchased from a third party, there is no constitutional restriction on suggesting that the nature and extent of the permission be ascertained before use. Surely, a prudent

4

merchant would have a claim against an unscrupulous entrepreneur who misled a good-faith purchaser of such a list.

The Court finds this argument unpersuasive.

## C.    TCPA and Vagueness

The Defendant suggests that the reasonable person cannot determine what conduct is prohibited, as a result the statute is unconstitutional. This lack of clear standard, the Defendants assert, "chills" the legitimate exercise of a constitutionally protected right. The argument suggests that because the right is freedom of speech, a stricter scrutiny must be applied

The statute, it is asserted, does not give fair warning to those affected by its sanction. The Defendants assert that by granting a private right of action to any "person or entity,"[3] Congress has impermissibly caused confusion. The application of the rule of construction that the use of a general term excludes application to a specific term creates the infirmity. As a result, it is suggested, that a reasonable person, reading the TCPA statute would find difficulty in divining its application to a corporate entity.

This problem is exacerbated by Congress' prohibition against the "use" of telephone facsimile by a person in violation of the TCPA scheme. This language, it is advanced by the Defendant, limits application to the actual sender, fails to give notice of potential liability to the actual intended beneficiary of the advertisement and at whose request the transmission was made.

"[Vagueness] challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975). See *United States v. Powell*, 423 U.S. 87, 92-93 (1975); *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32-33, 36 (1963). "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974). The rationale is evident: to sustain such a challenge, the complainant must prove that the enactment is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.[1]

---

[3] 47 U.S.C. § 227 (b) (3) (B)

5

*Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). Such a provision simply has no core." *Smith v. Goguen*, 415 U.S. 566, 578 (1974).

As the Defendants correctly state, the Court has consistently applied a higher standard where freedom of speech issues are involved. The First Amendment overbreadth doctrine, however, represents a departure from the traditional rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court. See, e.g., *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973); *United States v. Raines*, 362 U.S. 17, 21 (1960); *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). The reason for the special rule in First Amendment cases is apparent: An overbroad statute might serve to chill protected speech. First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the *in terrorem* effect of the statute. See *NAACP v. Button*, 371 U.S. 415, 433 (1963). Indeed, such a person might choose not to speak because of uncertainty whether his claim of privilege would prevail if challenged. The use of overbreadth analysis reflects the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted.

But the justification for the application of overbreadth analysis applies weakly, if at all, in the ordinary commercial context. As was acknowledged in *Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S., at 771 n. 24, there are "commonsense differences" between commercial speech and other varieties. See also id., at 775-781 (concurring opinion). Since advertising is linked to commercial well-being, it seems unlikely that such speech is particularly susceptible to being crushed by overbroad regulation. See id., at 771-772, n. 24. Moreover, concerns for uncertainty in determining the scope of protection are reduced; the advertiser seeks to disseminate information about a product or service to be provided, and presumably can determine more readily than others whether the proposed speech is truthful and protected. Ibid. Since overbreadth has been described by this Court as "strong medicine," which "has been employed... sparingly and only as a last resort," *Broadrick v. Oklahoma*, 413 U.S., at 613, the Court consistently declines to apply it to professional advertising, a context where it is not necessary to further its intended objective. Cf. *Bigelow v. Virginia*, 421 U.S., at 817-818;

6

Hence, the Court must first determine whether the TCPA regulates commercial speech rights of the Defendants or others. As oft repeated in this and the prior opinions, the statute regulates not the dissemination of information, but rather, the ability of a merchandiser to shifts the cost of doing business to a potential consumer. The TCPA scheme also encourages efficiency and economy in commerce by freeing important communication devices from unwanted interference. It does so only in areas of commerce. Hence, any challenge to the statute in question for vagueness or overbreath, must necessarily be limited to the claim against the Defendants as plead in the complaint. A facial challenge is not available to the Defendants.

The claims of the alleged TCPA violations found in the instant complaints are clear and unambiguous. This defeats the Defendants assertion that the statute is vague or overbroad.

In addition, the Congress took pains to describe some of the terms complained of by the Defendants. Indeed the term "person" is defined to be co-extensive with the common understanding of the word entity.[4] This renders the use of the rule of statutory construction suggested by the Movants unnecessary. Moreover, common legal principles of *respondeat superior* and aiding and abetting give reasonable notice of potential liability to merchandisers and others seeking a commercial transaction. These rules are imputed into regulatory schemes enacted by Congress. *See. Meyer v. Holley,* 537 U.S. 280, 285 (2003).

In their reply brief, the Defendants suggest that the vagueness issue arises in the context of identifying the circumstances under which permission to receive telephone facsimile advertising messages can be discerned. In support of this argument, they point to the rather tortured manner in which the FCC has attempted to develop regulations. While history and perhaps the Code of Federal Regulations speak volumes upon volumes on the role of the federal bureaucracy in our society, this particular argument loses sight of the fact that the TCPA statute clearly defines the prohibited conduct in plain language. The telephone facsimile is not violative of the TCPA if it is sent to someone who has give prior express invitation or permission.[5]

---

[4] 47 U.S.C. § 153

[5] 47 U.S.C. § 227 (s) (8)

7

It is apparent to this Court that such terms should be given their broadest meaning. Business persons searching for opportunities to advance their profitability by reducing costs or increasing market share choose many ways to receive information from suppliers or disseminate it to customers. They also widely disseminate contact information to these entities. The circumstances surrounding the acquiring of the recipients facsimile telephone number can be explored. If an ordinary reasonable person can conclude that the information was supplied with an invitation or permission to use it for business purposes, liability under the TCPA will not attach. The Court can envision circumstances where even informal exchanges of information given under certain circumstances will be determined to grant permission or constitute an invitation to receive otherwise prohibited facsimile messages as a matter of law.

The TCPA scheme is not unconstitutionally vague.

### D. TCPA and Constitutional Issues Related to Excessive Fines

Much of this argument is adopted from Memoranda submitted by the Defendants in the Group B Master motion. The Court has reviewed those arguments and adopts its reasoning in its decision in *Inspec Associates, Ltd. v. Charter One Bank, 03 CH 10965*. As noted above, the reasoning in that opinion is attached to this Memorandum and made a part hereof.

The more interesting argument in this area surrounds the potential aggregation of the statutory damages into massive damage awards which bear no relation to the actual harm caused. *See, e.g. State Farm Mutual Insurance Company v. Campbell*, 538 U.S. 408 (2003). The Court acknowledges that some portion of a statutory penalty is increased to encourage private enforcement of the law, thereby increasing compliance with its strictures. However, the actual impact of the aggregation cannot be measured at this time. Rather, it is suggested that such determinations are premature under the rubric of Rule 23 of the Federal Rules of Civil Procedure. *Parker v. Time Warner Entertainment Company*, 331 F. 3d 13 (2nd Cir. 2003). This appears to this Court to be the proper approach. Moreover, the concurring opinion in that case offered a solution to the dilemma posed by certifying such a class. The Defendants' brief suggests that this approach has also been taken in at least one other jurisdiction.

8

The Court will not dismiss the claim on this basis, but will review it as part of the class certification process, if necessary.

### E. TCPA and the Tenth Amendment

This argument has, for the reasons stated in the Memorandum in *Inspec Associates, Ltd. v. Charter One Bank, 03 CH 1096*, been rejected. The Court stands on reasoning expressed in that opinion

### F. Illinois Consumer Fraud Act (ICFA)

This claim is dismissed for the reasons stated in *Inspec Associates, Ltd. v. Charter One Bank, 03 CH 1096*. The Court adopts that reasoning in this case.[6]

---

[6]
In *Robinson v. Toyota Motor Credit Corporation*, 201 Ill. 2d 403 (2002), the Court defined the elements of an unfair business practice. In essence, the Court adopted the three part test cited with approval in *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972). Therefore, in order to measure whether a business practice is unfair, a court must consider the following factors: 1) whether the practice offends public policy; 2) whether it is immoral, unethical, oppressive or unscrupulous; and 3) whether it causes substantial injury to consumers. *Robinson*, 201 Ill. 2d at 417-418. The Court also noted that all three factors need not be met. Rather, the Court adopted the reasoning of the Connecticut Supreme Court in *Cheshire Mortgage Services, Inc. v. Montes*, 223 Conn. 80, 106 (1992). That Court, in a case involving "loan churning" observed that all three criteria need not be satisfied in order to support of unfairness. Rather, a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. *Cheshire*, 223 Conn. at 106.

As this claim is brought under ICFA the complaint must allege with particularity and specificity the unfair business practices of the defendants. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 502 (1996). The Plaintiffs fail to recognize that as a Section 2-615 Motion, the complaint must stand on its own, thus, reference to cannons issued by the FCC, reports or hearings are not relevant to the issues and will not be considered in resolving this Motion.

There is no question that transmitting unsolicited telephone facsimile advertisements violates public policy. First, the Criminal Code of 1961, as amended, prohibits this activity. *See*, 720 ILCS 5/26-3. Knowledge is defined by the Code in Section 5/4-5. A person acts knowingly when he is consciously aware that a result is practically certain to be caused by his conduct. 720 ILCS 5/4-5(b). There can be no question than any individual who causes a telephone facsimile transmission to occur acts knowingly. In addition, the failure of Illinois to "opt out" of the private enforcement of the TCPA suggests that is the public policy of Illinois as well.

The Plaintiffs allege the conduct is oppressive, yet they allege only one or two facsimile transactions to each Plaintiff. This, by inference, suggests minimal disruption of one's business or occupation. The exhibits to the complaint show each plaintiff had a reasonable alternative to the receipt of additional messages. They could call to remove themselves from the list. This conduct does not rise to the level of oppression envisioned by the drafters of ICFA.

The final factor requires the allegation of substantial injury to the consumer. In discussing the count alleging conversion, the Court indicated the doctrine of *de minimus non curat lex* had no application in this matter. A complete review of the movants' authorities confirms this position. No case cited involved a tort claim. They involved complaints of short redemption deposits in foreclosure cases, errors in paintaking damages or computing interest. The Court acknowledges that the Plaintiff's are not entitled to receive nominal or presumed damages in a claim under ICFA. *Dwan v. Leslie Oldsmobile, Inc.*, 229 Ill. App. 3d 1032, 1041 (1992). There are no facts from which the Court can determine the amount of damages incurred by the suggested class plaintiff or consumers as a whole. The term "substantial" is clearly a conclusion

9

III.    Order

A.  The Motion to Dismiss the Plaintiffs' claims under the Telephone Consumer Act of 1990 is Denied. The Defendants are ordered to answer said complaints within 28 days hereof;

B.  The Motion to Dismiss the claims of violating the Illinois Consumer Fraud and Deceptive Practices Act is granted. No Plaintiff may re-file such a claim without prior leave of Court;

C.  Issues relating to Discovery will be finalized on October 14, 2004 at the scheduled hearing.

Enter:_____

Judge        1510

---

Thus, evidence of only one of the Robinson factors are found in the Plaintiff's complaint. This Court concludes that the Plaintiff has not stated a claim under ICFA. In reaching this decision, the Court recognizes that the failure to include Illinois' prohibition against unsolicited telephone facsimile transmissions in Section 2Z of ICFA (815 ILCS 505/2Z, also prevents a finding of a per se violation of ICFA. Illinois ex rel. Daley v. Grady, 192 Ill. App. 3d 330, 332 (1989).

# TAB 4

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

WHITING CORPORATION,                )
                                    )
                   Plaintiff        )        No. 02 CH 6332
                                    )
        v.                          )        Judge Patrick E. McGann
                                    )        Calendar 6
                                    )
MSI MARKETING, INC.                 )        (As related to the list of cases
                                    )          attached hereto as Exhibit 1
                   Defendants.      )          pursuant to General Order 22)

### CORRECTED MEMORADUM OPINION AND ORDER

#### I.    INTRODUCTION

Commencing in 2001, numerous plaintiffs have filed more than 30 complaints in the Circuit Court of Cook County, Illinois seeking relief against various defendants for actions involving the sending and receipt of advertisements via telephone facsimile machines. These actions were assigned to this Court, as related by the Presiding Judge of the Circuit's Chancery Division.

Court and Counsel have conducted case management conferences in an effort to create an efficient management plan for the processing of these cases. As a result, this Court entered a case management order which allowed defendants to file consolidated Motions to Dismiss the separate or consolidated complaints filed by the Plaintiffs. The Court also required the Plaintiffs in those cases to file a consolidated response. A list of all the cases to which this order applies is attached as Exhibit A. The court, on a later date, will entertain any Motions to Dismiss that raise individual issues pertinent only to the moving party.

On March 4, 2003, the Court allowed the United States of America to intervene, as one of the issues raised in the consolidated Motions was the constitutionality of 47 U.S.C. 227 (b)(1)(c). The Court also entertained oral argument on these consolidated Motions on that date. The grounds and issues raised in those motions will be discussed as they relate to each theory of recovery.

Each of the complaints seek money damages on three theories: 1) the private right of action granted to each recipient of an unsolicited telephone facsimile advertisement, 47 U.S.C. 227(b)(3)("TCPA"); 2) violations of the Illinois Consumer Fraud and Deceptive Practices Act, ("ICFA") 815 ILCS 505/2; and 3) common law conversion.

The well-pled facts, as they relate to these motions, allege that each plaintiff received an unsolicited advertisement via the use of their personal telephone facsimile machine. This action limited each plaintiff's access to equipment used in their business, occupation or for personal use. This activity also converted each plaintiff's personal property; to wit, paper and toner, to their own use.

## II    CONSTITUTIONALITY OF REGULATION OF TELEPHONE FACSIMILE ADVERTISING

The defendants, in their consolidated Motion to Dismiss the plaintiffs' claims brought pursuant to the TCPA, assert that the regulation of advertisements by telephone facsimile is unconstitutionally vague and unnecessarily impinges on freedom of speech rights granted by the First Amendment. In addition, they argue that the TCPA violates the advertiser's Due Process Rights under the Fifth and Fourteenth Amendments and imposes excessive fines in violation of the Eighth Amendment.

The Telephone Consumer Protection Act of 1991, codified at 47 U.S.C. 227, provides in relevant part; "It shall be unlawful for any person...to use any [transmitting device]...to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. 227(b)(1)(c). The term "unsolicited advertisement" is defined as "any material advertising the commercial availability or quality of any property, goods or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. 227(a)(4). Thus, the TCPA prohibits only commercial advertising.

As the statute in question seeks to regulate commercial speech, it must meet the test set out in Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 57 (1980). Initially, it must be observed that commercial speech is different from other varieties of speech because it proposes a commercial transaction which traditionally occurs in an area subject to governmental regulation. Ohralik v. Ohio

2

State Bar Assn., 436 U.S. 447, 445-456 (1978). However, any regulation of such speech must be cognizant of the controlling principle that our union depends on a free enterprise economy. The allocation of society's resources depends upon a free flow of information. Thus, it is in society's interest that a free flow of information be maintained so that the consumer has enough information to make intelligent and well informed decisions. Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council Inc., 425 U.S. 748 (1976).

In order to maintain the balance between the limited ability of government to regulate commercial speech and the consumer's right to the full and free flow of information, the Court in Central Hudson adopted a four part analysis to determine the constitutionality of any proposed restriction on commercial speech. First, the court must determine whether the speech comes within the First Amendment. To be protected, such speech must concern lawful activity and not be misleading. Next, the court must determine whether the government's interest in regulating the communication is substantial. If these two tests are met, then a determination must be made as to whether the regulation directly advances the governmental interest asserted and whether it is not more extensive than necessary to serve the asserted interest. Central Hudson, 447 U.S. at 566.

Applying this analysis to the TCPA's ban on unsolicited telephone facsimile advertising, it is clear there is no claim that any of the information distributed is misleading or promotes any illegal activity.

The Plaintiffs bear the burden of establishing that the legislation survives the remainder of the analysis. Florida Bar v. Went For It, Inc., 515 U.S. 618 (1995). The Plaintiffs and the intervening Petitioner United States of America, posit that the TCPA was enacted to address the substantial government interest of preventing the shifting of the cost of advertising to the potential consumer and the economic disruptions caused by the intrusive activity of the defendants. The Plaintiffs include this later interest under the broad umbrella of "invasion of privacy." The Court's determination of substantial governmental interest is limited to these two pronouncements. This Court cannot engage in supposition to find additional interests in need of protection. Edenfield v. Fane, 507 U.S. 761, 768 (1992). The burden of establishing these interests is not satisfied by mere speculation or conjecture. There must be a demonstration that the harms cited are real.

3

Edenfield, 507 U.S. at 770-71. The evidence of the governmental interest can come from anecdotes, studies, literature published in the issue. Edenfield, 507 U.S. at 771-773; Florida Bar, 515 U.S. at 626-627.

The proponents observe that 15 states, including Illinois, have enacted similar bans on unsolicited facsimiles. They also note that two separate Congresses held hearings on the issue. Subcommittees took testimony on the issue and members noted anecdotal information from constituents on the issue. One Congressman, Edward Mackey of Massachusetts, likened receiving an unsolicited fax to receiving "junk mail with the postage due." Private citizens from various walks of life, including the legislative counsel for the American Civil Liberties Union, noted the burden imposed on consumers by the cost shifting effect of receiving an unsolicited advertisement by telephone facsimile.

The Congress also received testimony as to the business disruption caused by this activity. Witnesses testified as to the inability to access equipment because it was occupied by an uninvited user. Evidence was also taken which indicates necessary or anticipated communications were disrupted.

There is no record of similar proceedings in the Senate. However, the bills of both Houses were reconciled in committee. The Court, without invading the separation of powers, cannot find or conjecture that there was anything but a complete consideration of the issues when the TCPA was enacted.

In reviewing the constitutionality of a statute, courts must accord substantial deference to the predictive judgments of Congress. The Supreme Court has recognized that Congress is better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions. Even in the realm of First Amendment, where Congress must base its conclusions upon substantial evidence, deference must be accorded to its findings as to the harm to be avoided. Turner Broadcasting System, Inc., v. F.C.C., 520 U.S. 180, 195-196 (1996). Thus, it appears to this Court that the government has a substantial interest in preventing the cost shifting of advertising and the unwanted disruption of economic activity.

The defendant's argue that improved technology has substantially reduced that burden. Modern fax machines no longer use expensive special papers. Increased

memories allow for multi-tasking by the equipment virtually eliminating the "temporary kidnapping" of facsimile machines. Thus, they posit, any interests identified by Congress have dissipated. The Congress, perhaps in anticipation of the vast explosion in technology, received testimony concerning the increased capacity of the senders of these messages. Indeed, one of the defendants, Fax.Com, solicits customers with a promise to save more than 75% over direct mail costs. The Court can infer that some of these savings are passed on to consumers who must now pay for the printing. Evidence adduced in other cases involving this issue confirm the problems identified by the Congress still exists. See, Missouri ex. Rel. Nixon v. American Blast Fax, Inc., 196 F. Supp. 2d 920, 924-26 (testimony concerning business disruptions, preventing access to phone lines, occupying personnel with other duties, increased capacity of facsimile senders). Nothing presented by the defendants, however, undermines the continued existence of the identified and substantial government interests.

The defendants also assert that the prohibition of these facsimile transactions is not dissimilar to the receipt of junk mailings. While it is true that the Court could find no substantial interest in prohibiting the distribution of unwanted "junk mail," Bolger v. Young Drug Products Corp., 463 U.S. 60 (1983), the Court was never asked if the recipient was also required to pay the "postage due" on the mailing or pay a toll on the trip to the wastebasket, let alone subsidize the mailer's printing expense.

The defendants also place great emphasis on Missouri ex. rel. Nixon v. American Blast Fax, Inc., supra. Unfortunately, as is the fate of all trial judges, the Appellate panel found fault with Judge Limbaugh's analysis and reversed this decision. Missouri ex. rel. Nixon v. American Blast Fax, Inc., 2003 U.S. App. Lexis 5469 (8th Cir. 2003)(Doc. 02-2705/2707).

Having found the existence of two substantial governmental interests, the Court must determine whether the legislative enactment directly addresses these interests. This requires the Plaintiffs to demonstrate that the restriction imposed will not only advance the governmental interest, but that it will do so to a material degree. 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 505 (1996). This Court does not find that the TCPA creates a complete ban on telephone facsimile advertising. There is nothing in the law that prevents a distributor from soliciting and obtaining consents for such advertising.

5

This can be done in a number of ways such as direct mail or contact, solicitations in printed media, or telephone solicitation. Perhaps the best way to identify the parameters of this requirement is to furnish examples of restrictions that were found unrelated to the asserted interest. The City of Cincinnati, no doubt attempting to dissipate any image from its nickname Porkopolous, enforced an ordinance limiting news racks in order to improve community aesthetics. The result was a reduction of the over 1600 such racks by 62. The publications using these racks were not "mainstream" media. The reduction in unsightly news boxes was in the words of two courts "paltry" or "minute." The regulation, however, was found to have no relation to the stated governmental interest. City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 424 (1993). Similarly, a ban on radio advertising of private state government authorized casino gambling by a federal regulation was found to have no relation to the recognized government interest of reducing gambling. This result was reached because the ban excluded promotion of Indian sponsored casinos and state run lotteries. Greater New Orleans Broadcasting Assn. v. United States, 527 U.S. 173 (1999).

This restriction directly and materially advances the governmental interest in the efficient operation of commercial enterprises. The cost to industry of both increased operating expenses and lost productivity was amply demonstrated to Congress.

The defendants note the failure to include unsolicited non-commercial faxes supports their position that the goals of the government are not being advanced by the TCPA because these faxes also shift costs and disrupt the orderly conduct of business. They cite to decisions such as Greater New Orleans Rubin v. Coors Brewing Co., 514 U.S. 476 (1995). Each of these cases had one distinguishing fact, because in those cases there was no basis to suggest the bans would advance the stated goals. Gambling would not be reduced because Indian sponsored casinos and lotteries could be promoted. Temperance would not be promoted, because alternate means of advertising the alcoholic content of beer was available.

More importantly, the Congress heard evidence that private or non-commercial facsimile transmissions represented but a small percentage of unsolicited messages. Most recipients welcomed the message. Thus, no concern over this segment of unsolicited messaging was ever expressed to the Congress.

6

The other issues raised by the defendants are equally unpersuasive. The Supreme Court has noted that unsolicited junk mail cannot be prohibited because "the short, though regular journey from mail box to trash can...is an acceptable burden so far as the Constitution is concerned." Bolger v. Youngs Drug Products Corp., 463 U.S. at 72 quoting Lamont v. Commissioner of Motor Vehicles, 269 F. Supp. 880, 883 (S.D.N.Y. 1967). There can be no greater cost in taking the short regular walk to the telephone and hanging up on an unsolicited telemarketer. Some of our more imaginative fellow citizens may actually enjoy the exercise as a diversion from the insipid television, or tense moments at the dinner table.

The final prong is the determination that the regulation is not more extensive than necessary to serve the asserted interest. This, in the area of commercial speech, does not mean the least restrictive means. The case law requires a reasonable fit between the legislature's ends and the means chosen to accomplish those ends. Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 556 (1999). The defendants posit that there were numerous less restrictive alternatives such as allowing one free fax so that the recipient could notify the sender of any desire not to receive further messages. Another suggestion would be the creation of a "no-fax" list similar to that established by the government to reduce unwanted telemarketing. The defendants also suggest that regulations as to the times when fax messaging can occur would also be less restrictive.

The Plaintiffs and the Intervening United State of America attempt to shift the burden of disproving the existence of the fourth prong of the Central Hudson test. The standard, however, is that the proponent of the statute must show that Congress "carefully calculated the costs and benefits associated with the burden on speech imposed by the regulations." City of Cincinnati, 507 U.S. at 417.

To make this determination, it appears to this Court it is important to understand the effect of the TCPA ban on unsolicited commercial telephone facsimile messaging. This statute does not prevent any person engaged in commercial activity from either sending or receiving information about that activity. In fact, it does not prohibit the use of telephone facsimile devices for advertising. It requires the advertiser to identify those persons who are willing to expend their resources both in time and money to receive the commercial messages being sent.

7

It prohibits the advertiser from passing part of its costs on to a potential consumer. From this understanding, the Court must determine if the restriction imposed, while perhaps not the single best disposition, is one whose scope is in proportion to the interest served. Board of Trustees of the State University of New York v. Fox, 492 U.S. 469, 480 (1989). The suggestions by the defendants as to the regulation of message delivery times does nothing to advance the government interest of preventing cost-shifting. It is also apparent that the concerns Congress addressed in the TCPA were different in the regulation of telemarketers and facsimile advertising. There was a clear recognition of the substantial interference caused by the blast fax industry. It is not this Court's role to substitute its judgment for that of the Congress. The ban on unsolicited commercial telephone facsimile messaging is a reasonable means to the stated government end.

The defendants posit that section 227(b) of the TCPA is unconstitutionally vague. They argue that the definition of the term "unsolicited advertisement" is so vague that persons of common understanding must necessarily guess at its meaning. This ambiguity is exacerbated because senders are subject to private claims, creating a likelihood of differing interpretations in various jurisdictions.

The Due Process Clause of the Fifth Amendment to the United States Constitution, made applicable to the various states by the Fourteenth Amendment, is fundamentally violated by "any statute which either forbids or requires the doing of any act in terms so vague that (persons) of common intelligence must necessity guess at its meaning and differ to its application." Connally v. General Construction Co., 269 U.S. 385, 391 (1926). In Connally, the Court found that a statute that requires, under progressive penalties, that workers be paid the "current rate of wages" in the "locality" where they were working to be too vague to satisfy Due Process concerns. The Court noted that the term "locality" had no definition as to what area constituted a locality. Mr. Justice Sutherland, writing for the Court, recognized that reasonable people could differ as to the boundary of the "locality." The Court indicated that terms that are elastic or dependent on circumstances were problematic. Similarly, the Court found that the term "current rate of wages" was too vague. The Court noted that rates of pay had various levels begetting a minimum or maximum or an amount in between. This uncertainty left an employer to guess at the required payment. The Court also observed that judges and jurors had no.

8

standards by which to judge an accused's conduct. This could lead to very inconsistent results in the prosecution of alleged violations.

Comparing the Connally decision with the Court's decision in Roberts v. United States Congress, 468 U.S. 609 (1984) gives a clearer understanding of the principle. In that case, the Jaycees challenged a determination by the Minnesota Human Rights Department that the Jaycees denied access to a "place of public accommodation" on the basis of the applicant's gender. The Jaycees argue that the term's definition was too vague to satisfy Due Process requirements. This term was defined by Minnesota Law as "a business accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services or facilities, privileges, advantages, or accommodations are extended, offered, sold or otherwise made available to the public." Roberts, 468 U.S. at 469. Membership in the Jaycees was offered to any male applicant aged 21-35 who paid the appropriate fees. Women were accepted as Associate Members but were denied certain benefits given to their male counterparts.

The Jaycees main argument focused on Minnesota's decision that this organization was a public place of accommodation while a similar group, the Kiwanis Club, was not. This created, according to the Jaycees, the sort of vagueness the Due Process Clause was designed to prohibit. In dismissing this argument, the Court found that unlike the open enrollment policy of the Jaycees, Kiwanis Clubs has a formal procedure for choosing members based on specific and selective criteria. These additional standards were clearly outside the contested definition found in the Minnesota law.

Turning now to the TCPA, an "unsolicited advertisement" is defined as "any material advertising the commercial availability or quality of any property goods or services." 47 U.S.C. 227 (a)(4). Merriam Webster defines commercial, when used as an adjective, in numerous ways, including, "work intended for commerce, producing artistic work of low standards for quick market success, suitable, adequate or prepared for commerce; and emphasizing skills or subjects useful in business." Merriam Webster's Collegiate Dictionary, 10th Ed.1994. In addition, at least one commentator has identified distinctions between commercial and non-commercial speech found in the Supreme Court's analysis of this issue. First, the truth of the information is more easily verifiable,

9

and secondly, it is engaged in "for profit." Kosinski and Banner, "Who's Afraid of Commercial Speech?" 76 Va. L. Rev. 627, 634. Admittedly, the authors argue that these are distinctions without difference, but this Court must acknowledge and give deference to these well-established principles continually enunciated by our Supreme Court.

Prior to answering the question as to whether the statute is vague by subjecting it to questions presented by hypothetical situations, the Court must determine if the defendants conduct comes clearly within the proscription of the statute. Village of Hoffman Estates v. The Flipside, Hoffman Estates, 455 U.S. 489, 495 (1981). Clearly, it does. Each facsimile message advertises the price and availability of services, such as, internet connections, long distance or cellular telephone service, or products such as packaged learning programs, or toner for facsimile and other printing devices. Thus, the defendants should not be heard to complain of the statute's vagueness.

Assuming arguendo, that the Defendant's hypotheticals should be considered, the Court's analysis suggests the following resolutions. A carwash or candy sale is not conducted by a high school band for profit in the business sense of the word "commercial." A plea to oppose apartheid in the manner suggested does not advertise the commercial availability or quality of a product, nor does the announcement, without more, of an essay contest. A warning concerning the danger of a product would be subject to an affirmative defense of necessity, 720 ILCS 5/7-13, or privilege.

The availability of private enforcement of the statute does not give the theoretical plaintiffs "unrestrained power....(to) charge a person with a violation." Kolender v. Lawson, 461 U.S. 352, 359 (1983). As indicated, the statute has a clear meaning and is easily understandable by persons of common intelligence. A defendant wrongfully sued would have all remedies that are available to any person so situated.

Thus, this Court does not find that the TCPA violates the Due Process prohibition against vague statutes.

The defendants finally assert that the TCPA's damage clause violates the Due Process clause of the Fifth and Fourteenth Amendments, as well as, the excessive fine clause of the Eighth Amendment.

The Due Process Clause of the Fifth and Fourteenth Amendments prohibits federal and state governments, respectively, from imposing a "grossly excessive" punishment on

a tortfeasor. TXO Production Corp. v. Alliance Resource Corp., 509 U.S. 443, 454 (1993). In order to make this determination, the Court must first identify the interest the government seeks to protect and then determine whether the award is grossly excessive in relation to those identified interests. TXO, 509 U.S. at 456.

The Court has already identified those interests as preventing the shifting of advertising costs to potential consumers and promoting the efficient operation of this nation's businesses. The Court also notes that each defendant received adequate notice of the potential penalty if their conduct deviated from the required norm. Thus, the Supreme Court's decision nullifying an award for punitive damages on the basis of lack of notice is inapposite. BMW of North American v. Gore, 517 U.S. 559 (1995). Unlike the situation before the Court here, BMW was not sufficiently informed that the same conduct which was acceptable in some jurisdictions, but not in others, was subject to a penalty 500 times greater than the actual loss. It is clear that the penalty here is even greater, but unlike the operators of BMW, who had no notice that the procedure employed ran afoul of the law in Alabama, the statute clearly proscribes the conduct before any defendant acted. Thus, the standard to be applied is more properly found in St. Louis, Iron Mountain & Southern Railway v. Williams, 251 U.S. 63 (1919). There, the Court acknowledged the wide latitude that legislatures have in protecting public interest, the numberless opportunities for committing the offense, and the need for securing uniform adherence to established law. This Court is wary of substituting its judgment for that of Congress. The Court is also concerned about the potential damage claims in this case. However, no evidence has been introduced quantifying the amount of damages incurred by businesses in lost productivity. Thus, no mathematical certainty can be reached as to the relationship between actual damages and the penalty imposed. The defendants correctly point to the problems confronted by Judge Spears in Texas v. American Blast Fax, Inc., 164 F. Supp. 2d 892 (D.C. TX. 2001). Any penalty computed by multiple violations would be a result of the defendants' use of technology to aggressively violate a statute that is clear on its face. However, this issue must await full resolution until all of the evidence is heard, so that a complete record can be established.

Thus, the Court does not find the TCPA on its face imposes a sanction grossly disproportionate to the interests sought to be protected.

11

Turning now to the Eighth Amendment excessive fine issue. This analysis is similar to that under the prior Due Process inquiry. A fine is a valid exercise of the legislature unless it is grossly disproportionate to the nature of the violation. United States v. Bajakajian, 524 U.S. 321 (1998). However, as the dissent in that decision noted, substantial deference must be given legislative determinations as to sanctions for illegal acts. Bajakajian, 524 U.S. at 348. On this record, this Court cannot make such a determination, thus, the Motion to Dismiss is denied.

Having found the TCPA constitutional the Court moves to analyze the remaining issues.

### III.    THE PLAINTIFFS MAY NOT PROSECUTE A PRIVATE RIGHT OF ACTION IN ILLINOIS COURTS

The defendant's assert that no private action for violations of the TCPA can be maintained in Illinois state courts because Congress' action in establishing private rights of action in state courts violates the Tenth Amendment to the United States Constitution, and Illinois has never authorized the prosecution of TCPA matters in its courts, providing only for criminal sanctions. The four arguments advanced by the defendants are, in this Court's opinion, summarized above.

Article VI of the United States Constitution provides that the laws of the United States made pursuant to the Constitution "shall be the supreme Law of the Land, and the Judges in every State shall be bound thereby."

In Testa v. Katt, 330 U.S. 386 (1947), the Court was called upon to determine whether Rhode Island's courts could properly refuse to hear a claim brought under the Emergency Price Control Act. Unlike the TCPA, this law gave concurrent jurisdiction to Federal, State, and Territorial Courts to entertain these claims. The basis for the declination by the Rhode Island Courts was the traditional right enjoyed by the states to enforce penal laws of a foreign state. The Court noted that since the time of the first congress, laws have been enacted conferring jurisdiction on state courts to enforce federal penal statutes. While disputes raged over the relationship between federal and state governments during the first half of the 19th Century and ultimately, albeit temporarily, were resolved by war, the Supreme Court has been predictably steadfast in holding, "If an Act of Congress

12

given a penalty to a party aggrieved, without specifying a remedy for its enforcement, there is no reason why it should not been forced, if not provided otherwise by some act of Congress, by a proper action in a State Court." Claflin v. Houseman, 93 U.S. 130, 137 (1876). Thus, in Testa, the Court dismissed as inadmissible the argument that the state's law must be consistent with the federal regulatory scheme.

In International Science and Technology Institute, Inc., v. Inacom Communications, Inc., 106 F. 3d 1146 (4th Cir. 1997), a decision relied on heavily by the defendants, after determining that the TCPA granted exclusive jurisdiction for the private right of action in state courts, the court considered the Tenth Amendment argument. The court noted that the TCPA was enacted, in part, in response to claims by several states that efforts to curb unsolicited facsimile messages were being thwarted by the simple fact that many of these messages were traveling in interstate commerce, an area the States designated to be regulated by Congress in ratifying the U.S. Constitution. The Court then acknowledged the role of the Supremacy Clause in our constitutional structure. After expressing concern that Congress not impermissively usurp state resources as prohibited by New York v. United States, 505 U.S. 144 (1992), the Court stated any potential conflict was avoided by allowing states to affirmatively deny access to its courts for the private prosecution of TCPA claims.

This reasoning is persuasive to this Court. This, as the Court noted, strikes a balance between the right of Congress to regulate interstate commerce and the state's right to allocate its resources to problems it deems necessary and important. The TCPA only encourages state participation in Congress' regulatory scheme. Local officials, accountable to their electors, make the decisions as to state priorities. This also recognizes the role of the Supremacy Clause in our dual sovereign form of government.

Thus, this Court finds no prohibition to the maintenance of a private right of action for violation of the TCPA in state courts because Illinois has not acted to decline jurisdiction over these matters.

IV.    CONVERSION

The Defendants have filed a Motion to Dismiss the counts of Plaintiffs' consolidated complaint alleging conversion pursuant to Section 2-615 of the Code of

13

Civil Procedure, 735 ILCS 5/2-615.  A Section 2-615 motion to dismiss attacks the sufficiency of the complaint, and this Court should decide the motion only on the allegations set forth in the complaint. Schwanke, Schwanke and Assoc. v. Martin, 241 Ill. App. 3d 738, 744 (1st Dist. 1992).  All well-pleaded facts in the complaint must be taken as true with all inferences from it to be drawn in favor of the non-movant. Curtis Casket Co. v. D. A. Brown, 259 Ill. App. 3d 800, 804 (1st Dist.1999).  This Court accepts as true all well-pleaded facts, but does not need to accept conclusions or inferences which are not supported by specific factual allegations.

In their complaint, the Plaintiffs allege that the Defendants sent telephone facsimile messages to the Plaintiffs without obtaining prior permission.  The complaint further alleges, prior to the initiation of the transmission, that each plaintiff had purchased paper and toner for their respective use and had an immediate right to the possession and use of these items.  Plaintiffs further allege that the receipt of the unsolicited facsimile message resulted in the unauthorized use of toner and paper by the defendants which rendered these items unusable by the Plaintiffs.

To sufficiently allege conversion a plaintiff must allege: 1) the defendant's unauthorized and wrongful act of control, dominion or ownership over the plaintiff's personal property; 2) the plaintiff's right in the property; 3) the plaintiff's right to immediate possession of the property, absolutely and unconditionally; and, 4) the plaintiff's demand for possession of the property. Roderick Development Investment Company, Inc. v. Community Bank of Edgewater, 282 Ill. App. 3d 1052 (1996).  The complaint seeks actual and punitive damages as well as an injunction against future acts of conversion.

At the outset, it must be noted that the complaint does not allege conversion of the Plaintiff's fax machine, only its paper and toner.  Thus, cases such as Omnibus International, Inc. v. AT & T, 2002 Tex. App. LEXIS 8234 (TX. App. 2002) are inapposite.  Moreover, this case remains an unpublished opinion, and under Texas Law it cannot be cited as authority.

The Plaintiffs have pled facts alleging each element of conversion.  As observed earlier in this opinion, the use of a facsimile machine for the distribution of printed material shifts the recipient of the materials into the role of printer.  This imposes all of

14

the attendant costs on an unwilling recipient. This is sufficient to allege the first three elements of the tort.

The final element, however, has not been alleged. This element is unnecessary when there is another independent act of conversion that can be shown. Jensen v. Chicago and Western Indiana R. R. Co., 94 Ill. App. 3d 915, 933 (1981). The allegations and reasonable inferences clearly indicate that the paper and toner had been consumed in the process of printing the advertisements sent by or on behalf of the Defendants.

Therefore, the Court finds there are sufficient allegations to state a claim for conversion.

The Defendants assert that not withstanding the existence of a properly pled claim, any damages suffered by the proposed class representative are so inconsequential that no claim should be recognized. They opine that the cost incurred by the receipt of an individual facsimile message, including paper, is no more than eight cents.

Initially, the Court must recognize that the doctrine of *de minimus non curat lex* is usually confined to matters involving an alleged breach of contract. It is applied to avoid finding a breach where the harm caused is so slight or the damages nominal. Pacini v. Regopoulous, 281 Ill. App. 3d 274, 279 (1996). This Court also agrees that much, if not all, of the Plaintiff's arguments and citations do not speak to the relevant issues. Having made these observations, however, this Court is compelled to deny the Motion to Dismiss.

Illinois and other jurisdictions recognize that where a party has established an infringement of a right, damages are presumed. Ainsworth v. Century Supply Co., 295 Ill. App. 3d 644, 649-650 (1998). This entitles a plaintiff to an award of nominal damages. In Ainsworth, the plaintiff was depicted in an advertisement for the commercial availability of floor covering products and supplies from the defendant. The use of plaintiff's likeness was unauthorized. In his deposition, the plaintiff testified that he was angered to see the commercial. In reversing the grant of summary judgment, the Court held that the plaintiff was entitled to an award of nominal damages, perhaps even the value achieved by Century by taking his image for their use. Ainsworth, 295 Ill. App. 3d at 650. This presumption also arises where, as here, the claim is an intentional tort. Crosby v. City of Chicago, 11 Ill. App. 3d 625, 630 (1973).

15

With respect to injunctive relief, the Plaintiffs, however, have not shown their lack of an adequate remedy at law. The Plaintiffs can seek damages under this theory as well as the TCPA, hence, their claim for injunctive relief is dismissed with prejudice.

Similarly, the Plaintiffs claim for punitive damages is not supported by well-pled facts. There are no allegations of fraud, actual malice, gross negligence or willfulness, beyond that to state a claim for conversion. Cirrincione v. Johnson, 184 Ill. 2d 109, 115-16 (1988). Moreover, absent some proof of activity undertaken to inundate a particular recipient with telephone facsimile messages, this Court doubts that such a claim will ever lie. In making this statement, the Court has considered the volume of messages modern technology permits. Nevertheless, discovery may lead to the discovery of facts that will make such a claim viable. Thus, subject to a Motion to Amend Pleadings, the claim for punitive damages is dismissed without prejudice.

### V.    ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICE ACT

The defendants have filed a Motion to Dismiss the count seeking relief under the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") pursuant to Section 2-615 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-615. They advance three arguments in support of their Motion. First, they argue that these are insufficient factual allegations to support a claim that damages were proximately caused by the Defendants action. In addition, they assert that the factual allegations are insufficient to support a claim that the defendants engaged in "deceptive" or "unfair" conduct prohibited by the ICFA. Finally, they note that any statutes alleged to be violated by their conduct does not support a "per se" violation of ICFA. The Court will analyze these arguments in the order perceived to be most useful.

Initially, it should be observed that the parties agree there are no allegations of deceptive practices. Thus, in order to establish a claim, the Plaintiffs must allege ultimate facts that show the Defendants engaged in unfair practices. In Robinson v. Toyota Motor Credit Corporation, 201 Ill. 2d 403 (2002), our Supreme Court discussed the elements of such a claim. ICFA is a regulatory remedial statute designed to protect consumers against unfair business practices and is to be liberally construed to effectuate its purpose. Cripe v. Leiter, 184 Ill. 2d 185, 191 (1998).

16

In Robinson, the Court defined the elements of an unfair business practice. In essence, the Court adopted the three-part test cited with approval in F.T.C. v. Sperry & Hutchinson Co., 405 U.S. 233 (1972). Therefore, in order to measure whether a business practice is unfair, a court must consider the following factors: 1) whether the practice offends public policy; 2) whether it is immoral, unethical, oppressive or unscrupulous; and 3) whether it causes substantial injury to consumers. Robinson, 201 Ill. 2d at 417-418. The Court also noted that all three factors need not be met. Rather, the Court adopted the reasoning of the Connecticut Supreme Court in Chesire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 106 (1992). That Court, in a case involving "loan churning" observed that all three criteria need not be satisfied in order to support a finding of unfairness. Rather, a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. Chesire, 223 Conn. at 106.

As the claim is brought under ICFA, the complaint must allege with particularity and specificity the unfair business practices of the defendants. Connick v. Suzuki Motor Co., 174 Ill. 2d 482, 502 (1996). The Plaintiffs fail to recognize that in a Section 2-615 Motion, the complaint must stand on its own, thus, reference to citations issued by the FCC, reports or hearings are not relevant to the issues and will not be considered in resolving this Motion.

The well-pled facts, taken as true for purposes of this Motion, are set out above. There is no question that transmitting unsolicited telephone facsimile advertisements violates public policy. First, the Criminal Code of 1961, as amended, prohibits this activity. See, 720 ILCS 5/26-3. Knowledge is defined by the Code in Section 5/4-5. A person acts knowingly when he is consciously aware that a result is practically certain to be caused by his conduct. 720 ILCS 5/4-5(b). There can be no question than any individual who causes a telephone facsimile transmission to occur acts knowingly. In addition, the failure of Illinois to "opt out" of the private enforcement of the TCFA suggests that this Act is the public policy of Illinois as well.

The Plaintiffs allege the conduct is oppressive, yet they allege only one or two facsimile transactions to each Plaintiff. This, by inference, suggests minimal disruption of one's business or occupation. The exhibits to the complaint show each plaintiff had a

17

reasonable alternative to the receipt of additional messages. They could call to remove themselves from the list. This conduct does not rise to the level of oppression envisioned by the drafters of ICFA.

The final factor requires the allegation of substantial injury to the consumer. In discussing the count alleging conversion, the Court indicated the doctrine of *de minimus non curat lex* had no application in this matter. A complete review of the movants' authorities confirms this position. No case cited involved a tort claim. They involved complaints of short redemption deposits in foreclosure cases, errors in summing damages, or computing interest. The Court acknowledges that the Plaintiff's are not entitled to receive nominal or presumed damages in a claim under ICFA. Duran v. Leslie Oldsmobile, Inc., 229 Ill. App. 3d 1032, 1041 (1992). There are no facts from which the Court can determine the amount of damages incurred by the suggested class plaintiff or consumers as a whole. The term "substantial" is clearly a conclusion.

Thus, evidence of only one of the Robinson factors are found in the Plaintiff's complaint. This Court concludes that the Plaintiff has not stated a claim under ICFA. In reaching this decision, the Court recognizes that the failure to include Illinois' prohibition against unsolicited telephone facsimile transmissions in Section 2Z of ICFA (815 ILCS 505/2Z, also prevents a finding of a per se violation of ICFA. Illinois ex rel. Daley v. Grady, 192 Ill. App. 3d 330, 332 (1989).

Therefore, the Count of the Complaint alleging a violation of the Illinois Consumer Fraud and Deceptive Practices Act is Dismissed.

Finally, this Court feels constrained to remark about post-argument activities of the attorneys. It is clearly within the requirements of the Illinois Rules of Professional Conduct to advise the Court of any change of law used in party's argument prior to the Court's decision on the matter. RPC 3.3. The lawyers are to be commended for their action in this regard.

However, this Court seriously doubts that the obligations imposed by that Rule grant counsel a license to present a thirty-plus page brief supporting a clients' position after arguments were closed. If the need arose, a proper motion to re-open arguments would be appropriate.

18

This Court, while troubled by the tactic, will regard it as overzealous advocacy and has returned the unsolicited but permitted telephone facsimile transmission as well as the correspondence to counsel unopened and unread.

VI.    ORDER

A.  The Motions to Dismiss the Count of the Consolidated Complaint alleging a violation of the TCPA is denied;

B.  The Motion to Dismiss the Count of the Consolidated Complaint alleging Conversion is denied;

C.  The Count of the Consolidated Complaint alleging a violation of ICFA is dismissed; the Plaintiffs are given 28 days to file an amended complaint;

D.  The Defendants shall file answer to the Counts alleging violation of the TCPA and conversion within 28 days;

E.  The matter is scheduled for case management conference on May 12, 2003 at 2:30 p.m.

## ENTERED

APR 03 2003

DATED:_____    ENTERED:_____
JUDGE
PATRICK McGANN - 1517
                                    Judge                    1510

19

## EXHIBIT A

### DEFENDANTS JOINING IN
### CONSOLIDATED MOTIONS TO DISMISS IN RELATED TCPA CASES

| | |
|---|---|
| 02 CH 1189 | Goldberg v. Wall Street Alert |
| 02 CH 6332 | Whiting Corp v. MSI, Y2K Marketing |
| 02 CH 6335 | Whiting Corp v. PageComm of Illinois |
| 02 CH 6336 | Whiting Corp v. Fax.Com, Inc. |
| 02 CH 6905 | Bernstein v. American Family & Bezanis |
| 02 CH 6908 | Bernstein v. Fax.Com, Inc. |
| 02 CH 7687 | Whiting Corp v. Lucas Associates |
| 02 CH 7745 | Construction v. Gersten Financial |
| 02 CH 7748 | Construction Consulting Grp v. Qwest Communications,Inc. |
| 02 CH 7824 | Construction v. PageComm of Illinois |
| 02 CH 7827 | Construction v. Superior Marketing |
| 02 CH 8362 | Phillips v. Consolidate Steel Supp |
| | (not joining in conversion motion because no conversion count alleged Consolidated Steel & Supply Co.) |
| 02 CH 8364 | Phillips v. Midco, Inc. |
| 02 CH 8641 | Elliot-Dunne v. Judicial Attorney Service |
| 02 CH 8714 | Martin v. Onstaff, Inc. |
| 02 CH 10491 | Elliot-Dunne v. Voicestream Wireless |
| 02 CH 10852 | Elliot-Dunne v. Spradling |
| 02 CH 10890 | Schlosser v. MSI Marketing |
| 02 CH 10919 | Brill v. Johnson |

# TAB 5

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1563162 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

C
Garrett v. RentGrow, Inc.
N.D.Ill.,2005.
Only the Westlaw citation is currently
available.
United States District Court,N.D. Illinois,
Eastern Division.
Melissa GARRETT, Plaintiff,
v.
RENTGROW, INC. and Apartment Invest-
ment Management Company, Defendants.
No. 04 C 8309.

July 1, 2005.

Michael Jonathan Nachsin, Jonathan
Nachsin, P.C., Chicago, IL, for Plaintiff.
Stephen P. Durchslag, Ronald Y.
Rothstein, Samuel S. Park, Winston &
Strawn, Edwin L. Durham, Darnella J.
Ward, Rachlis, Durham, Duff & Adler,
Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

MAROVICH, J.
   *1 Plaintiff Melissa Garrett ("Garrett")
filed a three-count complaint against de-
fendants RentGrow, Inc. ("RentGrow") and
Apartment Investment and Management
Company ("AIMCO"). In Counts I and I of
her complaint, Garrett asserts that Rent-
Grow violated the Fair Credit Reporting
Act, 15 U.S.C. § 1681, and the Illinois
Consumer Fraud and Deceptive Business
Practices Act ("Illinois Consumer Fraud
Act" or "ICFA"), 815 ILCS § 505/2. In
Count III, Garrett asserts that AIMCO viol-
ated the Illinois Consumer Fraud Act. De-
fendant AIMCO moves pursuant to Rule
12(b)(6) of the Federal Rules of Civil Pro-
cedure for an order dismissing plaintiff's
claim against it. For the reasons set forth
below, the Court grants AIMCO's motion

to dismiss.

I. *Background*

   For purposes of this motion to dismiss,
the Court takes as true the allegations in
the complaint. As alleged in the complaint,
the relevant facts are as follows. AIMCO, a
corporation organized as a real estate in-
vestment trust, is a substantial owner/op-
erator of apartment properties throughout
the United States. AIMCO managed, and
may also have owned, a federally-subsid-
ized apartment complex commonly known
as Continental Plaza Apartments
("Continental"). Continental's management
subscribed to and utilized an information
service provided by RentGrow, a corpora-
tion engaged in tenant screening for own-
ers and/or managers of multifamily apart-
ment buildings. RentGrow compiles ten-
ancy history data, including incidents, evic-
tions, etc., on individuals seeking apart-
ments, at the request of owners and/or
managers of such apartments.

   Garrett was interested in living in an
apartment at the Continental. It offered bet-
ter living conditions, security and mainten-
ance than the apartment in which she was
then living. Also, because units at the Con-
tinental were federally subsidized, living
there would have reduced her rent and util-
ity expenses. Thus, in 2003, Garrett applied
and was wait-listed for an apartment at
Continental.

   In early August 2003, Continental's
management pulled Garrett's application
from the waiting list and sent her a letter
indicating that she need only complete the
application process at Continental to secure
an apartment. After Garrett completed her

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1563162 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

application, Continental's management obtained a report from RentGrow. The RentGrow report stated that an eviction judgment had been entered against Garrett in Kankakee, Illinois in December 2002. Continental's management then sent Garrett a letter, dated August 20, 2003, rejecting her application for an apartment in the building.

Garrett maintains that Continental's rejection of her application was based solely on this RentGrow report. Garrett alleges that Continental stated "previous landlord history" as the cause for her denial in the August 20th letter, as well as in a subsequent conversation she initiated with Continental's management. According to Garrett, during this conversation, a representative of Continental's management told her that the "previous landlord history" consisted solely of the Kankakee eviction detailed in the RentGrow report.

*2 After receiving the August 20th rejection letter, Garrett informed RentGrow that she never resided at the property listed in the Kankakee case and was never sued for eviction from that property. Garrett claims that she then provided RentGrow with evidence supporting her position and contradicting the information detailed in its report. This evidence indicated that she resided in Chicago at the time in which she is claimed to have been evicted from the Kankakee property. Garrett maintains that RentGrow did not change its report on her and that Continental's management continued to rely on the tenancy history provided by RentGrow despite her objections to its accuracy.

Ultimately, Garrett was unable to obtain an apartment at the Continental complex. Garrett asserts that AIMCO committed an unfair practice, in violation of the

Illinois Consumer Fraud Act, by refusing to re-examine or reverse its denial of her application after she had demonstrated that the basis for denial was inaccurate.

## II. *Standard on a motion to dismiss*

The Court may dismiss claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure where the plaintiff fails "to state a claim upon which relief can be granted."Fed.R.Civ.P. 12(b)(6). The purpose of a motion to dismiss under this Rule is to test the sufficiency of the complaint, not to rule on its merits. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In considering a motion to dismiss, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *McCullah v. Gadert,* 344 F.3d 655, 657 (7th Cir.2003). On a motion to dismiss, the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."*Cole v. U.S. Capital, Inc.,* 389 F.3d 719, 724 (7th Cir.2004) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

## III. *Discussion*

In support of its motion to dismiss, AIMCO first argues that the plaintiff does not adequately plead an Illinois Consumer Fraud Act claim in that she fails to allege an unfair practice. Next, AIMCO argues that the plaintiff fails to allege intent.

The Illinois Consumer Fraud Act is a "regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices."*Robinson v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1563162 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

*Toyota Motor Credit Corp.,* 201 Ill.2d 403, 416-417, 266 Ill.Dec. 879, 775 N.E.2d 951 (Ill.2002). Specifically, chapter two of the Act prohibits unfair methods of competition and unfair or deceptive acts or practices used or employed in the conduct of any trade or commerce. 815 ILCS § 505/2.

To successfully state a claim under the Illinois Consumer Fraud Act, a plaintiff must allege: (1) a deceptive act or unfair practice by the defendant; (2) that the defendant intended that the plaintiff rely on that act or practice, or intent by the defendant to deceive, defraud, or be unfair to the plaintiff; (3) that the deception or unfair practice occurred in the course of conduct involving trade and commerce; and (4) that the deceptive act or unfair practice proximately caused the plaintiff's injury. *Jenkins v. Mercantile Mortgage Co.,* 231 F.Supp.2d 737, 747 (N.D.Ill.2002); *Krause v. GE Capital Mortgage Servs., Inc.,* 314 Ill.App.3d 376, 246 Ill.Dec. 774, 731 N.E.2d 302, 311 (2000).

**A. Failure to allege an unfair practice**

**\*3** An act or practice is "unfair" under the Illinois Consumer Fraud Act if (1) the practice, without having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise; (2) it is immoral, unethical, oppressive, or unscrupulous; (3) it causes substantial injury to consumers ("*Robinson* factors").*Robinson v. Toyota Motor Credit Corp.,* 201 Ill.2d 403, 417-18, 266 Ill.Dec. 879, 775 N.E.2d 951, 960-61 (2002). The Illinois Supreme Court has explained that "all three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or to a lesser extent it meets

all three."*Robinson,* 201 Ill.2d at 418, 266 Ill.Dec. 879, 775 N.E.2d 951 (citing *Cheshire Mortgage Services, Inc. v. Montes,* 223 Conn. 80, 106, 612 A.2d 1130, 1143-44 (1992)).

In this case, Garrett asserts that AIMCO's conduct constituted an unfair practice. Specifically, Garrett claims that the refusal of Continental's management to re-examine or reverse its denial of her application constituted such an unfair practice. Although AIMCO, through Continental management, controlled the success of Garrett's application, AIMCO's refusal to re-examine or reverse its denial does not support an unfair practice claim because it does not satisfy the *Robinson* factors for measuring unfairness.

**1. Offends public policy**

A practice, without having been previously considered unlawful, offends public policy if it violates a standard of conduct set out by an existing statute or common law doctrine that typically governs such situations. *See, e.g., Robinson,* 201 Ill.2d at 421, 266 Ill.Dec. 879, 775 N.E.2d 951 (finding no offense to public policy in Toyota's leasing charge disclosure practices because they met the standards set out by the Truth in Lending Act); *Carroll v. Butterfield Health Care, Inc.,* 2003 U.S. Dist. LEXIS 19287, at \*9 (N.D.Ill. Oct. 29, 2003) (finding no offense to public policy in nursing home's personal guarantee of payment for admission requirement despite its prohibition by Medicaid Act because Act did not provide for private right of action); *Ekl v. Knecht,* 223 Ill.App.3d 234, 165 Ill.Dec. 760, 585 N.E.2d 156, 163 (1991) (finding a plumber's practice of demanding unreasonable payments and threatening to undo repairs after commen-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 1563162 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

cing work offended common law doctrine governing contracts formed under duress and coercion).

In this case, AIMCO's conduct does not offend public policy. Unlike *Robinson* and *Carroll*, Garrett fails to point to any established statute or common law doctrine regarding the evaluation of apartment rental applicants or the utilization of information services in making rental determinations. Accordingly, the alleged conduct does not satisfy the first of the *Robinson* factors. Thus, AIMCO's practice does not offend public policy as considered in measuring unfairness.

### 2. Is immoral, unethical, oppressive or unscrupulous

A practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer. *See, e.g., Robinson*, 201 Ill.2d at 419-20, 266 Ill.Dec. 879, 775 N.E.2d 951 (finding no immoral or oppressive conduct based on plaintiff's ability to lease a car from another provider and the reasonableness of incremental fees included in pricing); *Ekl*, 165 Ill.Dec. 760, 585 N.E.2d at 163 (finding that plumber's threats to stop work, undo work already completed, and turn off plaintiffs' water if not paid an "outrageous" fee was oppressive, unscrupulous and coercive because of plaintiffs' lack of choice and the unreasonableness of charges).

*4 In this case, AIMCO's conduct does not constitute immoral, unethical, oppressive, or unscrupulous behavior. Like *Robinson*, there is no oppressive or unscrupulous conduct involved because Garrett could have sought subsidized housing elsewhere.

Although the Continental represented Garrett's ideal, Garrett does not allege that there was an utter lack of meaningful choice or any coercion which forced her to seek an apartment only in the Continental. Thus, plaintiff fails to allege immoral, unethical, oppressive, or unscrupulous conduct.

### 3. Causes substantial injury to consumers

A practice causes substantial injury to consumers if it causes significant harm to the plaintiff and has the potential to cause injury to a large number of consumers. *See, e.g., Carroll*, 2003 U.S. Dist. LEXIS 19287, at *9-10 (finding plaintiff's injury of garnished wages to settle personal guarantee not substantial enough); *Ekl*, 165 Ill.Dec. 760, 585 N.E.2d at 163 (plumber's threats to stop and undo work if he was not paid a large fee caused plaintiffs substantial injury because (a) they were deprived of bargaining power and forced to pay an unreasonable incremental amount, and (b) it could cause similar substantial injury to other consumers).

In this case, AIMCO's conduct does not and would not cause substantial injury to consumers. AIMCO's reliance on information provided by RentGrow and decision not to review candidates' individual tenancy histories does not cause substantial injury to consumers generally because it relates only to those few consumers who have potentially errant information in their reports. Unlike *Ekl*, where the plumber could extract excessive fees in any similar situation, AIMCO's practice would only apply to a small subset of applicants who disputed an entry in their records. Thus, plaintiff has failed to allege conduct which causes substantial injury to consumers.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 5
Not Reported in F.Supp.2d, 2005 WL 1563162 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Because Garrett fails to allege an "unfair practice," the Court concludes that Garrett does not state a claim under the *Illinois Consumer Fraud Act* against AIMCO.

### B. Failure to allege intent

Additionally, even if Garrett's allegations against AIMCO met the criteria of an unfair practice, she must still allege the second prong of an ICFA claim, intent. To satisfy this requirement, a plaintiff must allege either intent by the defendant that the plaintiff rely on that act or practice, or intent by the defendant to deceive, defraud, or be unfair to the plaintiff. *Krause,* 246 Ill.Dec. 774, 731 N.E.2d at 311.

In this case, Garrett fails to allege that AIMCO had an intent to deceive, defraud, or be unfair to her. In fact, Garrett does not even allege that AIMCO knew that the information contained in the RentGrow report was inaccurate. Accordingly, Garrett fails to state a claim under the Illinois Consumer Fraud Act.

### IV. *Conclusion*

For the reasons set forth above, the Court grants AIMCO's motion to dismiss Count III, plaintiff's only claim against it. Plaintiff's third count against defendant AIMCO is dismissed without prejudice, and plaintiff is granted 28 days to file an amended complaint.

N.D.Ill.,2005.
Garrett v. RentGrow, Inc.
Not Reported in F.Supp.2d, 2005 WL 1563162 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

Westlaw.

Not Reported in N.E.2d                                                              Page 1
Not Reported in N.E.2d, 2004 WL 3135348 (Ill.Cir.)
(Cite as: Not Reported in N.E.2d)

▷
Kim v. Sussman
Ill.Cir.,2004.
    Only the Westlaw citation is currently
    available.Ben H. KIM, Plaintiff,
                    v.
        Jay SUSSMAN, Defendants.
            No. 03 CH 07663.

              Oct. 19, 2004.

                ORDER

MASON, J.
    *1 This matter comes before the Court
on plaintiff Ben Kim's, motion for class
certification. Plaintiff brought this action
after receiving an unsolicited facsimile
transmission from the defendant, Jay Suss-
man. Defendant's solicitation was sent
through a Canadian entity, Canafax. The
complaint contains three counts. Count I
alleges that defendant violated the Tele-
phone Consumer Protection Act, 47 U.S.C.
§ 227 ("TCPA"), by sending unsolicited
facsimile transmissions without the recipi-
ent's "express invitation or permission."
Count II alleges that defendant committed
the tort of conversion by using plaintiff's
paper and toner to print the facsimile trans-
mission. Finally, Count III alleges that de-
fendant violated the Illinois Consumer
Fraud Act, 815 ILCS 505/2 ("ICFA"), in
that defendant's fax solicitation constituted
an unfair business practice.

    The focus of the parties' arguments re-
lating to class certification has been
plaintiff's TCPA claim in view of the fact
that Congress expressly designed the
TCPA to remedy the harm caused by re-
ceiving unsolicited faxes. The TCPA, en-
acted in 1991, was intended to address the

nuisance posed to individuals and busi-
nesses by the receipt of unsolicited fax
transmissions. The law prohibits the use of
"any telephone facsimile machine com-
puter, or other device to send an unsoli-
cited advertisement to a telephone facsim-
ile machine"47 U.S.C. § 227(b)(1)(c). The
statute further creates a private right of ac-
tion allowing a "person or entity" to bring
an action in state court for injunctive and
monetary relief. Recoverable damages are
the actual monetary loss as a result of the
violation or $500 per violation, whichever
is greater, and if the Court finds a willful or
knowing violation of the statute, the court
may increase the award up to $1500 per vi-
olation. Id. at (b)(2)(c)(3).

    The TCPA further vests exclusive juris-
diction in federal courts over actions by the
various state attorneys general alleging that
any person has engaged in repeated viola-
tions of the Act and authorizes injunctive
and monetary relief in the amounts
provided for individual violations. In com-
menting on the TCPA, Senator Ernest
Hollings stated: "Small claims court or a
similar court would allow the consumer to
appear before the court without an attor-
ney. The amount of damages in this legis-
lation is set to be fair to both the consumer
and the telemarketer."137 Cong. Rec.
S16205 (November 7, 1991). It is in this
context that the Court evaluates plaintiff's
motion to certify a class of all persons who
received unsolicited faxes from defendant.

    Pursuant to Section 2-801 of the Illinois
Code of Civil Procedure, 735 ILCS
5/2-801, plaintiff must satisfy four pre-
requisites for maintenance of a class ac-
tion: (1) the class is so numerous that join-
der of all members is impracticable, (2)
questions of fact or law common to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 2004 WL 3135348 (Ill.Cir.)
(Cite as: Not Reported in N.E.2d)

class predominate over individual issues; (3) there exists adequate representation for the class; and (4) a class action is an appropriate method for the fair and efficient adjudication of the controversy. Of the foregoing prerequisites, defendant contests the first, second, and fourth. Adequacy of representation is undisputed.

*2 Defendant disputes that "the class is so numerous that joinder of all members is impracticable" and that questions common to the class predominate over individual issues. Although there is no bright line test to determine numerosity, the Illinois courts generally follow the reasoning that greater than 40 parties satisfies numerosity, but less than 25 people is insufficient. *Wood River Area Development Corp. v. Germania Federal Savings and Loan Ass'n,* 198 Ill.App.3d 445, 449-50, 144 Ill.Dec. 631, 555 N.E.2d 1150 (5th Dist.1990). In this case, plaintiff has identified six fax recipients, two of whom purchased policies of insurance from the defendant after receiving the solicitation. At the hearing on plaintiff's motion, plaintiff's counsel represented that approximately ten more recipients had been identified. Plaintiff contends that the Court can infer the number of class members from the cost of the fax. Plaintiff extrapolates that based on a total payment by defendant of $1527.04, and an estimated cost of $0.10 per transmission, approximately 15,270 faxes were sent. However, although this action has been pending for over one year, plaintiff has failed to take the obvious steps to provide a reasonable estimate of the number of class members, such as obtaining information from Canafax (the company that actually transmitted the solicitation) as to the number of faxes actually sent. The Court questions whether reliance on estimates is justified given the availability of discovery methods that would enable the numerosity issue to be precisely determined. As to the predominance factor, several courts have concluded, in the context of a motion for class certification under the TCPA, that individual issues, including each individual class member's burden to demonstrate that the transmission in question was unsolicited, preclude class certification. See *Kondos v. Lincoln Prop. Co.,* 110 S.W.3d 716, 721-22 (Tex.Ct.App.2003); *Livingston v. U.S. Bank, N.A.,* 58 P.3d 1088, 1090-91 (Colo.Ct.App.2002); *Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 403-04 (E.D.Pa.1995). The Court finds the reasoning of these authorities persuasive, but notes that there exist other authorities supporting plaintiff's position. See *Kaufman v. ACS Systems, Inc.,* 110 Cal.App. 4th 886, 110 Cal.App.4th 886, 2 Cal.Rptr.3d 296, 328 (2003); *Nicholson v. Hooters of August, Inc.,* 245 Ga.App. 363, 537 S.E.2d 468 (2000).

Yet, even if the Court were to find in plaintiff's favor on the numerosity and predominance issues, class certification would nevertheless be denied. Given the statutory framework of plaintiff's claims, the Court strongly believes that a class action is not an appropriate method for the "fair and efficient" adjudication of this controversy. As noted above, in enacting the TCPA, Congress expressly struck a balance that was designed to be fair both to the recipient and the sender of the facsimile. Congress believed that allowing an individual to file an action in small claims court to redress the nuisance of unsolicited faxes and to recover a minimum of $500 in damages was an adequate incentive to address what is at most, a minor intrusion into an individual's daily life. Congress added harsher penalties for chronic or willful violators in the form of actions in federal court by the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                    Page 3
Not Reported in N.E.2d, 2004 WL 3135348 (Ill.Cir.)
(Cite as: Not Reported in N.E.2d)

various state attorneys general, in which the potential for substantial award of damages exists. To engraft on this statutory scheme the possibility of private class actions, with potential recoveries in the millions of dollars, strikes the Court as unfair given the nature of the harm Congress attempted to redress in the TCPA.

*3 Furthermore, certification of a class in this case poses several administrative problems, not the least of which is that in order to notify absent class members of the pendency of this action, another "unsolicited" facsimile transmission will have to be sent. This is because the only practical way of identifying potential class members would be to use the same transmission list (if it still exists) that Canafax used in sending out the original solicitation. Although such a transmission, not constituting an advertisement, does not fall within the parameters of the TCPA's prohibitions, the irony of sending out what plaintiff estimates will be 15,000 facsimiles to notify class members of their inclusion in a class in this case is inescapable. In addition, the one-page transmission from defendant was sent well over one year ago. The likelihood that anyone to whom notice of the pendency of this case was sent would recall receipt of defendant's solicitation, much less have retained a copy, is remote, at best. Therefore, the only potential, albeit indirect, corroboration for any given claim would be the fact that the recipient's fax number matches one on the Canafax list. In effect, by certifying a class in this case, the Court would be sanctioning the dedication of substantial judicial and administrative resources to the identification and compensation of a class of persons who, in all likelihood, immediately discarded the offending transmission and were not sufficiently annoyed by it to pursue the

virtually guaranteed remedy provided to them under the TCPA.

Analyzing plaintiff's motion for class certification in the context of his other claims for conversion and violation of the Illinois Consumer Fraud Act yields no different result. Unlike the TCPA, a plaintiff claiming conversion or a violation of the Consumer Fraud Act is limited to recovering actual damages. The "actual" damages suffered by members of the putative class, assuming, in fact, that defendant converted the paper and toner necessary to print the offending solicitation or engaged in an "unfair" business practice, are miniscule, i.e., pennies per plaintiff. See Hayna v. Arby's Inc., 99 Ill.App.3d 700, 55 Ill.Dec. 1, 425 N.E.2d 1174 (1st Dist.1981). The wisdom of certifying a class to redress such deminimis claims has been questioned. See Rudgayzer & Gratt v. LRS Communications, Inc., 3 Misc.3d 159, 776 N.Y.S.2d 158 (N.Y.Civ.Ct.2003). Particularly where, as here, Congress has designed a statutory scheme to "incentivize" the holder of such a claim to file suit, the necessity of invoking a class action to redress these alternative claims is diminished.

The denial of class certification in this case does not leave plaintiff without a remedy-the remedy designed by Congress to address this nuisance. Assuming that the 16 or so individuals plaintiff has identified pursue their claims and are each awarded the minimum $500 per violation, it will have cost defendant over $9500 for his violation of the TCPA-the $1527 he originally paid Canafax plus $8000 for the plaintiffs who complained of the unsolicited advertisement. Such a sum is clearly sufficient to punish past and discourage future violations of the Act. On the other hand, certifying a class threatens to impose

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                    Page 4
Not Reported in N.E.2d, 2004 WL 3135348 (Ill.Cir.)
**(Cite as: Not Reported in N.E.2d)**

on defendant a virtually automatic liability to thousands of individuals in a sum that dwarfs the magnitude of the harm involved. Congress clearly did not intend to cripple individuals and entities using broadcast facsimile transmissions to solicit business.[FN1] Instead, it devised a streamlined remedy designed to be "fair" to both the recipient and the sender of the fax. To certify a class under these circumstances would upset that balance.

> FN1. It is no answer, as plaintiff suggests, that defendant's insurance carrier may ultimately be obligated to cover the amount of the judgment in this case. The availability of insurance for a particular claim does not enter into the analysis of whether a class action is the appropriate method for adjudication of the controversy. Further, the possibility of passing the loss on to another entity that could, in turn, raise premiums, draft exclusions or decline future coverage altogether has its own ramifications which counsel against class certification in this case.

*4 For the foregoing reasons, plaintiff's motion for class certification is denied.

Ill.Cir.,2004.
Kim v. Sussman
Not Reported in N.E.2d, 2004 WL 3135348 (Ill.Cir.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.