## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| R. RUDNICK & CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 08 C 1856 |
| v. | ) | |
| | ) | Judge Gottschall |
| GF PROTECTION INC., | ) | |
| d/b/a GUARDIAN FALL PROTECTION, | ) | Magistrate Judge Brown |
| and JOHN DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
### MOTION TO DISMISS COUNTS II AND III OF PLAINTIFF'S COMPLAINT

Plaintiff R. Rudnick & Co. respectfully submits this response in opposition to defendant GF Protection Inc. d/b/a Guardian Fall Protection's ("GF") motion to dismiss Counts II (Illinois Consumer Fraud Act, 815 ILCS 505/2, "ICFA") and III (common law conversion) of plaintiff's complaint.

## I.      INTRODUCTION.

Plaintiff R. Rudnick & Co. filed a complaint against GF Protection Inc. d/b/a Guardian Fall Protection's ("GF") for its actions in sending or causing the sending of unsolicited advertisements to telephone facsimile machines in violation of the Telephone Consumer Protection Act, 47 U.S.C. §227 ("TCPA"), the Illinois Consumer Fraud Act, 815 ILCS 505/2 ("ICFA"), and the common law (conversion).  Defendant has moved to dismiss arguing that the ICFA and common law counts were insufficiently pled.  Similar motions were denied by Judge Pallmeyer in Centerline Equipment Corp. v. Banner Personnel Service, Inc., 07 C 1611, 2008

U.S. Dist. LEXIS 15946 (N.D. Ill. March 3, 2008); Judge Hibbler in <u>Pollack v. Cunningham</u>

<u>Financial Group, LLC</u>, 08 C 1405 (N.D. Ill. June 2, 2008) (slip opinion); and Judge Aspen in

<u>Sadowski v. Med1Online, LLC</u>, 07 C 2973, 2008 U.S. Dist. LEXIS 41766 (N.D. Ill. May 27,

2008).

## II.    PLAINTIFF HAS PROPERLY STATED A CLAIM FOR UNFAIR PRACTICES IN VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT.

Defendant asserts that the transmission of facsimile advertisements does not

constitute an "unfair practice" under the ICFA.  (Def. Memo., p. 4) The ICFA prohibits "unfair"

as well as "deceptive" acts and practices. In determining whether an act or practice is "unfair,"

both federal and state law consider:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise  --  whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness;
>
> (2) whether it is immoral, unethical, oppressive or unscrupulous;
>
> (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

<u>FTC v. Sperry & Hutchinson Co.</u>, 405 U.S. at 244-45 n. 5; <u>Robinson v. Toyota Motor Credit</u>

<u>Corp.</u>, 201 Ill.2d 403, 775 N.E.2d 951 (2002).  <u>Robinson</u> made clear, that the ICFA is violated

by unfair acts and practices that are not also deceptive.

Furthermore,  "All three [<u>Sperry</u>] criteria do not need to be satisfied to support a

finding of unfairness.  A practice may be unfair because of the degree to which it meets one of

the criteria or because to a lesser extent it meets all three." <u>Robinson</u>.  Plaintiff has a valid claim

under <u>Robinson</u>.

Defendant argues that ICFA §2Z, 815 ILCS 505/2Z,  imposes a limitation on the

general prohibition of "unfair" acts and practices in ICFA §2, 815 ILCS 505/2, as construed in

Robinson. (Def. Memo., p. 5) Defendant contends that acts and practices cannot be condemned

under the "public policy" aspect of Robinson unless they are listed in §2Z.

Defendant's §2Z argument is wrong as § 2Z does not bar a federal claim under

the TCPA. While the TCPA is not listed in §2Z, neither was the federal Consumer Leasing Act

("CLA"), relied upon in Robinson, or the federal Truth in Lending Act ("TILA"), relied upon in

Cheshire Mtge. Services, Inc. v. Montes, 223 Conn. 80, 106, 612 A.2d 1130, 1143 (1992), which

was decided under an identical Connecticut statute and was cited with approval in Robinson.

Defendant's argument is inconsistent with the Illinois Supreme Court's holding in Robinson that

statutes not listed in §2Z, namely CLA and TILA, can furnish the basis for a finding of "unfair"

acts or practices.

In view of the mandate in ICFA §11a, 815 ILCS 505/11a, that "This Act shall be

liberally construed to effect the purposes thereof," and the "clear mandate from the Illinois

legislature that the courts of this State utilize the Act to the utmost degree in eradicating all

forms of deceptive and unfair business practices and grant appropriate remedies to injured

parties," Bank One Milwaukee v. Sanchez, 336 Ill. App. 3d 319, 783 N.E.2d 217, 220 (2d Dist.

2003) (citations omitted), the Court should simply apply the analysis required by Robinson and

inquire whether the "broadcasting" of unsolicited advertising faxes in violation of the federal

TCPA and the Illinois Criminal Code, 720 ILCS 5/26-3, "offends public policy as it has been

established by statutes." It clearly does.

In this case, both federal and state statutes prohibit the practices that GF engages

in. As the court held in Destination Ventures, sending unsolicited fax advertising "represents an

unfair shifting of the cost of advertising from the advertiser to the unwitting customer.  Also . . .

unsolicited and unwanted faxes can tie up a machine for hours and thwart the receipt of

legitimate and important messages."  Destination Ventures, Ltd. v. F.C.C., 844 F.Supp. 632, 636

(D. Ore.1994), aff'd  46 F.3d 54 (9th Cir. 1995) (citations omitted).  Clearly, forcing recipients to

pay for GF's advertising is against Illinois public policy.

        Practices that inflict unavoidable injury are oppressive and unfair.  Elder v.

Coronet Ins. Co., 201 Ill. App. 3d 733, 746, 558 N.E.2d 1312 (1st Dist. 1990); People ex rel

Fahner v. Hedrich, 108 Ill. App. 3d 83, 90, 438 N.E.2d 924 (2nd Dist. 1982).   In Hedrich the

court held that a "commissions" on the sale of their mobile homes was a oppressive practice

because the tenants had no reasonable alternative but to submit.  Id. at 90.  Business and

individuals must leave their fax machines on in order to run their operations or communicate.  In

this case, like in Hedrich, plaintiff had no reasonable alternative but to receive the unwanted

faxes and pay the charges associated with receiving the faxes.  Defendant did not seek

permission prior to sending the unsolicited fax advertisement as defendant is well aware that

permission would not be forth coming.

        According to defendant, the injury is avoidable because **after** the injury occurs,

plaintiff could have called a removal number that was listed on bottom of the fax.  (Def. Memo.,

p. 6) Defendant argues that now plaintiff is required to read the advertisement and participate in

an automated phone system to avoid an injury after it has already occurred.  "Even if a recipient

of an unsolicited fax can later remove himself from the possibility of receiving future faxes, this

does nothing to compensate the recipient for the injury that has already resulted from the receipt

of the fax in the first place."  Sadowski v. Med1Online, LLC, 07 C 2973, 2008 U.S. Dist. LEXIS

41766, at *22 (N.D. Ill. May 27, 2008).

Defendant's argument also ignores the fact that many fax blasters do not honor removal requests. Evidence will show that use of the "removal number" often results in more faxes being sent by an advertiser who now knows that someone picked up and read his fax. In particular, the August 2, 2002 citation issued by the FCC to fax broadcaster Fax.com presents compelling evidence with respect to the lack of effectiveness of the "removal numbers." In re Fax.com, Inc., FCC 02-226, 2002 FCC LEXIS 3853,15-17 (FCC Aug. 2, 2002) (Ex. A).

Finally, if plaintiff is required to take time out of its work day to participate in this process, plaintiff is further damaged. Plaintiff is expending time that should be spent on work related issues and not spending the day opting out of the numerous faxes it receives daily.

Defendant's actions are also injurious. A 1990 study by the California Public Utility Commission found that unsolicited fax advertising cost recipients millions of dollars in California alone. An August 2, 2002 citation issued by the FCC to fax broadcaster Fax.com, Inc. noted (pp. 5-6, n. 21) that some businesses had received hundreds or thousands of fax advertisements within short periods, tying up fax equipment for hours. Moreover, these abuses occur when it is illegal to send unsolicited fax advertising at all.

The problem created by junk faxing has increased in recent years. A 2006 GAO report on junk faxes states: "Since 2003, consumers complained more to the FCC about junk faxes than about any other issue under FCC's jurisdiction except indecency and obscenity in radio and television broadcasting." "In 2000, [the] FCC recorded about 2,200 junk fax complaints; in 2005, it recorded over 46,000."GAO-06-425, Report to Congressional Committees, Telecommunications, Weaknesses in Procedures and Performance Management

Hinder Junk Fax Enforcement, April 2006, p. 2 (http://www.gao.gov/new.items/d06425.pdf).

The GAO Study of Junk Fax Enforcement was ordered by Congress and required:

> (a) In General.--The Comptroller General of the United States shall conduct a study regarding complaints received by the Federal Communications Commission concerning unsolicited advertisements sent to telephone facsimile machines, which study shall determine--
>
>> (1) the mechanisms established by the Commission to receive, investigate, and respond to such complaints;
>>
>> (2) the level of enforcement success achieved by the Commission regarding such complaints;
>>
>> (3) whether complainants to the Commission are adequately informed by the Commission of the responses to their complaints; and
>>
>> (4) whether additional enforcement measures are necessary to protect consumers, including recommendations regarding such additional enforcement measures.
>
> (b) Additional Enforcement Remedies.--In conducting the analysis and making the recommendations required under subsection (a)(4), the Comptroller General shall specifically examine--
>
>> (1) the adequacy of existing statutory enforcement actions available to the Commission;
>>
>> (2) the adequacy of existing statutory enforcement actions and remedies available to consumers;
>>
>> (3) the impact of existing statutory enforcement remedies on senders of facsimiles;
>>
>> (4) whether increasing the amount of financial penalties is warranted to achieve greater deterrent effect; and
>>
>> (5) whether establishing penalties and enforcement actions for repeat violators or abusive violations similar to those established under section 1037 of title 18, United States Code, would have a greater deterrent effect.
>
> (c) Report.--Not later than 270 days after the date of enactment of this Act, the Comptroller General shall submit a report on the results of the study under this

section to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Energy and Commerce of the House of Representatives.

Public Act 109-21, July 9, 2005.   Clearly, the sending of unsolicited faxes has been known to cause substantial injury to consumers.  See, Orkin Exterminating Co. v. FTC, 849 F.2d 1354 (11th Cir. 1988).

Plaintiff has suffered an actual and substantial injury as alleged in the complaint. "Costs that are imposed on an unwilling consumer can constitute a substantial injury." Centerline Equipment Corp. v. Banner Personnel Service, Inc., 07 C 1611, 2008 U.S. Dist. LEXIS 15946, at *27 (N.D. Ill. March 3, 2008).  Since the factor determining unfairness is not focused on individual injury to the plaintiff but rather "whether it causes substantial injury to consumers."  Plaintiff has not only alleged that it received 3 unsolicited advertising facsimiles from defendant but also alleged that a "mass broadcasting of faxes" to "at least 40 other persons in Illinois" occurred.  (Cmplt., ¶¶ 7-9, 16-17) Thus, "the aggregate harm caused by this practice would be substantial."  Centerline, 2008 U.S. Dist. LEXIS 15946, at *29.

Indeed, the taking of small amounts of money from large numbers of persons is precisely the sort of conduct that implicates the ICFA.   Eshaghi v. Hanley Dawson Cadillac Co., 214 Ill. App. 3d 995, 574 N.E.2d 760, 766 (1st Dist. 1991).  Illinois law does not permit a defendant to steal large sums of money in small increments.  In People ex rel Hartigan v. Stianos, 131 Ill. App. 3d 575, 475 N.E.2d 1024, 1029 (2nd Dist.1985), the court held that a retailer's practice of charging consumers sales tax in an amount slightly greater than that authorized by law was both deceptive and unfair precisely because it took small amounts of money (a few cents per transaction  – less than involved here) from large numbers of consumers:

We conclude that the practice described in this case is both deceptive and unfair as those terms are used in the Consumer Fraud Act.  The sales tax rates which may be charged to consumers have been fixed by statute; the legislature set the tax rate at 1.25%, but the evidence here is that defendants collected an average of 4.75%.  While the three sales upon which this case is premised reflect only a few cents in overcharges, it is apparent that similar overcharges, if permitted to continue, could aggregate very substantial losses and injury to the consuming public.  It is also unfair to permit the extraction from the consumer of excessive sums under the guise it is a lawful tax.  If, as defendants alleged in their answer, the excess sums collected were turned over to the State, defendants' conduct remains unfair and deceptive to the consumers' injury. (Emphasis added)

Accord,  Saltzman v. Enhanced Services Billing, Inc., 348 Ill. App. 3d 740, 811 N.E.2d 191 (1st Dist. 2004);  Sanders v. Lincoln Service Corp., 91 C 4542, 1993 U.S. Dist. LEXIS 4454 (N.D. Ill., April 5, 1993) ("A lender with numerous customers could realize substantial profits from the use of the funds gained through small individual overcharges");  Orkin Exterminating Co. v. FTC, 849 F.2d 1354, 1365 (11th Cir. 1988) (FTC Act; "[I]njury may be sufficiently substantial [to constitute an unfair practice] if it causes small harm to a large class of people").

"Junk faxing" is also an "unfair method of competition." "Unfair methods of competition" are methods which are illegal or unscrupulous or dishonest and give businesses that engage in them a competitive advantage over those which do not.  FTC v. R. F. Keppel & Bro., Inc., 291 U.S. 304 (1934); Fitzgerald v. Chicago Title & Trust Co., 72 Ill. 2d 179, 380 N.E.2d 790 (1978) (following Keppel).  Businesses that obey the law and pay all of the costs associated with their advertising (e.g., postage) are at an unfair disadvantage compared to businesses that engage in the  "unfair shifting of the cost of advertising from the advertiser to the unwitting customer."  Indeed, the entire purpose and effect of "junk faxing" is to accomplish this.

Judge Pallmeyer of this Court has recently upheld an ICFA claim in Centerline Equipment Corp. v. Banner Personnel Service, Inc., 07 C 1611, 2008 U.S. Dist. LEXIS 15946

(N.D. Ill. March 3, 2008), as did Judge Aspen in <u>Sadowski v. Med1Online, LLC</u>, 07 C 2973, 2008 U.S. Dist. LEXIS 41766 (N.D. Ill. May 27, 2008), and Judge Hibbler in <u>Pollack v. Cunningham Financial Group, LLC</u>, 08 C 1405 (N.D. Ill. June 2, 2008) (slip opinion).  Illinois state courts upholding ICFA claims based on "junk faxing"  include <u>Brill v. Becktold Enterprises, Inc.</u>, 06 CH 1520 (Cook Co., Ill., Cir. Ct., Oct. 26, 2006)(<u>Ex. B</u>); <u>Rosario's Fine Jewelry, Inc, v. Jurgens Fine Jewelry, Inc.</u>, 06 CH 6677 (Cook Co., Ill., Cir. Ct. Jan. 19, 2007) (<u>Ex. C</u>);  <u>Telecommunications Network Design, Inc. v. Bach Business Credit, Inc.</u>, 03 CH 9246 (Cook Co., Ill., Cir. Ct. Jan. 26, 2005) (<u>Ex. D</u>);  <u>Mark Chair Co. v. Mortgage Mgrs., Inc.</u>, 02 LK 247 (Kane Co., Ill., Cir.Ct. Dec. 20, 2002) (<u>Ex. E</u>);  <u>American Life Ins. Co. v. American Tel. & Data</u>,  04 L 974  (DuPage Co., Ill., Cir.Ct. March 24, 2005) (<u>Ex. F</u>);  <u>Eclipse Mfg. Co. v. T.J. Copy Products, Inc.</u>, 03 CH 1344 (Lake Co., Ill., Cir.Ct. 2004) (<u>Ex. G</u>); <u>Zoes v. Fairon & Assoc., Inc.</u>, 04 CH 455 (McHenry Co., Ill., Cir Ct. Jan. 12, 2005) (<u>Ex. H</u>). Further, the Central District of Illinois has upheld an ICFA claim based on "junk faxing" brought by the Attorney General. <u>People v. Discovery Mktg., Inc.</u>, 99-3243 (C.D.Ill., Feb. 14, 2000) (<u>Ex. I</u>).

Defendant focuses entirely on the faxes sent to plaintiff in arguing that plaintiff has failed to adequately plead "unfairness."  (Def. Memo., pp. 7-8) However, to focus solely on the faxes received by plaintiff is "too narrow.  The ICFA allows a determination that practices, as well as individual acts, are unfair."  <u>Centerline</u>, 2008 U.S. Dist. LEXIS 15946, at *25-26. Consistent with the <u>Robinson</u> factors, the proper focus is on the "mass broadcasting of faxes" to "at least 40 other persons in Illinois." (Cmplt., ¶¶ 16-17) Plaintiff has met this standard.

In sum, plaintiff has met the burden of unfairness articulated by <u>Robinson</u> and defendant's motion to dismiss must be denied.

III.    **THE CIRCUMSTANCES RELATED TO PLAINTIFF'S ICFA VIOLATION OCCURRED PRIMARILY AND SUBSTANTIALLY IN ILLINOIS.**

Defendant argues that plaintiff has not alleged sufficient facts to sustain an ICFA claim pursuant to the Illinois Supreme Court's decision in <u>Avery v. State Farm Mutual Automobile Insurance Co.</u>, 835 N.E.2d 801 (Ill. 2005).  (Def. Memo., pp. 8-9)  Defendant is wrong.  In <u>Avery</u>, the Illinois Supreme Court held that an ICFA claim could not be sustained where there was no connection with Illinois except for the allegation that the violation at issue was based on a theory that emanated from defendant's corporate offices in Illinois.  However, in this case, plaintiff has plead sufficient facts to sustain its ICFA claim.

Plaintiff is an Illinois corporation that maintains fax equipment in Wheeling, Illinois.  (Cmplt., ¶ 3)  Plaintiff alleged that it received 3 unsolicited advertising facsimiles from defendant on its fax machine.  (Cmplt., ¶¶ 7-9)  Plaintiff further alleged that "defendants have transmitted similar unsolicited fax advertisements to at least 40 other persons in Illinois." (Cmplt., ¶ 17)   Additionally, plaintiff alleged that defendant transacted business in Illinois. (Cmplt., ¶ 6(b))  Plaintiff has alleged sufficient, specific facts and connections with Illinois to maintain an ICFA claim.

IV.    **PLAINTIFF HAS ALLEGED A CAUSE OF ACTION FOR CONVERSION.**

Plaintiff alleges that by sending unsolicited fax advertisements to plaintiff and the class members, defendant converted to their own use toner and paper belonging to plaintiff and the class members.

The elements of conversion are satisfied here because the plaintiff's complaint states a cause of action sounding in conversion.  First, the defendant's conduct, which occurred without consent, is an unauthorized assumption of control over plaintiff's paper and toner. Second, plaintiff is the owner of the paper and toner and has a right to them.  Here, plaintiff had paid for paper and ink and had it in its possession.  Plaintiff was entitled to the specific paper and ink, not 1/1000 of the paper in some storage facility.  Third, plaintiff had an unconditional right

to the immediate possession of the property at the time of the conversion.  Plaintiff had an unconditional right to immediate possession of that paper and toner which defendant denied. Finally, the act of defendant in sending the unsolicited fax was unlawful in itself and therefore, plaintiff did not have to make a demand in order to properly plead a conversion claim.  See 720 ILCS 5/26-3.  Destruction of personal property constitutes conversion and no additional facts need be plead in accordance with Fed. R. Civ. P. 8.

Destruction or alteration of personal property constitutes conversion as well as its asportation.  Fortech, LLC v. R. W. Dunteman Co., 366 Ill. App. 3d 804, 852 N.E.2d 451, 462 (1st Dist. 2006);  Agrinetics, Inc. v. Stob, 90 Ill. App. 3d 107; 412 N.E.2d 714 (2nd Dist. 1980); American Financial Svcs. Group v. Treasure Bay Gaming & Resorts, Inc., 99 Civ. 1068, 2000 U.S.Dist. LEXIS 8668, *34 and n. 6 (S.D.N.Y. June 23, 2000) ("destroying" property or "altering its nature" or effecting "a substantial change or damage" constitute conversion); Restatement 2nd, Torts, §226.  Comment b to §226 points out that it is not necessary in a destruction or alteration case that the defendant have possession of the chattel to convert it, "as where he intentionally shoots and kills the horse which the plaintiff is riding."  The essence of conversion "is not acquisition by the wrongdoer but a wrongful deprivation of the owner thereof."  Jensen, supra, 419 N.E.2d at 593; accord, Fortech, supra, 366 Ill. App. 3d at 810-11, 852 N.E.2d at  457.

Demand is not necessary in such a case because the destruction or alteration constitutes an "independent act of conversion."  Fortech, supra.  Demand is only required where the defendant lawfully obtained the property, as where goods are placed for storage and the warehouseman refuses to return them upon  request without good reason,  Guice v. Sentinel Tech., Inc.,  294 Ill. App. 3d 97, 111, 689 N.E.2d 355 (1st Dist. 1997); Kime v. Dale, 14 Ill. App. 308  (2nd Dist. 1884), and is never required where it would be futile, Monroe County Water Coop. v. City of Waterloo, 107 Ill. App. 3d 477, 481, 437 N.E.2d 1237 (5th Dist. 1982).  In this case, "[a] demand would have been futile because not only was Defendant never in possession of

these objects, but after they were used to print Defendant's advertisements, Defendant could no longer return them in their unaltered state."  Sadowski v. Med1Online, LLC, 07 C 2973, 2008 U.S. Dist. LEXIS 41766, at *29 (N.D. Ill. May 27, 2008).

The issue in such cases is whether the damages include the rights represented by the paper or other amounts beyond the value of the paper itself.  Olds v. Chicago Open Board of Trade, 33 Ill.App. 445 (1st Dist. 1889).  If not, the plaintiff recovers the value of what was converted or nominal damages, the latter as vindication of the plaintiff's rights.  Indiana Hi-Rail Corp. v. Decatur Junction Ry., 37 F.3d 363, 366 (7th Cir. 1994) (recognizing that under Illinois law a conversion without proof of actual damages entitles the plaintiff to nominal damages); Brewster v. VanLiew, 119 Ill. 554, 561-62, 8 N.E. 842, 845 (1886); Barrelett v. Bellgard, 71 Ill.280 (1874); Illinois Education Ass'n v. Illinois Fed. of Teachers, 107 Ill.App.3d 686, 437 N.E.2d 1265 (4th Dist. 1982)(nominal damages awardable for conversion if other damages not proved); Traveltown, Inc. v. Gerhardt Invest. Group, 586 F.Supp. 256 (N.D.N.Y. 1984) ($100 nominal damages awarded for conversion of blueprints, where plaintiff had a copy and defendant made no use of them).

Moreover, causing or directing the taking, destruction or alteration of property is conversion, just as if the defendant performed all of the necessary acts with his own hands. Fortech, LLC v. R. W. Dunteman Co., supra, 366 Ill.App.3d 804, 852 N.E.2d 451, 456 (1st Dist. 2006); Restatement 2nd, Torts, §226, comment b, supra  (shooting and destroying plaintiff's animal, which is analogous to using up paper and ink, is conversion).  "[O]ne causing and intending an act or result is as responsible as if he had personally performed the act or produced the result," Fortech, supra, citing Buckner v. Atlantic Plant Maintenance, 182 Ill.2d 12, 694 N.E.2d 565 (1998) (separate opinion of Freeman, C.J.).

There is no de minimis defense.  As noted above, an action for conversion may be maintained based on one piece of paper and at least nominal damages are awarded for the invasion of plaintiff's property rights.  Most importantly,  it is not appropriate for a court to

overrule the determination of both Congress and the Illinois legislature to prohibit junk faxing by deciding that harms legislatively deemed worthy of judicial attention are not so worthy. "Although the monetary impact of a single unsolicited fax is minor, it is nevertheless a cost borne by the recipient and recognized by Congress as a compensable harm." Universal Underwriters Ins. Co. v. Lou Fusz Automotive Network, Inc., 401 F.3d 876, 880 (8th Cir. 2005).

As a result, every Illinois court to have considered the issue has upheld a claim for conversion based on "junk faxing." Whiting Corp. v. MSI Mktg., 02 CH 6332 (Cook Co., Ill., Cir. Ct. April 3, 2003) (Ex. J); Whiting Corp. v. MSI Mktg., 02 CH 6332 (Cook Co., Ill., Cir. Ct. May 7, 2004) (Ex. K); Zoes v. North American Bancard, 03 CH 17879 (Cook Co., Ill. Cir. Ct., Oct. 2004) (Ex. L); Telecommunications Network Design v. Bach Business Credit Inc., 03 CH 9246 (Cook Co., Ill., Cir. Ct., Jan. 26, 2005) (Ex. D); Brill v. Becktold Enterprises, Inc., 06 CH 1520 (Cir. Ct. Cook Co., Ill., Oct. 26, 2006) (Ex. B); Rosario's Fine Jewelry, Inc, v. Jurgens Fine Jewelry, Inc., 06 CH 6677 (Cook Co., Ill., Cir. Ct. Jan. 19, 2007) (Ex. C); CE Design, Inc. v. ZMC, Inc., 03 CH 1304 (DuPage Co., Ill., Cir Ct. November 5, 2004) (Ex. M); Robin Hill Dev. Co. v. JD&T Enterprises, 01 L 527 (DuPage Co., Ill., Cir. Ct. Oct. 3, 2002) (Ex. N); Kubiesa v. Tier One Telecomm., 03 L 425, 2004 TCPA Rep. 1293 (DuPage Co., Ill., Cir. Ct., Aug. 4, 2004) (Ex. O); American Life Ins. Co. v. American Tel. & Data, 04 L 974 (DuPage Co., Ill., Cir. Ct. March 24, 2005) (Ex. F); Stonecrafters, Inc. v. Wholesale Life Ins. Brokerage, Inc., 03 CH 435 (McHenry Co., Ill., Cir. Ct., July 28, 2004) (Ex. P); Zoes v. Fairon & Associates, Inc., 04 CH 455 (McHenry Co., Ill., Cir. Ct. Jan. 12, 2005) (Ex. H); Eclipse Mfg. Co. v. T.J. Copy Products, Inc., 03 CH 1344 (Lake Co., Ill., Cir. Ct. 2004) (Ex. G); Mark Chair Co. v. Mortgage Mgrs., Inc., 02-LK 247 (Kane Co., Ill., Cir. Ct. Dec. 20, 2002) (Ex. E). In Mark Chair, for example, the court held that "the defendant's conduct, which occurred without consent, is an unauthorized assumption of control over plaintiff's paper and toner. Second, plaintiff is the owner of the paper and toner and has a right to them. Third, plaintiff had an unconditional right to the immediate possession of the property at the time of the conversion.

Plaintiff had an unconditional right to immediate possession of that paper and toner which defendant denied.  Finally, the act of defendant in sending the unsolicited fax was unlawful in itself and therefore, plaintiff did not have to make a demand in order to properly plead a conversion claim.  See 720 ILCS 5/26-3."

Insofar as Rossario's Fine Jewelry, Inc. v. Paddock Publs., Inc., 443 F.Supp.2d 976 (N.D. Ill. 2006), states that paper cannot be the subject of conversion, or that altering a chattel cannot be conversion, or that only one who personally and directly commits conversion is liable, or that some conversions are too small to bother with, it is inconsistent with controlling Illinois Supreme Court authority on each of those points, and thus incorrectly decided. Furthermore, Judge Pallmeyer in Centerline, rejected *all* of the arguments raised by defendant in its motion to dismiss after considering Rosario's and denied defendant's motion to dismiss the conversion claim.  Judges Aspen and Hibbler also considered and rejected these arguments in Sadowski v. Med1Online, LLC, 07 C 2973, 2008 U.S. Dist. LEXIS 41766 (N.D. Ill. May 27, 2008), and Pollack v. Cunningham Financial Group, LLC, 08 C 1405 (N.D. Ill. June 2, 2008) (slip opinion).

In short,  plaintiff has alleged a set of facts which, if proved, will entitle it to relief. Defendant's motion to dismiss the conversion count is without merit and should be denied.

## V.    CONCLUSION.

For the reasons stated herein, defendant's motion to dismiss Counts II and III of plaintiff's complaint should be denied.


Respectfully submitted,


s/ Heather Kolbus
Heather Kolbus


Daniel A. Edelman
Heather Kolbus

14

EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

## <u>CERTIFICATE OF SERVICE</u>

        I, Heather Kolbus, certify that on May 7, 2008, I caused a true and accurate copy of the foregoing document to be served upon the party listed below via the court's CM/ECF system.

Alan I. Becker
becker@litchfieldcavo.com

Stephanie W. Tipton
tipton@litchfieldcavo.com

                 /s/ Heather Kolbus
                Heather Kolbus

16

# EXHIBIT A

LexisNexis® *Total Research System*                              ■ Switch Client ÷ Preferences ÷ Sign Out ÷ 🛛 Help

My Lexis ™ \ Search \ Research Tasks \ Get a Document \ *Shepard's* \ Alerts \ Total Litigator \ Transactional Advis

Service: **Get by LEXSEE®**
Citation: **2002 FCC LEXIS 3853**

*17 FCC Rcd 15927, *; 2002 FCC LEXIS 3853, **;*
*27 Comm. Reg. (P & F) 459*

In the Matter of Fax.com, Inc.; Apparent Liability for Forfeiture

File No. EB-02-TC-120; NAL/Acct. No. 200232170004; FRN 0007-2970-47

**RELEASE-NUMBER:** FCC 02-226

FEDERAL COMMUNICATIONS COMMISSION

17 FCC Rcd 15927; 2002 FCC LEXIS 3853; 27 Comm. Reg. (P & F) 459

August 7, 2002 Released; Adopted August 2, 2002

**CORE TERMS:** fax, com, advertisement, unsolicited, facsimile, consumer, telephone, forfeiture, machine, message, entity, opt-out, staff, advertiser, sending, transmission, recipient, database, website, broadcasting, faxing, broadcaster, accessed, sender, maximum, right of action, transmitted, permission, toll-free, automated

**ACTION:**
**[**1]** NOTICE OF APPARENT LIABILITY FOR FORFEITURE

**JUDGES:** By the Commission: Commissioner Abernathy issuing a statement

**OPINION:**
**[*15927] I. INTRODUCTION**

1. In this Notice of Apparent Liability for Forfeiture (NAL), we find that Fax.com, Inc. (Fax.com) n1 apparently willfully or repeatedly violated section 227 of the Communications Act of 1934, as amended (Act), n2 and the Commission's rules and orders, by sending unsolicited advertisements to telephone facsimile machines on 489 separate occasions. n3 Based on the facts and circumstances surrounding these apparent violations, we find that Fax.com is apparently liable for forfeiture in the amount of $ 5,379,000. n4

n1 Fax.com, Inc. is headquartered at 120 Columbia Street, Suite 500, Aliso Viejo, California 92656. According to Dun & Bradstreet Business Information Report, Fax.com began operations in 1998. Fax.com is a closely held corporation whose president, Mr. Kevin Katz, owns 35% of the capital stock. Value Capital owns 33% of capital stock and Fax.com employees own the remaining 32% of capital stock. *See* Dun & Bradstreet Business Information Report, April 3, 2002. For purposes of this NAL, we specify that Fax.com encompasses all affiliated entities, successors, and assigns as well as its corporate officers, Mr. Katz, Thomas Roth, Jeffrey Dupree, and Eric Wilson. **[**2]**

n2 Section 227 was added to the Communications Act of 1934 by the Telephone Consumer Protection Act of 1991, Pub.L 102-243, 105 Stat. 2394, and is most commonly known as the TCPA.

n3 *See* 47 U.S.C. § 227(b)(1)(C); 47 C.F.R. § 64.1200(a)(3); *see also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order,* 7 FCC Rcd 8752, 8779, (1992) (*TCPA Report and Order*) (stating that section 227 of the Act prohibits the use of telephone facsimile machines to send unsolicited advertisements).

n4 *See* 47 U.S.C. § 503(b)(1). The Commission has the authority under this section of the Act to assess a forfeiture against any person who has "willfully or repeatedly failed to comply with any of the provisions of this Act or of any rule, regulation, or order issued by the Commission under this Act . . . ."

[*15928] **II. BACKGROUND**

2. Fax.com characterizes itself as a "fax broadcaster," transmitting messages to telephone facsimile machines on behalf of other entities for a fee. According to its website, Fax.com specializes in transmitting its clients' [**3] advertisements to telephone facsimile machines whose numbers are contained in the Fax.com database, which it touts as "the industry's largest fax number database." n5 In its promotional materials, Fax.com also offers to design or improve its clients' advertising copy. n6 The unsolicited facsimile advertisements that are the subject of this NAL are the product of Fax.com's fax broadcasting enterprise. With the exception of one message, n7 the advertisements do not promote products, goods, or services provided by Fax.com but, instead, promote a wide variety of products, goods, or services offered by numerous entities that have employed Fax.com to send their advertisements to telephone facsimile machines.

n5 *See* http://www/fax.com/Services/faxblast.asp (website accessed May 29, 2002). Fax.com's website, copyrighted 2000, contains the following additional claims:

> Fax.com is the only company that can boast 16 million fax numbers. With another 16 million records soon available, Fax.com will be the leading place to purchase fresh fax broadcasting data. http://www.fax.com/company_profile/our_business.asp (website accessed May 29, 2002).

> Broadcast your advertising fax based on radius, Zip Codes, Metro Area, Area Code, County, State or the entire U.S. using a database that will exceed 30 million fax numbers. http://www.fax.com/Why_use_fax/direct.asp (website accessed May 29, 2002).

[**4]

n6 *See* http://www.fax.com/Consumer_support/FAQs.asp (website accessed May 29, 2002) ("If you would like, we can send you a questionnaire about your company, consult with you and design outstanding fax broadcast ads for you."); http://www.fax.com?Services/addl_seerv.asp (website accessed May 29, 2002) ("Our design department will work with you to design your fax ad, choose type fonts, create graphics, and develop the ideal fax that will achieve the greatest response.").

n7 *See* note 40, *infra*.

3. In December 2000 and May 2001, after receiving correspondence from consumers who complained about having been faxed unsolicited advertisements on behalf of six Fax.com

clients, the Commission staff issued citations to Fax.com n8 pursuant to section 503(b)(5) of the Act. n9 The staff cited Fax.com for allegedly violating section 227(b)(1)(C) of the Act and [*15929] section 64.1200(a)(3) of the Commission's rules by transmitting unsolicited advertisements to consumers' telephone facsimile machines on behalf of the six clients. n10 The citations noted that

> although entities that merely transmit facsimile messages on behalf of others are not liable for compliance with the [**5] prohibition on faxing unsolicited advertisements, the exemption from liability does not exist when a fax transmitter has "'a high degree of involvement or actual notice of an illegal use and [has] failed to take steps to prevent such transmissions.'" Accordingly, fax transmitters do not enjoy an absolute exemption from liability under the TCPA and the Commission's Rules. n11

n8 Citation letters from Kurt A. Schroeder, Deputy Chief, FCC Telecommunications Consumers Division to Kevin Katz, Fax.com President (Dec. 26, 2000; May 11, 2001; May 31, 2001) (collectively *Fax.com Citations* or staff citations).

n9 47 U.S.C. § 503(b)(5). Under section 503(b)(5), the Commission may not assess a forfeiture penalty against any person that does not hold a license, permit, certificate, or other Commission authorization, and is not an applicant for such instruments, unless "(A) such person is first issued a citation of the violation charged; (B) is given a reasonable opportunity for a personal interview with an official of the Commission, at the field office of the Commission nearest to the person's place of residence; and (C) subsequently engages in conduct of the type described in the citation." We note that this section does not require the multiple citations given by the staff here; only a single citation was necessary before initiation of a forfeiture proceeding. [**6]

n10 The staff also cited the following Fax.com clients for alleged violations of section 227 and the Commission's rules and orders: Platinum Travel Club and Teleconcepts Technologies; Colorjet, Inc.; Millenium Marketing and Sales, Ltd.; Website University; US Travel Services, Inc.; and Advanced Cellular Communications, Inc. This proceeding does not encompass any actions against the cited companies.

n11 *Fax.com Citations* at 2 (footnotes omitted) (citing *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Memorandum Opinion and Order*, 10 FCC Rcd 12391, 12407 (1995) (*TCPA Memorandum Opinion and Order*); *TCPA Report and Order*, 7 FCC Rcd 8752, 8780 (1992) (quoting *Use of Common Carriers*, 2 FCC Rcd 2819, 2820 (1987))).

4. The citations informed Fax.com that it could face monetary forfeitures up to $ 11,000 for each subsequent violation if Fax.com either (1) was highly involved on behalf of the sender of any unsolicited facsimile advertisements, or (2) continued to transmit advertisements for the six named clients without taking steps to ensure that those [**7] entities had obtained permission from recipients to fax the advertisements. The citations also directed Fax.com to answer several questions regarding its general practices with respect to its fax broadcasting activities and its specific arrangements with the six clients. Finally, the citations informed Fax.com that within 21 days of the date of each citation, it could either request a personal interview at the nearest Commission field office, or provide a written statement responding to the citation.

5. On January 31, 2001, June 1, 2001, and June 21, 2001, Fax.com responded to the citations with virtually identical pleadings that were filed jointly on behalf of Fax.com and its six cited clients. In each instance, Fax.com and the clients claimed that the prohibition on faxing unsolicited advertisements contained in section 227 and the Commission's implementing regulations is an unconstitutional infringement on the First Amendment free speech rights of Fax.com and its advertisers. Fax.com also addressed the staff's questions regarding its fax broadcasting operations. In that regard, Fax.com claimed that although it offers clients "advice and assistance relative to graphics presentations,"  **[**8**]**  it had not exercised any editorial control over any of the advertisements that were at issue in the six citations. n12 Nonetheless, Fax.com **[*15930]** emphasized that it retains discretion to refuse to transmit any advertisement it deems "offensive or misleading." n13 Fax.com stated that it provided the fax distribution lists for each of its clients whose advertisements were addressed by the citations. Fax.com explained that it compiles its database of telephone facsimile numbers by (1) purchasing lists of fax numbers from independent vendors, (2) identifying fax numbers "through its own research methods," and (3) recording fax numbers provided by individuals who have asked, through an automated process, to be included in Fax.com's database. With respect to the telephone facsimile numbers obtained from independent vendors and Fax.com's research efforts, Fax.com conceded that it "has historically taken no steps to verify consent or established business relationships." n14 Fax.com stated that it "routinely" sends what it characterizes as a "non-commercial" message regarding missing children to each number added to the Fax.com database. n15 Entitled "Your Permission Please," the message "asks"  **[**9**]** recipients to agree to receive from Fax.com alerts regarding missing children. The message states that "to help offset the cost' of the missing children alerts, Fax.com will also send "a limited amount of commercial paid advertising" not to exceed one fax per week. The message instructs recipients who do not wish to receive the alerts or advertisements to call a toll-free "opt-out" number. Finally, Fax.com emphasized that it only transmits advertisements that contain such an opt-out number that fax recipients may call if they do not wish to receive similar advertisements in the future. n16

n12 January 31 Response at 27; June 1 Response at 28; June 21 Response at 27.

n13 January 31 Response at 27; June 1 Response at 29; June 21 Response at 28.

n14 January 31 Response at 30; June 1 Response at 31-32; June 21 Response at 30.

n15 January 31 Response at 30-31; June 1 Response at 32; June 21 Response at 31. Judging by information provided by consumers to this Commission, it does not appear that Fax.com is using this message routinely at the present time; only one such message is included in the instant forfeiture action. See note 40, infra.

n16 January 31 Response at 28-29; June 11 Response at 27; June 21 Response at 27-28. **[**10**]**

6. Following Fax.com's receipt of the staff's citations, the Commission has continued to receive information from numerous consumers indicating that Fax.com is still conducting its fax broadcasting activities in a manner that apparently violates section 227(b)(1)(C) of the Act and section 64.1200(a)(3) of the rules. The forfeiture proposed herein is based on this body of consumer information, which alleges that after Fax.com's receipt of the staff's citations, consumers continued to receive a variety of unsolicited facsimile advertisements, all traceable to Fax.com.

7. Table 1, "Unsolicited Advertisements Transmitted by Fax.com and Subject to Forfeiture

Pursuant to FCC 02-226," lists 489 unsolicited fax advertisements that form the basis of this NAL. n17 Although only one of these advertisements mentions Fax.com in any way, some [*15931] consumers were able to discover that Fax.com had transmitted the ads. By obtaining information that identifies Fax.com as the telephone subscriber for (1) the various toll-free opt-out telephone numbers that are displayed on each advertisement, and/or (2) the telephone facsimile machine numbers from which various advertisements were sent, which are displayed [**11] in the advertisements' fax headers, the Commission staff has confirmed that Fax.com sent each advertisement listed in Table 1.

n17 As set forth in Table 1, these unsolicited facsimile advertisements were received by 46 individuals, businesses, or government offices between September 2001 and March 2002. Although some consumers' correspondence and related declarations detail additional unsolicited advertisements received before August 7, 2001, we do not list these violations in Table 1 because they are beyond the one-year statute of limitations set forth in section 503(b)(6)(B) of the Act, 5 U.S.C. § 503(b)(6)(B). Finally, we note that evidence of additional instances of unlawful conduct by Fax.com, subject to section 503(b)(6)(B)'s statute of limitations, may form the basis of additional enforcement actions.

8. Nine consumers have provided information showing that they each received over 20 unsolicited and unwanted advertisements that were transmitted by Fax.com clients on behalf of its clients. n18 The remaining 36 consumers have provided between one and 16 unsolicited fax ads each. n19 Each consumer who has provided information regarding the [**12] fax messages at issue herein has signed a declaration, under penalty of perjury, attesting that he or she (1) is either the owner of or responsible for the telephone facsimile machine that received the advertisement(s); (2) did not have an established business relationship with either Fax.com or the entity whose products, goods, or services were being advertised; and (3) did not grant prior express permission or invitation for the faxes to be sent. n20

n18 See Table 1 recording faxes received by Robert Isaac Carr (27 faxes), George D. Demet (29 faxes), Robert R. Dzimidas (21 faxes), L. ("Les") R. Docks (24 faxes), Allan Howard Frey (21 faxes), Heather Ann Hartnett (30 faxes), Douglas M. McKenna (95 faxes; 28 faxes - residential line, 67 faxes - business line), John P. Strang (30 faxes), and Wayne George Strang (48 faxes).

n19 Some consumers indicate that they actually have received far more advertisements from Fax.com than they have submitted to the Commission. See Facsimile message from John Koltun to Evelyn Dyson, FCC Telecommunications Consumers Division (Apr. 12, 2002); facsimile message from George Craig (on behalf of Gary Chou, Internal Revenue Service) to Evelyn Dyson, FCC Telecommunications Consumers Division (Mar. 18, 2002). [**13]

n20 One consumer describes particular circumstances to show that he neither solicited the faxes nor permitted another individual to do so on his behalf. See Declaration of Wayne George Strang (Jul. 22, 2002) (stating that Mr. Strang is the only member of his household and, thus, the only individual entitled to grant access to his telephone facsimile machine).

9. Consumer complaints about the faxes offer a snapshot of the disruption, expense, and inconvenience caused by Fax.com's unwanted fax transmissions. n21 For instance, several [*15932] consumers describe being awakened very late at night or in the early hours of the morning by the noise of their fax machines receiving an unsolicited advertisement from a Fax.com client. n22 Another consumer, Elkins Cox, describes the expense and inconvenience of receiving Fax.com's unwanted transmission on an older telephone facsimile machine and states

that he has chosen to turn off his machine rather than deal with the stream of unsolicited advertisements. n23 Robert McMeekin, M.D., complains about receiving unsolicited advertisements on a line that is reserved **[*15933]** for the receipt of patient medical data, and emphasizes the serious disruption to **[**14]** patient care caused by such unwanted faxes. n24

n21 Although not the basis for our action here, we note that accounts in public media, litigation against Fax.com, and correspondence to the Commission describe in detail substantial disruption and expense caused by Fax.com's widespread fax broadcasting of unsolicited advertisements. *See* "E-Mail Bill May Fail to Curtail Spamming," Brett Arquette, eWEEK Magazine, www.eweek.com/article/0,3658,s=1868&a=8229,00.asp, 2001 WL 4412169 (July 16, 2001) (describing disruption caused by business organization's receipt of up to 1,000 faxes per week from Fax.com):

> We have 320 DID (direct inward dialing) fax numbers assigned to our organization and recently had to add two more inbound trunks to keep up with the number of unsolicited faxes Fax.com was purnping out. During one week, Fax.com took up all four of the inbound lines that feed our 320 RightFax server numbers for 1.5 hours, virtually shutting down our fax system for that time.

*See also* "Fighting Back on the Fax," Ed Foster, InfoWorld Magazine, 2001 WL 22048648 (Aug. 13, 2001) (relaying readers' reports of disruption caused by Fax.com: "'We received over 100 faxes from Fax.com even though we had previously opted out for all our 135 or so incoming phone numbers. . .'"); *Covington & Burling v. International Marketing & Research, Inc., et.al.,* Second Amended Complaint, Civil Action No. 01-004360 (D.C. Superior Court, filed Dec. 13, 2001) ($ 2.45 million lawsuit alleging Fax.com "bombarded" law firm with 1,634 unsolicited advertisements during one week, "substantially interfering with the work of the firm."); Letter from Phillip L. Verveer and David M. Don, counsel for j2 Global Communications, Inc. to Kurt Schroeder, Deputy Chief, FCC Telecommunications Consumers Division (May 9, 2001) (describing disruption to j2's business operations caused by faxes transmitted by Fax.com and other fax broadcasters that send unsolicited advertisements):

> Over the last several months, Fax.com and American Blast Fax (and its affiliates) have flooded j2s telephone facsimile lines with hundreds of unsolicited faxes, despite j2's requests that they cease and desist transmission of unsolicited faxes. The flood of unsolicited advertisements severely disrupts the j2 service, interferes with customers' abilities to utilize the services, and on many occasions, crashes j2's servers for several hours at a time during the workday. When a server crashes, j2 customers are unable to access their accounts and thus cannot receive or send faxes and voicemails using the j2 service. Delivery of legitimate faxes to customers' email accounts is often delayed for hours.

*See also* "j2 Global Communications, Inc. Secures Agreement to End Unsolicited Fax Spam," j2 Global Communications, Inc. Press Release, http://biz.yahoo.com/prnews/020130/law050 (Jan 30, 2002) (reporting that j2 secured an agreement to end Fax.com's transmission of unsolicited fax advertisements to j2's more than 4.5 million customers). **[**15]**

n22 *See* Letter from James Allan Dobbins to the Direct Marketing Association (Oct. 4, 2001); facsimile message from Richard V.N. Ginn to Carmen Bates, FCC Telecommunications Consumers Division (Mar. 16, 2002); Letter from Steven M. Greenberg to FCC (Dec. 7, 2001);

Letter from Sally Collins to FCC Consumer Information Bureau (Dec. 13, 2001).

n23 Letter from Elkins Cox to FCC Consumer Information Bureau (Sep. 21, 2001) and attached letter from Elkins Cox to Georgia Governor's Office of Consumer Affairs (Sep. 5, 2001) ("In my home setup, I must answer the phone, realize it is a fax call, and transfer the call to the fax machine," which prints the fax at a cost of $ .30 per page).

n24 Letter from Robert R. McMeekin, M.D. to FCC Consumer Information Bureau (Jan. 11, 2002). Dr. McMeekin mistakenly identifies two faxes as being transmitted on October 31 and December 31, 2000. The faxes included with Dr. McMeekin's letter contain header information that shows that they actually were received on those days in the year 2001.

10. Some consumers complain about unsuccessful attempts to remove their telephone facsimile machine numbers from Fax.com's database and describe frustration [**16] with Fax.com's automated opt-out lines, which do not identify Fax.com as the entity responsible for the fax number database. n25 Fax.com is not identified on its clients' advertisements and similarly, in many cases, the advertiser itself is unnamed. n26 In such instances, consumers describe difficulties in ascertaining the entity to which they should direct a complaint about receipt of the faxes. Some consumers who were able to contact either the advertiser or Fax.com report that they encountered hostility, misrepresentation, and unresponsiveness. For example, Andrew Hansis has asked the Commission to take action with respect to two unsolicited advertisements he received in October 2001, neither of which identified the company whose service was being [*15934] advertised. n27 With respect to the first advertisement, Mr. Hansis states that he called the telephone number provided on the advertisement for service orders and was provided with a name and telephone number of a "responsible individual" with whom he could discuss the unsolicited advertisement. After unsuccessfully attempting to reach this individual, Mr. Hansis reports he received a telephone call from Charles Martin, an employee of [**17] Fax.com. According to Mr. Hansis, Mr. Martin "was unwilling to tell me the source of how the number was placed in the database, only that it was 'called in'" at an earlier date. n28

n25 Information provided by consumers indicates that Fax.com continued to send faxes even after receiving optout calls. For instance, a log provided by William Robert White, President of Regency Sales, Inc., documents over 50 attempts between May 2000 and August 2001 to use Fax.com's opt-out numbers to halt Regency's receipt of unsolicited advertisements from Fax.com's clients. Despite these attempts, Fax.com continued to transmit unsolicited advertisements to Regency, as evidenced by at least 12 faxes received by Regency from December 2001 to February 2002. See Table 1; see also Letter from Andrew Hansis to Consumer Information Bureau (Oct. 5, 2001) (October 5 Hansis Letter) (stating that Mr. Hansis continued to receive faxes even after using Fax.com's automated opt-out system and speaking with a senior Fax.com employee in an effort to end the faxing); Consumer Form for Telephone-Related Issues from Norman Jensen, III (rec'd Jan. 8, 2002) (consumer continued to receive at least one advertisement a week despite "repeatedly" calling opt-out numbers and faxing a message to the originating fax number asking that his telephone facsimile number be removed from the fax number database); Consumer Form for Telephone-Related Issues from Dora Wong Goto (rec'd Oct. 15, 2001) (Goto Complaint Form); annotated copies of faxes submitted by James Allan Dobbins. It is clear that a call to one Fax.com opt-out line does not end all fax transmissions from the company. We emphasize here that even an effectively administered opt-out system does not change the statutory ban on sending unsolicited facsimile advertisements or insulate such transmissions from statutory penalties. However, the fact that Fax.com apparently does not even adhere to its own stated procedures makes its conduct even more egregious. [**18]

n26 Over 20 per cent of the faxes listed in Table 1 do not identify the entity whose products, goods, or services are being advertised. Section 227(d)(1)(B) of the Act and section 68.318 of the Commission's rules require that all faxes display in a margin at the top or bottom of each page or on the first page of a fax transmission, the following information: the date and time of transmission; the name of the individual, business, or other entity that sent the fax; and the telephone number of either the sending machine or the individual, business, or other entity responsible for sending the fax. With respect to identification requirements for the fax sender and the telephone number of the sender or sending machine, the Commission has determined that the entity that creates the content of the fax message is generally responsible for compliance. _Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Order on Further Reconsideration,_ 12 FCC Rcd 4609, 4610 n.7, 4613 (1997) (finding that liability rests with entity that is responsible for the content of the fax message, not with a fax broadcaster that does "not determine the message content or to whom they are sent.") If, however, a fax broadcaster voluntarily chooses to place its own identifying information on a message faxed for another entity, "it must be clear which entity is the content originator and which entity is merely the transmitter of the message." 12 FCC Rcd at 4613. [**19]


n27 Letter from Andrew Hansis to Consumer Information Bureau (Oct. 4, 2001) (_October 4 Hansis Letter_); _October 5 Hansis Letter._


n28 _October 4 Hansis Letter; see, e.g., Goto Complaint Form_ (consumer made two calls to Fax.com but was unable to reach a live person or have calls returned).

## III. DISCUSSION

11. Section 227(b)(1)(C) of the Act prohibits any person from using "a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." n29 An unsolicited advertisement is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." n30 The Commission has determined that an established business relationship between a fax sender and recipient demonstrates consent to receive telephone facsimile advertisement transmissions. n31 The mere distribution or publication of a telephone facsimile number, however, does not confer invitation or permission to transmit advertisements to a particular telephone facsimile machine. n32


n29 47 U.S.C. § 227(b)(1)(C). Section 227 defines a telephone facsimile machine as "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." _Id._ § 227(a)(2). This blanket prohibition applies to all unsolicited advertisements transmitted to telephone facsimile machines. The Act does not permit the sending of unsolicited advertisements by facsimile to either business or residential telephone facsimile machines. [**20]


n30 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(5).


n31 _See TCPA Report and Order,_ 7 FCC Rcd at 8779 n. 87; _TCPA Memorandum Opinion and Order,_ 10 FCC Rcd at 12408.

n32 *Id.*

## A. Constitutional Issue.

12. Fax.com and its client advertisers have argued that the broad prohibition on sending unsolicited facsimile advertisements violates their constitutional right to free speech guaranteed under the First Amendment. Federal courts have previously considered similar arguments. For example, the Court of Appeals for the Ninth Circuit, where Fax.com is located, has determined that the TCPA does not violate the First Amendment's protection of commercial **[*15935]** speech. n33 Moreover, administrative agencies are to presume that the statutes that Congress directs them to implement are constitutional. n34 Accordingly, we reject Fax.com's arguments in this regard.

n33 *See Destination Ventures v. FCC*, 46 F.3d 54, 55-57 (9th Cir. 1995) (ban on unsolicited fax advertisements does not violate the advertiser's First Amendment rights because it reasonably fits the government's interest in preventing the shifting of advertising costs to consumers); *see also Kenro, Inc. v. Fax Daily, Inc.*, 962 F.Supp. 1162, 1167-69 (S.D. Ind. 1997) (ban on unsolicited fax advertisements is narrowly tailored to achieve the government's intended purpose and does not violate the First Amendment guarantee of commercial free speech); *Texas v. American Blast Fax*, 121 F. Supp.2d 1085, 1091-92 (W.D. Tex. 2000). *But see Missouri v. American Blast Fax*, 196 F. Supp. 920 (E.D. Mo. 2002), appeal pending Nos. 02-2705, 02-2707 (8th Cir.) (government failed to demonstrate that the harms associated with unsolicited facsimile advertisements are real, that the blanket prohibition on faxing such materials would significantly alleviate such harms, and that the prohibition was not more extensive that necessary to serve the government's interests). The latter case is not implicated in this NAL because none of the fax transmissions for which we are assessing a forfeiture were received in or, to our knowledge, sent from the eastern judicial district of Missouri. **[**21]**

n34 *Johnson v. Robison*, 415 U.S. 361, 368 (1974) (quoting *Oestereich v. Selective Service Board*, 393 U.S. 233, 242 (1968) (Harlan, J., concurring in result) ("Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdictions of administrative agencies.")).

## B. Fax.com's Liability Under 47 U.S.C. § 227(b)(1)(C) and 47 C.F.R. § 64.1200(a)(3).

13. Because of the nature of its operations, Fax.com is liable for violations of section 227(b)(1)(C) of the Act and section 64.1200(a)(3) of our rules even though it generally acts on behalf of other parties in sending unsolicited advertisements to telephone facsimile machines. The Commission has held that the prohibition on sending unsolicited fax advertisements does not apply to fax broadcasters that operate like common carriers by merely transmitting their customers' messages without determining either content or destination. n35 In finding that such entities are not liable under section 227(b)(1)(C) of the Act or section 64.1200(a)(3) of the rules, the Commission has focused on the nature **[**22]** of an entity's activity rather than any label that that entity may claim. Specifically, the Commission's rulings clearly indicate that a fax broadcaster's exemption from liability is based on the type of activities it undertakes, and only exists "in the absence of 'a high degree of involvement or actual notice of an illegal use and failure to prevent such transmissions.'" n36 Regardless of whether Fax.com characterizes itself as a disinterested fax broadcaster, it is clear that the company's activities place it outside the exempted category of fax broadcasting applied by Commission and render it a fax sender within the meaning of section 227(b)(1)(C).

n35 *TCPA Memorandum Opinion and Order*, 10 FCC Rcd at 12407. *See TCPA Report and Order*, 7 FCC Rcd at 8780.

n36 *Id.* (quoting *Use of Common Carriers*, 2 FCC Rcd at 2820).

14. The record here clearly establishes that Fax.com uses its own extensive distribution list of telephone facsimile numbers to send its clients' advertisements, and that it knowingly sends advertisements to such numbers without regard to whether the facsimile machine **[**23]** owner or responsible party either granted permission to send the advertisement or had **[*15936]** an established business relationship with the advertiser or Fax.com. n37 In addition, Fax.com apparently reviews the text of its clients' advertisements, not only to assist with graphic design, n38 but also to assess content. n39 Such conduct is clear evidence of Fax.com's high degree of involvement in the unlawful activity. Moreover, the staff's citations provided Fax.com with actual notice that its fax broadcasting activities do not comply with federal law.

n37 *See* para. 5, *supra*.

n38 *See* note 6, *supra*.

n39 Fax.com's website states that "as a responsible service provider, Fax.com makes a conscious effort to censor any offensive literature or graphic content from its platform." http://www.fax.com/company_profile/our_business.asp (website accessed May 29, 2002). In addition, as indicated above, in response to our citations, Fax.com has suggested that it may review its clients' advertisements to ensure that they are not "offensive or misleading." *See* para. 5, *supra*. Such editorial influence is inconsistent with Fax.com's claim that it does not exercise control over the content of its clients' advertisements. Fax.com's close involvement in the undertakings of its clients is evidenced by the fact that Fax.com is the subscriber for the toll-free sales number (800-550-0406) displayed on one of its client's advertisements. *See, e.g.*, Advertisements from Infinity Communications to Heather Ann Hartnett (Nov. 2, 2001; Dec. 12, 2001).

**[**24] C. Violations Evidenced by the Consumer Correspondence.**

15. As an initial matter, the staff has reviewed every facsimile that forms the basis for this NAL to confirm that each message advertises the commercial availability or quality of a product, good or service and, thus, constitutes an advertisement as set forth by section 227(a)(4) of the Act and section 64.1200(f)(5) of our rules. n40 Further, the record indicates that the consumers at issue neither granted express permission to send the advertisements nor had an established business relationship with either Fax.com or the entities on whose behalf the advertisements were faxed. n41 In light of this information, we conclude that the 489 faxes **[*15937]** detailed in Table 1 all are unsolicited advertisements and, thus, violate the statutory prohibition on faxing such materials.

n40 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(5); *see* para. 8, *supra*. The advertisements include promotions for cellular telephone service, stock market offerings, commercially offered seminars, clocks, vacation packages, office supplies and equipment, and insurance services. The Moneyline Report's stock advertisements, claim, "This Fax is intended for information purposes only and is not a commercial solicitation under the Telephone Consumer Protection Act. It is not an offer to buy or sell anything." Despite this disclaimer, the faxes clearly promote

a stock offering and thus constitute an advertisement under 47 U.S.C. § 227(a)(4) and 47 C.F.R. § 64.1200(f)(4). *See, e.g.,* Advertisement from Moneyline Report to John P. Strang (Oct. 16, 2001) ("Moneyline Report is putting FXGP on our Strong Buy-Aggressive Growth recommendation list. . . ."). Finally, one of the advertisements included in this forfeiture action is Fax.com's own "Your Permission Please" message, which purportedly seeks permission to fax consumers both missing children alerts and "a limited amount of paid commercial advertising." See Advertisement from Fax.com to Heather Ann Hartnett (Dec. 31, 2001). Contrary to Fax.com's assertion, such messages are indeed both commercial and prohibited under section 227(b)(1)(C) of the Act and section 64.1200(a)(3) of our rules. *See TCPA Memorandum Opinion and Order,* 10 FCC Rcd at 12408 ("Facsimile requests for permission to transmit would impose costs on facsimile recipients unless and until the recipient were able to ask that such transmissions be stopped. This kind of 'negative option' (in which the sender presumes consent unless advised otherwise) is contrary to the statutory requirement for prior express permission or invitation."). **[**25]**

n41 In fact, several consumers indicate that Fax.com continued to fax advertisements to them even after they attempted to stop such faxes by calling one or more of Fax.com's toll-free opt-out numbers. *See* note 25, *supra.*

**D. Forfeiture Amount.**

16. As set forth above, we conclude that Fax.com apparently willfully or repeatedly violated the Act and the Commission's rules and orders by using a telephone facsimile machine, computer, or other device to send unsolicited advertisements to telephone facsimile machines. Fax.com apparently did not cease its unlawful conduct even after the Commission staff issued citations warning that it was engaging in unlawful conduct and could be subject to monetary forfeitures for subsequent violations. Accordingly, a proposed forfeiture is warranted against Fax.com for its apparent willful or repeated violations of the ban on unsolicited facsimile advertisements contained in section 227 of the Act and the Commission's rules and orders.

17. Section 503(b) of the Act authorizes the Commission to assess a forfeiture of up to $ 11,000 for each violation of the Act or of any rule, regulation, or order issued by the Commission under the Act by **[**26]** a non-common carrier or other entity not specifically designated in section 503 of the Act. n42 In exercising such authority, we are to take into account "the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." n43

n42 Section 503(b)(2)(C) provides for forfeitures up to $ 10,000 for each violation by cases not covered by subparagraph (A) or (B), which address forfeitures for violations by licensees and common carriers, among others. *See* 47 U.S.C. § 503(b). In accordance with the inflation adjustment requirements contained in the Debt Collection Improvement Act of 1996, Pub. L. 104-134, Sec. 31001, 110 Stat. 1321, the Commission implemented an increase of the maximum statutory forfeiture under section 503(b)(2)(C) to $ 11,000. *See* 47 C.F.R. § 1.80(b)(3); *Amendment of Section 1.80 of the Commission's Rules and Adjustment of Forfeiture Maxima to Reflect Inflation,* 15 FCC Rcd 18221 (2000).

n43 47 U.S.C. § 503(b)(2)(D); *The Commission's Forfeiture Policy Statement and Amendment of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines, Report and Order,* 12 FCC Rcd 17087, 17100-17101, (1997), *recon. denied,* 15 FCC Rcd 303 (1999) (*Forfeiture Policy Statement*). **[**27]**

18. Although the Commission's *Forfeiture Policy Statement* does not establish a base forfeiture

amount for violating the prohibition on sending unsolicited advertisements to a telephone facsimile machine, we have previously considered $ 4,500 per unsolicited fax advertisement as an appropriate base amount. n44 In addition, we have previously assessed a higher forfeiture of $ 10,000 per unsolicited fax advertisement in instances in which the fax recipient had previously asked the sender to refrain from faxing such materials. n45

n44 See *Get-Aways, Inc., Notice of Apparent Liability For Forfeiture*, 15 FCC Rcd. 1805, 1812 (1999); see also *Carolina Liquidators, Inc., Notice of Apparent Liability for Forfeiture*, 15 FCC Rcd 16837, 16842 (2000) (*Carolina Liquidators NAL*); *Tri-Star Marketing, Notice of Apparent Liability for Forfeiture*, 15 FCC Rcd 11295, 11300 (2000) (*Tri-Star NAL*); *US Notary, Inc. Notice of Apparent Liability for Forfeiture*, 15 FCC Rcd 16999, 17003 (2000).

n45 See *Carolina Liquidators NAL*, 15 FCC Rcd at 16842; *Tri-Star NAL*, 15 FCC Rcd at 11300. **[**28]**

**[*15938]** 19. In the instant case, we believe that the maximum forfeiture amount of $ 11,000 per violation is warranted for each unsolicited advertisement transmitted by Fax.com and documented by the consumer correspondence. It is clear from Fax.com's own promotional materials and its responses to our citations that Fax.com's primary business activity itself constitutes a massive n46 on-going violation of section 227(b)(1)(C) of the Act and section 64.1200(a)(3) of the Commission's rules, and that Fax.com is well aware of this fact. Fax.com's primary commercial offering is a fax broadcasting service that clearly does not comply with federal restrictions governing facsimile advertisements. As outlined above, by its own admission and as demonstrated by the consumer information, Fax.com generally conducts its fax broadcasting without any regard to whether the fax recipient has an established business relationship with either Fax.com or the advertiser, or has otherwise granted express permission for the advertisement to be sent. We conclude that this unlawful undertaking merits maximum forfeitures for each of the violations at issue here. Although we believe that the nature of Fax.com's enterprise **[**29]** by itself warrants imposition of a maximum forfeiture for each violation, we discuss below the particularly egregious aspects of Fax.com's conduct.

n46 Fax.com's website, copyrighted 2000, claims:

By mid-1999, all systems were in place with an initial broadcasting capacity of two million faxes per day. Following its plan to continue increasing line capacity to three million faxes per day by 2001, Fax.com is well on its way.

http://www.fax.com/company_profile/about.asp (website accessed May 29, 2002).

20. Fax.com's Actions with Respect to Private Suits to Enforce Section 227. We are especially concerned because it appears that Fax.com has acted in a manner that thwarts the unique statutory enforcement mechanism established by section 227 of the Act. Under the statute, the Commission, state attorneys general, or aggrieved consumers may initiate actions to enforce certain prohibitions and restrictions contained in section 227 of the Act, including the prohibition on sending unsolicited fax advertisements. Section 227(b)(3) affords consumers an opportunity to initiate actions in state courts to enjoin violations of, *inter alia*, the prohibition on faxing unsolicited **[**30]** advertisements, and/or to recover damages equivalent to the actual monetary loss caused by such violations or $ 500, whichever is greater, for each violation. Damages may be trebled if a court determines that the violation was "willful and knowing." As we describe below, Fax.com appears to have engaged in a pattern of deception and intimidation to conceal its involvement in sending prohibited faxes n47 and to frustrate

consumers' efforts to exercise the statutory private right of action.

n47 As mentioned above, only one of the 489 faxes that form the basis for this NAL identifies Fax.com in any way. Nonetheless, Fax.com's various toll-free opt-out numbers appear on each advertisement. In fact, the wording of the opt-out notices, and the fact that they are contained on advertisements for individual entities, clearly convey the erroneous impression that opt-out numbers are associated with individual advertisers. *See, e.g.,* Advertisement from Y2 Marketing to D. Leon Taylor (Oct. 16, 2001) ("If you received this fax in error and would like to have your number removed from our database, call toll-free at 800-822-9033; Advertisement from eStock Pick of the Week to Robert Isaac Carr (Jan. 9, 2002) ("To have your name removed from our database, please call our toll free service at: (800)-331-4510); Advertisements from Central Imaging Supply to L. ("Les") R. Docks (Nov. 2 and 8, 2001) ("To have your number removed from our database, please call our automated toll-free center at 800-457-5410). As shown in Tables 2 and 3, however, opt-out numbers are not assigned uniquely to individual advertisers. These tables reveal that a single advertiser may be associated with multiple opt-out numbers and likewise a single opt-out number may be associated with multiple advertisers. **[\*\*31]**

[**\*15939**] 21. We have obtained evidence that Fax.com employee Charles Martin filed an apparently false statement regarding his employment status before a California court considering a consumer's section 227(b)(3) claim for damages against Fax.com client American Benefit Mortgage. In two statements filed with the Los Angeles Superior Court and signed under penalty of perjury, Mr. Martin falsely identifies himself both as "Compliance Manager for American Benefit Mortgage, Inc." and as "Officer of the Company [American Benefit Mortgage] - Manager of Human Resources." n48 Through Mr. Martin's false claim to be employed by a client, Fax.com subverts the judicial decision-making process and skews the statutory private right of action accorded under section 227 by ensuring that the court does not have an accurate record upon which to base its decision.

n48 "Representative Appearance Declaration Pursuant to CCP 116.540(B)" signed by Charles Martin and filed in Los Angeles Superior Court (Feb. 26, 2001, Apr. 3, 2001). According to Dun & Bradstreet, Charles Martin is not an officer of American Benefit Mortgage. *See* Dun & Bradstreet Business Information Report (June 7, 2002). In addition, an Enforcement Bureau staff member called American Benefit Mortgage's automated telephone directory, followed instructions to press keypads to spell Mr. Martin's name, and received a message that the name could not be found in the directory. **[\*\*32]**

22. We have also obtained letters, signed by Mr. Martin, that were received by consumers in response to "demand letters" n49 that the consumers sent to Fax.com clients seeking to obtain monetary damages for unsolicited advertisements. Mr. Martin's letters are labeled "Inadmissible Settlement Communication," and state that the consumers that "fall under . . . exceptions . . . to receiving facsimile messages under 47 U.S.C. Section 227." n50 In addition, Mr. Martin warns the consumers to expect countersuits that if they pursue their private right of action in the state courts where they reside:

If you pursue this matter in Virginia our company will seek civil and criminal charges in California. n51

[**\*15940**] If you think you have an action under the TCPA then file it in New Jersey. I will then pursue civil and criminal actions against you in the California Superior Courts. You can hire local legal counsel and we will litigate these matters with a jury trial. n52

If you pursue this matter in Massachusetts we will then file the appropriate actions in

California Superior Court. n53

Mr. Martin does not identify who "we" or "our company" is, and there is **[\*\*33]** no information on the face of the letters that would reveal the identity of Mr. Martin's employer or the corporate entity he actually represents. n54 In two cases, however, consumers have provided us with photocopies of the envelopes in which Mr. Martin's letters arrived. In each case, the return address shows the name and address of the individual advertisers to which the consumers directed their demand letters. The envelopes also show a metered mail stamp indicating that the letters were mailed from Aliso Viejo, California - Fax.com's corporate headquarters - despite the fact that the return address was in a different location. n55

n49 Demand letters are a popular tool among TCPA advocates and consumers who seek to self-enforce section 227 though the statute's private right of action. In such demand letters, a consumer generally complains about receiving a prohibited advertisement, asserts the private right of action to recover monetary damages, and asks the advertiser to pay a specified amount to avoid being sued in state court. We do not suggest that any advertiser or fax broadcaster is obligated to accede to a demand letter or that failure to do so somehow indicates an alleged violator's bad faith. **[\*\*34]**

n50 *See* Letter from Charles Martin to Terry P. Carter (Oct. 25, 2001) (*Carter Letter*); Letter from Charles Martin to Amy K.C. Goebel (Nov. 2, 2001) (*Goebel Letter*).

n51 *Carter Letter.*

n52 Letter from Charles Martin to Richard M. Zelma (Nov. 9, 2001) (*Zelma Letter*).

n53 *Goebel Letter.*

n54 The line below Mr. Martin's name simply reads, "Compliance Department." *See Carter Letter* (reference line refers to Advanced Communications); *Goebel Letter* (reference line refers to Advanced Communications); Letter *Zelma Letter* (reference line refers to Colorjet, Inc.).

n55 The envelope for the *Zelma Letter* shows a return address for Colojet, Inc. in Louisville, Kentucky while the metered postal stamp, PB8722193, shows that the envelope was mailed from Aliso Viejo, California. Likewise, the envelope for the *Goebel Letter* shows a return address for Advanced Communications in Long Beach, California (located in Los Angeles County) and the identical metered postal stamp number, which shows that the envelope was mailed from Aliso Viejo, California (located in Orange County).

23. Fax.com's letters are troublesome in several respects. First, **[\*\*35]** Fax.com's apparent deception regarding its authorship of the correspondence appears to be part of a concerted effort to discourage private enforcement actions against Fax.com's individual clients while, at the same time, concealing Fax.com's potential liability for the violations. In addition, the letters go beyond valid legal defenses and misrepresent the requirements of section 227(b)(1)(C), n56 again **[\*15941]** in an apparent effort to convince the recipients that they do not have a cause of action. Finally, the letters allude to retaliatory and possible vexatious court actions if recipients exercise the private right of action provided by section 227(b)(3). n57 Fax.com's

obvious attempts to thwart consumers' statutory private right of action threaten the effectiveness of the unique three-pronged enforcement mechanism that Congress created in section 227.

n56 One letter states, "As you are aware there are three exceptions to receiving facsimile messages under 47 U.S.C. Section 227. You fall under two of those exceptions." *Carter Letter*. In reality, there is one exception to the ban on faxing unsolicited advertisements: when the recipient has given prior express permission or invitation to send the advertisement. 47 U.S.C. § 227(b)(1)(C). As noted above, the Commission has determined that an established business relationship between the fax sender and recipient constitutes the requisite permission or invitation to fax. *See* para. 11, *supra*. Other information from consumers also indicates Mr. Martin's deception regarding the section 227(b)(1)(C) of the Act:

> Mr. Martin has continued to attempt to misinform me about the TCPA, stating at various times that Fax.com is exempt from the TCPA, that California law overrides the TCPA, that Fax.com was a non-profit organization and thus exempt from § 227(b)(1)(C), that Fax.com has never lost a case, that the FCC has not cited Fax.com, etc.

Letter from Mark James, Marketing Power, Inc. to Yanic Hardie, FCC (Apr. 2, 2001) (*James Letter*). [**36]

n57 One consumer has alleged that he was a victim of such a retaliatory lawsuit. Richard Zelma, a well-known TCPA advocate, claims that Charles Martin falsely swore out a complaint in the state of New Jersey charging Mr. Zelma with harassment. *State of New Jersey v. Richard Zelma*, Norwood Municipal Court Summons No. S-2001-000002-0241, File No. 8875.1000 (Jan. 23, 2001). The case was dismissed for failure to prosecute. The claims made by Mr. Zelma and Mr. Martin are moot, and in any event, would not be properly before this Commission; we therefore take no position on the validity of such claims.

24. Fax.com's Marketing of Its Fax Broadcasting Service. The record indicates that Fax.com does not disclose to its clients the broad prohibition on faxing unsolicited advertisements imposed by section 227 of the Act and our rules and orders. Fax.com's extensive promotional website does not mention section 227 at all. Information on the website creates the erroneous impression that opt-out numbers provide the only recourse for consumers who object to receiving unsolicited fax advertisements. n58 As indicated above, federal law does not address opt-out numbers in any way and even [**37] the effective use of such numbers in no way mitigates the fact that every unsolicited fax advertisement violates federal law. n59 In addition to deceiving prospective customers by omitting crucial information, Fax.com apparently has affirmatively misstated federal law governing unsolicited facsimile advertisements. One consumer reports a conversation with a Fax.com salesperson:

> I acted hesitant about the legality of the whole thing, but Mr. Horvat assured me that Fax.com works with the FCC and other agencies to act within the Federal Guidelines. He further stated that Fax.com includes a federally required 'opt-out' number at the bottom of the fax which makes sending the faxes legal. n60

In addition to subjecting consumers to greater numbers of unlawful faxes, Fax.com's deceptive marketing leaves its clients, which include small businesses, vulnerable to federal, state, and private enforcement actions that may involve substantial monetary penalties.

n58 See http://www.fax.com/Customer_support/FAQs.asp (website accessed May 29, 2002) ("Q: Do prospective clients complain about receiving the faxes? A: If someone does not want to receive any more faxes, there is an 800 number at the bottom of each and every fax sent through Fax.com that an individual can call to have the fax number removed from your campaign list.") [**38]

n59 See note 25, supra. We note that the broad federal prohibition on faxing unsolicited advertisements applies to both interstate and intrastate transmissions. See 47 U.S.C. § 152(b) (section 227, inter alia, is not subject to the provision that generally excludes Commission jurisdiction over intrastate matters); 47 U.S.C. § 227(e) (section 227 does not preempt state law that imposes more restrictive intrastate requirements).

n60 James Letter.

[*15942] 25. Fax.com's Dealings with the Commission. Fax.com has not been forthcoming in its dealings with the Commission. The staff's citations directed Fax.com to describe in detail its involvement in "providing, compiling, generating, or editing" distribution lists of telephone facsimile numbers used to transmit advertisements on behalf of clients. Specifically, the staff asked

Does your company employ or compensate any individuals or entities outside the company, including any tax-exempt nonprofit organizations, for any service, activity, assistance, or facilities used in connection with your company's providing, compiling, generating, [**39] or editing of such [distribution] lists? Please describe such arrangements in detail.

Initially, Fax.com suggests that the staff's inquiry "appear[s] to be completely irrelevant and immaterial to the violations alleged in the Citations." n61 The Commission, however, has broad authority and discretion to investigate conduct under its jurisdiction n62 and to "conduct its proceedings in such manner as will best conduce the proper dispatch of business and to the ends of justice." n63 Despite its reservations, Fax.com nonetheless purports to substantively answer the staff's question, summarily stating that it uses "its own research methods" as one means of compiling its facsimile number database. n64 In addition, Fax.com states, "Fax.com does not, to its knowledge, employ or compensate any tax-exempt non profit organization(s) in connection with Fax.com's business, including the providing, compiling, generating or editing of distribution list(s) of telephone numbers." n65 By limiting its answer to tax-exempt nonprofit entities, Fax.com has failed to answer the staff's inquiry, which clearly sought information pertaining to "any individuals or entities outside the company, including [**40] any tax-exempt nonprofit organizations." n66 Despite the staff's warning that the concealment of any material fact is punishable by fine or imprisonment, n67 Fax.com did not disclose to the Commission its remunerative relationship with at least one individual who apparently housed automatic telephone dialing equipment that Fax.com used to "war dial" massive blocks of telephone numbers to determine which numbers belong to telephone facsimile machines. n68

n61 January 31 Response at 29; June 1 Response at 29-30; June 21 Response at 28-29.

n62 47 U.S.C. § 403 provides that "the Commission shall have full authority and power at any

time to institute an inquiry, on its own motion, in any case and as to any matter or thing . . . concerning which any question may arise under any provisions of this Act, or relating to the enforcement of any of the provisions of this Act."

n63 47 U.S.C. § 154(j).

n64 *See* January 31 Response at 29; June 1 Response at 30; June 11 Response at 29.

n65 *Id.* (emphasis added).

n66 *Fax.com Citations* at 2 (emphasis added).

n67 *Id.*

n68 In this context, war dialing uses automated equipment to dial telephone numbers, generally sequentially, and software to determine whether each number is associated with a fax or voice line. In April 2000, the state of Washington entered into a consent decree with Fax.com to settle its complaint alleging that this war-dialing scheme had resulted in a barrage of calls to telephone lines at the University of Washington Medical Center, including lines for emergency services and patient rooms, in violation of section 227(a)(1)(A) of the Act and section 64.1200(a)(1) of our rules. *State of Washington v. Fax.com, Inc.*, No. C01-0369 (W.D. Wash. May 13, 2001) (consent decree permanently enjoining Fax.com from, *inter alia*, using automated dialing equipment to call any hospital patient room or emergency medical telephone number within Washington state and providing for $ 90,000 payment to the state in civil penalties, damages, and attorneys fees). We recognize that although Fax.com has agreed to an injunction and monetary payment, it does not admit the allegations in Washington's complaint. We do not address or pass judgment on all aspects of Fax.com's conduct in this regard, which, in any event, is beyond the statute of limitations set by the Act. Nonetheless, we need not ignore materials that document an arrangement whereby Fax.com paid an individual to house and operate the war-dialing equipment. *See* Participation Agreement between Fax Broadcast Systems and Mike Salvus (Apr. 4, 2000) (providing for Mr. Salvus's agreement to house in his residence war-dialing, or "casting," equipment as part of Fax Broadcast Systems' "Fax Broadcast Placement Program"); "Dear Participant" Form Letter from Paul L. Stanton, Fax Broadcast Systems (Mar. 30, 2000) (informing recipients that Fax.com has taken over from Fax Broadcast Systems, payments to participants in the fax broadcast placement program). In light of this information, it is clear that Fax.com did not honestly answer the staff's questions. We do not address here possible sanctions against Fax.com for its concealment. [**41]

[*15943] 26. Maximum Forfeiture Is Warranted. Fax.com's pervasive and egregious pattern of deception confirms our determination that the maximum forfeiture amount is warranted for each violation set forth in Table 1. The record here shows that even after the staff notified Fax.com that its actions violated the Act and the Commission's rules and orders, Fax.com continued its massive unlawful enterprise. The *Forfeiture Policy Guidelines* provide for upward adjustments to the maximum statutory forfeiture amount in cases such as this which involve egregious misconduct and intentional violation. n69 Accordingly, based on the nature and gravity of Fax.com's conduct and the continued need to ensure compliance with section 227(b)(1)(C) of the Act, we find Fax.com apparently liable in the amount of $ 11,000 for each of 489 violations. This results in a proposed total forfeiture of $ 5,379,000. Fax.com shall have the opportunity to submit evidence and arguments in response to this NAL to show that no forfeiture should be imposed or that some lesser amount should be assessed. n70

n69 *Forfeiture Policy Statement,* 12 FCC Rcd at 17,101.

n70 *See* 47 U.S.C. § 503(b)(4)(C); 47 C.F.R. § 1.80(f)(3). **[**42]**

## IV. CONCLUSION AND ORDERING CLAUSES

27. We have determined that Fax.com apparently violated section 227 of the Act and the Commission's rules and orders by using a telephone facsimile machine, computer, or other device to send the 489 unsolicited advertisements identified in Table 1 and discussed above. We have further determined that Fax.com is apparently liable for forfeitures in the amount of $ 5,379,000.

28. Accordingly, IT IS ORDERED, pursuant to section 503(b)(5) of the Act, as amended, 47 U.S.C. § 503(b)(5), and section 1.80 of the Commission's rules, 47 C.F.R. § 1.80, that Fax.com, Inc. IS HEREBY NOTIFIED of an Apparent Liability for Forfeiture in the amount of $ 5,379,000 for willful or repeated violations of section 227(b)(1)(C) of the Act, 47 U.S.C. **[*15944]** § 227(b)(1)(C), and section 64.1200(a)(3) of the Commission's rules, 47 C.F.R. § 64.1200(a)(3), and the related orders described in the paragraphs above.

29. IT IS FURTHER ORDERED, pursuant to section 1.80 of the Commission's rules, 47 C.F.R. § 1.80, that within thirty (30) days of the release of this Notice, Fax.com, Inc. SHALL PAY the full amount of **[**43]** the proposed forfeiture n71 OR SHALL FILE a response showing why the proposed forfeiture should not be imposed or should be reduced.

n71 The forfeiture amount should be paid by check or money order drawn to the order of the Federal Communications Commission. Reference should be made on Fax.com, Inc.'s check or money order to "NAL/Acct/No. 200232170004." Such remittances must be mailed to Forfeiture Collection Section, Finance Branch, Federal Communications Commission, P.O. Box 73482, Chicago, Illinois 60673-7482.

30. IT IS FURTHER ORDERED that a copy of this Notice of Apparent Liability for Forfeiture SHALL BE SENT by certified mail to Kevin Katz, President, Fax.com, Inc., 120 Columbia Street, Suite 500, Aliso Viejo, California 92656.

Marlene H. Dortch

Secretary

**CONCUR BY:**
ABERNATHY

**CONCUR:**
  **[*15945]**

## SEPARATE STATEMENT OF COMMISSIONER KATHLEEN Q. ABERNATHY

*Re: Fax.com Apparent Liability for Forfeiture, File No. EB-02-TC-120, NAL/Acct. No. 200232170004*

I strongly support this Notice of Apparent Liability and hope that other fax broadcasters will take notice that the Commission will strictly enforce the Telephone Consumer Protection Act. As set forth in detail in the NAL, Fax.com appears to have founded **[**44]** its business on the practice of sending unsolicited faxes in flagrant violation of the TCPA. The record also suggests that Fax.com deliberately misled consumers regarding the company's requirements and

consumers' rights under the TCPA. Despite repeated warnings from the Commission and numerous consumer complaints, the company appears to have made no effort to mend its ways. As a result, many consumers have been harassed in their homes and had their businesses disrupted by unwanted fax solicitations--and, adding insult to injury, were forced to pay for this privilege.

This NAL makes clear that the Commission will not tolerate such conduct; indeed, we propose to punish Fax.com to the maximum extent of our statutory authority. When I became a Commissioner, I pledged to protect consumers by stringently enforcing the Communications Act and the Commission's rules. I am proud that the Commission is taking this responsibility seriously and sending such a strong signal that companies cannot violate the law with impunity.

**APPENDIX:**
**TABLE 1**

**Unsolicited Advertisements Transmitted by Fax.com and Subject to Forfeiture Pursuant to FCC 02-226**

**(Fax.com, Inc., Notice of Apparent Liability for Forfeiture) [**45]**

| FAX RECIPIENT | NUMBER OF FAXES | DATE FAX RECEIVED | ADVERTISER (Bold type denotes advertiser that is not identified by fax text) | FAX.COM OPT-OUT NUMBER |
|---|---|---|---|---|
| Thomas W. Bell, Jr. (Accredo Health, Inc.) | | 12/10/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | | 12/12/01 | Mortgage Market | 800-443-7628 |
| | 3 | 1/7/002 | Tower Group | 800-457-5410 |
| Cappy Caplan (MRO Electronic Distributors, Inc.) | 1 | 1/15/02 | Stock Traders Alert | 800-785-8505 |
| Lucretia A. Cartharius (Rosenbaum Investments) | | 11/20/01 | Stockscape Network Group (Small Cap Central) | 800-443-7628 |
| | | 11/26/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| | | 11/27/01 | Central Imaging Supply | 800-457-5410 |
| | | 12/7/01 | Vacation Getaway Travel, Inc | 800-822-9033 |
| | 5 | 2/22/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| Robert Isaac Carr | | 12/10/01 | Advanced Communications | 800-785-6698 |
| | | 12/17/01 | Media Broadcast | 800-443-7628 |

|  |  |  | Solutions (Wall Street Examiner) |  |
| --- | --- | --- | --- | --- |
|  |  | 12/27/01 | Cell Direct | 800-965-7235 |
|  |  | 12/27/01 | Vacation Getaway Travel, Inc | 800-822-9033 |
|  |  | 1/6/02 | Y2 Marketing | 800-822-9033 |
|  |  | 1/9/02 | eStock Pick of the Week | 800-331-4510 |
|  |  | 1/12/02 | Y2 Marketing | 800-822-9033 |
|  |  | 1/15/02 | Advanced Communications | 800-785-6698 |
|  |  | 1/16/02 | Office Warehouse | 800-822-9033 |
|  |  | 1/17/02 | Union Trust Mortgage | 800-443-7628 |
|  |  | 1/17/02 | Office Warehouse | 800-822-9033 |
|  |  | 1/18/02 | Investors Today | 800-331-4510 |
|  |  | 1/23/02 | Wireless Center | 800-822-9033 |
|  |  | 1/28/02 | Office Warehouse | 800-766-0816 |
|  |  | 1/29/02 | Axin Corporation | 800-822-9033 |
|  |  | 2/1/02 | Vacation Showroom ("Corporate Travel Division") | 800-822-9033 |
|  |  | 2/10/02 | Y2 Marketing | 800-766-0816 |
|  |  | 2/13/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  |  | 2/14/02 | Bentley Mortgage | 800-822-9033 |
|  |  | 2/19/02 | Vacation Warehouse | 800-443-7628 |
|  |  | 2/27/02 | Advanced Communications | 800-785-6698 |
|  |  | 3/4/02 | National Communications | 800-822-9033 |
|  |  | 3/6/02 | Vacation Warehouse | 800-822-9033 |
|  |  | 3/14/02 | Altimate Marketing | 800-976-3734 |
|  |  | 3/19//02 | LifeQuotes of America, Inc. | 800-976-3734 |
|  |  | 3/28/02 | Apollo Transportation | 800-822-9033 |
|  | 27 | 3/28/02 | Partnership for Education | 800-976-3734 |
| Terry Powell Carter | 1 | 10/10/01 | Advanced Communications | 800-785-6698 |
| Gary Chou (United States Department of the Treasury, Internal Revenue Service) |  | 10/3/01 | Advanced Communications | 800-785-6698 |
|  |  | 10/6/01 | Y2 Marketing | 800-822-9033 |
|  |  | 10/11/01 | Central Imaging Supply | 800-457-5410 |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  | (1:51 p.m.) |  |
|  |  | 10/11/01 | Central Imaging Supply | 800-457-5410 |
|  |  |  | (2:00 p.m.) |  |
|  |  | 10/16/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-766-0816 |
|  |  | 10/30/01 | Moneyline Report | 800-364-0216 |
|  |  | 11/1/01 | First Chartered Investments | 800-443-5716 |
|  |  | 11/2/01 | Businesscoach.com | 800-766-0816 |
|  |  | 12/10/01 | Call Center Network - The Wireless Center | 800-822-9033 |
|  |  | 1/7/02 | Y2 Marketing | 800-766-0816 |
|  |  | 1/9/02 | Elite Communications | 800-822-9033 |
|  |  | 1/15/02 | Equity Market Watch | 800-766-0816 |
|  |  | 1/23/02 | Call Center Network | 800-822-9033 |
|  |  | 2/6/02 | Tallclocks, Inc. | 800-457-5410 |
|  |  | 2/7/02 | Elite Communications | 800-766-0816 |
|  | 16 | 3/7/02 | Y2 Marketing | 800-663-8758 |
| Sally Collins |  | 12/11/01 | First Chartercd Investments | 800-443-5716 |
|  | 2 | 12/13/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| Elkins Cox | 1 | 9/5/01 | Florida Reservations | 877-276-1974 |
| George D. Demet | | 9/6/01 | LifeQuotes of America, Inc. | 800-443-7628 |
| (Palantir.net) | | 9/27/01 | Axin Corporation | 800-822-9033 |
|  |  | 9/28/01 | American Cellular Inc. | 800-822-9033 |
|  |  | 10/11/01 | Cell Direct | 800-822-9033 |
|  |  | 10/11/01 | Wall Street Alert | 800-785-6698 |
|  |  | 10/16/01 | Moneyline Report | 800-364-0216 |
|  |  | 10/24/01 | Axin Corporation | 800-822-9033 |
|  |  | 10/26/01 | Cell Direct | 800-822-9033 |
|  |  | 10/30/01 | Moneyline Report | 800-364-0216 |
|  |  | 11/13/01 | Stock Traders Alert | 800-785-8505 |
|  |  | 11/28/01 | Kit Stuff Wireless | 800-822-9033 |
|  |  | 11/29/01 | Telecommservices.net (Fine Telecommunications, Inc.) | 800-965-7235 |
|  |  | 11/29/01 | Office Warehouse | 800-822-9033 |
|  |  | 11/29/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |

| | | 12/5/01 | Bullish Report | 800-331-4510 |
|---|---|---|---|---|
| | | 12/10/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| | | 12/21/01 | eStock Pick of The Week | 800-331-4510 |
| | | 12/26/01 | Cell Direct | 800-822-9033 |
| | | 1/3/02 | Office Warehouse | 800-766-0816 |
| | | 1/8/02 | Y2 Marketing | 800-766-0816 |
| | | 1/10/02 | Altimate Marketing | 800-976-3734 |
| | | 1/10/02 | Bullish Report | 800-331-4510 |
| | | 1/22/01 | Cell Direct | 800-822-9033 |
| | | 1/24/02 | Axin Corporation | 800-822-9033 |
| | | 1/27/02 | Y2 Marketing | 800-766-0816 |
| | | 1/29/02 | Telecommservices.net (Fine Telecommunications, Inc.) | 800-965-7235 |
| | | 2/2/02 | Y2 Marketing | 800-766-0816 |
| | | 2/7/02 | Bridge 21/Financial Management Solutions | 800-766-0816 |
| | 29 | 2/12/02 | Office Warehouse | 800-822-9033 |
| James Allan Dobbins | 1 | 10/24/01 | Ticket Solutions | 800-822-9033 |
| L. ("Les") R. Docks | | 10/31/01 | Absolute Wireless | 800-443-7628 |
| | | 11/2/01 | Central Imaging Supply | 800-457-5410 |
| | | 11/8/01 | Central Imaging Supply | 800-457-5410 |
| | | 11/13/01 | Dr. Roger Arredondo | 800-443-7628 |
| | | 11/14/01 | Advanced Communications | 800-785-6698 |
| | | 11/19/01 | Central Imaging Supply | 800-457-5410 |
| | | 11/20/01 | Stock Traders Alert | 800-785-8505 |
| | | 11/20/01 | Satellite Country | 800-766-0816 |
| | | 11/30/01 | Y2 Marketing | 800-822-9033 |
| | | 12/5/01 | Dr. Roger Arredondo | 800-822-9033 |
| | | 12/11/01 | Absolute Wireless | 800-822-9033 |
| | | 12/18/01 | Absolute Wireless | 800-822-9033 |
| | | 12/28/01 | Cell Direct | 800-965-7235 |
| | | 12/30/01 | Y2 Marketing | 800-822-9033 |
| | | 1/2/02 | Union Trust Mortgage | 800-766-0816 |
| | | 1/4/02 | Axin Corporation | 800-822-9033 |
| | | 1/6/02 | Y2 Marketing | 800-822-9033 |
| | | 1/7/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | | 1/7/02 | Tallclocks, Inc. | 800-457-5410 |

|  |  |  |  |
|---|---|---|---|
|  | 1/9/02 | Holiday Orlando ("Travel News Release") | 800-457-5410 |
|  | 1/15/02 | Dr. Roger Arredondo | 800-822-9033 |
|  | 1/17/02 | Holiday Orlando ("Travel News Release") | 800-457-5410 |
|  | 1/26/02 | Y2 Marketing | 800-766-0816 |
| 24 | 1/29/02 | Cell Direct | 800-965-7235 |
| Richard Don | 10/11/01 | Wall Street Alert | 800-785-6698 |
| 2 | 10/16/01 | Moneyline Report | 800-364-0216 |
| Robert R. Dzimidas | 10/30/01 | Moneyline Report | 800-364-0216 |
|  | 11/1/01 | Strategic Stock Intelligence, Inc. | 800-443-7628 |
|  | 11/1/01 | Investor's Business Report (The Wall Street Alert) | 800-785-6698 |
|  | 11/6/01 | Wall Street Alert | 800-785-6698 |
|  | 11/13/01 | American Cellular Inc. | 800-822-9033 |
|  | 11/14/01 | Wall Street Investment Alert | 800-443-7628 |
|  | 11/14/01 | DSC Inc. (Digital Systems Concepts, Inc.). | 800-822-9033 |
|  | 11/14/01 | Wall Street Outlook | 800-443-7628 |
|  | 11/19/01 | Stock Traders Alert | 800-785-8505 |
|  | 11/27/01 | JWP | 800-822-9033 |
|  | 11/28/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
|  | 11/30/01 | Advanced Communications | 800-785-6698 |
|  | 12/4/01 | Wall Street Investment Alert | 800-331-4510 |
|  | 12/4/01 | Investors Today | 800-331-4510 |
|  | 12/5/01 | Bullish Report | 800-331-4510 |
|  | 12/6/01 | Moneyline Report | 800-364-0216 |
|  | 12/6/01 | Wireless Connections | 800-822-9033 |
|  | 12/9/01 | Y2 Marketing | 800-822-9033 |
|  | 12/11/01 | NBM Information | 800-331-4510 |
|  | 12/17/01 | American Cellular Inc. | 800-822-9033 |
| 21 | 1/15/02 | Stock Traders Alert | 800-785-8505 |
| Cheryl Edmondson | 10/8/01 | LifeQuotes of America, Inc. | 800-443-7628 |
| (Applied Communication Systems, Inc.) |  |  |  |

| | | | |
|---|---|---|---|
| | | 10/10/01 (1:03 a.m.) | Wall Street Alert | 800-785-6698 |
| | 3 | 10/10/01 (9:31 p.m.) | Wall Street Alert | 800-785-6698 |
| Lori Frayne (Hasty Air Freight, Inc.) | | 9/13/01 | Wireless Connections | 800-822-9033 |
| | | 10/2/01 | DSC Inc. (Digital Systems Concepts, Inc.) | 800-766-0816 |
| | | 10/3/01 | Wall Street Alert | 800-785-6698 |
| | 4 | 10/5/01 | Wireless Telecom | 800-822-9033 |
| Allan Howard Frey | | 11/28/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| | | 11/29/01 | Central Imaging Supply | 800-457-5410 |
| | | 12/12/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| | | 1/4/02 | Holiday Management Group | 800-457-5410 |
| | | 1/10/02 | Advanced Communications | 800-785-6698 |
| | | 2/9/02 | Y2 Marketing | 800-766-0816 |
| | | 2/11/02 | Vacation Warehouse | 800-663-8758 |
| | | 2/14/02 | Stock Traders Alert | 800-785-8505 |
| | | 2/15/02 | Vacation Showroom ("Corporate Travel Division") | 800-822-9033 |
| | | 2/17/02 | Y2 Marketing | 800-766-0816 |
| | | 2/20/02 | DreamQuest International Travel | 800-766-0816 |
| | | 2/22/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
| | | 2/27/02 | Advanced Communications | 800-785-6698 |
| | | 3/4/02 | Futuredreams | 800-822-9033 |
| | | 3/4/02 | Bridge 21/American Financial Services | 800-976-3834 |
| | | 3/6/02 | Vacation Center | 800-822-9033 |
| | | 3/11/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | | 3/20/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
| | | 3/26/02 | Vacation Center | 800-822-9033 |
| | | 3/28/02 | Cell Direct | 800-766-0816 |
| | 21 | 4/3/02 | Greater Orlando | 800-822-9033 |

| | | | Vacation | |
|---|---|---|---|---|
| Richard V. N. Ginn | | 3/6/02 | Y2 Marketing | 800-663-8758 |
| | 2 | 3/15/02 | Vacation Center | 800-822-9033 |
| Charles L. Gomes | 1 | 10/12/01 | Y2 Marketing | 800-822-9033 |
| Dora Wong Goto | | 9/25/01 | Tallclocks, Inc. | 800-822-9033 |
| | 2 | 9/28/01 | Advanced Communications | 800-785-6698 |
| Steven M. Greenberg | 1 | 12/7/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| Bathsheba L. Grossman (Protoshape) | | 1/30/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | | 2/6/02 | Elite Communications | 800-766-0816 |
| | 3 | 2/7/02 | Global Key Holiday International a.k.a.Fantasy Marketing and Research | 800-443-7628 |
| Andrew Hansis | | 10/4/01 | Call Center Network | 800-822-9033 |
| | 2 | 10/5/01 | Elite Communications | 800-822-9033 |
| Heather Ann Hartnett | | 10/5/01 | Central Imaging Supply | 800-457-5410 |
| | | 10/9/01 | Rosenbaum Chiropractic and Carpal Tunnel Clinic | 800-965-7235 |
| | | 10/29/01 | Strategic Stock Intelligence, Inc. | 800-443-7628 |
| | | 11/1/01 | South Cooper Auto Mart | 800-443-7628 |
| | | 11/1/01 | Advanced Communications | 800-785-6698 |
| | | 11/2/01 | Infinity Communications | 800-822-9033 |
| | | 11/6/01 | Strategic Stock Intelligence, Inc. | 800-443-7628 |
| | | 11/6/01 | Rosenbaum Chiropractic and Carpal Tunnel Clinic | 800-965-7235 |
| | | 11/20/01 | Strategic Stock Intelligence, Inc. | 800-443-7628 |
| | | 11/28/01 | Quality Auto Mart | 800-443-7628 |
| | | 11/30/01 | South Cooper Auto Mart | 800-443-7628 |
| | | 12/3/01 | Advanced Communications | 800-785-6698 |

|  |  | 12/4/01 | Union Trust Mortgage | 800-766-0816 |
|  |  | 12/5/01 | Holiday Management Group | 800-457-5410 |
|  |  | 12/12/01 | Infinity Communications | 800-822-9033 |
|  |  | 12/12/01 | Rosenbaum Chiropractic and Carpal Tunnel Clinic | 800-965-7235 |
|  |  | 12/13/01 | South Cooper Auto Mart | 800-822-9033 |
|  |  | 12/17/01 | Cell Direct | 800-965-7235 |
|  |  | 12/19/01 | South Cooper Auto Mart | 800-822-9033 |
|  |  | 12/21/01 | Holiday Management Group | 800-457-5410 |
|  |  | 12/31/01 | Fax.com | 800-443-7628 |
|  |  | 1/8/02 | Advanced Communications | 800-785-6698 |
|  |  | 1/16/02 | American Marble Liquidators | 800-822-9033 |
|  |  | 1/17/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
|  |  | 1/28/02 | Vacation Center | 800-822-9033 |
|  |  | 2/6/02 | Holiday Management Group | 800-457-5410 |
|  |  | 2/7/02 | Vacation Center | 800-822-9033 |
|  |  | 2/11/02 | Advanced Communications | 800-785-6698 |
|  |  | 2/18/02 | Holiday Management Group | 800-457-5410 |
|  | 30 | 2/19/02 | Carpal Tunnel Injury Center | 800-766-0816 |
| Norman B. Jensen, III |  | 10/2/01 | Orlando Promotions, Inc. | 800-443-7628 |
|  |  | 12/12/01 | Office Warehouse | 800-822-9033 |
|  | 3 | 1/31/02 | DreamQuest Travel | 800-766-0816 |
| Suzie Johnson |  | 11/5/01 | Advanced Communications | 800-785-6698 |
|  |  | 11/9/01 | Stockscape Network Group (Small Cap Central) | 800-443-7628 |
|  |  | 11/19/01 | Infinity Communications | 800-822-9033 |
|  |  | 12/3/01 | Advanced Communications | 800-785-6698 |
|  |  | 12/11/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |

|  |  | 12/11/01 | Cell Direct | 800-965-7235 |
|--|--|----------|-------------|--------------|
|  |  | 12/19/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  |  | 1/4/02 | Advanced Communications | 800-785-6698 |
|  |  | 1/7/02 | Cell Direct | 800-965-7235 |
|  |  | 1/10/02 | Infinity Communications | 800-822-9033 |
|  | 11 | 1/16/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| John Koltun (Geographic Resources Solutions |  | 12/14/01 | Bagoba | 800-443-7620 |
|  |  | 1/10/01 | Accounting Solutions | 800-822-9033 |
|  | 3 | 1/15/01 | Vacation Getaway Travel, Inc. | 800-457-5410 |
| Nathaniel Kramer | 1 | 5/2/02 | Advanced Communications | 800-785-6698 |
| Anne McCarten-Gibbs (Words That Work) |  | 12/6/01 | Call Center Network | 800-822-9033 |
|  |  | 12/7/01 | Central Imaging Supply | 800-457-5410 |
|  |  | 12/7/01 | Y2 Marketing | 800-822-9033 |
|  |  | 12/14/01 | Veb Tickets | 800-822-9033 |
|  |  | 12/20/01 | Call Center Network | 800-822-9033 |
|  |  | 12/20/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  | 7 | 12/27/01 | Call Center Network | 800-822-9033 |
| Douglas M. McKenna - residential line |  | 9/17/01 | Burt Custom Finance | 800-443-7628 |
|  |  | 9/20/01 | Central Imaging Supply | 800-457-5410 |
|  |  | 10/15/01 | Burt Custom Finance | 800-443-7628 |
|  |  | 10/16/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  |  | 10/17/01 | Advanced Communications | 800-785-6698 |
|  |  | 10/24/01 | Investor's Business Report | 800-785-6698 |
|  |  | 10/30/01 | Moneyline Report | 800-364-0216 |
|  |  | 11/5/01 | Burt Custom Finance | 800-443-7628 |
|  |  | 11/6/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  |  | 11/14/01 | Infinity Communications | 800-822-9033 |

|  |  | 11/14/01 | Y2 Marketing | 800-822-9033 |
|---|---|---|---|---|
|  |  | 11/19/01 | Choice Wireless | 800-822-9033 |
|  |  | 11/21/01 | Central Imaging Supply | 800-457-5410 |
|  |  | 11/28/01 | Central Imaging Supply | 800-457-5410 |
|  |  | 11/29/01 | Advanced Communications | 800-785-6698 |
|  |  | 12/2/01 | Y2 Marketing | 800-822-9033 |
|  |  | 12/4/01 | Strategic Stock Intelligence, Inc. | 800-331-4510 |
|  |  | 12/7/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  |  | 12/26/01 | Holiday Management Group | 800-457-5410 |
|  |  | 1/2/02 | Advanced Communications | 800-785-6698 |
|  |  | 1/17/02 | eStock Pick of The Week | 800-331-4510 |
|  |  | 2/13/02 | eStock Pick of The Week | 800-331-4510 |
|  |  | 2/17/02 | Y2 Marketing | 800-822-9033 |
|  |  | 2/20/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
|  |  | 2/27/02 | New Century Mortgage Corporation | 800-443-7628 |
|  |  | 2/28/02 | Stockscape Network Group (Small Cap Central) | 800-364-0216 |
|  |  | 2/28/02 | Travel To Go | 800-822-9033 |
|  | 28 | 3/6/02 | Burt Custom Finance | 800-822-9033 |
| Douglas M. McKenna (President, Mathemaesthetics, Inc.) - business line |  | 9/4/01 | Vacation Getaway Travel, Inc. | 800-443-7628 |
|  |  | 9/7/01 | MBA Financial Group | 800-443-7628 |
|  |  | 9/10/01 | Central Imaging Supply | 800-457-5410 |
|  |  | 9/13/01 | Advanced Communications | 800-785-6698 |
|  |  | 9/24/01 | Rocky Mountain Financial | 800-443-5716 |
|  |  | 9/28/01 | Burt Custom Finance | 800-443-7628 |
|  |  | 10/8/01 | Central Imaging Supply | 800-457-5410 |
|  |  | 10/17/01 | Vacation Getaway | 800-822-9033 |

|         |                                                  |              |
|---------|--------------------------------------------------|--------------|
|         | Travel, Inc.                                     |              |
| 10/22/01 | Advanced Communications                          | 800-785-6698 |
| 10/25/01 | Market Wizard Alerts                             | 800-331-3622 |
| 10/29/01 | Burt Custom Finance                             | 800-443-7628 |
| 10/29/01 | Central Imaging Supply                          | 800-457-5410 |
| 11/5/01 | Vacation Getaway Travel, Inc.                   | 800-822-9033 |
| 11/7/01 | Wall Street Reporter                           | 800-364-0216 |
| 11/7/01 | Investor's Business Report                     | 800-785-6698 |
| 11/13/01 | Kit Stuff Wireless/Keep In Touch Stuff         | 800-822-9033 |
| 11/14/01 | Choice Wireless                                | 800-822-9033 |
| 11/14/01 | Y2 Marketing                                   | 800-822-9033 |
| 11/15/01 | Infinity Communications                        | 800-822-9033 |
| 11/16/01 | Wall Street Outlook                            | 800-443-7628 |
| 11/20/01 | Stockscape Network Group (Small Cap Central)   | 800-443-7628 |
| 11/26/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| 11/27/01 | Strategic Stock Intelligence, Inc.             | 800-443-7628 |
| 11/28/01 | Advanced Communications                        | 800-785-6698 |
| 11/29/01 | Market Advisors                                | 800-331-4510 |
| 12/2/01 | Y2 Marketing                                   | 800-822-9033 |
| 12/4/01 | Wall Street Reporter                           | 800-364-0216 |
| 12/5/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| 12/7/01 | Bullish Report                                 | 800-331-4510 |
| 12/10/01 | Bullish Report                                 | 800-331-4510 |
| 12/11/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| 12/18/01 | DMGI, Inc. (NAVADA)                            | 800-443-7620 |
| 12/20/01 | Advanced Communications                        | 800-785-6698 |
| 1/15/02 | Stock Traders Alert                            | 800-785-8505 |
| 1/15/02 | Holiday Management Group                        | 800-457-5410 |
| 1/16/02 | Equity Market Watch                            | 800-766-0816 |

| | | | |
|---|---|---|---|
| | 1/22/02 | Equity Market Watch | 800-822-9033 |
| | 1/23/02 | A2Z Financial | 800-965-7235 |
| | 1/23/02 | Equity Market Watch | 800-766-0816 |
| | 1/28/02 | IDC Solutions (Independent Dish Contractors Solutions) | 800-822-9033 |
| | 2/5/02 | Wall Street Equity Report | 800-331-4510 |
| | 2/5/02 | Central Imaging Supply | 800-976-3734 |
| | 2/7/02 | Equity Market Watch | 800-976-3734 |
| | 2/8/02 | Equity Market Watch | 800-766-0816 |
| | 2/13/02 | eStock Pick of The Week | 800-331-4510 |
| | 2/16/02 | Y2 Marketing | 800-822-9033 |
| | 2/22/02 | Financial Freedom Report | 800-331-4510 |
| | 2/27/02 | New Century Mortgage Corporation | 800-443-7628 |
| | 2/27/02 | Bullish Report | 800-331-4510 |
| | 3/1/02 | Travel To Go | 800-822-9033 |
| | 3/14/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
| | 3/18/02 | Premium Ink | 800-766-0816 |
| | 3/26/02 | Advanced Communications | 800-785-6698 |
| | 3/30/03 | Y2 Marketing | 800-822-9033 |
| | 4/9/02 | Travel To Go | 800-822-9033 |
| | 4/9/02 | Tallclocks, Inc. | 800-457-5410 |
| | 4/9/02 | Wall Street OTC | 800-331-4510 |
| | 4/17/02 | Strategic Stock Intelligence, Inc. | 800-976-3734 |
| | 4/18/02 | Toner Zone | 800-976-3734 |
| | 4/21/02 | Wall Street Watch | 800-766-0816 |
| | 4/22/02 | eStock Pick of The Week | 800-331-4510 |
| | 4/23/02 | Wall Street Watch | 800-766-0816 |
| | 4/29/02 | Great West Funding | 800-965-7235 |
| | 4/29/02 | Wall Street Watch | 800-766-0816 |
| | 4/29/02 | Bull Run Report | 800-822-9033 |
| | 4/30/02 | Wall Street Watch | 800-766-0816 |
| 67 | 5/1/02 | DSC Inc. (Digital Systems Concepts, Inc.) | 800-822-9033 |
| Robert R. McMeekin, M.D. | 10/2/01 | Advanced Communications | 800-785-6698 |

|  |  | 10/31/01 | Central Imaging Supply | 800-457-5410 |
|---|---|---|---|---|
|  |  | 12/31/01 | Cell Direct | 800-766-0816 |
|  |  | 1/3/02 | Holiday Management Group | 800-457-5410 |
|  |  | 1/11/02 | Advanced Communications | 800-785-6698 |
|  |  | 1/16/02 | Vacation Center | 800-822-9033 |
|  |  | 1/30/02 | Axin Corporation | 800-822-9033 |
|  |  | 2/4/02 | Central Imaging Supply | 800-976-3734 |
|  | 9 | 4/3/02 | Tallclocks, Inc. | 800-457-5410 |
| Karl Narveson | 1 | 1/15/02 | Tallclocks, Inc. | 800-457-5410 |
| Nancy North |  | 9/26/01 | Satellite Country | 800-443-7628 |
|  |  | 9/28/01 | Central Imaging Supply | 800-457-5410 |
|  | 3 | 10/2/01 | Dr. Roger Arredondo | 800-443-7628 |
| Elena C. Rau | 1 | 11/1/01 | American Cellular Inc. | 800-822-9033 |
| Cheryl S. Sandor | 1 | 11/15/01 | Central Imaging Supply | 800-457-5410 |
| (K.C. Enterprises of Vero Beach d.b.a. Vero Glass And Mirror) |  |  |  |  |
| David Schoeller (Independent Medical Evaluations, Inc.) |  | 10/18/01 | Infinity Communications | 800-822-9033 |
|  |  | 10/25/01 | Infinity Communications | 800-822-9033 |
|  |  | 11/27/01 | Cell Direct | 800-766-0816 |
|  |  | 1/7/02 | Cell Direct | 800-766-0816 |
|  |  | 1/10/02 | Advanced Communications | 800-785-6698 |
|  | 6 | 1/20/02 | Cell Direct | 800-766-0816 |
| Vernon Schryver (Rhyolite Software) |  | 9/5/01 | Vacation Getaway Travel, Inc. | 800-443-7628 |
|  |  | 9/6/01 | Burt Custom Finance | 800-443-7628 |
|  |  | 10/15/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  |  | 10/24/01 | Investor's Business Report | 800-785-6698 |
|  |  | 10/31/01 | Burt Custom Finance | 800-443-7628 |
|  |  | 11/6/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  |  | 1/15/02 | 4 B's Ventures, Inc. | 800-443-7628 |
|  |  | 1/17/02 | eStock Pick of The Week | 800-331-4510 |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | 1/23/02 | Clarion Mortgage | 800-965-7235 |
|  |  | 1/28/02 | IDC Solutions (Independent Dish Contractors Solutions) | 800-822-9033 |
|  |  | 1/29/02 | IDC Solutions (Independent Dish Contractors Solutions) | 800-822-9033 |
|  |  | 1/30/02 | Advanced Communications | 800-785-6698 |
|  |  | 2/1/02 | Equity Market Watch | 800-766-0816 |
|  |  | 2/6/02 | Jerve Dominguez d.b.a. AAAOpp.com | 800-822-9033 |
|  | 15 | 2/7/02 | Central Imaging Supply | 800-766-0816 |
| Gene Sellards |  | 10/2/01 | Orlando Promotions, Inc. | 800-443-7628 |
|  |  | 10/10/01 | Wall Street Alert | 800-785-6698 |
|  |  | 10/11/01 | Wall Street Alert | 800-785-6698 |
|  |  | 10/15/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  |  | 10/15/01 | Advanced Communications | 800-785-6698 |
|  |  | 10/22/01 | Central Imaging Supply | 800-457-5410 |
|  |  | 11/2/01 | Y2 Marketing | 800-822-9033 |
|  |  | 11/8/01 | Strategic Stock Intelligence, Inc. | 800-443-7628 |
|  |  | 11/9/01 | Y2 Marketing | 800-822-9033 |
|  | 10 | 11/13/01 | Central Imaging Supply | 800-457-5410 |
| John C. Steinberger |  | 5/23/02 | Advanced Communications | 800-785-6698 |
|  | 2 | 6/10/02 | Vacation Center of Delaware | 800-822-9033 |
| John P. Strang |  | 9/11/01 | Lexington Chiropractic Associates | 877-276-1974 |
|  |  | 10/16/01 | Moneyline Report | 800-364-0216 |
|  |  | 10/17/01 | Advanced Communications | 800-785-6698 |
|  |  | 10/29/01 | Wall Street Alert | 800-785-6698 |
|  |  | 10/29/01 | Dr. John Jurcisin | 877-276-1974 |
|  |  | 11/2/01 | Central Imaging Supply | 800-457-5410 |
|  |  | 11/6/01 | Lexington Chiropractic Associates | 877-276-1974 |

|          |                                                 |                |
|----------|-------------------------------------------------|----------------|
| 11/8/01  | Tallclocks, Inc.                                | 800-822-9033   |
| 11/14/01 | Dr. John Jurcisin                               | 877-276-1974   |
| 11/15/01 | Vacation Getaway Travel, Inc.                   | 800-822-9033   |
| 11/19/01 | Advanced Communications                         | 800-785-6698   |
| 11/27/01 | Legacy Quote                                    | 800-443-7628   |
| 11/28/01 | Lexington Chiropractic Associates               | 877-276-1974   |
| 11/29/01 (5:14) | Stockscape Network Group (Small Cap Central) | 800-443-7628 |
| 11/29/01 (8:39) | Stockscape Network Group (Small Cap Central) | 800-443-7628 |
| 12/5/01  | Kit Stuff Wireless/Elephant Wireless            | 800-822-9033   |
| 12/7/01  | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628  |
| 12/14/01 | Advanced Communications                         | 800-785-6698   |
| 12/17/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628  |
| 1/9/02   | Lexington Chiropractic Associates               | 877-276-1974   |
| 1/10/02  | Discount Funding Associates, Inc.               | 800-822-9033   |
| 1/15/02  | Media Broadcast Solutions (The Stock Bulletin)  | 800-766-0816   |
| 1/15/02  | Dr. John Jurcisin                               | 877-276-1974   |
| 1/18/02  | Lana Rozenberg, DDS                             | 800-443-7628   |
| 1/29/02  | Wall Street Equity Report                       | 800-331-4510   |
| 2/1/02   | Vacation Center                                 | 800-822-9033   |
| 2/3/02   | Y2 Marketing                                    | 800-766-0816   |
| 2/7/02   | Financial Freedom Report                        | 800-331-4510   |
| 2/11/02  | Midtown Medical and Health Offices, P.C.        | 800-766-0816   |
| 30 2/12/02 | Quote Master USA Ltd.                         | 800-443-7628   |

Wayne George
Strang

| 10/1/01 | Elite Communications | 800-822-9033 |

| 10/5/01 | Call Center Network - The Wireless Center | 800-822-9033 |
| 10/16/01 | Wall Street Alert | 800-785-6698 |
| 10/17/01 | Elite Communications | 800-822-9033 |
| 10/22/01 | Creative Solutions | 800-443-7628 |
| 10/23/01 | Dishmaster | 800-822-9033 |
| 10/23/01 | Elite Communications | 800-822-9033 |
| 10/24/01 | Central Imaging Supply | 800-457-5410 |
| 10/25/01 | Infinity Communications | 800-822-9033 |
| 1/14/02 | IDC Solutions (Independent Dish Contractors Solutions) | 800-822-9033 |
| 1/16/02 | Tallclocks, Inc. | 800-457-5410 |
| 1/19/02 | Y2 Marketing | 800-822-9033 |
| 1/22/02 | Elite Communications | 800-976-3734 |
| 1/31/02 | Holiday Management Group | 800-457-5410 |
| 2/7/02 | American Benefit Mortgage, Inc. | 800-992-5329 |
| 2/8/02 | Elite Communications | 800-822-9033 |
| 2/14/02 | Central Imaging Supply | 800-457-5410 |
| 2/16/02 | Y2 Marketing | 800-766-0816 |
| 2/19/02 | Elite Communications | 800-766-0816 |
| 2/24/02 | Y2 Marketing | 800-766-0816 |
| 2/25/02 | DreamQuest International Travel | 800-766-0816 |
| 3/6/02 | Elite Communications | 800-766-0816 |
| 3/7/02 | Holiday Management Group | 800-457-5410 |
| 3/12/02 | Holiday Management Group | 800-457-5410 |
| 3/15/02 | Vacation Center of Delaware | 800-822-9033 |
| 3/15/02 | American Benefit Mortgage, Inc. | 800-992-5329 |
| 3/22/02 (3:51 p.m.) | Elite Communications | 800-822-9033 |
| 3/22/02 (5:47 p.m.) | Elite Communications | 800-822-9033 |
| 3/22/02 | Telecommservices.net (Fine Telecommunications, Inc.) | 800-965-7235 |

|  |  | 4/10/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
|  |  | 4/16/02 | Elite Communications | 800-822-9033 |
|  |  | 4/22/02 | Partnership for Education | 800-976-3734 |
|  |  | 4/24/02 | Holiday Management Group | 800-457-5410 |
|  |  | 4/26/02 | 1st Capital Lending & Realty | 800-766-0816 |
|  |  | 4/29/02 | Bull Run Report | 800-822-9033 |
|  |  | 4/29/02 | Free Digital Phone Center | 800-766-0816 |
|  |  | 5/5/02 | Stock Pick of the Month Report | 800-331-4510 |
|  |  | 5/7/02 | Vacation Center of Delaware | 800-822-9033 |
|  |  | 5/9/02 | Wall Street Stock Alerts | 800-766-0816 |
|  |  | 5/9/02 | Free Digital Phone Center | 800-766-0816 |
|  |  | 5/13/02 | Mortgage Lending Group | 800-822-9033 |
|  |  | 5/20/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
|  |  | 5/21/02 | Free Digital Phone Center | 800-766-0816 |
|  |  | 5/29/02 | Wall Street Watch | 800-766-0816 |
|  |  | 6/7/02 | Holiday Management Group | 800-457-5410 |
|  |  | 6/10/02 | Vacation Getaway Travel, Inc. | 800-457-5410 |
|  |  | 6/17/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
|  | 48 | 6/19/02 | Free Digital Phone Center | 800-766-0816 |
| D. Leon Taylor (Dethloff & Associates) |  | 10/15/01 | Wall Street Alert | 800-785-6698 |
|  |  | 10/16/01 | Y2 Marketing | 800-822-9033 |
|  | 3 | 10/22/01 | Moneyline Report | 800-364-0216 |
| Craig C. Truitt (Truitt, Brown & Truitt) |  | 1/7/02 | eStock Pick of The Week | 800-331-4510 |
|  |  | 1/8/02 | Y2 Marketing | 800-766-0816 |
|  |  | 1/14/02 | Media Broadcast Solutions (The Stock Bulletin) | 800-766-0816 |
|  |  | 1/16/02 | Financial Freedom | 800-331-4510 |

| | | | | |
|---|---|---|---|---|
| | | | Report | |
| | | 1/18/02 | Stock Traders Alert | 800-785-8505 |
| | | 1/22/02 | Axin Corporation | 800-822-9033 |
| | | 1/23/02 | Equity Market Watch | 800-822-9033 |
| | | 1/25/02 | Telecommservices.net (Fine Telecommunications, Inc.) | 800-965-7235 |
| | | 1/27/02 | Y2 Marketing | 800-766-0816 |
| | | 1/28/02 | Wall Street Equity Report | 800-331-4510 |
| | | 1/31/02 | Equity Market Watch | 800-976-3734 |
| | | 2/2/02 | Y2 Marketing | 800-766-0816 |
| | | 2/4/02 | Investors Today | 800-331-4510 |
| | 14 | 2/6/02 | Equity Market Watch | 800-766-0816 |
| Andrew Neill Vollmer | | 11/14/01 | Cell Direct | 800-766-0816 |
| | | 11/28/01 | Media Broadcast Solutions (Wall Street Examiner) | 800-443-7628 |
| | | 12/7/01 | Advanced Communications | 800-785-6698 |
| | | 12/17/01 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | | 12/31/01 | Cell Direct | 800-766-0816 |
| | | 2/14/02 | Vacation Center | 800-822-9033 |
| | | 2/17/02 | Y2 Marketing | 800-766-0816 |
| | 8 | 2/25/02 | Advanced Communications | 800-785-6698 |
| William Robert White (Regency Sales, Inc.) | | 12/11/01 | Bagoba | 800-443-7620 |
| | | 12/17/01 | Elite Communications | 800-822-9033 |
| | | 12/17/01 | Lou Gaudio's Health Club & Day Spa | 800-443-7628 |
| | | 12/17/01 | South Coast Optometry | 800-992-5329 |
| | | 12/17/01 | Call Center Network - The Wireless Center | 800-822-9033 |
| | | 1/16/02 | Free Digital Phone Center | 800-976-3734 |
| | | 1/17/02 | Dale Carnegie Training | 800-822-9033 |
| | | 1/17/02 | Call Center Network - The Wireless Center | 800-822-9033 |
| | | 1/30/02 | Central Imaging Supply | 800-976-3734 |
| | | 1/31/02 | Elite Communications | 800-822-9033 |

| | | 2/5/02 | Vacation Getaway Travel, Inc. | 800-822-9033 |
| | 12 | 2/12/02 | Wall Street Alert | 800-785-6698 |
| Richard M. Zelma | | 10/29/01 | LifeQuotes of America, Inc. | 800-443-7628 |
| | | 10/30/01 | Investor's Business Report (The Wall Street Alert) | 800-785-6698 |
| | | 10/30/01 | 2 For 1 Inkjet | 800-822-9033 |
| | 4 | 10/31/01 | Keep in Touch Stuff/Kit Stuff Wireless | 800-822-9033 |
| | 489 | | | |

[**46]

**TABLE 2**

**Fax.com Advertisers and Associated Opt-Out Numbers**

**(Fax.com, Inc., Notice of Apparent Liability for Forfeiture, FCC 02-226)**

| ADVERTISER (Bold type denotes advertiser that is not identified by fax text) | NUMBER OF FAXES | FAX.COM OPT-OUT NUMBER(S) |
|---|---|---|
| 1st Capital Lending & Realty | 1 | 800-766-0816 |
| 2 For 1 Inkjet | 1 | 800-822-9033 |
| 4 B's Ventures, Inc. | 1 | 800-443-7628 |
| A2Z Financial | 1 | 800-965-7235 |
| Absolute Wireless | 3 | 800-443-7628 800-822-9033 |
| Accounting Solutions | 1 | 800-822-9033 |
| Advanced Communications | 37 | 800-785-6698 |
| Altimate Marketing | 2 | 800-976-3734 |
| American Benefit Mortgage, Inc. | 2 | 800-992-5329 |
| American Cellular Inc. | 4 | 800-822-9033 |
| American Marble Liquidators | 1 | 800-822-9033 |
| Apollo Transportation | 1 | 800-822-9033 |
| Axin Corporation | 7 | 800-822-9033 |
| Bagoba | 2 | 800-443-7620 |
| Bentley Mortgage | 1 | 900-822-9033 |
| Bridge 21/American Financial Services | 1 | 800-976-3834 |
| Bridge 21/Financial Management Solutions | 1 | 800-766-0816 |
| Bull Run Report | 2 | 800-822-9033 |
| Bullish Report | 6 | 800-331-4510 |
| Burt Custom Finance | 8 | 800-443-7628 800-822-9033 |
| Businesscoach.com | 1 | 800-766-0816 |

| | | |
|---|---|---|
| Call Center Network/The Wireless Center | 9 | 800-822-9033 |
| Carpal Tunnel Injury Center | 1 | 800-766-0816 |
| Cell Direct | 17 | 800-766-0816 |
| | | 800-822-9033 |
| | | 800-965-7235 |
| Central Imaging Supply | 27 | 800-457-5410 |
| | | 800-766-0816 |
| | | 800-976-3734 |
| Choice Wireless | 2 | 800-822-9033 |
| Clarion Mortgage | 1 | 800-965-7235 |
| Creative Solutions | 1 | 800-443-7628 |
| Dale Carnegie Training | 1 | 800-822-9033 |
| Digital Systems Concepts, Inc. (DSC, Inc.) | 3 | 800-766-0816 |
| | | 800-822-9033 |
| Discount Funding Associates, Inc. | 1 | 800-822-9033 |
| Dishmaster | 1 | 800-822-9033 |
| DMGI, Inc. (NAVADA) | 1 | 800-443-7620 |
| Dr. John Jurcisin | 3 | 877-276-1974 |
| Dr. Roger Arredondo | 4 | 800-443-7628 |
| | | 800-822-9033 |
| DreamQuest Travel/DreamQuest International Travel | 3 | 800-766-0816 |
| Elite Communications | 16 | 800-766-0816 |
| | | 800-822-9033 |
| | | 800-976-3734 |
| Equity Market Watch | 10 | 800-766-0816 |
| | | 800-822-9033 |
| | | 800-976-3734 |
| eStock Pick of the Week | 8 | 800-331-4510 |
| Fax.com | 1 | 800-443-7628 |
| Financial Freedom Report | 3 | 800-331-4510 |
| First Chartered Investments | 2 | 800-443-5716 |
| Florida Reservations | 1 | 877-276-1974 |
| Free Digital Phone Center | 5 | 800-766-0816 |
| | | 800-976-3734 |
| Futuredreams | 1 | 800-822-9033 |
| Global Key Holiday International a.k.a. Fantasy Marketing and Research | 1 | 800-443-7628 |
| Great West Funding | 1 | 800-965-7235 |
| Greater Orlando Vacation | 1 | 800-822-9033 |
| Holiday Management Group | 13 | 800-457-5410 |
| Holiday Orlando ("Travel News Release") | 2 | 800-457-5410 |
| Independent Dish Contractors Solutions (IDC Solutions) | 4 | 800-822-9033 |
| Infinity Communications | 9 | 800-822-9033 |

| | | |
|---|---|---|
| Investor's Business Report | 5 | 800-785-6698 |
| Investors Today | 3 | 800-331-4510 |
| Jerve Dominguez d.b.a. AAAOpp.com | 1 | 800-822-9033 |
| JWP | 1 | 800-822-9033 |
| Kit Stuff Wireless/Keep In Touch Stuff/Elephant Wireless | 4 | 800-822-9033 |
| Lana Rozenberg, DDS | 1 | 800-443-7628 |
| Legacy Quote | 1 | 800-443-7628 |
| Lexington Chiropractic Associates | 4 | 877-276-1974 |
| LifeQuotes of America, Inc. | 4 | 800-443-7628 |
| | | 800-976-3734 |
| Lou Gaudio's Health Club & Day Spa | 1 | 800-443-7628 |
| Market Advisors | 1 | 800-331-4510 |
| Market Wizard Alerts | 1 | 800-331-3622 |
| MBA Financial Group | 1 | 800-443-7628 |
| Media Broadcast Solutions (The Stock Bulletin/Wall Street Examiner) | 19 | 800-766-0816 |
| | | 800-443-7628 |
| Midtown Medical and Health Offices, P.C. | 1 | 800-766-0816 |
| Moneyline Report | 9 | 800-364-0216 |
| Mortgage Lending Group | 1 | 800-822-9033 |
| Mortgage Market | 1 | 800-443-7628 |
| National Communications | 1 | 800-822-9033 |
| NBM Information | 1 | 800-331-4510 |
| New Century Mortgage Corporation | 2 | 800-443-7628 |
| Office Warehouse | 7 | 800-766-0816 |
| Orlando Promotions, Inc. | 2 | 800-443-7628 |
| Partnership for Education | 2 | 800-976-3734 |
| Premium Ink | 1 | 800-766-0816 |
| Quality Auto Mart | 1 | 800-443-7628 |
| Quote Master USA Ltd. | 1 | 800-443-7628 |
| Rocky Mountain Financial | 1 | 800-443-5716 |
| Rosenbaum Chiropractic and Carpal Tunnel Clinic | 3 | 800-965-7235 |
| Satellite Country | 2 | 800-443-7628 |
| | | 800-766-0816 |
| South Coast Optometry | 1 | 800-992-5329 |
| South Cooper Auto Mart | 4 | 800-443-7628 |
| | | 800-822-9033 |
| Stock Pick of the Month Report | 1 | 800-331-4510 |
| Stock Traders Alert | 8 | 800-785-8505 |
| Stockscape Network Group (Small Cap Central) | 6 | 800-364-0216 |
| | | 800-443-7628 |
| Strategic Stock Intelligence, Inc. | 8 | 800-443-7628 |
| | | 800-331-4510 |

|  |  | 800-976-3734 |
|---|---|---|
| Tallclocks, Inc. | 8 | 800-457-5410 |
|  |  | 800-822-9033 |
| Telecommservices.net (Fine Telecommunications, Inc.) | 4 | 800-965-7235 |
| Ticket Solutions | 1 | 800-822-9033 |
| Toner Zone | 1 | 800-976-3734 |
| Tower Group | 1 | 800-457-5410 |
| Travel To Go | 3 | 800-822-9033 |
| Union Trust Mortgage | 3 | 800-443-7628 |
|  |  | 800-766-0816 |
| Vacation Center | 8 | 800-822-9033 |
| Vacation Center of Delaware | 3 | 800-822-9033 |
| Vacation Getaway Travel, Inc. | 34 | 800-457-5410 |
|  |  | 800-822-9033 |
|  |  | 800-443-7628 |
|  |  | 800-457-5410 |
| Vacation Showroom ("Corporate Travel Division") | 2 | 800-822-9033 |
| Vacation Warehouse | 3 | 800-443-7628 |
|  |  | 800-663-8758 |
|  |  | 800-822-9033 |
| Veb Tickets | 1 | 800-822-9033 |
| Wall Street Alert | 12 | 800-785-6698 |
| Wall Street Equity Report | 3 | 800-331-4510 |
| Wall Street Investment Alert | 2 | 800-331-4510 |
|  |  | 800-443-7628 |
| Wall Street OTC | 1 | 800-331-4510 |
| Wall Street Outlook | 2 | 800-443-7628 |
| Wall Street Reporter | 2 | 800-364-0216 |
| Wall Street Stock Alerts | 1 | 800-766-0816 |
| Wall Street Watch | 5 | 800-766-0816 |
| Wireless Center | 1 | 800-822-9033 |
| Wireless Connections | 2 | 800-822-9033 |
| Wireless Telecom | 1 | 800-822-9033 |
| Y2 Marketing | 37 | 800-663-8758 |
|  |  | 800-766-0816 |
|  |  | 800-822-9033 |
|  | 489 |  |

[**47]

**TABLE 3**

**Fax.com Opt-Out Numbers and Associated Advertisers**

**(Fax.com, Inc., Notice of Apparent Liability for Forfeiture, FCC 02-226)**

| FAX.COM OPT-OUT NUMBER | ADVERTISER |
|---|---|
| 877-276-1974 | Dr. John Jurcisin |

Florida Reservations
Lexington Chiropractic Associates
800-331-3622 Market Wizard Alerts
800-331-4510 Bullish Report
eStock Pick of The Week
Financial Freedom Report
Investors Today
Market Advisors
NMB Information
Stock Pick of the Month Report
Strategic Stock Intelligence, Inc.
Wall Street Equity Report
Wall Street Investment Alert
Wall Street OTC
800-364-0216 Moneyline Report
Stockscape Network Group (Small Cap Central)
Wall Street Reporter
800-443-5716 First Chartered Investments
Rocky Mountain Financial
800-443-7620 Bagoba
DMGI, Inc. (NAVADA)
800-443-7628 4 B's Ventures, Inc.
Absolute Wireless
Burt Custom Finance
Creative Solutions
Dr. Roger Arredondo
Fax.com
Global Key Holiday International
 a.k.a.Fantasy Marketing and Research
Lana Rozenberg, DDS
Legacy Quote
LifeQuotes of America, Inc.
Lou Gaudio's Health Club & Day Spa
MBA Financial Group
Media Broadcast Solutions (Wall Street
Examiner)
Mortgage Market
New Century Mortgage Corporation
Orlando Promotions, Inc.
Quality Auto Mart
Quote Master USA Ltd.
Satellite Country
South Cooper Auto Mart
Stockscape Network Group (Small Cap Central)
Strategic Stock Intelligence, Inc.
Union Trust Mortgage
Vacation Getaway Travel, Inc.
Vacation Warehouse

<table>
<tr><td></td><td>Wall Street Investment Alert</td></tr>
</table>

Wall Street Investment Alert
Wall Street Outlook
800-457-5410 Central Imaging Supply
Holiday Management Group
Holiday Orlando ("Travel News Release")
Tallclocks, Inc.
Tower Group
Vacation Getaway Travel, Inc.
800-663-8758 Vacation Warehouse
Y2 Marketing
800-766-0816 1st Capital Lending & Realty
Bridge 21/Financial Management Solutions
Businesscoach.com
Carpal Tunnel Injury Center
Cell Direct
Central Imaging Supply
Digital Systems Concepts, Inc. (DSC, Inc.)
DreamQuest International Travel
Elite Communications
Equity Market Watch
Free Digital Phone Center
Media Broadcast Solutions (Wall Street Examiner)
Midtown Medical and Health Offices, P.C.
Office Warehouse
Premium Ink
Satellite Country
Union Trust Mortgage
Wall Street Stock Alerts
Wall Street Watch
Y2 Marketing
800-785-6698 Advanced Communications
Investor's Business Report
Wall Street Alert
800-785-8505 Stock Traders Alert
800-822-9033 2 For 1 Inkjet
Absolute Wireless
Accounting Solutions
American Cellular Inc.
American Marble Liquidators
Apollo Transportation
Axin Corporation
Bentley Mortgage
Burt Custom Finance
Bull Run Report
Call Center Network - The Wireless Center
Cell Direct
Choice Wireless

Dale Carnegie Training
Digital Systems Concepts, Inc. (DSC, Inc.)
Discount Funding Associates, Inc.
Dishmaster
Dr. Roger Arredondo
Equity Market Watch
Futuredreams
Greater Orlando Vacation
Independent Dish Contractors Solutions/IDC Solutions
Infinity Communications
Jerve Dominguez d.b.a. AAAOpp.com
JWP
Kit Stuff Wireless/Keep In Touch Stuff/Elephant Wireless
Mortgage Lending Group
National Communications
Office Warehouse
South Cooper Auto Mart
Tallclocks, Inc.
Ticket Solutions
Travel To Go
Vacation Center
Vacation Center of Delaware
Vacation Getaway Travel, Inc.
Vacation Showroom
Vacation Warehouse
Veb Tickets
Wireless Center
Wireless Connections
Wireless Telecom
Y2 Marketing

800-965-7235 A2Z Financial
Cell Direct
Clarion Mortgage
Great West Funding
Rosenbaum Chiropractic and Carpal Tunnel Clinic
Telecommservices.net (Fine Telecommunications, Inc.)

800-976-3734 Altimate Marketing
Bridge 21/American Financial Services
Central Imaging Supply
Elite Communications
Equity Market Watch
Free Digital Phone Center
LifeQuotes of America
Partnership for Education

Strategic Stock Intelligence, Inc.
Toner Zone
800-992-5329 American Benefit Mortgage, Inc.
South Coast Optometry
877-276-1974 Dr. John Jurcisin
Florida Reservations
Lexington Chiropractic Associates

[**48]

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Communications Law > Broadcasting > Sponsorship Identifications 
Communications Law > Federal Acts > General Overview 
Communications Law > Privacy > Telephone Consumer Protection Act 

Service:  **Get by LEXSEE®**
Citation:  **2002 FCC LEXIS 3853**
View:  Full
Date/Time:  Monday, June 23, 2008 - 1:26 PM EDT

---

LexisNexis®    About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©  2008 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

# EXHIBIT B

*Brill v. Becktold Ent., Inc.*, 2006 TCPA Rep. 1494 (Ill. Cir. Oct. 26, 2006).           Page: 1

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| JAMES BRILL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     06 CH 1520 |
| | ) |
| BECKTOLD ENTERPRISES, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This cause comes before the court on Defendant Becktold Enterprises, Inc.'s motion to dismiss Plaintiff James Brill's Class Action Complaint pursuant to 735 ILCS 5/2-619.1. The court has been fully advised of the premises herein.

Brill's case is one of more than 50 related cases currently assigned to this Calendar which involve claims for violations of the Telephone Consumers Protection Act of 1991 ("TCPA"), the Illinois Consumer Fraud Act, and for common law conversion. The cases have been divided into Groups A, B, and C. Becktold's motion to dismiss has been designated as the "Master Motion" for Group A and all the Group A cases have joined in the Master Motion. A list of the Group A cases is attached at Exhibit A. Defendant International Card Establishment, Inc. has filed a Supplemental Memorandum of Law in support of the Master Motion raising additional grounds for dismissal of the consumer fraud claims.

TCPA Claims

*Private Right of Action under TCPA:*

Plaintiffs allege that Defendants violated the federal Telephone Consumer Protection Act ("TCPA"), 47 USCS §227 (2004), which prohibits using any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to another telephone facsimile machine. Section 227 allows for state jurisdiction over private causes of action under the TCPA and reads as follows:

> (3) Private right of action. A person or entity may, if otherwise permitted by the law or rules of court of a State, bring in an appropriate court of that State –
>> (A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,
>> (B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

1

**TCPALAW.COM**
Obtained from
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

(C) both such actions.

47 USCS §227 (2004).

Defendants argue that the individual States are required to pass an enabling statute before a claim can be brought pursuant to the TCPA in state court. Of the numerous courts that have considered this issue, only one court, a Texas appellate court, Autoflex Leasing, Inc. v. Manufacturers Auto Leasing, Inc., 16 S.W.3d 815 (Tex. App., 2000), held that it was necessary for States to pass enabling legislation. This decision was later rejected by a different Texas appellate court, The Chair King, Inc. v. GTE Mobilnet of Houston, Inc., 135 S.W.3d 365 (Tex. App. 2004). The "opt in" approach is illogical given the wording of §227.

Rejecting the "opt in" approach, several State courts have found that the language "if otherwise permitted by the law or rules of court of a State" acknowledges the principle that States have the right to structure their courts as desired and are not obligated to change the structure of their courts or their procedural rules to accommodate TCPA claims. E.g., R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc., 857 A.2d 1, 11 (Md. 2004); Condon v. Office Depot, Inc., 855 So.2d 644 (Fla. App. 2003); Schulman v. Chase Manhattan Bank, 268 A.D.2d 174 (N.Y. App. Div. 2000). This interpretation is in keeping with the language of the statute and the legislative history and takes into account constitutional requirements. R.A. Ponte, 857 A.2d at 7, 13. "[I]f the exercise of a State court's ordinary jurisdiction under established local laws is 'appropriate to the occasion and is invoked in conformity with those laws,' a state court may not refuse jurisdiction over a claim based on Federal law." Schulman, 268 A.2d at 179, citing, Mondou v. New York, New Haven & Hartford R.R. Co., 223 U.S. 1, 57.

Other State courts have found that the language "if otherwise permitted by the law or rules of court of a State" supports an "opt out" approach where states may pass legislation prohibiting such actions in their State courts, but otherwise must hear these actions. E.g., The Chair King, Inc. v. GTE Mobilnet of Houston, Inc., 135 S.W.3d 365 (Tex. App. 2004); Hooters of Augusta, Inc. v. Nicholson, 537 S.E.2d 468 (Ga. App. 2000).

Regardless of whether the "acknowledgement" or "opt out" approach is used, and the "acknowledgment" approach is the better reasoned one, it is clear that Illinois is not required to pass enabling legislation in order for suits to be brought pursuant to the TCPA in Illinois courts. This court is a court of general jurisdiction and has the ability to hear TCPA claims without further legislation.

Defendants argue that Illinois has opted out of the TCPA. Defendants, however, have not cited to any statute expressly opting out of the TCPA. Defendants point to 720 ILCS 5/26-3, passed one year *before* the enactment of the TCPA. A statute passed prior to the enactment of the TCPA cannot constitute an "opt out." Defendants also contend that Illinois has impliedly opted out of the TCPA by making unsolicited fax advertising a petty criminal offense and by not amending consumer fraud laws to take into account fax

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

solicitations. This argument is illogical and without merit. This court has the jurisdiction to hear TCPA cases unless hearing such cases would be prohibited by the laws or rules of this court. Defendants have not pointed to any law or rule which prohibits this court from exercising jurisdiction over TCPA claims. Such a prohibition cannot be "implied" from the circumstances relied upon by Defendants.

Plaintiffs can pursue a private right of action under the TCPA in this court.

*Constitutional Arguments*:

Excessive Penalties:

Defendants first contend that the TCPA is unconstitutional as it violates the Fifth and Fourteenth Amendments of the U.S. Constitution. Defendants argue that the TCPA's statutory fines are unconstitutionally excessive in violation of the Due Process clause of the Fifth and Fourteenth Amendments. This argument has been soundly rejected by the courts which have considered the issue.

The TCPA allows an individual to recover the actual monetary loss for each violation of the TCPA or $500 in damages, whichever is greater. 47 U.S.C. §227(b)(3)(2006). Defendants claim that this penalty violates due process, but a statutory penalty violates due process ". . .'only where the penalty prescribed is so severe and oppressive as to be wholly disproportional to the offense and obviously unreasonable.'" United States v. Citrin, 972 F.2d 1044, 1051 (9th Cir. 1992)(citation omitted). The TCPA penalty does not rise to this level.

As noted by the court in Kenro, Inc. v. Fax Daily, Inc., 962 F. Supp. 1162, 1165 (S.D. Ind. 1997), "[t]he fact that the TCPA establishes as a remedy a damages award of $500, even when actual monetary damage is less than $500, does not itself make the award excessive and unreasonable." The penalty fashioned by Congress was concerned with more than the actual cost of fax paper and toner, the remedy was fashioned to take into account "the difficult to quantify business interruption costs imposed upon recipients of unsolicited fax advertisements, effectively deter the unscrupulous practice of shifting these costs to unwitting recipients of 'junk faxes,' and 'provide adequate incentive for an individual plaintiff to bring suit on his own behalf.'" Id. at 1166. The TCPA's $500 penalty "when measured against the overall harms of unsolicited fax advertising and the public interest in deterring such conduct, is not 'so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable.'" State of Texas v. American Blast Fax, Inc., 121 F. Supp. 2d 1085, 1091 (W.D. Tex. 2000)(citation omitted).

First Amendment:

Defendants next contend that the TCPA violates the First Amendment. This argument has been just as soundly rejected. The test for whether regulations of commercial speech violate the First Amendment has been set forth by the U.S. Supreme Court in Central Hudson Gas & Electric Corp. v. Public Service Corp., 447 U.S. 557

3

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

(1980). Under Central Hudson, regulations of commercial speech are valid as long as they involve a substantial governmental interest, directly advance that interest, and are narrowly tailored to serve that interest. Id. at 563.

It is clear that the TCPA involves a substantial governmental interest contrary to Defendants' argument. There is a substantial governmental interest "in restricting unsolicited fax advertisements in order to prevent the cost shifting and interference such unwanted advertising places on the recipient." State of Missouri ex. rel. Nixon v. American Blast Fax, Inc., 323 F.3d 649, 655 (8th Cir. 2000); see also, State of Texas v. American Blast Fax, Inc., 121 F. Supp. 2d at 1092 ("Congress' interests in passing the TCPA – preventing 'unwitting customers' from bearing the brunt of advertising costs and preventing unwanted fax machine interference – are substantial and real."); Destination Ventures, Ltd. v. Federal Communications Comm'n, 46 F.3d 54, 56 (9th Cir. 1995). Defendants claim that Congress lacked the necessary "findings" to establish a significant governmental interest, but this claim has been previously, and correctly, rejected. State of Missouri ex. rel. Nixon v. American Blast Fax, Inc., 323 F.3d at 654.

The TCPA also clearly meets the requirement that regulations of commercial speech directly advance the governmental interest. Like other defendants before them, the Defendants before this court claim that the TCPA does not directly advance the government's interest. Defendants argue that the TCPA fails to meet this requirement by banning only commercial speech. Defendants' argument is without merit. As set forth in Destination Ventures, 46 F.3d at 56, "[b]ecause Congress's goal was to prevent the shifting of advertising costs, limiting its regulation to faxes containing advertising was justified." "By placing restrictions on those responsible for a large portion of the problem, the TCPA directly and materially advances the congressional goal of limiting the harm arising from unsolicited fax advertisements. State of Missouri ex. rel. Nixon v. American Blast Fax, Inc.; 323 F.3d at 655.

Defendants' contention that the TCPA's ban of unsolicited fax advertisements is not narrowly tailored is also without merit. Congress was not required to use the "least restrictive means" necessary to address the problem of unsolicited fax advertisements. Board of Trustees of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989). Rather, Congress was required to employ "a means narrowly tailored to achieve the desired objective." Id. Given the fact that Congress's desired objective in enacting the TCPA was to protect consumers from the cost shifting and interference imposed by unsolicited fax advertisements, the TCPA's ban on such faxes is narrowly tailored. E.g., State of Missouri ex. rel. Nixon v. American Blast Fax, Inc., 323 F.3d at 659; Destination Ventures, 46 F.3d at 56; State of Texas v. American Blast Fax, Inc., 121 F. Supp. 2d at 1091-92; Kenro, Inc. v. Fax Daily, Inc., 962 F. Supp. at 1168-69.

Defendants next claim that the TCPA violates the First Amendment because it unconstitutionally imposes "strict liability" by failing to include a knowledge requirement. Defendants claim that an advertiser could have permission to send a fax but mistakenly dial the wrong number subjecting the advertiser to a $500 fine. In effect,

4

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

Defendants are making an "overbreadth" argument contending that the TCPA would punish advertisers who did not intend to violate the TCPA.

Unfortunately for Defendants, the Plaintiffs before this court all allege that Defendants engaged in mass campaigns of sending unsolicited fax advertisements and Defendants have not presented any evidence to this court that the faxes they sent to Plaintiffs were solicited by others and Defendants merely misdialed. As noted by Plaintiffs, "facial invalidity" does not apply to commercial speech, Central Hudson, 447 U.S. at 565, n. 8; Board of Trustees of the State of N.Y., 492 U.S. at 481, and Defendants must show that the TCPA is unconstitutional as applied to them. They cannot do so.

Vagueness:

Defendants next argue that the TCPA is unconstitutionally vague. This argument is wholly lacking in credibility. The TCPA's language is plain and clear and does not meet the standard of unconstitutional vagueness. E.g., Roberts v. United States Jaycees, 468 U.S. 609, 629 (1984)(A statute is unconstitutionally vague when it is so unclear that two different individuals "must necessarily guess at its meaning").

Tenth Amendment:

Finally, Defendants argue that the TCPA is unconstitutional because the Tenth Amendment to the U.S. Constitution precludes Congress from conferring exclusive jurisdiction over a Federal claim upon State courts. Federal courts, however, have held that they do have jurisdiction over TCPA claims. E.g., 427 F.3d 446 (7th Cir. 2005). Defendants' argument is without merit.

The TCPA is constitutional.

Illinois Consumer Fraud Act

*Preemption*:

In its Supplemental Memorandum, Defendant International Card Establishment, Inc. ("ICE") argues that any claims under the Illinois Consumer Fraud Act ("ICFA") are preempted by the TCPA because Illinois lacks jurisdiction over interstate telecommunication transmissions. Initially, Plaintiffs Linda Hoppa and Jeffrey Brown argue that ICE's preemption argument is premature because the Class Action Complaint directed toward ICE does not allege that ICE sent the offending faxes from out-of-state. This argument is disingenuous. The Class Action Complaint alleges that ICE, a California corporation, sent faxes into Illinois. (Brown Complaint, ¶¶4-6). There are no facts alleged in the Class Action Complaint which indicate that ICE sent any intrastate faxes.

The TCPA contains no express preemption of state laws on the same subject. The TCPA contains only the following provision which provides as follows:

5

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

(1) STATE LAW NOT PREEMPTED.  Except for the standards prescribed under subsection (d) and subject to paragraph (2) of this subsection, nothing in this section or in the regulations prescribed under this section shall prevent any State law that imposes more restrictive intrastate requirements of regulations on or which prohibits —

    (A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements . . .

47 USC §227(e)(1).

"In areas of traditional state regulation, [the U.S. Supreme Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005). The above language does not, contrary to ICE's arguments, clearly and manifestly express an intention to preempt consumer fraud claims for interstate fax solicitations.

The cases cited by ICE, Klein v. Vision Lab Telecommunications, Inc., 399 F. Supp. 2d 528 (S.D. N.Y. 2005), and Chamber of Commerce of the United States of America v. Lockyer, 2006 WL 462482 (E.D. Cal. 2006), do not support ICE's preemption argument. In both Lockyer and Klein, the courts considered state laws which specifically regulated the unsolicited sending of fax advertisements. In Lockyer, the regulation at issue was more restrictive than the TCPA and in Klein the regulation at issue was less restrictive. The purpose of the ICFA, unlike the statutes at issue in Klein and Lockyer, is not to regulate interstate fax advertisements but to address deceptive and unfair practices in general. Nothing in the ICFA is in direct conflict with the TCPA and there is nothing in the language of the TCPA which clearly and manifestly shows an intention to preempt general state consumer laws which provide an additional remedy for the sending of unsolicited fax advertisements. Bates, 544 U.S. at 449; Klein, 399 F. Supp. 2d at 541.

Plaintiffs' ICFA claims are not preempted by the TCPA.

*Failure to State a Claim*:

Defendants first argue that Plaintiffs have failed to state a claim under the ICFA because the allegations do not satisfy the test for whether conduct amounts to an unfair practice set forth in Robinson v. Toyota Motor Credit Corp., 201 Ill. 2d 403 (2002). This court has already considered, and rejected, this argument in a written memorandum and order issued in Telecommunications v. Bach, 03 CH 9246.

The ICFA allows for claims for unfair practices as well as deceptive acts.  In determining whether conduct is unfair, a court should consider: (1) whether the conduct offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers. Id. at 417-18. All three prongs do not have to be satisfied to support a finding of unfairness. Id. at 418. "'A

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008.  No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

*Brill v. Becktold Ent., Inc.*, 2006 TCPA Rep. 1494 (Ill. Cir. Oct. 26, 2006).          Page: 7

practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Id.

It is clear that the conduct alleged by Plaintiffs offends the public policy of both the Federal government, as evidenced by the passage of the TCPA, and of Illinois which has criminalized Defendants' conduct. Defendants argue, however, that their conduct is not oppressive and Plaintiff has not shown substantial injury. While it is true that there is no substantial injury to any one individual Plaintiff before this court, the alleged conduct is unscrupulous and greatly offends the public policy of Illinois which has criminalized this conduct. The public policy prong alone justifies a finding of an unfair act. Robinson is clear that it is not necessary for a plaintiff to satisfy all criteria and that meeting one criterion can be sufficient.

Defendants also argue that Plaintiffs cannot state claims under the ICFA because they cannot show the existence of actual damages. Defendants' theory is that each Plaintiff sustained only *de minimis* damages of a few cents as a result of Defendants' conduct. Any argument regarding the actual amount of damages is not only premature, but also ignores the fact that the cases before the court are class actions. Finding that Plaintiffs were not damaged because each plaintiff was only damaged in small amounts would allow Defendants to escape any consequences for their alleged conduct "by committing many small violations that were not worth the time and effort of individual plaintiffs to redress or were beyond their ability or resources to remedy." Christakos v. Intercounty Title Co., 196 F.R.D. 496, 502 (N.D. Ill. 2000). Defendants rely on Judge Patrick McGann's opinion in Whiting Corp. v. MSI Marketing, Inc., 02 CH 6332, which addressed the substantiality of damages with regard to the Robinson factors. Judge McGann offered no opinion on whether Plaintiffs could show the existence of actual damages.

Defendants have not cited a single case on point which supports their argument. Defendants are of the opinion that Plaintiffs have not suffered any cognizable damage. The court disagrees.

Plaintiffs have sufficiently stated claims under the ICFA.

Conversion

Defendants argue that Plaintiff cannot state a claim for conversion. Conversion is an unauthorized deprivation of property from a person entitled to its possession." IOS Capital, Inc. v. Phoenix Printing, Inc., 348 Ill. App. 3d 366, 370 (4th Dist. 2004). "To prove conversion, the plaintiff must establish (1) a right in the property; (2) a right to immediate possession; (3) wrongful control by the defendant, and (4) a demand for the property." Id.

Defendants first argue that Plaintiffs have not alleged a wrongful or unauthorized deprivation of property. This argument is wholly without merit. The sending of unsolicited fax advertisements is prohibited under the TCPA and Illinois has criminalized

7

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

*Brill v. Becktold Ent., Inc.*, 2006 TCPA Rep. 1494 (Ill. Cir. Oct. 26, 2006).     Page: 8

this conduct. Defendants cannot credibly argue that their conduct was not wrongful or unauthorized.

Defendants next argue that Plaintiffs cannot allege a right to immediate possession of their toner and paper used by the fax machine. While the owner of a fax machine does expect that paper and toner will be used, the owner reasonably expects that the fax machine and supplies will be used for the business purposes of the owner. Plaintiffs allege that Defendants hijacked their machines for their own advertising purposes without consent using Plaintiffs' toner and paper. Plaintiffs had an immediate right of possession of their toner and paper.

Defendants also argue that Plaintiffs do not allege that they were dispossessed of their property, but this argument is disingenuous. Once Defendants' advertisements were printed with Plaintiffs' paper and toner, Plaintiffs were dispossessed of the paper and toner.

Defendants next argue that Plaintiffs have not alleged that they made any demand upon Defendants to return the toner and paper. Again, this argument is disingenuous. Once the advertisements were printed out by the fax machines, the paper and toner were irretrievably lost. Plaintiffs were not required to demand the return of property permanently converted by Defendants.

Finally, Defendants argue that Plaintiff cannot plead substantial damages, but this is not an element of a conversion claim. Plaintiffs have alleged that Defendants converted their property and they are not required to do more.

**IT IS HEREBY ORDERED** that the Master Motion to Dismiss for Group A is denied in its entirety.



ENTERED
JUDGE DAVID R. DONNERSBERGER•1941
OCT 2 8 2006
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

Judge David R. Donnersberger

8

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

## Exhibit A:

### Group A

| | |
|---|---|
| 06 CH 1803- | Clearbrook v. First Guaranty |
| 05 CH 21230- | Western Railway v. Addison |
| 06 CH 1439- | Brill v. Card Service |
| 06 CH 2613- | Hoppe v. Int'l Card Est. |
| 06 CH 4478- | Hoppe v. Abba Bonding |
| 06 CH 14740- | Ballard v. Intek |
| 06 CH 12462- | Shah v. EProfit |
| 05 CH 21845- | Sadowski v. Easy Drop |

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

EXHIBIT C

*Rossario's Fine Jewelry, Inc. v. Jurgens Fine Jewelry, Inc.*, 2007 TCPA Rep. 1720, 2007
WL 1961779 (Ill.Cir. Jan 19, 2007)

**County Department, Chancery Division.**
**Cook County.**

**ROSSARIO'S FINE JEWELRY, INC., Plaintiff,**

**v.**

**JURGENS FINE JEWELRY, INC., et al., Defendants.**

**No. 06 CH 6677.**

**January 19, 2007.**

NOTICE: The rules of some jurisdictions may impose limitations on the use of
materials not designated for publication in certain officially sanctioned reporters.
Consult the rules of the applicable jurisdiction regarding use and citation of this
opinion.

**RESULT:**

Motion to dismiss denied.

**SYNOPSIS:**

[under review]

**SUBSEQUENT HISTORY:**

none found

**PRIOR HISTORY:**

none found

**APPEARANCES:**


**JUDGES:**

Andrew Berman, Judge.

**HEADNOTES:**

[under review]

**OPINION:**

Memorandum and Order

[**\*1**] This cause comes before the court on Defendants Jurgens Fine ?? Maria C.
Pooch, Jurgens Enterprises L.L.C., and Jurgen W. Pooch's motion to dismiss pursuant
to 735 ILCS 5/2-615 and 5/2-619. The court has been fully advised of the premises
herein.

Plaintiff Rossario Fine Jewelry, Inc. has filed a Class Action Complaint against
Defendants Jurgens Fine Jewelry, Inc., Maria C. Pooch, Jurgen Enterprises, L.L.C.,
and Jurgen W. Pooch. Rossario's case is one of many related cases currently
assigned to this Calendar which involve claims for violations of the Telephone
Consumers Protection Act of 1991 ("TCPA"), the Illinois Consumer Fraud Act, and for
common law conversion. The Plaintiffs in these cases allege that the Defendants
have engaged in mass-faxing of unsolicited advertisements.

The cases have been divided into Groups A, B, and C. The Group A "Master
Motion" to dismiss brought by Becktold Industries, Inc. was previously denied by
Judge David R. Donnersberger. The Jurgen Defendants' motion to dismiss has been
designated as the "Master Motion" for Group B and all the Group B cases have joined
in this Master Motion. A list of the Group B cases is attached as Exhibit A.

The Group B master motion to dismiss filed by the Jurgen Defendants is practically
identical to the Group A master motion to dismiss. In addition to Rossario's
Response to the Group B master motion, the Group B Plaintiffs have adopted the

Group A Response filed by James Brill as their supplemental response.

*TCPA Claims (§2-615 and §2-619)*

*Private Right of Action under TCPA (§2-615):*

Plaintiffs allege that Defendants violated the federal Telephone Consumer Protection Act ("TCPA"), 47 USCS §227 (2004), which prohibits using any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to another telephone facsimile machine. Section 227 allows for state jurisdiction over private causes of action under the TCPA and reads as follows:

(3) Private right of action. A person or entity may, if otherwise permitted by the law or rules of court of a State, bring in an appropriate court of that State -

(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

47 USCS §227 (2004).

Defendants seek to dismiss Plaintiff's TCPA claim pursuant to §2-615. As with the Group A motion to dismiss, Defendants argue that the individual States are required to pass an enabling statute before a claim can be brought pursuant to the TCPA in state court and Illinois has not passed such a statute. Defendants' position, however, is not supported by the vast majority of case law. Of the numerous courts that have considered this issue, only two Texas courts, *Autoflex Leasing, Inc. v. Manufacturers Auto Leasing,* Inc., 16 S.W.3d 815 (Tex. App.. 2000), and *The Chair King, Inc. v. GTE Mobilnet of* Houston, Inc., 184 S.W.3d (Tex. 2006), have held that it was necessary for States to pass enabling legislation and the decisions were not well-reasoned. The adoption of the "opt in" approach is illogical given the language of §227.

Several State courts which have rejected the "opt in" approach have found that the language "if otherwise permitted by the law or rules of court of a State" acknowledges the principle that States have the right to structure their courts as desired and are not obligated to change the structure of their courts or their procedural rules to accommodate TCPA claims. *E.g., Condon v. Office Depot, Inc.,* 855 So.2d 644 (Fla. App. 2003); *R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc.,* 857 A.2d 1, 11 (Md. 2004); *Schulman v. Chase Manhattan Bank,* 268 A.D.2d 174 (N.Y. App. Div. 2000). The "acknowledgement" approach is in keeping with the language of the statute and the legislative history while also taking into account constitutional requirements. *R.A. Ponte,* 857 A.2d at 7, 14. "[I]f the exercise of a State court's ordinary jurisdiction under established local laws is 'appropriate to the occasion and is invoked in conformity with those laws,' a state court may not refuse jurisdiction over a claim based on Federal law." *Schulman,* 268 A.2d at 179, *citing, Mondou v. New York, New Haven & Hartford R.R. Co.,* 223 U.S. 1, 57.

Other State courts have found that the language "if otherwise permitted by the law or rules of court of a State" supports an "opt out" approach where States may pass legislation prohibiting such actions in their State courts, but otherwise must hear these actions. *E.g., Hooters of Augusta, Inc. v. Nicholson,* 537 S.E.2d 468 (Ga. App. 2000).

The "acknowledgment" approach is based upon sounder reasoning. However, regardless of whether the "acknowledgement" or "opt out" approach is used, it is clear that Illinois is not required to pass enabling legislation in order for suits to be brought pursuant to the TCPA in Illinois courts. This court is a court of general jurisdiction and has the ability to hear TCPA claims without further legislation. Illinois does not need to "opt in" to the TCPA.

Defendants further argue that Illinois has opted out of the TCPA. There is no

Illinois statute, however, that expressly opts out of the TCPA. As with the previous Group A motion, Defendants argue that 720 ILCS 5/26-3, passed prior to the enactment of the TCPA, constitutes an opting out of the TCPA. It is obvious that a statute passed prior to the enactment of the TCPA cannot constitute an "opt out." Defendants also assert, as in the Group A motion, that Illinois has impliedly opted out of the TCPA by making unsolicited fax advertising a petty criminal offense and by not amending consumer fraud laws to address fax solicitations. This argument is without merit. Trial courts have the jurisdiction to hear TCPA cases unless hearing such cases would be prohibited by the laws or rules of the court. As with the Group A Defendants, the Group B Defendants have not identified any law or rule prohibiting this court from exercising jurisdiction over TCPA claims.

Finally, Defendants argue that requiring States to "opt out" of the TCPA violates the Tenth Amendment to the U.S. Constitution. This argument presumes that Congress conferred exclusive jurisdiction over TCPA claims upon State courts. The Seventh Circuit, however, has held that federal courts do have jurisdiction over TCPA claims. *Brill v. Countrywide Home Loans, Inc.,* 427 F.3d 446, 450-51 (7th Cir. 2005).

Plaintiffs are entitled to pursue a private right of action under the TCPA in this court.

*Constitutional Arguments* (§2-619):

Defendants also contend, pursuant to §2-619, that the TCPA is unconstitutional because it violates the First, Fifth, and Eighth Amendments of the U.S. Constitution. These arguments are without merit.

First Amendment:

Defendants first argue that the TCPA violates the First Amendment. This argument has been soundly rejected by the courts which have considered it. The test for whether regulations of commercial speech violate the First Amendment has been set forth by the U.S. Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service* Corp., 447 U.S. 557 (1980). Under *Central Hudson,* regulations of commercial speech are valid as long as they involve a substantial governmental interest, directly advance that interest, and are narrowly tailored to serve that interest. *Id.* at 564.

It is clear that the TCPA involves a substantial governmental interest contrary to Defendants' argument. There is a substantial governmental interest "in restricting unsolicited fax advertisements in order to prevent the cost shifting and interference such unwanted advertising places on the recipient." *State of Missouri ex. rel. Nixon v. American Blast Fax, Inc.,* 323 F.3d 649, 655 (8th Cir. 2000); *see also, State of Texas v. American Blast Fax, Inc.,* 121 F. Supp. 2d 1085, 1092 ("Congress' interests in passing the TCPA - preventing 'unwitting customers' from bearing the brunt of advertising costs and preventing unwanted fax machine interference - are substantial and real."); *Destination Ventures, Ltd. v. Federal Communications Comm'n,* 46 F.3d 54, 56 (9th Cir. 1995). It is not necessary to establish the reality of harm by empirical studies "and Congress used acceptable alternative bases when enacting the TCPA." *Phillips Randolph* Enterprises, LLC v. Fields, 2007 U.S. Dist. LEXIS 3027, *9 (N.D. Ill. Jan. 11, 2007).

The TCPA also clearly meets the requirement that regulations of commercial speech directly advance the governmental interest. Defendants argue that the TCPA fails to meet this requirement by banning only commercial speech, but this argument is without merit. "Because Congress's goal was to prevent the shifting of advertising costs, limiting its regulation to faxes containing advertising was justified." *Destination* Ventures, 46 F.3d at 56. "By placing restrictions on those responsible for a large portion of the problem, the TCPA directly and materially advances the congressional goal of limiting the harm arising from unsolicited fax advertisements." *State of Missouri ex. rel.* Nixon v. American Blast Fax, Inc., 323 F.3d at 655.

       6/23/2008 1:07 PM

Defendants' contention that the TCPA's ban of unsolicited fax advertisements is not narrowly tailored is also without merit. Congress was not required to use the "least restrictive means" necessary to address the problem of unsolicited fax advertisements. *Board of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989). Rather, Congress was required to employ "a means narrowly tailored to achieve the desired objective." *Id.* Given the fact that Congress's desired objective in enacting the TCPA was to protect consumers from the cost shifting and interference imposed by unsolicited fax advertisements, the TCPA's ban on such faxes is narrowly tailored. *E.g., State of* Missouri ex. rel. Nixon v. American Blast Fax, Inc., 323 F.3d at 659; *Destination* Ventures, 46 F.3d at 56; *State of Texas v. American Blast Fax, Inc.,* 121 F. Supp. 2d at 1091-92; *Kenro, Inc. v. Fax Daily, Inc.,* 962 F. Supp. 1162, 1168-69 (S.D. Ind. 1997).

The TCPA does not violate the First Amendment.

Excessive Penalties:

As with the Group A motion, Defendants argue that the TCPA unconstitutionally imposes excessive penalties. Defendants argue that the TCPA's statutory fines are unconstitutionally excessive in violation of the Fifth and Eighth Amendments to the U.S. Constitution. These arguments are without merit.

The TCPA allows an individual to recover the actual monetary loss for each violation of the TCPA or $500 in damages, whichever is greater. 47 U.S.C. §227(b)(3)(2006). Defendants contend that this penalty violates due process, but a statutory penalty violates due process "...'only where the penalty prescribed is so severe and oppressive as to be wholly disproportional to the offense and obviously unreasonable.' " *United States v. Citrin,* 972 F.2d 1044, 1051 (9th Cir. 1992)(citation omitted). The TCPA penalty does not rise to this level.

In *Kenro, Inc. v. Fax Daily, Inc.,* 962 F. Supp. at 1165, the court found that "[t]he fact that the TCPA establishes as a remedy a damages award of $500, even when actual monetary damage is less than $500, does not itself make the award excessive and unreasonable." The penalty fashioned by Congress was not aimed at compensating plaintiffs for the actual cost of fax paper and toner; the remedy was fashioned to take into account "the difficult to quantify business interruption costs imposed upon recipients of unsolicited fax advertisements, effectively deter the unscrupulous practice of shifting these costs to unwitting recipients of 'junk faxes,' and 'provide adequate incentive for an individual plaintiff to bring suit on his own behalf.' " *Id.* at 1166.

The TCPA's $500 penalty "when measured against the overall harms of unsolicited fax advertising and the public interest in deterring such conduct, is not 'so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable.' " *State of Texas v. American Blast Fax, Inc.,* 121 F. Supp. 2d at 1091 (W.D. Tex. 2000)(citation omitted). As recently noted by the Northern District of Illinois, "the Due Process clause of the 5th Amendment does not impose upon Congress an obligation to make illegal behavior affordable ..." *Phillips,* 2007 U.S. Dist. LEXIS at *7-8.

Defendants further argue that the TCPA violates the Eighth Amendment. The Eighth Amendment's prohibition against the imposition of excessive fines, however, "does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has received any right to receive a share of the damages awarded." *Browning-Ferris Industries v. Kelco Disposal,* 492 U.S. 257, 263-64 (1989). The TCPA allows private causes of action for money damages. As such, the Eighth Amendment has no application.

The TCPA is constitutional.

*Illinois Consumer Fraud Act (§2-615)*

Defendants contend that Plaintiffs' claims under the Illinois Consumer Fraud Act

("ICFA") fail to state a cause of action. Defendants are mistaken.

Defendants first argue that Plaintiffs have failed to state a claim under the ICFA because the allegations do not show conduct amounting to an unfair practice actionable under the ICFA. The ICFA allows for claims for unfair practices as well as deceptive acts. _Robinson v. Toyota Motor Credit Corp.,_ 201 Ill. 2d 403 (2002). In determining whether conduct is unfair, a court should consider: (1) whether the conduct offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers. _Id._ at 417-18. All three prongs do not have to be satisfied to support a finding of unfairness. _Id._ at 418. " 'A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." _Id._

Contrary to Defendants' arguments, the conduct alleged by Plaintiffs does offend the public policy of both the Federal government, as evidenced by the passage of the TCPA, and of Illinois which has criminalized Defendants' conduct. Like the Defendants in the Group A motion to dismiss, Defendants argue that their conduct was not oppressive and Plaintiffs have not shown substantial injury. While it is true that there is no substantial monetary injury to any one individual Plaintiff before this court, the alleged conduct of conducting mass faxing of unsolicited advertisements shows a pattern of unscrupulous conduct which greatly offends the public policy of Illinois which has criminalized this conduct. _Robinson_ is clear that it is not necessary for a plaintiff to satisfy all three criteria and that meeting even one criterion can be sufficient to show the existence of an unfair practice. In the instant case, Plaintiffs have alleged conduct which meets two of the criteria.

Defendants also argue, like the Group A Defendants before them, that Plaintiffs cannot state claims under the ICFA because they cannot show the existence of actual damages. Defendants' theory is that each Plaintiff sustained only _de minimis_ damages of a few cents as a result of Defendants' conduct. This argument ignores the fact that the cases before the court were filed as class actions. Finding that Plaintiffs were not damaged because each plaintiff was only damaged in small amounts would allow Defendants to escape any consequences for their alleged conduct "by committing many small violations that were not worth the time and effort of individual plaintiffs to redress or were beyond their ability or resources to remedy." _Christakos v. Intercounty Title Co.,_ 196 F.R.D. 496, 502 (N.D. Ill. 2000). Defendants rely on Judge Patrick McGann's opinion in _Whiting Corp. v. MSI Marketing, Inc.,_ 02 CH 6332, which addressed the substantiality of damages with regard to the _Robinson_ factors. Judge McGann offered no opinion on whether Plaintiffs could show the existence of actual damages.

Plaintiffs have sufficiently stated claims under the ICFA.

_Conversion_

Finally, Defendants contend, again as the Group A Defendants before them, that Plaintiffs cannot state a claim for conversion. Conversion is the unauthorized deprivation of property from a person entitled to its possession." _IOS Capital, Inc. v. Phoenix_ Printing, Inc., 348 Ill. App. 3d 366, 370 (4th Dist. 2004). "To prove conversion, the plaintiff must establish (1) a right in the property; (2) a right to immediate possession; (3) wrongful control by the defendant, and (4) a demand for the property." _Id._

Defendants contend that Plaintiffs have not alleged a wrongful or unauthorized deprivation of property. The sending of unsolicited fax advertisements, however, is prohibited under the TCPA and Illinois has criminalized this conduct. Despite Defendants' argument to the contrary, the sending of an unsolicited fax advertisement is "inherently wrongful."

Defendants next claim that Plaintiffs have not alleged a right to immediate possession of their toner and paper used by the fax machine. Defendants are mistaken. The owner of a fax machine reasonably expects that the fax machine and supplies will be used for the business purposes of the owner. Plaintiffs allege that

Defendants hijacked their machines for their own advertising purposes without consent using Plaintiffs' toner and paper. Plaintiffs had an immediate right of possession to their toner and paper.

Defendants also argue that Plaintiffs do not allege that they were dispossessed of their property, but this argument is disingenuous. Once Defendants' advertisements were printed with Plaintiffs' paper and toner, Plaintiffs were dispossessed of the paper and toner.

Defendants further contend that Plaintiffs have not alleged that they made any demand upon Defendants to return the toner and paper. Plaintiffs were not required to demand the impossible. Once the advertisements were printed out by the fax machines, the paper and toner were irretrievably converted and any demand for their return would be futile.

Finally, Defendants argue that they did not "seriously interfere" with Plaintiffs' property by sending a short advertisement. "Serious interference" is not an element of a conversion claim. Plaintiffs have alleged that Defendants converted their property and they are not required to do more.

Plaintiffs have sufficiently stated claims for conversion.

*Trespass (specific to Rossario v. Jurgens)*

In their Reply brief, the Jurgen Defendants argue for the first time that Rossario has not stated a claim for trespass. This argument is without merit. First, an argument cannot be raised for the first time in a Reply. Second, and more importantly, Rossario's Class Action Complaint does not allege a claim for trespass.

IT IS HEREBY ORDERED that Defendants' Group B master motion to dismiss is denied in its entirety.

Judge Andrew Berman

# # #

Printed on Monday, June 23, 2008.

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

# EXHIBIT D

(Rev. 9/13/04) CCG 0002

Order
_____
IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

TELECOMMUNICATIONS NETWORK DESIGN, INC.

v.

No. 03 CH 09246
52460
4734
4217

BACH BUSINESS CREDIT, INC.

JUDGE DAVID R. DONNERSBERGER
JAN 26 2005
Circuit Court - 1541

ORDER

THIS MATTER COMING TO BE HEARD ON DEFENDANTS' MOTION TO DISMISS DUE NOTICE HAVING BEEN GIVEN AND THIS COURT BEING FULLY ADVISED IT IS SO ORDERED THAT:

1) DEFENDANTS' MOTION TO DISMISS IS DENIED THE COURT WILL ISSUE A MEMORANDUM ON ITS RULING;

2) DEFENDANTS' HAVE 28 DAYS TO ANSWER PLAINTIFF'S COMPLAINT; AND

3) STATUS HEARING IS SO FOR MARCH 8, 2005 AT 10:00 AM

Atty. No.: 6270758
Name: LITCHFIELD CAVO
STEPHAN TIPTON

Atty. for: DEFENDANTS
Address: 303 W MADISON SUITE 300
City/State/Zip: CHICAGO, IL 60622
Telephone: 312 781 6656

ENTERED:

_____
Judge                    Judge's No.

MC

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

# EXHIBIT E

# IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL CIRCUIT
## KANE COUNTY, ILLINOIS

MARK CHAIR COMPANY,      )
                               )
         Plaintiff,        )
                               )
      vs.                  )       Case No. 02 LK 247
                               )
MORTGAGE MANAGERS, INC.      )
                               )
         Defendants.     )

Clerk of the Circuit Court
Kane County, IL

DEC 2 0 2002

FILED:     0'41
ENTERED

## ORDER

THIS CAUSE coming on for the Court's ruling on the Defendant's 2-619 and 2-615

Motion to Dismiss, the Court having considered said motion as well as the Response, Reply and

Surreply filed in conjunction therewith, along with the Brief of the Intervenor, United States of

America, the arguments of counsel and applicable case-law, and now being fully advised in the

premises,

## MAKES THE FOLLOWING FINDINGS OF FACT/CONCLUSIONS OF LAW:

A.    The *Telephone Consumer Protection Act* (TPCA) is a federal statute prohibiting

      the transmission of commercial advertising by fax to parties who have not

      previously consented to the receipt of same.

B.    The standard applicable for the determination of the constitutionality of a

      restriction on commercial speech as protected by the First Amendment is set forth

      in *Central Hudson Gas & Electric Corporation v. Public Service Commission of*

      *New York*, 447 U.S. 557(1980):

1

C.    In applying the _Central Hudson_ test to the facts of the case at bar, the Court

determines as follows:

1.    That the commercial speech in question concerns lawful activity and is not

misleading.

2.    That the government interest in obviating the cost shifting of unsolicited

fax advertising from the sender to the recipient thereof and preemption of

the recipient's use of its fax machine is substantial for the protection of fax

machine owners against the expense of unwanted advertising as well as

the attendant interruption of fax capabilities during such transmissions.

3.    That unsolicited fax advertising requires those undesirous of it to become

unwilling participants in the sender's advertising processes.

4.    That alternative means are available at the sender's expense to publish its

intended commercial message.

5.    That the principal thrust of the TCPA is as a restriction of the mode of

transmission rather than of commercial speech itself.

6.    That a single fax transmission in violation of the TCPA is not _de minimus_

in nature when viewed in the context of a larger advertising program and

the potential proliferation of unsolicited fax advertising generally.

7.    That the TCPA directly advances the government interest of reducing the

aforementioned cost shifting effects and disruption of fax services.

8.    That the regulation set forth in the TCPA is not more extensive than is

necessary to further the government interest asserted and that lesser

2

restrictive means would likely diminish its regulatory effectiveness and, further, burden the recipient rather than the sender of fax advertising.

9.  For the foregoing reasons, the Court finds that the TCPA is not violative of the Constitution.

D.  That Illinois courts, as courts of general jurisdiction, possess the authority to hear all justiciable claims under state law or by authority conferred by federal law and, as such, require no separate and distinct legislation as contemplated by the drafters of the TCPA, as may be required in states with courts of limited jurisdiction, to avail litigants with the right to private actions provided therein.

E.  That Count II of plaintiff's complaint states a cause of action sounding in conversion.

F.  That Count III of plaintiff's complaint states a statutory cause of action under the provisions of the *Illinois Consumer Fraud Act*.

IT IS, THEREFORE, HEREBY ORDERED:

1.  Defendant's 2-619 and 2-615 Motion to Dismiss is denied.

2.  Defendant is allowed 21 days to file its Answer to the Complaint herein.

ENTER: December 20, 2002

*[signature]*

JUDGE

3

# EXHIBIT F

2116 (Rev. 02/05)

ORDER

UNITED STATES OF AMERICA

COUNTY OF DU PAGE

STATE OF ILLINOIS

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

American Dye Pro Co.

-vs-

American Telephone &
Data

CASE NUMBER

04 L 974.

File Stamp Here

## ORDER

This matter coming on to be heard, the Court being fully advised in the premises and having jurisdiction of the subject matter, IT IS ORDERED HEREBY:

Defendants motion to dismiss is denied based on the reasoning set forth in Kabrica, April/ v. Tier Inc Telecom & Mgmt. Group, case no. 03 L 425 (DuPage Co. Cir. Ct. Aug. 4 2004)

Case management and status set for April 28, 2005 at 9 AM.

Plaintiffs motion for class certification is entered and continued Until April 28, 2005 at 9 AM.

Defendants responses to plaintiffs discovery requests due on or before April 7, 2005. ✓

COPY

Name: Edelman Combs Lattuner & Goodwin, LLC

DuPage Attorney No.: 9425

Attorney for: Plaintiff

Address: 120 S. LaSalle St. 18 flr.

City/State/Zip: Chicago IL 60603

Telephone: 312 739 4200

ENTER: _____

JUDGE

DATE: 24 March 2005

CHRIS KACHIROUBAS, CLERK OF THE 18TH JUDICIAL CIRCUIT COURT ©
WHEATON, ILLINOIS 60189-0707

# EXHIBIT G

STATE OF ILLINOIS        )
                              )    ss

COUNTY OF LAKE        )

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| Eclipse Manufacturing Co.,<br>    Plaintiff, | ) ) ) | |
| v. | ) | 03 CH 1344 |
| T.J. Copy Products, Inc. and<br>Tracy J. Wertz,<br>    Defendants | ) ) ) ) | Judge David M. Hall |

FILED

APR 2 3 2004

CIRCUIT CLERK

## ORDER

Before this court is a motion by the Defendants to dismiss the complaint brought by Eclipse Manufacturing Company ("Eclipse") concerning the propriety of unsolicited facsimile transmissions sent by the Defendants. Defendants assail the complaint on several fronts. They contend that the Telephone Consumer Protection Act ("TCPA") violates numerous constitutional rights and must be invalidated by this court. Defendants also assert that several of Eclipse's claims fail to state a cause of action. Defendants' contentions will be addressed in turn.

1.   Sections 2-615 and 2-619

Defendants move this court to dismiss or strike "portions" of Plaintiff's Complaint or to move this court for judgment on the pleadings. Defendants rely on 735 ILCS 5/2-615 and 735 ILCS 5/2-619 in support of these proposed actions. A Section 2-619 motion raises certain defects or defenses and questions whether judgment should be entered as a matter of law. *Illinois Graphics Co. v. Nickum*, 159 Ill.2d 469, 494 (Ill. 1994). In turn, a

section 2-615 motion questions whether a complaint states a valid cause of action. *Id.* at

488.

As an initial matter, this court will consider the threshold issues before it, addressing

Plaintiff's standing and statutory right to bring this suit.

2. Defendants' Jurisdictional Arguments are Without Merit

Plaintiff has adequately demonstrated in its complaint that it received a commercial

facsimile from T.J. Copy Products, allegedly in violation of the TCPA. The TCPA

provides a statutorily conferred cause of action, enabling Plaintiff to bring suit in this

court. Since Plaintiff has alleged that the Defendants have acted in contravention of

federally established law, it would appear that there is a viable case before this court.

A statutory challenge under the Illinois Constitution requires a direct injury from the

enforcement of a statute that is: (1) distinct and palpable; (2) fairly traceable to

defendant's actions; and (3) substantially likely to be redressed by granting the relief

requested. *Glisson v. City of Marion*, 188 Ill.2d 211, 221 (Ill. 1999). Plaintiff has

adequately pleaded a distinct and palpable injury – the transmission of the unsolicited,

commercial fax. The transmission was fairly traceable to the Defendants' actions

because it originated from T.J. Products, Inc. Lastly, the relief requested should provide

Plaintiff with redress because an injunction would serve to stop the actual injury and a

monetary award would compensate the public harm caused by unfettered, unsolicited,

commercial faxes. The court finds that Plaintiff has standing to maintain this action.

Defendants suggest that Illinois provides no private right of action enabling the

Plaintiff to bring suit. This view has been conclusively rejected by courts nationwide.

*See, e.g., Murphey v. Lanier*, 204 F.3d 911, 914 (9th Cir. 2000); *International Science &*

*Technology Institute, Inc. v. Inacom Communications, Inc.*, 106 F.3d 1146 (4th Cir. 1997); *Erienet, Inc. v. Velocity Net*, 156 F.3d 513, 515 (3rd Cir. 1998). The TCPA expressly creates a private cause of action for violations of the Act to be had in state courts. 47 U.S.C. § 227(b)(3). States *may* choose to prevent their courts from hearing private actions under the TCPA. *See International Science*, 106 F.3d at 1156. There is no indication that Illinois has done so here. As a result, the court finds that Plaintiff has presented a viable private claim before this court.

Defendants' final attack on the procedural posture of Plaintiff's claim centers on the fact that the TCPA prohibits "persons" from making unsolicited, commercial facsimile transmissions and not "entities." A brief review of the United States Code reveals that "persons" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1 (2004). The court finds that Plaintiff is a person under the Act.

3. The TCPA has Been Upheld as Universally Constitutional

Without regard to numerous judicial determinations upholding the constitutionality of the TCPA, Defendants assail the constitutional propriety of the TCPA. Defendants assert that the TCPA violates the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. A wide variety of federal and state courts have thoroughly examined the constitutionality of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. In addition to satisfying general constitutional concerns, the universal consensus among the courts is that the TCPA easily satisfies concerns raised under the First Amendment relating to the regulation of commercial speech pursuant to *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980).

3

Defendants have not presented any new bases to support their argument that the prohibition of unsolicited, commercial speech, in the form of facsimile transmissions, is unconstitutional.

This court will individually address the array of Defendants' constitutional challenges.

### a. The First Amendment Challenge

Illinois courts employ the well-accepted *Central Hudson Gas* analysis when determining whether restrictions on commercial speech are constitutional. *See, e.g.*, *Vuagniaux v. Department of Professional Regulation*, 802 N.E.2d 1156 (Ill. 2003). To pass constitutional muster under the *Central Hudson Gas* analysis, the court must consider four factors. First, it must be determined whether the speech concerns unlawful activity, or whether it is misleading. *Id.* at 1167. Commercial speech which advocates unlawful activity or is misleading in nature receives no First Amendment protection. *Id.* Second, the court must analyze whether the asserted governmental interest in regulating the speech is substantial. *Id.* Third, the court must determine "whether the regulation directly advances the governmental interest asserted." *Id.* Lastly, it must be examined whether the regulation is more extensive than necessary to serve the governmental interest. *Id.*

Since *Central Hudson Gas* is controlling authority on this matter and has been employed by all courts considering this issue, it is appropriate for this court to do the same here. This is because the TCPA, by its plain meaning, prohibits the solicitation of commercial speech only. Moreover, the speech in question here, the unsolicited fax sent to Eclipse, is undoubtedly commercial in nature. It includes phrases such as:

"Unbelievable Deals!" and "Limited Inventory!! Call Now." As such, it is apparent that the communication at issue, and the statutory reach of the TCPA, are clearly limited to commercial speech. The TCPA easily passes the factors announced under the *Central Hudson Gas* analysis.

          i.  The Speech at Issue is not Unlawful or Misleading

Because the first factor, whether the speech is unlawful or misleading, is not at issue in this litigation, it is considered satisfied for purposes of this analysis. The court finds that the speech in question is not unlawful or misleading.

          ii.  There is a Substantial Interest in Eliminating Unwanted Commercial Faxes

In enacting the TCPA, Congress found that there was a substantial national interest in eliminating the ability of commercial fax marketers to shift the costs of advertisers to individuals through unsolicited, commercial facsimile transmissions. Further, there are also substantial interests in eliminating interruptions and interference commonly associated with unwanted faxes. Federal courts considering this issue have routinely held these interests as substantial or compelling. *See, e.g., Missouri v. American Blast Fax, Inc.*, 323 F.3d 649, 655 (8th Cir. 2003); *Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 55 (9th Cir. 1995). Moreover, three sister Illinois Circuit Courts have found a substantial interest in the TCPA as well. *See, e.g., Whiting Corp. v. MSI Marketing, Inc.*, No. 02 CH 6332 (Cook County, Illinois April 3, 2003) ("[I]t appears to this Court that the government has a substantial interest in preventing the cost shifting of advertising and the unwanted disruption of economic activity"); *Robin Hill Development Co. v. JD&T Enterprises, Inc.*, No. 01 L 527 (DuPage County, Illinois, October 3, 200) (upholding the substantial interest analysis); *Mark Chair Co. v. Mortgage Managers, Inc.*, No. 02 LK

247 (Kane County, Illinois, December 20, 2002) (explaining that the "government interest in obviating the cost shifting of unsolicited fax advertising from the sender to the recipient thereof and preemption of the recipient's use of its fax machine is substantial").

A well-documented legislative history underscores the fact that explosive growth in unsolicited facsimile advertising posed a realistic threat of economic harm to Americans with facsimile machines. This court will not belabor this well-established fact. Since unrestricted, unsolicited, commercial faxes cause considerable, demonstrated economic injury, the State has a strong interest in protecting fax owners and preventing these unsolicited transmissions.

It is manifestly clear that both the United States of American and Illinois have a substantial interest in protecting unwitting owners of facsimile machines from bearing the costs of unwanted, commercial fax advertising. The TCPA is undoubtedly directed towards preventing the unjustified cost-shifting associated with unsolicited facsimile transmissions and the business disruptions and delays common in the practice of "junk faxes." Like many courts before, this court holds that the TCPA easily passes the substantial governmental interest analysis.

### iii. The TCPA Directly Advances the Interest in Prohibiting Unsolicited, Commercial Facsimile Transmissions

A properly tailored restriction "focuses on the source of the evils the [government] seeks to eliminate . . . and eliminates them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 n. 7 (1989). Plaintiffs have the burden of demonstrating that the restriction imposed by the TCPA will not only advance the governmental interest but will do so to a material degree. *44 Liquormart, Inc. v.*

6

*Rhode Island*, 517 U.S. 484, 505 (1996). Since unsolicited, commercial facsimile transmissions are responsible for the bulk of advertising cost shifting, banning *unsolicited*, commercial facsimiles is a reasonable method to achieve Congress' goal of reducing cost shifting. *See, e.g., Destination Ventures*, 46 F.3d at 56. The TCPA is a narrow response to the "evil" that prompted it - unsolicited, commercial facsimile transmissions. It prohibits no more communication than is necessary because it proscribes the very activity that causes the economic harm at issue here and extends no further.

The TCPA directly advances the government's interest of protecting consumers from bearing the costs of unwanted advertising. By carefully prohibiting only unsolicited, commercial faxes, it satisfies the third *Central Hudson Gas* analysis.

iv. The TCPA is not More Expansive Than Necessary.

The last inquiry to be made involves whether the regulation is more extensive than necessary to serve the governmental interest. *Vuagniaux*, 802 Ill.2d at 1167. It should be first noted that the "least restrictive means" test has no role in the commercial speech context. *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995). The test employed here is not whether Congress used the least restrictive means, but rather whether there:

is a 'fit' between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.

*American Blast Fax, Inc.*, 323 F.3d at 659 (internal quotations and citations omitted).

In this case, the TCPA leaves open ample alternative means of communication for commercial advertisers to engage in. Those who wish to communicate advertisements by

7

facsimile transmission are still allowed to do so as fax advertising is permissible with the prior consent of recipients. *See id.* Those impacted by the law are, of course, also still free to advertise in other media formats, such as television or newspaper, where the advertiser bears the cost of publishing the advertisement. The TCPA is not excessively expansive; instead, it protects the owners of facsimile machines from the very evil that prompted the legislation.

The central inquiry here is whether the scope of the TCPA's speech restriction is proportionate to the interests served. *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 480 (1989). The interests here include the burdensome shift of costs from the advertiser to the consumer and the disruption of the use of facsimile machines. It is apparent that Congress' decision to prohibit only those facsimile transmissions that caused the economic injuries described represents a reasonable fit between the "legislature's ends" and the "means chosen to accomplish those ends" – the implementation of the TCPA. *American Blast Fax, Inc.*, 323 F.3d at 659 (internal quotations and citations omitted).

"It was not unreasonable for Congress to choose a system that protects those who would otherwise be forced to bear unwanted burdens over those who wish to send and receive unsolicited fax advertising." *Id.* The restriction employed by the TCPA is adequately tailored to protect consumers from the unwanted burdens of receiving unsolicited faxes. This is not a case where a complete ban of speech is in place. Rather, several alternative channels of communication remain open to commercial speakers. Because it has already been determined that the TCPA directly advances the substantial interest of protecting consumers from unwanted commercial faxes, and that it leaves open

alternative channels of communication, the court finds that the TCPA achieves a reasonable fit between the means adopted and the ends it seeks to serve.

The court finds that, as written, the TCPA satisfies all four elements of the *Central Hudson Gas* analysis.

### b. Vagueness Challenges

Defendants assert that the TCPA is void for vagueness because it "does not define what constitutes prior express invitation or permission nor what would constitute a facsimile." Mot. to Dismiss at 4. Because of this, Defendants assert, they cannot know what is necessary to avoid liability. Memo. in Support of Mot. to Dismiss at 10. Criminal laws may be deemed unconstitutionally vague when they "fail to provide the kind of notice that would enable a person of ordinary intelligence to understand what conduct is prohibited." *People v. Law*, 202 Ill.2d 578, 582 (Ill. 2002) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999)). Criminal laws may also be declared unconstitutionally vague when they fail to provide explicit standards of enforcement. *Id.*

Before this court can conduct a vagueness analysis, it must first turn its attention to the conduct of the Defendants challenging the law. *Village of Hoffman Estates v. The Flipside*, 455 U.S. 489, 495 (1981). "A Plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* In this case, the Defendants have allegedly sent an unsolicited, commercial facsimile transmission to the Plaintiff. As a result, their conduct is "clearly proscribed" by the TCPA and they are not proper parties to contest its alleged vagueness. Nor is it possible for Defendants to assert a facial challenge against the statute, where the statute clearly applies to their conduct, because the overbreadth doctrine does not apply to

commercial speech. *See Waters v. Churchill*, 511 U.S. 661, 670 (1994). The court finds that the Defendants lack standing to make a vagueness challenge to the TCPA.

Defendants also assert that 720 ILCS 5/26-3, an Illinois criminal provision prohibiting unsolicited, commercial facsimile transmissions, is unconstitutionally vague. Plaintiff, however, has not based its causes of action on this statute and Defendants' challenge is, accordingly, not ripe. Hypothetical cases or controversies, challenging laws that are not being enforced against the Defendants, do not satisfy the requirements of the ripeness doctrine. *Simcox v. Simcox*, 131 Ill.2d 491, 498 (citing *Poe v. Ulman*, 367 U.S. 497, 507 (1961)).

Even if Defendants could properly raise the issue of vagueness, the terms "prior express invitation or permission" and "facsimile" do not suffer from the constitutional malady of vagueness. To guide the Defendants, this court looks to Funk & Wagnall's New International Dictionary of the English Language for assistance. Funk & Wagnall's Dictionary defines "prior" as "preceding in time, order, or importance." Funk & Wagnall's New International Dictionary of the English Language 1002 (2003). It defines "express" as "to put (thought or opinion) into spoken or written words." *Id.* at 448. Funk & Wagnall's defines "invitation" as "the act of inviting; courteous solicitation to come to some place or to do some act; especially a requesting of another's company: a standing *invitation* to dinner." *Id.* at 670. "Permission" is defined as "the act of permitting or allowing; license granted; formal authorization; consent." *Id.* at 941. Lastly, "facsimile" is defined as "an exact copy or reproduction, often differing in scale but always identical or closely imitative in detail, material, etc." *Id.* at 453. These are hardly unfamiliar words or phrases with uncertain meaning.

To be successful in their void for vagueness claim, Defendants must be able to illustrate why the challenged phrases "fail to provide the kind of notice that would enable a person of ordinary intelligence to understand what conduct is prohibited." *Law*, 202 Ill.2d at 582. Instead, Defendants make vague and conclusory allegations. The court finds that the challenged terms share a common and well-understood meaning which would otherwise deny the Defendants' vagueness challenge.

### c. The TCPA Does not Violate Due Process or Provide for Excessive Fines

Defendants next argue that the TCPA violates their right to Due Process and that the award of statutory damages would violate the Eighth Amendment's prohibition against excessive fines. The Due Process Clause of the Fifth and Fourteenth Amendments prohibits governments from imposing "grossly excessive" punishments. *TXO Production Corp. v. Alliance Resource Corp.*, 509 U.S. 443, 454 (1993). The TCPA provides that a defendant, if found liable, must compensate the plaintiff for actual monetary loss per violation or $500 in damages, whichever is greater. *See* 47 USC § 227(b)(3). Defendants explain that allowing damages of $500 per violation of the TCPA is "wholly disproportionate to the offense and completely unreasonable."

A statutory penalty violates due process "only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, Iron Mt. & S. Ry. Co. v. Williams*, 251 U.S. 63 (1919). At least two federal courts have upheld the damages provided by the TCPA under similar challenges. *See, e.g., Texas v. American Blast Fax, Inc.*, 121 F.Supp.2d 1085, 1090 (W.D. Texas 2000); *Kenro, Inc. v. Fax Daily, Inc.*, 962 F.Supp. 1162, 1167 (S.D. Ind. 1997). As the *American Blast Fax, Inc.* court explained:

11

> [T]he TCPA damages provision was not designed solely to compensate each private injury caused by unsolicited fax advertisements, but also to address and deter the overall public harm caused by such conduct. As the court stated in Kenro, the TCPA was meant to take into account the difficulty to quantify business interruption costs imposed upon recipients of unsolicited fax advertisements, effectively deter the unscrupulous practice of shifting these costs to unwitting recipients of junk faxes, and provide adequate incentive for an individual plaintiff to bring suit on his own behalf. The Supreme Court has stated that statutory damages designed to address such public wrongs need not be confined or proportioned to [actual] loss or damages; for, as it is imposed as a punishment for the violation of a public law, the Legislature may adjust its amount to the public wrong rather than the private injury, just as if it were going to the state.

121 F.Supp.2d at 1090 (internal quotations omitted). The propriety of a penalty must be tested "with due regard for the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence" to the law. *Williams*, 251 U.S. at 67.

The $500 minimum damages provision withstands constitutional scrutiny when measured against the overall public harm attributed to unsolicited, commercial faxes. These identified harms include substantial interference with facsimile machines and the shifting of advertising costs from the advertiser to the consumer. *American Blast Fax, Inc.*, 121 F.Supp.2d at 1091. Minimum damage clauses that are addressed to remedying a public wrong do not violate the Due Process Clause. The court finds that the TCPA passes constitutional muster under the Due Process Clause.

With regard to the Eighth Amendment excessive fine issue, fines are valid unless they are grossly disproportionate to the nature of the violation. *United States v. Bajakajian*, 524 U.S. 321 (1998). However, in *Browning-Ferris Indus. Of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 264 (1989), the Supreme Court explained that the excessive

12

fine provision of the Eighth Amendment "does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded." The excessive fines provision was concerned with the prosecutorial power of the state, not the extent or purposes of civil damages. Since the TCPA has allowed for private causes of actions, as demonstrated here, that provides for money damages, it does not implicate the Eighth Amendment. Accordingly, the court finds that the TCPA's monetary damages do not amount to excessive fines prohibited by the Eighth Amendment.

4. Conversion

Plaintiff alleges that the Defendants used Plaintiff's paper, ink, or toner for Defendants' advertising purposes. That rendered the paper, ink, and toner unusable by Plaintiff. Defendants, in turn, suggest that Plaintiff has failed to plead a sufficient cause of action for the tort of conversion. Specifically, Defendants attack Plaintiff's alleged failure to plead that the Defendants assumed control, dominion, or ownership of the paper and ink or toner. Several considerations are helpful in making the determination of whether a proper cause of action for conversion has been pleaded.

"The essence of conversion is not acquisition by the wrongdoer, but a wrongful deprivation of the owner thereof." *Dickson v. Riebling*, 30 Ill.App.3d 965, 967 (1st Dist. 1981). In fact, all that is required to demonstrate a successful showing of conversion is that the Defendants exercised control over the chattel "in a manner inconsistent with the plaintiff's right of possession." *Jensen v. Chicago & W.I.R. Co.*, 94 Ill.App.3d 915, 932 (1st Dist. 1981). In general, four factors must be established to succeed on a conversion claim: (1) the defendant wrongfully and without permission assumed control, dominion,

or ownership over the property; (2) the plaintiff has a right to the property; (3) plaintiff has an absolute and unconditional right to the immediate possession of the property; (4) the plaintiff made a demand for possession. *Western States Ins. Co. v. Louis E. Olivero & Assoc.*, 283 Ill.App.3d 307, 310 (3d Dist. 1996).

At least one other court has already held that the first three factors of conversion are met when a defendant sends unsolicited, commercial faxes to another's facsimile machine because it shifts the costs of advertising onto the recipient. *See, e.g., Whiting Corp. v. MSI Marketing, Inc.*, 02 CH 6332 at 14-15 (Cook County, Illinois April 3, 2003). This court adopts the reasoning of *Whiting Corp.* as persuasive. The Plaintiff has an unqualified possessory ownership interest in its facsimile machine, paper, ink, and toner. Beyond that, Defendants assumed control of the property when they sent unsolicited facsimile transmissions to the Plaintiff. These facts alone satisfy the first three factors of conversion. *See id.* Also, under established Illinois case law, Plaintiff need not make a demand for conversion where there is another independent act of conversion that can be demonstrated. *Jensen v. Chicago & Western Indiana R.R. Co.*, 94 Ill.App.3d 915, 933 (1st Dist. 1981). Since paper, toner, and ink would be consumed while the facsimile machine was overtaken by Defendants' facsimile transmission, other independent acts of conversion are reasonably found here, thus eliminating the requirement that the Plaintiff need make a demand for possession for there to be a proper claim of conversion. *See Whiting Corp.*, 02 CH 6332 at 15 (Cook County, Illinois April 3, 2003). The court finds that conversion has been sufficiently plead.

5. The Illinois Consumer Fraud and Deceptive Business Practices Act

The Defendants have asked that Plaintiff's Consumer Fraud claim be dismissed because it fails to state a cognizable cause of action. The Act protects consumers against any deceptive or unfair acts. 815 ILCS 505/2. In *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403 (2002), the Supreme Court of Illinois laid forth the elements for a successful claim under the Consumer Fraud Act. To determine whether a business practice is unfair or deceptive, a court must consider: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive or unscrupulous; and (3) whether it causes substantial injury to consumers. *Id.* at 417-18. It is not required that all three factors be met for a successful Consumer Fraud action to be illustrated. *Id.* at 418. Rather, a "practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* (quoting *Chesire Mortgage Services, Inc. v. Montes*, 223 Conn. 80, 106 (Conn. 1992)).

In analyzing the first factor, transmitting unsolicited, commercial facsimile transmissions violates established Illinois public policy. The public policy of Illinois is found in its Constitution, its statutes, and its judicial decisions. *Reed v. Farmers Ins. Group.*, 188 Ill.2d 168, 174-75 (Ill. 1999) (citing *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill.2d 333, 341 (Ill. 1989)). The Illinois Legislature has prohibited the transmission of unsolicited, commercial facsimiles, pursuant to 720 ILCS 5/26-3(b), and this reflects the public policy of Illinois by prohibiting the unsolicited facsimile transmission of commercial advertisements. Thus, the act of sending unsolicited, commercial facsimile transmissions violates recognized public policy of Illinois, satisfying the first factor in *Robinson*.

The second factor this court must analyze in determining whether a violation of the Consumer Fraud Act exists is whether the act in question is immoral, unethical, oppressive or unscrupulous. *Robinson*, 201 Ill.2d at 417-18. In this instance, the Plaintiff has attached one facsimile to its Complaint as a demonstration of the communications sent by the Defendants. From the allegations contained in Plaintiff's Complaint, this court must determine whether Defendants' actions are immoral, unethical, oppressive or unscrupulous. Yet, it remains to be seen, by means of the discovery process, whether additional evidence will be produced evidencing conduct that is oppressive in this case. Certainly the transmission of one unsolicited, facsimile communication is annoying, but hardly oppressive. Yet, Plaintiff brings a class action complaint, alleging that Defendants may be engaged in a pattern of sending excessive amounts of faxes, thus amounting to an oppressive practice. The determination of this factor will require further evidence and development of the class action in this suit. As a result, it would be improper to dismiss this count at such a preliminary stage.

Considering the third factor, the Plaintiff must allege a substantial injury as a result of the Defendants' actions. There is no basis for the award of nominal or presumed damages under the Consumer Fraud Act. *Duran v. Leslie Oldsmobile, Inc.*, 229 Ill.App.3d 1032, 1041 (2d Dist. 1992). And there are not initial facts before the court from which it could make a determination about whether the aggregate injuries sustained are substantial. As a result, dismissing this class action count on this accord would be premature at this stage.

The court finds that Plaintiff has pleaded the minimum requirements for a claim under the Consumer Fraud Act.

### 6.  *De Minimis Non Curat Lex*

Defendants also buttress their claims supporting the dismissal of Plaintiff's Complaint with assertions that the damages are so infinitesimal that damages should not be awarded. T.J. Copy Products cites the doctrine of *de minimus non curat lex* as a maxim that precludes relief in this case. Illinois recognizes the rule that where a party has established the infringement of a right, damages are presumed. *Ainsworth v. Century Supply Co.*, 295 Ill.App.3d 644, 649-50 (2d Dist. 1998) (citing *Leslie Oldsmobile, Inc.*, 229 Ill.App.3d at 1040). This presumption entitles parties to nominal damages. In this case, the TCPA demonstrates that Plaintiff's rights may have been infringed, allowing for the award of, at minimum, nominal damages. Thus, no basis for dismissal is apparent as a result of Defendants' assertions

Furthermore, Plaintiff correctly notes that both Illinois and the United States have a firmly established public policy against the transmission of unsolicited, commercial facsimile transmissions. In fact, the TCPA itself provides for damages to be awarded up to $500 per violation of the Act. 47 U.S.C. § 227(c). The TCPA was born out of a concern about the impact of unwanted, commercial faxes being sent to fax machines. The TCPA addresses this concern and creates a financial disincentive for this to occur. Thus, because the TCPA provides for statutorily conferred damages to compensate for the public wrongs addressed by the Act, it cannot be said that the damages at issue are *de minimis*.

## FINDINGS

The court makes the following findings that:

1. Defendants' Jurisdictional Arguments are Without Merit.

   a. Plaintiff has standing to maintain this action.
   b. Plaintiff has presented a viable private claim before this court.
   c. Plaintiff is a person under the TCPA.

2. The TCPA is Constitutional.

   a. The TCPA Satisfies First Amendment Concerns
      i. The speech at issue is not unlawful or misleading.
      ii. The TCPA easily passes the substantial governmental interest analysis.
      iii. The TCPA directly advances the government's interest of protecting consumers from bearing the costs of unwanted advertising.
      iv. The TCPA achieves a reasonable fit between the means adopted and the ends it seeks to serve.

   b. The TCPA Satisfies the Vagueness Analysis
      i. The Defendants lack standing to make a vagueness challenge to the TCPA.
      ii. The challenged terms share a common and well-understood meaning which would otherwise deny the Defendants' vagueness challenge.

   c. The TCPA passes constitutional muster under the Due Process Clause.

   d. The TCPA's monetary damages do not amount to excessive fines prohibited by the Eighth Amendment.

3. Conversion has been sufficiently pleaded.

4. Plaintiff has pleaded the minimum requirements for a claim under the Consumer Fraud Act.

5. The damages at issue are not *De Minimis.*

The court finds that the Defendant has not demonstrated that the TCPA is unconstitutional under the First, Fifth, Eighth or Fourteenth Amendment to the United States Constitution.  The court also finds that the Plaintiff has adequately pleaded legally cognizable causes of action.

## HOLDING

It is therefore hereby ordered that Defendants' motion to dismiss is denied in its entirety.  Defendants shall answer or otherwise plead within 28 days.

ENTER:_____DAVID M. HALL_____
JUDGE DAVID M. HALL

Dated this _____ April 2004 at Waukegan, Illinois

# EXHIBIT H

PAGE 82/82

04/14/2005    CIRCUIT COURT FOR THE 19th JUDICIAL CIRCUIT

STATE OF ILLINOIS
COUNTY OF McHENRY    } SS

GEN. NO. 04 CH 455

☐ Jury  ☐ Non-Jury

Zoes                    vs.    Fair

FILED
McHenry County, Illinois
JAN 12 2005
VERNON W. KAYS, JR.
Clerk of the Circuit Court

Date  1/12/05    Plaintiff's Attorney  Edelman    Defendant's Attorney  Bielke

## ORDER

1. Defendant's motion to dismiss is denied.

2. Defendants have 28 days to answer.

3. This matter is continued for status on plaintiff's class certification motion, to March 16, 2005 at 9 a.m. Rm C 320.

prepared by:  Dan Edelman

Attorney for:  Plaintiff

Attorney Registration No.  00712054

Judge  Michael J. Caldwell

# EXHIBIT I

*Illinois v. Discovery Mktg., Inc.*, 2000 TCPA Rep. 1110 (C.D. Ill., Feb. 14, 2000).    | Page: 1



IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

PEOPLE OF THE STATE OF
ILLINOIS                          )
                                  )
            Plaintiff,            )
                                  )
    v.                            )
                                  )
DISCOVERY MARKETING, INC.,        )    No. 99-3243
and  SOURCE MARKETING, INC.,      )
d/b/a/ Fax Source,                )
                                  )
            Defendants.           )

**FILED**

FEB 14 2000

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

### ORDER

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendant Source Marketing, Inc., d/b/a/ Fax Source's (Fax Source) Motion to Dismiss. The Plaintiff People of the State of Illinois (Illinois) claims Fax Source violated the Telephone Consumer Protection Act, 47 U.S.C. §227 et seq. (TCPA), and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. (CFA). The Complaint alleges that Fax Source is a fax broadcaster that distributed Defendant Discovery Marketing, Inc.'s (Discovery) advertisements to consumer fax machines in Illinois. Count IV

1

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

*Illinois v. Discovery Mktg., Inc.*, 2000 TCPA Rep. 1110 (C.D. Ill., Feb. 14, 2000).     Page: 2

alleges Fax Source sent unsolicited fax advertisements in violation of the TCPA. Count V alleges Fax Source sent faxes without including in the message (1) the date and time the message was sent, and (2) the identification of the sender. Count VI alleges that Fax Source sent deceptive messages in violation of the CFA.

Count V states a claim under the TCPA because Fax Source failed to identify the source of Discovery's faxes. The Federal Communication Commission's (FCC) interpretation of the TCPA requires fax broadcasters to identify the sender of the fax on the transmission. The failure to identify the source of the communication may also be a deceptive practice under the CFA. Thus, Count VI states a claim. Fax broadcasters, however, are not liable for the content of the messages they transmit unless they have either (1) a high degree of involvement in the plan to send prohibited messages, or (2) actual notice that the message is prohibited and then fail to take steps to stop the transmission. Count IV fails to allege that Fax Source had either actual notice or a high degree of involvement in the plan to send illegal advertising. Count IV therefore fails to state a claim and is dismissed.

For purposes of this motion, the Court must accept as true all well-

2

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

pleaded factual allegations contained in the Complaint and draw all inferences in the light most favorable to the non-moving party. Hager v. City of West Peoria, 84 F.3d 865, 868-69 (7th Cir. 1996); Covington Court, Ltd. v. Village of Oak Brook, 77 F.3d 177, 178 (7th Cir. 1996). A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle it to relief. Doherty v. City of Chicago, 75 F.3d 318, 322 (7th Cir.1996).

According to the Complaint, Discovery sent advertisements via fax to Illinois citizens. The recipients did not authorize Discovery to send the advertisements. At least some of the advertisements did not identify either Discovery or Fax Source as the sender of the messages. Rather, the messages appeared to be internal office memoranda addressed to all employees. The ads offered discounted Bahama Cruises to the first 50 or 100 individuals who called an 800 telephone number listed in the messages. From the appearance of the advertisements one could conclude that the recipient's employer either sent or authorized the advertisements. Some of the faxes stated at the bottom that recipients could call a separate 800 number to remove their names from the list of recipients. Some of the faxes also contained a fax identification number.

3

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

Discovery used Fax Source's services to send the advertisements. Fax Source is a fax broadcaster.[1] It can send a fax message virtually simultaneously to many different fax telephone numbers. It advertises that it has a data base containing 500,000 fax telephone numbers. The fax identification number on some of Discovery's faxes was Fax Source's reference number. Fax Source's 800 telephone number was listed on some of the faxes as the number to call to remove the recipient from the faxing list. Fax Source also modified its equipment to omit from the message the date and time the message was sent and the source of the message.[2]

The Complaint does not allege: (1) that Fax Source knew the content of Discovery's fax messages or participated in the preparation of the content; (2) that Fax Source provided the fax telephone numbers of the recipients of the Discovery faxes; or (3) that Fax Source knew whether the recipients authorized Discovery to send them the faxed messages.

The TCPA, and its accompanying regulations, prohibit sending

---

[1] The Complaint alleges no other affiliation between Discovery and Fax Source. Discovery is located in Florida. Fax Source is located in Colorado.

[2] Illinois alleges that FCC regulations require all faxing equipment manufactured after December 20, 1992, to mark messages with such identifying information. When read in the light most favorable to Illinois, this fact implies that Fax Source modified its equipment to omit this information.

4

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008.  No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

unsolicited advertisements by fax. 47 U.S.C. §227(b)(1)(C); 47 C.F.R. §64.1200(a)(3). The sender must have the prior express consent of the recipient before sending the advertisement. Id.; 47 U.S.C. §227(a)(4). The TCPA and its regulations further require senders to state on the message: (1) the source of the message, and (2) the date and time the message was sent. 47 U.S.C. §227(d)(1) and (d)(2); 47 C.F.R. §68.318(d).

The TCPA, however, does not define who is the "sender". The FCC addressed that question in a number of enforcement opinions. The FCC concluded that the entity on whose behalf a message is sent is principally liable for compliance with the TCPA. In the Matter of Rules and Regulations Implementing the TCPA, 10 F.C.C. Rcd. 12,391, 1995 WL 464817 at page 11 (1995).

The FCC considered the fax broadcaster generally to be subject to the same rules as common carriers, such as the telephone companies transmitting the fax signal. Common carriers are only liable for illegal transmissions if they have a high degree of involvement in the illegal activity or have actual notice of the illegal message and fail to take steps to prevent the transmission. In the Matter of Rules and Regulations Implementing the TCPA, 7 F.C.C. Rcd. 8752, 1992 WL 690928 at 19

5

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

(1992), <u>citing In the Matter of Enforcement of Prohibitions Against the Use of Common Carriers for the Transmission of Obscene Materials,</u> 2 F.C.C. Rcd. 2819, 1987 WL 344925 at 3 (1987).

The FCC did not conclude that fax broadcasters were equivalent to common carriers, however. As the actual operator of the equipment transmitting the message, the FCC concluded that the fax broadcaster must place the required identifying information on the message. 7 F.C.C. Rcd. 8752, 1992 WL 690928 at 19 (1992). The FCC later decided that the fax broadcaster must only identify the entity on whose behalf it sent the transmission. It need not identify itself as the broadcaster of the message. <u>In the Matter of Rules and Regulations Implementing the TCPA,</u> 12 F.C.C. Rcd. 4609, 1997 WL 177258 at 2 (1997) ("we require that a facsimile broadcast service provider ensure that the identifying information of the entity on whose behalf the provider sent the messages appear on the facsimile message").

Count V of the Complaint, therefore, alleges a claim against Fax Source for violation of the TCPA. Fax Source failed to identify Discovery as the entity on whose behalf the faxes were sent. Count IV, however, does not state a claim against Fax Source for sending unsolicited advertising.

6

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

The Complaint does not allege either that Fax Source (1) had a high degree of involvement in the illegal advertising, or (2) had actual notice of the illegal conduct and failed to stop the transmission. None of the allegations say that Fax Source either knew the content of the messages or participated in creating the messages.

The TCPA does not prohibit all unsolicited messages, only unsolicited advertising. A Fax Source customer may wish to send out political messages, religious messages, educational messages, or a myriad of other types of messages that do not violate the TCPA. The Court agrees with the FCC that fax broadcasters should not be obligated to censor customers' speech. To state a claim, Illinois must allege that Fax Source either participated in the plan to send unsolicited advertising or had actual notice Discovery was attempting to use its services to send unsolicited advertising by fax.

The Complaint does not allege either involvement by Fax Source in the plan to advertise by fax. The Complaint does not allege that Fax Source had any knowledge or involvement in producing the advertising content of the Discovery messages. The Complaint alleges that Fax Source had a data base of 500,000 fax numbers, but does not allege that Fax Source either

7

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

selected the recipients of Discovery's messages or knew whether the recipients requested the information. Without some allegations of notice or knowing participation, Count IV of the Complaint fails to state a claim.

Illinois urges the Court to reject the FCC interpretations of the TCPA. It argues that Fax Source violated the plain meaning of the statute. The TCPA declares that it shall be unlawful, "to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. §227(b)(1)(C). Fax Source used a machine to send advertising; the advertising was unsolicited; thus, Fax Source must be liable.

This logic would impose an obligation on every retail copy store, hotel, or other establishment that offers fax services to the public, to read every message customers wish to send, to decide whether a message is advertising, and if so, to determine whether the advertising is unsolicited. The Court agrees with the FCC that Congress did not intend to put such a burden on businesses who offer communications services to the public; Congress intended to put the burden on the entity that desires to advertise. The transmission service provider should not be a censor; it should only be liable if it is knowingly involved in the illegal conduct or has actual notice

8

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

that the communication is illegal and fails to prevent the transmission. Count IV fails to state a claim.

Illinois states a supplemental state claim in Count VI for violation of the CFA. The CFA prohibits unfair and deceptive practices in commerce. 815 ILCS 505/2. Sending Discovery's messages in Illinois is clearly a commercial practice. 815 ILCS 505/1(f) (1996). The practice becomes deceptive if it creates a likelihood of deception or has a capacity to deceive. People ex rel. Hartigan v. Knecht Services, Inc., 216 Ill.App.3d 843, 857, 575 N.E.2d 1378, 1387, 159 Ill.Dec. 318, 327 (1991). Here, Fax Source modified its sending equipment to remove that information. Omitting this information could cause recipients to believe their employers either sent the message or authorized the message. Creating such an impression could create a likelihood of deception or have a capacity to deceive. Count VI therefore states a claim.

Fax Source argues again that only Discovery should be liable under the CFA because it is responsible for the content of the message. Fax Source cites Zekman v. Direct American Marketers, Inc., 182 Ill.2d 359, 369, 695 N.E.2d 853, 859, 231Ill.Dec. 80, 86 (1998), in support of this argument. The Zekman Court held that the telephone company cannot

9

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

violate the CFA simply because a customer uses a 900 telephone number deceptively. Rather, a party must actively participate in the deceptive practice to be liable under the CFA. Fax Source, unlike the telephone company, did participate. Fax Source is required to identify the source of the message; it did not do that. In fact, it took steps to omit this information from the message. It thus participated in the alleged deceptive practice. Count VI states a claim.

Therefore, the Motion of Source Marketing, Inc., d/b/a/ Fax Source to Dismiss (d/e 9) is ALLOWED in part and DENIED in part. Count IV is dismissed. The motion is denied in all other respects. Should Illinois determine, either now or through discovery, that it has a good faith basis to file an amended Count IV that would state a claim against Fax Source for sending unsolicited fax advertisements, it may seek leave to amend the Complaint. Fed.R.Civ.P. 15(a). Defendant Fax Source shall answer Counts V and VI of the Complaint within 10 days of the date of this Order.

IT IS THEREFORE SO ORDERED.

ENTER: _February 12_, 2000.

FOR THE COURT:

JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE

10

Obtained from
**TCPALAW.COM**
The leading source for TCPA legal research

Copyright © 2008. No claim to text of U.S. Government works. This file is property of TCPALaw.com. Acquisition and use of this document is subject to subscriber agreement. All rights reserved. Contact subscriptions@TCPALaw.com for more information.

**Responses and Replies**
1:08-cv-02560 R. Rudnick & Co. v. Anderson et al
DENLOW


### United States District Court

### Northern District of Illinois - CM/ECF LIVE, Ver 3.2.1

**Notice of Electronic Filing**

The following transaction was entered by Kolbus, Heather on 6/23/2008 at 4:28 PM CDT and filed on 6/23/2008

**Case Name:**          R. Rudnick & Co. v. Anderson et al
**Case Number:**       1:08-cv-2560
**Filer:**                   R. Rudnick & Co.
**Document Number:** 12

**Docket Text:**
**RESPONSE by R. Rudnick & Co.in Opposition to MOTION by Defendants Joe Anderson, Richard Anderson to dismiss *Plaintiff's Complaint*[9] (Attachments: # (1) Exhibit A-B, # (2) Exhibit C Part 1, # (3) Exhibit C Part 2, # (4) Exhibit D-F, # (5) Exhibit G-L)(Kolbus, Heather)**


**1:08-cv-2560 Notice has been electronically mailed to:**

Cathleen M. Combs     ccombs@edcombs.com

Daniel A. Edelman     courtecl@edcombs.com, dedelman@edcombs.com

David Thaddeus Grisamore     dgriz67@sbcglobal.net

Heather A. Kolbus     hkolbus@edcombs.com

James O. Latturner     jlatturner@edcombs.com

**1:08-cv-2560 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1040059490 [Date=6/23/2008] [FileNumber=4936058-0

] [6f599d4f73643973aa13976a0a625e6a26db9f3e6a5e95141868b317f491d736b2a
24ac37f615bfdd830a7d816bf2429ee170cf3e75869b6f943cfb49fb54ede]]

**Document description:**Exhibit A-B
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1040059490 [Date=6/23/2008] [FileNumber=4936058-1
] [942d4a58682b6dbef01662ece0d876dbd557740b668441ed68bc28be9c0bb9ff490
dd345a2b2c241d00d02dec62f2f49cb2dbf9f4a344e6656d8386b848be48b]]

**Document description:**Exhibit C Part 1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1040059490 [Date=6/23/2008] [FileNumber=4936058-2
] [313040a50909a98d842b94ae9d56dbf4881906f400acc36aa5bee46516b05d96750
f50175c31975186e35a77613bd2a1d5607dd541f4170e1cf1e15bd6b29d53]]

**Document description:**Exhibit C Part 2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1040059490 [Date=6/23/2008] [FileNumber=4936058-3
] [2cc02d25902a065eb8a75723487636267d76c0eb752e3d20c1bb11f62f903b295af
b6a78e1dcd71c3d1d76f5c90d26f685957d6b6fa91aac4c8cbe60586d0eb8]]

**Document description:**Exhibit D-F
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1040059490 [Date=6/23/2008] [FileNumber=4936058-4
] [9c8db04f00836eee59ca590529c282a9cf646ae35f7619a8cbc74e5c3ebc4679c66
3da835634da1a2682ac1fc1d05d90fbd729f404458ef579f55024e324770d]]

**Document description:**Exhibit G-L
**Original filename:**n/a
**Electronic document Stamp:**
[ STAMP dcecfStamp_ID=1040059490 [Date=6/23/2008] [FileNumber=4936058-5
] [3d1699bbc2e86d15bf7d89356fafb20de56e2bd77569284d3b9e00602cc72a11416
9c2c6b33da767743217b3458b00ec591c6131c7878c100e0e5e2100d71847]]

# EXHIBIT J

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT, CHANCERY DIVISION

WHITING CORPORATION, Plaintiff

v.

MSI MARKETING, INC., Defendant

No. 02 CH 6332

Decided April 3, 2003

NOTICE: The rules of some jurisdictions may impose limitations on the use of materials not designated for publication in certain officially sanctioned reporters. Consult the rules of the applicable jurisdiction regarding use and citation of this opinion.

DISPOSITION:

Defendants' consolidated motions to dismiss denied with respect to all claims except claims under the Illinois Consumer Fraud and Deceptive Practice Act.

SYNOPSIS:

A large number of related cases bringing TCPA, state statutory, and state common law claims were consolidated for hearing defendant's motion to dismiss on various arguments. The United States intervened. The court rejected claims that the TCPA violated 1) First Amendment speech rights, 2) due process and excessive fines clauses, and 3) vagueness doctrine. The court also sustained common law conversion claims. The court dismissed state claims under the Illinois Consumer Fraud and Deceptive Practice Act.

SUBSEQUENT HISTORY:

PRIOR HISTORY:

CITED BY:

APPEARANCES:

JUDGES:
Patrick E. McGann

HOLDINGS:

[☞1] Constitutional Law: First Amendment

As the statute in question seeks to regulate commercial speech, it must meet the test set out in *Central Hudson*.

[☞2] Constitutional Law: First Amendment

Deference must be accorded to its findings as to the harm to be avoided. *Turner Broadcasting System, Inc.*

## Exhibit 3

**[☞3] Constitutional Law: First Amendment**

The TCPA does not create a complete ban on telephone facsimile advertising.

**[☞4] Constitutional Law: First Amendment**

The TCPA does not prohibit the use of telephone facsimile devices for advertising.

**[☞5] Constitutional Law: Vagueness**

Defendants should not be heard to complain of the statute's vagueness when defendants conduct comes clearly within the proscription of the statute. *Village of Hoffman Estates*.

**[☞6] Constitutional Law: Excessive Fines**

The amount of damages is the result of the defendants' use of technology to aggressively violate a statute that is clear on its face.

**[☞7] Opt-in/Opt-out**

Rejecting the "opt-in" interpretation recognizes the role of the Supremacy Clause in our dual sovereign form of government. There is no prohibition to the maintenance of a private right of action for violation of the TCPA in state courts because Illinois has not acted to decline jurisdiction over these matters.

**[☞8] State Common Law Claims** -

To sufficiently allege conversion a plaintiff must allege: 1) the defendant's unauthorized and wrongful act of control, dominion or ownership over the plaintiff's personal property; 2) the plaintiff's right in the property; 3) the plaintiff's right to immediate possession of the property, absolutely and unconditionally; and, 4) the plaintiff's demand for possession of the property.

**[☞9] State Common Law Claims: Conversion**

The use of a facsimile machine for the distribution of printed material imposes all of the attendant costs on an unwilling recipient. This is sufficient to allege the first three elements of the tort of conversion.

**[☞10] Actual Damages**

The doctrine of *de minimus non curat lex* is usually confined to matters involving an alleged breach of contract.

**[☞11] State Law Claims**

There is no question that transmitting unsolicited telephone facsimile advertisements violates public policy.

**OPINION:**


CORRECTED MEMORADUM OPINION AND ORDER·

**[*1] I. INTRODUCTION**

Commencing in 2001, numerous plaintiffs have filed more than 30 complaints in the Circuit Court of Cook County, Illinois seeking relief against various defendants for actions involving the sending and receipt of advertisements via telephone facsimile machines. These actions were assigned to this Court, as related by the Presiding Judge of the Circuit's Chancery Division.

Court and Counsel have conducted case management conferences in an effort to create an efficient management plan for the processing of these cases. As a result, this Court entered a case management order which allowed defendants to file consolidated Motions to Dismiss the separate or consolidated complaints filed by the Plaintiffs. The Court also required the Plaintiffs in those cases to file a consolidated response. A list of all the cases to which this order applies is attached as Exhibit A. The court, on a later date, will entertain any Motions to Dismiss that raise individual issues pertinent only to the moving party.

On March 4, 2003, the Court allowed the United States of America to intervene, as one of the issues raised in the consolidated Motions was the constitutionality of 47 U.S.C. 227 (b)(1)(c). The Court also entertained oral argument on these consolidated Motions on that date. The grounds and issues raised in those motions will be discussed as they relate to each theory of recovery.

[*2] Each of the complaints seek money damages on three theories: 1) the private right of action granted to each recipient of an unsolicited telephone facsimile advertisement, 47 U.S.C. 227(b)(3)("TCPA"); 2) violations of the Illinois Consumer Fraud and Deceptive Practices Act, ("ICFA") 815 ILCS 505/2; and 3) common law conversion.

The well-pled facts, as they relate to these motions, allege that each plaintiff received an unsolicited advertisement via the use of their personal telephone facsimile machine. This action limited each plaintiff's access to equipment used in their business, occupation or for personal use. This activity also converted each plaintiff's personal property; to wit, paper and toner, to their own use.

## II. CONSTITUTIONALITY OF REGULATION OF TELEPHONE FACSIMILE ADVERTISING

The defendants, in their consolidated Motion to Dismiss the plaintiffs' claims brought pursuant to the TCPA, assert that the regulation of advertisements by telephone facsimile is unconstitutionally vague and unnecessarily impinges on freedom of speech rights granted by the First Amendment. In addition, they argue that the TCPA violates the advertiser's Due Process Rights under the Fifth and Fourteenth Amendments and imposes excessive fines in violation of the Eighth Amendment.

The Telephone Consumer Protection Act of 1991, codified at 47 U.S.C. 227, provides in relevant part; "It shall be unlawful for any person...to use any [transmitting device]...to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. 227(b)(1)(c). The term "unsolicited advertisement" is defined as "any material advertising the commercial availability or quality of any property, goods or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. 227(a)(4). Thus, the TCPA prohibits only commercial advertising.

[☞1] As the statute in question seeks to regulate commercial speech, it must meet the test set out in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). Initially, it must be observed that commercial speech is different from other varieties of speech because it proposes a commercial transaction which traditionally occurs in an area subject to governmental regulation. *Ohralik v. Ohio* [*3] *State Bar Assn.*, 436 U.S. 447, 445-456 (1978). However, any regulation of such speech must be cognizant of the controlling principle that our union depends on a free enterprise economy. The allocation of society's resources depends upon a free flow of information. Thus, it is in society's interest that a free flow of information be maintained so that the consumer has enough information to make intelligent and well informed decisions. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council Inc.*, 425 U.S. 748 (1976).

In order to maintain the balance between the limited ability of government to regulate commercial speech and the consumer's right to the full and free flow of information, the Court in *Central Hudson* adopted a four part analysis to determine the constitutionality of any proposed restriction on commercial speech. First, the court must determine whether the speech comes within the First Amendment. To be protected, such speech must concern lawful activity and not be misleading. Next, the court must determine whether the government's interest in regulating the communication is substantial. If these two tests are met, then a determination must be made as to whether the regulation directly advances the governmental interest asserted and whether it is not more extensive than necessary to serve the asserted interest. *Central Hudson*, 447 U.S. at 566.

Applying this analysis to the TCPA's ban on unsolicited telephone facsimile advertising, it is clear there is no claim that any of the information distributed is misleading or promotes any illegal activity.

The Plaintiffs bear the burden of establishing that the legislation survives the remainder of the analysis. *Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995). The Plaintiffs and the intervening Petitioner United States of America, posit that the TCPA was enacted to address the substantial government interest of preventing the shifting of the cost of advertising to the potential consumer and the economic disruptions caused by the intrusive activity of the defendants. The Plaintiffs include this later interest under the broad umbrella of "invasion of privacy." The Court's determination of substantial governmental interest is limited to these two pronouncements. This Court cannot engage in supposition to find additional interests in need of protection. *Edenfield v. Fane*, 507 U.S. 761, 768 (1992). The burden of establishing these interests is not satisfied by mere speculation or conjecture. There must be a demonstration that the harms cited are real. [*4] *Edenfield*, 507 U.S. at 770-71. The evidence of the governmental interest can come from anecdotes, studies, literature published in the issue. *Edenfield*, 507 U.S. at 771-773; Florida Bar, 515 U.S. at 626-627.

The proponents observe that 15 states, including Illinois, have enacted similar bans on unsolicited facsimiles. They also note that two separate Congresses held hearings on the issue. Subcommittees took testimony on the issue and members noted anecdotal information from constituents on the issue. One Congressman, Edward Markey of Massachusetts, likened receiving an unsolicited fax to receiving "junk mail with the postage due." Private citizens from various walks of life, including the legislative counsel for the American Civil Liberties Union, noted the burden imposed on consumers by the cost shifting effect of receiving an unsolicited advertisement by telephone facsimile.

The Congress also received testimony as to the business disruption caused by this activity. Witnesses testified as to the inability to access equipment because it was occupied by an uninvited user. Evidence was also taken which indicates necessary or anticipated communications were disrupted.

There is no record of similar proceedings in the Senate. However, the bills of both Houses were reconciled in committee. The Court, without invading the separation of powers, cannot find or conjecture that there was anything but a complete consideration of the issues when the TCPA was enacted.

In reviewing the constitutionality of a statute, courts must accord substantial deference to the predictive judgments of Congress. The Supreme Court has recognized that Congress is better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions. [☞2] Even in the realm of First Amendment, where Congress must base its conclusions upon substantial evidence, deference must be accorded to its findings as to the harm to be avoided. *Turner Broadcasting System, Inc., v. F.C.C.*, 520 U.S. 180, 195-196 (1996). Thus, it appears to this Court that the government has a substantial interest in preventing the cost shifting of advertising and the unwanted disruption of economic activity.

The defendant's argue that improved technology has substantially reduced that burden. Modern fax machines no longer use expensive special papers. Increased [*5] memories allow for multi-tasking by the equipment virtually eliminating the "temporary kidnapping" of facsimile machines. Thus, they posit, any interests identified by Congress have dissipated. The Congress, perhaps in anticipation of the vast explosion in technology, received testimony concerning the increased capacity of the senders of these messages. Indeed, one of the defendants, Fax.Com, solicits customers with a promise to save more than 75% over direct mail costs. The Court can infer that some of these savings are passed on to consumers who must now pay for the printing. Evidence adduced in other cases involving this issue confirm the problems identified by the Congress still exists. *See, Missouri ex. Rel. Nixon v. American Blast Fax, Inc.*, 196 F. Supp. 2d 920, 924-26 (testimony concerning business disruptions, preventing access to phone lines, occupying personnel with other duties, increased capacity of facsimile senders). Nothing presented by the defendants, however, undermines the continued existence of the identified and substantial government interests.

The defendants also assert that the prohibition of these facsimile transactions is not dissimilar to the receipt of junk mailings. While it is true that the Court could find no substantial interest in prohibiting the distribution of unwanted "junk mail," *Bolger v. Young Drug Products Corp.*, 463 U.S. 60 (1983), the Court was never asked if the recipient was also required to pay the "postage due" on the mailing or pay a toll on the trip to the wastebasket, let alone subsidize the mailer's printing expense. The defendants also place great emphasis on *Missouri ex. rel. Nixon v. American Blast Fax, Inc.*, *supra*. Unfortunately, as is the fate of all trial judges, the Appellate panel found fault with Judge Limbaugh's analysis and reversed this decision. *Missouri ex. rel. Nixon v. American Blast Fax, Inc.*, 2003 U.S. App. Lexis 5469 (8th Cir. 2003)(Doc. 02-2705/2707).

Having found the existence of two substantial governmental interests, the Court must determine whether the legislative enactment directly addresses these interests. This requires the Plaintiffs to demonstrate that the restriction imposed will not only advance the governmental interest, but that it will do so to a material degree. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996). [☞3]This Court does not find that the TCPA creates a complete ban on telephone facsimile advertising. There is nothing in the law that prevents a distributor from soliciting and obtaining consents for such advertising. [*6] This can be done in a number of ways such as direct mail or contact, solicitations in printed media, or telephone solicitation. Perhaps the best way to identify the parameters of this requirement is to furnish examples of restrictions that were found unrelated to the asserted interest. The City of Cincinnati, no doubt attempting to dissipate any image from its nickname Porkopolous, enforced an ordinance limiting news racks in order to improve community aesthetics. The result was a reduction of the over 1600 such racks by 62. The publications using these racks were not "mainstream" media. The reduction in unsightly news boxes was in the words of two courts "paltry" or "minute." The regulation, however, was found to have no relation to the stated governmental interest. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424 (1993). Similarly, a ban on radio advertising of private state government authorized casino gambling by a federal regulation was found to have no relation to the recognized government interest of reducing gambling. This result was reached because the ban excluded promotion of Indian sponsored casinos and state run lotteries. *Greater New Orleans Broadcasting Assn. v. United States*, 527 U.S. 173 (1999).

[☞4] This restriction directly and materially advances the governmental interest in the efficient operation of commercial enterprises. The cost to industry of both increased operating expenses and lost productivity was amply demonstrated to Congress.

The defendants note the failure to include unsolicited non-commercial faxes supports their position that the goals of the government are not being advanced by the TCPA because these faxes also shift costs and disrupt the orderly conduct of business. They cite decisions such as *Greater New Orleans Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995). Each of these cases had one distinguishing fact, because in those cases there was no basis to suggest the bans would advance the stated goals. Gambling would not be reduced because Indian sponsored casinos and lotteries could be promoted. Temperance would not be promoted, because alternate means of advertising the alcoholic content of beer was available.

More importantly, the Congress heard evidence that private or non-commercial facsimile transmissions represented but a small percentage of unsolicited messages. Most recipients welcomed the message. Thus, no concern over this segment of

Whiting Corp. v. Mktg. Inc., 2003 TCPA Rep. 1141 (Ill. Cir. Apr. 9, 2003)                    Page 5 of 10

Case 1:08-cv-01853    Document 23    Filed 06/25/2008    Page 49 of 54

unsolicited messaging was ever expressed to the Congress.

[*7] The other issues raised by the defendants are equally unpersuasive. The Supreme Court has noted that unsolicited junk mail cannot be prohibited because "the short, though regular journey from mail box to trash can…is an acceptable burden so far as the Constitution is concerned." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. at 72 quoting *Lamont v. Commissioner of Motor Vehicles*, 269 F. Supp. 880, 883 (S.D.N.Y. 1967). There can be no greater cost in taking the short regular walk to the telephone and hanging up on an unsolicited telemarketer. Some of our more imaginative fellow citizens may actually enjoy the exercise as a diversion from the insipid television, or tense moments at the dinner table.

The final prong is the determination that the regulation is not more extensive than necessary to serve the asserted interest. This, in the area of commercial speech, does not mean the least restrictive means. The case law requires a reasonable fit between the legislature's ends and the means chosen to accomplish those ends. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (1999). The defendants posit that there were numerous less restrictive alternatives such as allowing one free fax so that the recipient could notify the sender of any desire not to receive further messages. Another suggestion would be the creation of a "no-fax" list similar to that established by the government to reduce unwanted telemarketing. The defendants also suggest that regulations as to the times when fax messaging can occur would also be less restrictive.

The Plaintiffs and the Intervening United State of America attempt to shift the burden of disproving the existence of the fourth prong of the Central Hudson test. The standard, however, is that the proponent of the statute must show that Congress "carefully calculated the costs and benefits associated with the burden on speech imposed by the regulations." *City of Cincinnati*, 507 U.S. at 417.

To make this determination, it appears to this Court it is important to understand the effect of the TCPA ban on unsolicited commercial telephone facsimile messaging. [☞4] This statute does not prevent any person engaged in commercial activity from either sending or receiving information about that activity. In fact, it does not prohibit the use of telephone facsimile devices for advertising. It requires the advertiser to identify those persons who are willing to expend their resources both in time and money to receive the commercial messages being sent.

[*8] It prohibits the advertiser from passing part of its costs on to a potential consumer. From this understanding, the Court must determine if the restriction imposed, while perhaps not the single best disposition, is one whose scope is in proportion to the interest served. *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 480 (1989). The suggestions by the defendants as to the regulation of message delivery times does nothing to advance the government interest of preventing cost-shifting. It is also apparent that the concerns Congress addressed in the TCPA were different in the regulation of telemarketers and facsimile advertising. There was a clear recognition of the substantial interference caused by the blast fax industry. It is not this Court's role to substitute its judgment for that of the Congress. The ban on unsolicited commercial telephone facsimile messaging is a reasonable means to the stated government end.

The defendants posit that section 227(b) of the TCPA is unconstitutionally vague. They argue that the definition of the term "unsolicited advertisement" is so vague that persons of common understanding must necessarily guess at its meaning. This ambiguity is exacerbated because senders are subject to private claims, creating a likelihood of differing interpretations in various jurisdictions.

The Due Process Clause of the Fifth Amendment to the United States Constitution, made applicable to the various states by the Fourteenth Amendment, is fundamentally violated by "any statute which either forbids or requires the doing of any act in terms so vague that (persons) of common intelligence must necessity guess at its meaning and differ to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926). In Connally, the Court found that a statute that requires, under progressive penalties, that workers be paid the "current rate of wages" in the "locality" where they were working to be too vague to satisfy Due Process concerns. The Court noted that the term "locality" had no definition as to what area constituted a locality. Mr. Justice Sutherland, writing for the Court, recognized that reasonable people could differ as to the boundary of the "locality." The Court indicated that terms that are elastic or dependent on circumstances were problematic. Similarly, the Court found that the term "current rate of wages" was too vague. The Court noted that rates of pay had various levels begetting a minimum or maximum or an amount in between. This uncertainty left an employer to guess at the required payment. The Court also observed that judges and jurors had no [*9] standards by which to judge an accused's conduct. This could lead to very inconsistent results in the prosecution of alleged violations.

Comparing the Connally decision with the Court's decision in *Roberts v. United States Congress*, 468 U.S. 609 (1984) gives a clearer understanding of the principle. In that case, the Jaycees challenged a determination by the Minnesota Human Rights Department that the Jaycees denied access to a "place of public accommodation" on the basis of the applicant's gender. The Jaycees argue that the term's definition was too vague to satisfy Due Process requirements. This term was defined by Minnesota Law as "a business accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services or facilities, privileges, advantages, or accommodations are extended, offered, sold or otherwise made available to the public." Roberts, 468 U.S. at 469. Membership in the Jaycees was offered to any male applicant aged 21-35 who paid the appropriate fees. Women were accepted as Associate Members but were denied certain benefits given to their male counterparts.

The Jaycees main argument focused on Minnesota's decision that this organization was a public place of accommodation while a similar group, the Kiwanis Club, was not. This created, according to the Jaycees, the sort of vagueness the Due Process Clause was designed to prohibit. In dismissing this argument, the Court found that unlike the open enrollment policy of the Jaycees, Kiwanis Club has a formal procedure for choosing members based on specific and selective criteria. These additional standards were clearly outside the contested definition found in the Minnesota law.

Turning now to the TCPA, an "unsolicited advertisement" is defined as "any material advertising the commercial availability or quality of any property goods or services." 47 U.S.C. 227 (a)(4). Merriam Webster defines commercial, when used as an adjective, in numerous ways, including, "work intended for commerce, producing artistic work of low standards for quick market success, suitable, adequate or prepared for commerce, and emphasizing skills or subjects useful in business." Merriam Webster's Collegiate Dictionary, 10 th Ed.1994. In addition, at least one commentator has identified distinctions between commercial and non-commercial speech found in the Supreme Court's analysis of this issue. First, the truth of the information is more easily verifiable, [*10] and secondly, it is engaged in "for profit." Kosinski and Banner, "Who's Afraid of Commercial Speech?"76 VA. L. REV. 627, 634. Admittedly, the authors argue that these are distinctions without difference, but this Court must acknowledge and give deference to these well-established principles continually enunciated by our Supreme Court.

[☞5] Prior to answering the question as to whether the statute is vague by subjecting it to questions presented by hypothetical situations, the Court must determine if the defendants conduct comes clearly within the proscription of the statute. *Village of Hoffman Estates v. The Flipside, Hoffman Estates,* 455 U.S. 489, 495 (1981). Clearly, it does. Each facsimile message advertises the price and availability of services, such as, internet connections, long distance or cellular telephone service, or products such as packaged learning programs, or toner for facsimile and other printing devices. Thus, the defendants should not be heard to complain of the statute's vagueness.

Assuming arguendo, that the Defendant's hypotheticals should be considered, the Court's analysis suggests the following resolutions. A carwash or candy sale is not conducted by a high school band for profit in the business sense of the word "commercial." A plea to oppose apartheid in the manner suggested does not advertise the commercial availability or quality of a product, nor does the announcement, without more, of an essay contest. A warning concerning the danger of a product would be subject to an affirmative defense of necessity, 720 ILCS 5/7-13, or privilege. The availability of private enforcement of the statute does not give the theoretical plaintiffs "unrestrained power…(to) charge a person with a violation." *Kolender v. Lawson,* 461 U.S. 352, 359 (1983). As indicated, the statute has a clear meaning and is easily understandable by persons of common intelligence. A defendant wrongfully sued would have all remedies that are available to any person so situated.

Thus, this Court does not find that the TCPA violates the Due Process prohibition against vague statutes.

The defendants finally assert that the TCPA's damage clause violates the Due Process clause of the Fifth and Fourteenth Amendments, as well as, the excessive fine clause of the Eighth Amendment.

The Due Process Clause of the Fifth and Fourteenth Amendments prohibits federal and state governments, respectively, from imposing a "grossly excessive" punishment on [*11] a tortfeasor. *TXO Production Corp. v. Alliance Resource Corp.,* 509 U.S. 443, 454 (1993). In order to make this determination, the Court must first identify the interest the government seeks to protect and then determine whether the award is grossly excessive in relation to those identified interests. *TXO,* 509 U.S. at 456.

The Court has already identified those interests as preventing the shifting of advertising costs to potential consumers and promoting the efficient operation of this nation's businesses. The Court also notes that each defendant received adequate notice of the potential penalty if their conduct deviated from the required norm. Thus, the Supreme Court's decision nullifying an award for punitive damages on the basis of lack of notice is inapposite. *BMW of North American v. Gore,* 517 U.S. 559 (1995). Unlike the situation before the Court here, BMW was not sufficiently informed that the same conduct which was acceptable in some jurisdictions, but not in others, was subject to a penalty 500 times greater than the actual loss. It is clear that the penalty here is even greater, but unlike the operators of BMW, who had no notice that the procedure employed ran afoul of the law in Alabama, the statute clearly proscribes the conduct before any defendant acted. Thus, the standard to be applied is more properly found in *St. Louis, Iron Mountain & Southern Railway v. Williams,* 251 U.S. 63 (1919). There, the Court acknowledged the wide latitude that legislatures have in protecting public interests, the numberless opportunities for committing the offense, and the need for securing uniform adherence to established law. This Court is wary of substituting its judgment for that of Congress. The Court is also concerned about the potential damage claims in this case. However, no evidence has been introduced quantifying the amount of damages incurred by businesses in lost productivity. Thus, no mathematical certainty can be reached as to the relationship between actual damages and the penalty imposed. The defendants correctly point to the problems confronted by Judge Spears in *Texas v. American Blast Fax, Inc.,* 164 F. Supp. 2d 892 (D.C. TX. 2001). [☞6] Any penalty computed by multiple violations would be a result of the defendants' use of technology to aggressively violate a statute that is clear on its face. However, this issue must await full resolution until all of the evidence is heard, so that a complete record can be established.

Thus, the Court does not find the TCPA on its face imposes a sanction grossly disproportionate to the interests sought to be protected.

[*12] Turning now to the Eighth Amendment excessive fine issue. This analysis is similar to that under the prior Due Process inquiry. A fine is a valid exercise of the legislature unless it is grossly disproportionate to the nature of the violation. *United States v. Bajakajian,* 524 U.S. 321 (1998). However, as the dissent in that decision noted, substantial deference must be given legislative determinations as to sanctions for illegal acts. *Bajakajian,* 524 U.S. at 348. On this record, this Court cannot make such a determination, thus, the Motion to Dismiss is denied.

Having found the TCPA constitutional the Court moves to analyze the remaining issues.

### III. THE PLAINTIFFS MAY NOT PROSECUTE A PRIVATE RIGHT OF ACTION IN ILLINOIS COURTS

The defendant's assert that no private action for violations of the TCPA can be maintained in Illinois state courts because Congress' action in establishing private rights of action in state courts violates the Tenth Amendment to the United States Constitution, and Illinois has never authorized the prosecution of TCPA matters in its courts, providing only for criminal sanctions. The four arguments advanced by the defendants are, in this Court's opinion, summarized above. Article VI of the United States Constitution provides that the laws of the United States made pursuant to the Constitution "shall be the supreme Law of the Land, and the Judges in every State shall be bound thereby."

In *Testa v. Katt,* 330 U.S. 386 (1947), the Court was called upon to determine whether Rhode Island's courts could properly refuse to hear a claim brought under the Emergency Price Control Act. Unlike the TCPA , this law gave concurrent jurisdiction to Federal, State, and Territorial Courts to entertain these claims. The basis for the declination by the Rhode Island Courts was the traditional right enjoyed by the states to enforce penal laws of a foreign state. The Court noted that since the time of the first congress, laws have been enacted conferring jurisdiction on state courts to enforce federal penal statutes. While disputes raged over the relationship between federal and state governments during the first half of the 19 th Century and ultimately, albeit temporarily, were resolved by war, the Supreme Court has been predictably steadfast in holding, "If an Act of Congress [*13] given a penalty to a party aggrieved, without specifying a remedy for its enforcement, there is no reason why it should not been forced, if not provided otherwise by some act of Congress, by a proper action in a State Court." *Claflin v. Houseman,* 93 U.S. 130, 137 (1876). Thus, in *Testa,* the Court dismissed as inadmissible the argument that the state's law must be consistent with the federal regulatory scheme.

In *International Science and Technology Institute, Inc., v. Inacom Communications, Inc.,* 106 F. 3d 1146 (4 th Cir. 1997), a decision relied on heavily by the defendants, after determining that the TCPA granted exclusive jurisdiction for the private right of action in state courts, the court considered the Tenth Amendment argument. The court noted that the TCPA was enacted, in part, in response to claims by several states that efforts to curb unsolicited facsimile messages were being thwarted by the simple fact that many of these messages were traveling in interstate commerce, an area the States designated to be regulated by Congress in ratifying the U.S. Constitution. The Court then acknowledged the role of the Supremacy Clause in our constitutional structure. After expressing concern that Congress not impermissively usurp state resources as prohibited by *New York v. United States,* 505 U.S. 144 (1992), the Court stated any potential conflict was avoided by allowing states to affirmatively deny access to its courts for the private prosecution of TCPA claims.

[☞ 7] This reasoning is persuasive to this Court. This, as the Court noted, strikes a balance between the right of Congress to regulate interstate commerce and the state's right to allocate its resources to problems it deems necessary and important. The TCPA only encourages state participation in Congress' regulatory scheme. Local officials, accountable to their electors, make the decisions as to state priorities. This also recognizes the role of the Supremacy Clause in our dual sovereign form of government.

Thus, this Court finds no prohibition to the maintenance of a private right of action for violation of the TCPA in state courts because Illinois has not acted to decline jurisdiction over these matters.

### IV. CONVERSION

The Defendants have filed a Motion to Dismiss the counts of Plaintiffs' consolidated complaint alleging conversion pursuant to Section 2-615 of the Code of [*14] Civil Procedure, 735 ILCS 5/2-615. A Section 2-615 motion to dismiss attacks the sufficiency of the complaint, and this Court should decide the motion only on the allegations set forth in the complaint. *Schwanke, Schwanke and Assoc. v. Martin,* 241 Ill. App. 3d 738, 744 (1 st Dist. 1992). All well-pleaded facts in the complaint must be taken as true with all inferences from it to be drawn in favor of the non-movant. *Curtis Casket Co. v. D. A. Brown,* 259 Ill. App. 3d 800, 804 (1 st Dist.1999). This Court accepts as true all well-pleaded facts, but does not need to accept conclusions or inferences which are not supported by specific factual allegations.

In their complaint, the Plaintiffs allege that the Defendants sent telephone facsimile messages to the Plaintiffs without obtaining prior permission. The complaint further alleges, prior to the initiation of the transmission, that each plaintiff had purchased paper and toner for their respective use and had an immediate right to the possession and use of these items. Plaintiffs further allege that the receipt of the unsolicited facsimile message resulted in the unauthorized use of toner and

paper by the defendants which rendered these items unusable by the Plaintiffs.

[☞8] To sufficiently allege conversion a plaintiff must allege: 1) the defendant's unauthorized and wrongful act of control, dominion or ownership over the plaintiff's personal property; 2) the plaintiff's right in the property; 3) the plaintiff's right to immediate possession of the property, absolutely and unconditionally; and, 4) the plaintiff's demand for possession of the property. *Roderick Development Investment Company, Inc. v. Community Bank of Edgewater*, 282 Ill. App. 3d 1052 (1996). The complaint seeks actual and punitive damages as well as an injunction against future acts of conversion.

At the outset, it must be noted that the complaint does not allege conversion of the Plaintiff's fax machine, only its paper and toner. Thus, cases such as *Omnibus International, Inc. v. AT & T*, 2002 Tex. App. LEXIS 8234 (TX. App. 2002) are inapposite. Moreover, this case remains an unpublished opinion, and under Texas Law it cannot be cited as authority.

The Plaintiffs have pled facts alleging each element of conversion. [☞9] As observed earlier in this opinion, the use of a facsimile machine for the distribution of printed material shifts the recipient of the materials into the role of printer. This imposes all of [*15] the attendant costs on an unwilling recipient. This is sufficient to allege the first three elements of the tort.

The final element, however, has not been alleged. This element is unnecessary when there is another independent act of conversion that can be shown. *Jensen v. Chicago and Western Indiana R. R. Co.*, 94 Ill. App. 3d 915, 933 (1981). The allegations and reasonable inferences clearly indicate that the paper and toner had been consumed in the process of printing the advertisements sent by or on behalf of the Defendants.

Therefore, the Court finds there are sufficient allegations to state a claim for conversion.

[☞10] The Defendants assert that not withstanding the existence of a properly pled claim, any damages suffered by the proposed class representative are so inconsequential that no claim should be recognized. They opine that the cost incurred by the receipt of an individual facsimile message, including paper, is no more than eight cents. Initially, the Court must recognize that the doctrine of *de minimus non curat lex* is usually confined to matters involving an alleged breach of contract. It is applied to avoid finding a breach where the harm caused is so slight or the damages nominal. *Pacini v. Regopoulous*, 281 Ill. App. 3d 274, 279 (1996). This Court also agrees that much, if not all, of the Plaintiffs arguments and citations do not speak to the relevant issues. Having made these observations, however, this Court is compelled to deny the Motion to Dismiss.

Illinois and other jurisdictions recognize that where a party has established an infringement of a right, damages are presumed. *Ainsworth v. Century Supply Co.*, 295 Ill. App. 3d 644, 649-650 (1998). This entitles a plaintiff to an award of nominal damages. In *Ainsworth*, the plaintiff was depicted in an advertisement for the commercial availability of floor covering products and supplies from the defendant. The use of plaintiff's likeness was unauthorized. In his deposition, the plaintiff testified that he was angered to see the commercial. In reversing the grant of summary judgment, the Court held that the plaintiff was entitled to an award of nominal damages, perhaps even the value achieved by Century by taking his image for their use. *Ainsworth*, 295 Ill. App. 3d at 650. This presumption also arises where, as here, the claim is an intentional tort. *Crosby v. City of Chicago*, 11 Ill. App. 3d 625, 630 (1973).

[*16] With respect to injunctive relief, the Plaintiffs, however, have not shown their lack of an adequate remedy at law. The Plaintiffs can seek damages under this theory as well as the TCPA, hence, their claim for injunctive relief is dismissed with prejudice. Similarly, the Plaintiffs claim for punitive damages is not supported by well-pled facts. There are no allegations of fraud, actual malice, gross negligence or willfulness, beyond that to state a claim for conversion. *Cirrincione v. Johnson*, 184 Ill. 2d 109, 115- 16 (1988). Moreover, absent some proof of activity undertaken to inundate a particular recipient with telephone facsimile messages, this Court doubts that such a claim will ever lie. In making this statement, the Court has considered the volume of messages modern technology permits. Nevertheless, discovery may lead to the discovery of facts that will make such a claim viable. Thus, subject to a Motion to Amend Pleadings, the claim for punitive damages is dismissed without prejudice.

## V. ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICE ACT

The defendants have filed a Motion to Dismiss the count seeking relief under the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") pursuant to Section 2-615 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-615. They advance three arguments in support of their Motion. First, they argue that these are insufficient factual allegations to support a claim that damages were proximately caused by the Defendants action. In addition, they assert that the factual allegations are insufficient to support a claim that the defendants engaged in "deceptive" or "unfair" conduct prohibited by the ICFA. Finally, they note that any statutes alleged to be violated by their conduct does not support a "per se" violation of ICFA. The Court will analyze these arguments in the order perceived to be most useful.

Initially, it should be observed that the parties agree there are no allegations of deceptive practices. Thus, in order to establish a claim, the Plaintiffs must allege ultimate facts that show the Defendants engaged in unfair practices. In *Robinson v. Toyota Motor Credit Corporation*, 201 Ill. 2d 403 (2002), our Supreme Court discussed the elements of such a claim.

ICFA is a regulatory remedial statute designed to protect consumers against unfair business practices and is to be liberally construed to effectuate its purpose. *Cripe v. Leiter*, 184 Ill. 2d 185, 191 (1998).

[*17] In *Robinson*, the Court defined the elements of an unfair business practice. In essence, the Court adopted the three-part test cited with approval in *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972). Therefore, in order to measure whether a business practice is unfair, a court must consider the following factors: 1) whether the practice offends public policy; 2) whether it is immoral, unethical, oppressive or unscrupulous; and 3) whether it causes substantial injury to consumers. Robinson, 201 Ill. 2d at 417- 418. The Court also noted that all three factors need not be met. Rather, the Court adopted the reasoning of the Connecticut Supreme Court in *Chesire Mortgage Service, Inc. v. Montes*, 223 Conn. 80, 106 (1992). That Court, in a case involving "loan churning" observed that all three criteria need not be satisfied in order to support a finding of unfairness. Rather, a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. *Chesire*, 223 Conn. at 106.

As the claim is brought under ICFA, the complaint must allege with particularity and specificity the unfair business practices of the defendants. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 502 (1996). The Plaintiffs fail to recognize that in a Section 2-615 Motion, the complaint must stand on its own, thus, reference to citations issued by the FCC, reports or hearings are not relevant to the issues and will not be considered in resolving this Motion.

The well-pled facts, taken as true for purposes of this Motion, are set out above. [☞ 11] There is no question that transmitting unsolicited telephone facsimile advertisements violates public policy. First, the Criminal Code of 1961, as amended, prohibits this activity. See, 720 ILCS 5/26-3. Knowledge is defined by the Code in Section 5/4-5. A person acts knowingly when he is consciously aware that a result is practically certain to be caused by his conduct. 720 ILCS 5/4-5(b). There can be no question that any individual who causes a telephone facsimile transmission to occur acts knowingly. In addition, the failure of Illinois to "opt out" of the private enforcement of the TCPA suggests that this Act is the public policy of Illinois as well.

The Plaintiffs allege the conduct is oppressive, yet they allege only one or two facsimile transactions to each Plaintiff. This, by inference, suggests minimal disruption of one's business or occupation. The exhibits to the complaint show each plaintiff had a [*18] reasonable alternative to the receipt of additional messages. They could call to remove themselves from the list. This conduct does not rise to the level of oppression envisioned by the drafters of ICFA.

The final factor requires the allegation of substantial injury to the consumer. In discussing the count alleging conversion, the Court indicated the doctrine of *de minimus non curat lex* had no application in this matter. A complete review of the movants' authorities confirms this position. No case cited involved a tort claim. They involved complaints of short redemption deposits in foreclosure cases, errors in summing damages, or computing interest. The Court acknowledges that the Plaintiff's are not entitled to receive nominal or presumed damages in a claim under ICFA. *Duran v. Leslie Oldsmobile, Inc.*, 229 Ill. App. 3d 1032, 1041 (1992). There are no facts from which the Court can determine the amount of damages incurred by the suggested class plaintiff or consumers as a whole. The term "substantial" is clearly a conclusion.

Thus, evidence of only one of the Robinson factors are found in the Plaintiff's complaint. This Court concludes that the Plaintiff has not stated a claim under ICFA. In reaching this decision, the Court recognizes that the failure to include Illinois' prohibition against unsolicited telephone facsimile transmissions in Section 2Z of ICFA (815 ILCS 505/2Z, also prevents a finding of a per se violation of ICFA. *Illinois ex rel. Daley v. Grady*, 192 Ill. App. 3d 330, 332 (1989).

Therefore, the Count of the Complaint alleging a violation of the Illinois Consumer Fraud and Deceptive Practices Act is Dismissed.

Finally, this Court feels constrained to remark about post-argument activities of the attorneys. It is clearly within the requirements of the Illinois Rules of Professional Conduct to advise the Court of any change of law used in party's argument prior to the Court's decision on the matter. RPC 3.3. The lawyers are to be commended for their action in this regard.

However, this Court seriously doubts that the obligations imposed by that Rule grant counsel a license to present a thirty-plus page brief supporting a clients' position after arguments were closed. If the need arose, a proper motion to re-open arguments would be appropriate.

[*19] This Court, while troubled by the tactic, will regard it as overzealous advocacy and has returned the unsolicited but permitted telephone facsimile transmission as well as the correspondence to counsel unopened and unread.

## VI. ORDER

A. The Motions to Dismiss the Count of the Consolidated Complaint alleging a violation of the TCPA is denied;

B. The Motion to Dismiss the Count of the Consolidated Complaint alleging Conversion is denied;

C. The Count of the Consolidated Complaint alleging a violation of ICFA is dismissed; the Plaintiffs are given 28 days to file an amended complaint;

D. The Defendants shall file answer to the Counts alleging violation of the TCPA and conversion within 28 days;

E. The matter is scheduled for case management conference on May 12, 2003 at 2:30 p.m.

DATED: April 3, 2003. ENTERED: April 3, 2003.

## [*20] EXHIBIT A

DEFENDANTS JOINING IN CONSOLIDATED MOTIONS TO DISMISS IN RELATED TCPA CASES

02 CH 1189 Goldberg v. Wall Street Alert

02 CH 6332 Whiting Corp v. MSI, Y2K Marketing

02 CH 6335 Whiting Corp v. PageComm of Illinois

02 CH 6336 Whiting Corp v. Fax.Com, Inc.

02 CH 6905 Bernstein v. American Family & Bezanis

02 CH 6908 Bernstein v. Fax.Com, Inc.

02 CH 7687 Whiting Corp v. Lucas Associates

02 CH 7745 Construction v. Gersten Financial

02 CH 7748 Construction Consulting Grp v. Qwest Communications,Inc.

02 CH 7824 Construction v. PageComm of Illinois

02 CH 7827 Construction v. Superior Marketing


02 CH 8362 Phillips v. Consolidate Steel Supp

(not joining in conversion motion because no conversion count alleged Consolidated Steel & Supply Co.)

02 CH 8364 Phillips v. Midco, Inc.

02 CH 8641 Elliot-Dunne v. Judicial Attorney Service

02 CH 8714 Martin v. Onstaff, Inc.

02 CH 10491 Elliot-Dunne v. Voicestream Wireless

02 CH 10852 Elliot-Dunne v. Spradling

02 CH 10890 Schlosser v. MSI Marketing

02 CH 10919 Brill v. Johnson

# # #

# EXHIBIT K

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DIVISION

WHITING CORPORATION, )
)
      Plaintiff )    No. 02 CH 6332
)
      v. )    Judge Patrick E. McGann
)
MSI MARKETING, INC., )
)
      Defendant. )

---

INSPE ASSOCIATES, LTD., )
)    03 CH 10965
      Plaintiff, )    and related cases as indicated on
)    Exhibit "A" attached
      v. )
)
CHARTER ONE BANK, )
)
      Defendant. )

### MEMORANDUM OPINION AND ORDER

This matter comes on for hearing on the Motion of Charter One Bank to dismiss the amended complaint of Inspe Associates, Ltd. seeking relief for alleged violations of the Telephone Consumers Protection Act of 1991, 47 USC 227 ("TCPA"); the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/2 ("ICFA"); common law conversion and property damage.   This case is one of a number, now exceeding seventy, of related cases assigned to this Calendar by the Presiding Judge of the Chancery Division of this Court.   This motion has been joined in by the parties in the cases listed in Exhibit "A" attached hereto as the motion raises issues that are common to those parties. This Court has allowed all Defendants who have participated in this motion to present motions that raise individual legal defenses to the claim of their respective Plaintiff.   This Court has or will issue rulings on each of those individual motions.

Charter One Bank ("Charter One" or "the Bank") seeks to dismiss Count I seeking relief for violation of the TCPA by asserting affirmative matter that seeks to avoid the legal effect of or defeating the claim. 735 ILCS 5/2-619. The Bank asserts that the statutory scheme envisioned by the Congress in enacting the TCPA requires a state to create, by affirmative legislative action, a state cause of action for violation of the TCPA. As an alternative position, Charter One suggests that legislative conduct subsequent to the passage of the TCPA clearly shows that Illinois has opted out of the TCPA's private right of action scheme.

The Bank also argues that the $500.00 per fax statutory penalty is so radically disproportionate to the actual damage suffered by a recipient of an unsolicited telephone facsimile message that it violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

Finally, Charter One posits that the TCPA's total ban on commercial fax advertising discriminates against speech based on its content when a less restrictive approach would satisfy the governmental interest sought to be protected by the regulation. Hence, the TCPA violates the freedom of speech rights guaranteed by the First Amendment to the United States Constitution.

As to the remaining counts, the Bank contests the legal sufficiency of each claim. 735 ILCS 5/2-615. The conversion claim must fail, it argues, because the Plaintiff does not assert that the mere fact of sending a telephone facsimile message is illegal. Hence, the Plaintiff can claim no greater interest in the paper and toner consumed by the message than the sender.

Charter One posits that the ICFA claim must fail because it fails to enumerate a violation of the Illinois statute prohibiting commercial telephone facsimile messages[1] as a per se ICFA violation. In addition, the Defendant argues that the mere sending of a commercial telephone facsimile message does not rise to the level of an unfair or deceptive act as defined by Illinois law.

---

[1] 720 ILCS 5/23-3

2

Finally, the Bank suggests that, because the paper and toner consumed by the message has no residual value, a claim for property damage will not lie.

## I.    LEGAL STANDARD

### A.    2-619 MOTION

Section 2-619 affords a means of obtaining a summary disposition of issues of law or easily proven issues of fact. Subsection (a)(9) permits dismissal where "the claim asserted is barred by other affirmative matter avoiding the legal effect of or defeating a claim."

The phrase affirmative matter encompasses any defense other than a negation of the essential allegations of the plaintiff's cause of action. For that reason, it is recognized that a 2-619(a)(9) motion to dismiss admits the legal sufficiency of the plaintiff's cause of action much in the same way that a 2-615 motion to dismiss admits a complaint's well-pleaded facts. Kedzie & 103rd Currency Exchange v. Hodge, 156 Ill. 2d 112, 115 (1993).

In making that last statement, the Illinois Supreme Court cited with approval the discussion of this issue in Barber-Coleman v. A & K Midwest Insurance Co., 236 Ill. App. 3d 1065 (1993). There, the court reasoned that affidavits in support of a 2-619 (a)(9) motion cannot be used to attack the factual sufficiency of a claim because the defendant admitted, for the purpose of the motion, those facts which are necessary to the plaintiff's claim.

A 2-619(a)(9) motion contrasts with a summary judgment motion in that the latter allows the movant to contest by affidavit the truth of the allegations made. In other words, by the use of affidavits the opposing party states that the material facts alleged in support of the claim or defense are not true. To the contrary, a 2-619(a)(9) motion asserts there exists other affirmative matter avoiding the legal effect or defeating the claim. Hence, a 2-619(a)(9) motion admits all well pled facts that are essential to the claim, but not any of the facts that may touch on the affirmative matters raised in the motion.

3

### B.     2-615 MOTION

A section 2-615 motion attacks the legal sufficiency of the Plaintiff's claim.  The

motion does not raise affirmative factual defenses, but rather alleges defects only on the face of the

complaint.  The question presented by a section 2-615 motion to dismiss is whether the allegations

of the complaint, when viewed in a light most favorable to the plaintiff, are sufficient to state a cause

of action upon which relief can be granted.  A cause of action will not be dismissed on the pleadings

unless it clearly appears that no set of facts can be proved which will entitle the plaintiff to recover.

Vernon v. Schuster, 179 Ill. 2d 338, 344 (1997); Bryson v. News America Publications, Inc., 174 Ill.

2d 77, 86-87 (1996).

### III.     DISCUSSION

The facts alleged in the Amended Complaint are rather straightforward and will

be discussed in the context of the analysis of the Defendant's grounds for dismissal.

### A.     COUNT I – TCPA

### 1.  NECESSITY OF STATE ACTION

The initial argument raised by Charter One involves a discussion of the legislative intent

expressed by the United States Congress in the language used in the TCPA as well as the intent of the

legislators who debated or discussed the bill during the deliberative process leading to its passage.

The TCPA, in pertinent part, prohibits the transmission of an unsolicited advertisement to a

telephone facsimile machine.[2]  An unsolicited advertisement is defined in the statute as any material

advertising the commercial availability or quality of any property, goods or services…[3]  The statute

also states that "any person or entity may, if otherwise permitted by the laws or rules of court of a

State, bring in an appropriate court of that State…an action to recover for actual monetary loss from

---

[2] 47 U.S.C. 227 (6)(1)(c)
[3] 47 U.S.C. 227 (a)(4)

such a violation, or to receive $500 in damages for each such violation, whichever is greater..."[4]

It is the language, "if otherwise permitted by the laws or rules of court of a State," that is the focus of the Bank's first argument

This text, it suggests, requires an affirmative authorization by a state before such private litigation may be brought in state court. No other conclusion, the Defendant asserts, can be culled from this language. Hence, in the Bank's view, a State must opt in before its courts may entertain a TCPA action.

This position is also buttressed, the Bank posits, by statements made by Senator Ernest Hollings, one of the TCPA's sponsors. On November 7, 1991, Senator Hollings discussion of the Bill's creation of a private right of action is quoted in the Congressional Record. After stating that the bill allows a private right of action in state courts, he recognizes the federal principle of state sovereignty by recognizing that the Federal Government cannot, because of constitutional restraints, dictate to the States "which court in each State shall be the proper <u>venue</u> for such an action. Nevertheless, it is my hope that States will make it as easy as possible for consumers to bring such actions, preferably in small claims courts..."[5]  The Senator then suggests these matters should not involve attorneys and the neutral fairness of the amount of damages allowed. Finally, he stated: "I thus expect that the States will act reasonably in permitting their citizens to go to court to enforce this bill."[6]

Finally, Charter One points to the decision of the Court of Appeals in <u>International Science & Technology Institute, Inc. v. Inacom Communications, Inc.</u>, 106 F.3d 1146 (4th Cir. 1997). It argues that many courts have misinterpreted the Court's reasoning.  The Bank suggests that the opening

---

[4] 47 U.S.C. 227 (6)(3)(B)
[5] 137 Cong. Rec. 516205-06 (emphasis added)
[6] *Id.*

paragraph of the opinion states the true result of the ruling. Judge Niemeyer, writing for the Court, stated "[Today this Court decides] that states have been given, subject to their consent, exclusive subject matter jurisdiction over private actions authorized by the [TCPA]."[7]

In order to determine Congress' intent in any law or statute, Court's must first analyze the text of the Act. New York State Conference of Blue Cross and Blue Shield Plans v. Travelers Insurance Co., 514 U.S. 645, 656 (1995). Only if the intent cannot be determined by the language of the Act should a court move on to analyze the structure and purpose of the Act in which it occurs. Id.

The language of the TCPA statute "if otherwise permitted" seemingly supports Charter One's argument that Congress envisioned a series of positive actions by state governments incorporating this new regulatory remedy into state law. However, such a reading ignores the context of the federal/state relationship created by the United States Constitution as well as the essential distinction between federal and state courts. When these factors are considered, it is clear that Congress created a remedy for a wrong, but recognized the rights of the several states to apportion their limited resources to address issues deemed important by the local electorate.

In 1944, Alfred Testa purchased an automobile in Providence, Rhode Island, for $210 above the ceiling price set under the then existing Emergency Price Control Act. After learning of the auto dealer's misfeasance, he filed suit in state court to recover "penal" damages for this wrong. Congress had, in creating the law, conferred concurrent jurisdiction on federal and state courts for claims arising from any alleged violation. The Rhode Island Supreme Court reversed the award of damages obtained by Mr. Testa on the basis that, absent Rhode Island's consent, the Congress could not require its courts to entertain such claims. The Supreme Court unanimously reversed the Rhode Island Court. Testa v. Katt, 330 U.S. 386 (1947). The Court noted that Article VI, Section 2 of the Constitution provides:

> "This Constitution, and the Laws of the United States which shall
> be made in Pursuance thereof; and all Treaties made, or which
> shall be made, under the Authority of the United States, shall be

---

[7] 106 F3d 1150

the supreme Law of the Land; and the Judges in every State
shall be bound thereby, and anything in the Constitution or Law
of any State to the Contrary not withstanding." (capitalization in original)

This "supremacy clause" has, since the first Congress convened, thereafter been interpreted as conferring jurisdiction on state courts to enforce federal civil laws. Subsequent Congresses expanded such jurisdiction to federal crimes and actions for penalties and forfeitures. Testa, 330 U.S. at 390-391. The Court went on to observe that this view was the subject of much controversy, some violent, until the end of the Civil War. Indeed, since Claflin v. Houseman, 93 U.S. 130 (1876), a principle of constitutional law has been that wherever Congress creates a remedy there is no valid reason why it should not be enforced in a proper action in state court. Id. at 137. Hence, in this Court's judgment, not only were private claims under the TCPA permitted in all states, but all states from the date of enactment are required, except as discussed below, to entertain such claims. This principle may also explain Senator Hollings' precise use of the word venue instead of jurisdiction.

This view is also supported by the distinction between the federal district courts and the trial courts of Illinois. The former are created by Acts of Congress which has the authority to limit the jurisdiction of such courts in accordance with Article III of the United States Constitution. As observed by the Court in International Science, the Congress has used this power to direct certain justiciable matters to the Federal Court of Claims, Court of International Trade or to strip district courts of original jurisdiction. International Science, 106 F.3d at 1155-1156.

The trial courts of Illinois are constitutional courts vested with jurisdiction over all justiciable matters. Article 6 Sections 1 and 9 of the Constitution of 1970. The only exception is the constitutionally recognized right of the legislature to create administrative bodies. Hence, under our federal system, the trial courts of Illinois, in accordance with the supremacy clause of the United States

Constitution, have original jurisdiction to hear claims seeking a remedy granted by the laws of the United States.

In addition, one issue not discussed by the parties is the disjunctive language used by the Congress. The words selected are "permitted by the laws or rules of court." Courts do not have the authority to limit by rule their jurisdiction over cases that are properly brought before them. Admittedly, in some circumstances, Courts for good reason may decline to exercise jurisdiction over a particular case; e.g. interstate *forum non conviens*. Rules of Court are used to prescribe procedures or determine assignment of cases properly before the Court. This disjunctive language also suggests that the Congress was attempting to facilitate the prosecution of these claims while, as will be discussed, acknowledging the sovereignty of the individual state. This determination is borne by the comments of Senator Hollings who strongly urged these matters be handled efficiently, without the participation of lawyers, in a small claims court. As discussed during argument, the distinguished gentleman form South Carolina probably never envisioned the use of class action procedures in an effort to remedy what appears to have been perceived by the Congress as a pervasive, but highly individualized, issue adversely affecting commerce.

It is important to observe that the Court in <u>Testa v. Katt</u>, *supra*, did not discuss the implication of the 10th amendment to the United States Constitution. That amendment reserves to the states all power not delegated to the United States by the Constitution or prohibited to the states by that compact. While one could argue that the supremacy clause resolves any issue in favor of the constitutionality of the TCPA, recent court decisions cast some doubt upon that perspective. *See e.g.* <u>New York v. United States</u>, 505 U.S.144 (1992). A more modern approach to this issue is found in the court's reasoning in <u>International Science</u>. Congress cannot, consistent with the 10th Amendment, invade the province of state sovereignty. Thus, unless a state has affirmatively enacted a similar

regulatory scheme, Congress cannot direct a state to enforce a federal claim. Here, Congress did not so act. The Congress, in choosing the language of the TCPA, encouraged the several states to enforce a national and uniform policy on this issue but gave each state the unfettered right to direct its judicial resources in response to the needs of its electorate by refusing to allow private claims under the TCPA. As stated by the Court in <u>International Science</u>:

> "Congress enacted the TCPA to assist states where they lacked jurisdiction; it empowered states themselves to enforce the TCPA in federal court; it authorized private enforcement exclusively in state courts; and <u>it recognized state power to reject Congress' authorization</u>." 106 F.3d at 1159. (emphasis added)

Hence, this Court concludes that the TCPA created an "opt out" scheme which allows claims for the federally created remedy absent affirmative legislative action limiting or eliminating said claim.

This rationale is also consistent with the constitutional principle that states have great latitude in establishing the structure and jurisdiction of their own courts. <u>Howlett ex rel. Howlett v. Rose</u>, 496 U.S. 356, 372 (1990). Thus, states are under no obligation to create special courts or change procedural rules to facilitate prosecution of claims arising under federal law. However, consistent with the supremacy clause and absent any explicit state statutory directive, an unmistakable implication from legislative history, or by a clear incompatibility between state court jurisdiction and federal interests, there is a presumption of state court jurisdiction over federal claims. <u>Gulf Offshore Co. v. Mobil Oil Corp.</u>, 453 U.S. 473, 478 (1981).

This determination also resolves the second issue raised by Charter One. The Bank suggests the failure of the legislature to include a private state right of action for the transmission of a commercial fax in 2000, when it created such a claim for unsolicited telephone advertising,[8] evidences an intent to reject Congress' authorization or "opt out" of the TCPA private right of action regulatory

---

[8] 815 ILCS 413/25

scheme. This intent, it is urged, can also be determined from the legislature's rejection, on two occasions, of attempts to include a TCPA type violation as part of consumer protection laws under ICFA.

Although Gulf Offshore Co., *supra.,* dealt with the question of concurrent jurisdiction over a federal claim, in the absence of contrary authority, its analysis, with a slight modification, of this issue is most helpful. There, the Court held that a legislative body's intent to limit a court's jurisdiction over a claim could be determined by an explicit statutory directive, unmistakable implication from legislative history or by a clear incompatibility between state court jurisdiction and federal interests. Gulf Offshore Co., 453 U.S. at 478.

There is no explicit action by the state legislature declining to accept jurisdiction over these claims. The third Gulf Offshore factor should best be modified to determine if there is any incompatibility between state interests and this federal remedy. The answer again is in the negative. Indeed, one of the central purposes of the TCPA was to enable states to have jurisdiction over an issue that largely affected interstate commerce.

The final issue to be resolved under this analysis is the implications found in the actions of the state legislature. The failure to include a remedy for TCPA prohibited conduct can hardly be conclusive evidence of the legislature's intent to reject Congress' authorization for such claims. First, the remedy of attorney's fees found under ICFA is not available under the TCPA. The legislature could have determined that such a remedy exceeded the congressional authorization to assist in the regulation of interstate commerce by expanding what was designed to be a *pro se* claim into a much more complex and expensive litigation process.

The second argument by the Bank is the failure to include a private right of action in state court for unsolicited telephone facsimiles in the Telephone Solicitations Act. First of all, the statute had a

specific focus, regulating telephone solicitations. There is nothing in this Court's or the legislative record that telephone facsimile advertising was even considered in the Bill or any proposed amendments. The lack of such historical information would result not in an unmistakable understanding of legislative action but guess and conjecture as to legislative intent.

Finally on this point, the Bank asserts that the failure of the legislature to amend the Illinois penal statute relating to the transmission of unsolicited telephone facsimile messages[9] which predate the TCPA expresses a legislative decision to reject the Congressional authorization of private rights of action. In support of their position they cite to R.A. Ponte Architects Ltd. v. Investor's Alert, Inc., 815 A.2d 816 (C.S.A. MD. 2003), cert grtd 822 A.2d 1224 (2003). There, the Maryland Special Court of Appeals found that the failure of the Maryland legislature to amend its pre-TCPA statute to grant a private cause of action for money damages, and the failure to enact three bills dealing with issues somewhat related to the use of facsimile machines demonstrated an intent to prohibit a private cause of action in state court for violation of state or comparable federal law. 815 A.2d at 828.

Initially, it must be noted that this decision has been found to express a minority position on the issue. Condon v. Office Depot, Inc., 855 So.2d 644, 648 (Fla. Dist. Ct. App. 2003). A clear reading of the decision indicates that contrary to its pronouncement that Court adopted the "opt in" position rejected by this Court. Finally, it appears the Ponte Court failed to use the proper standard in reaching its conclusion that the failure of the Maryland legislature to create a cause of action it never considered or to so act when it considered other issues meant there was no private right of action. Thus, the decision in R. A. Ponte is not persuasive.

## 2. DUE PROCESS CLAUSE VIOLATION

---

[9] 720 ILCS 5/26-3

Charter One urges this Court to conclude that the statutory penalty of $500 or $1,500 (if knowing or willful) per fax for a violation of the TCPA    (47 U.S.C. 227 (b)(3)) constitutes an unconstitutional taking of property without due process of law.  This conclusion is easily reached, the Bank asserts, when one considers that the damage to the consumer is but a few pennies but the remedy in the context of this class action could result in an award in the tens of millions of dollars.  They suggest by example that a class may consist of a defendant who has sent 100,000 facsimile messages in violation of the statute.  This may have cost consumers $10,000.   The penalty for such conduct is $50 million with a potential multiplier to reach $150 million.  This gross disproportionality violates the due process clause and must be struck down.  The Bank points to the recent decision of the United States Supreme Court in State Farm Mutual Automobile Insurance Co. v. Campbell, 123 S.Ct. 1513 (2003), as the most recent pronouncement by the Court on this issue.

In State Farm, its insured, Mr. Campbell, attempted to pass six vehicles on a two laned road; his judgment in this regard proved to be poor and resulted in the death of one person and the total permanent disability of another.  Mr. Campbell was sued for damages by the injured parties.  The Plaintiffs offered to settle the matter for the $50,000 policy, but State Farm declined.  Despite strong counsel to the contrary, State Farm took the case to trial assuring Mr. Campbell his assets were secure. The jury found that he was 100% at fault and awarded damages in the amount of $185,849.  State Farm refused to pay this amount, filed an appeal bond and advised Mr. Campbell to place his home for sale to satisfy the amount of the claim.  Ultimately, State Farm paid the judgment after the Utah Supreme Court affirmed the jury's verdict.

Mr. Campbell and the injured parties joined forces to bring a bad faith action against State Farm.  During discovery it was learned that State Farm had a national policy to cap losses that Mr.

Campbell claimed, and apparently the jury agreed, were tortious. A verdict of $145 million in punitive damages was returned against State Farm.

In reversing the judgment of the Utah Supreme Court, the Court acknowledged the legal principle that the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. State Farm, 123 S. Ct. 1520-1521. This concern, the Court noted, dates back to the Magna Carta. The common law procedure for imposition of punitive damages, the Court believes, poses an acute danger of the arbitrary deprivation of property. The reason is that elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also the severity of the penalty that a state may impose. BMW of North America v. Gore, 517 U.S. 558, 574 (1996). The State Farm Court found that the defendant was impermissibly called to answer for unrelated incidents in states other than Utah. The Court reasoned, in part, that conduct lawful in one State cannot be used to aggravate a penalty in a State where such conduct is illegal. This defeats the Due Process requirement of notice. Here, the TCPA claim is a statutory remedy that clearly announces the proscribed conduct and defines the potential penalties. Moreover, the TCPA regulations existed for many years before the allegations of wrongdoing made by the Plaintiff herein. The decisions of the Supreme Court in State Farm and its rather recent ancestors, see State Farm, 123 S. Ct. 1528 (Ginsburg, J. dissenting), simply have no application to the matter before the Court.

As suggested by this Court in its earlier decision rejecting a similar argument, the standard to be applied here is found in St. Louis Iron Mountain and Southern Railway v. Williams, 251 U.S. 63 (1919). In Williams, the Court was called upon to determine the constitutionality of an Arkansas statute which created a private right of action for railroad passengers who were charged more than the

rate set by regulation. An aggrieved passenger was entitled to recover a penalty of "not less than fifty dollars nor more than three hundred dollars" for each offense as well as costs of suit and attorneys fees. Williams recovered a seventy-five dollar penalty and twenty-five dollars in attorney's fees after successfully prosecuting such a claim. The standard to be applied is whether the penalty is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." Williams, 251 U.S. at 67. This determination of validity is not to be made merely by contrasting the penalty with the possible overcharge in an individual case. The court must consider the interest of the public, the numberless opportunities for committing the offense and the need for securing uniform adherence to the law. Williams, 251 U.S. at 68. The focus of the Court at this point in the proceedings is to determine the facial constitutionality of the TCPA remedy. In doing so, there must be given recognition to the wide latitude a government is given in protecting public interest. This Court should not be anxious to substitute its judgment for that of the Congress. As suggested in this Court's prior decision in Whiting Corporation v. MSI Marketing, Inc., 02 CH 6332, this decision as to the constitutionality of the remedy as applied may best be resolved once a class is certified. Subsequent research by the Court indicates this issue may impact on the very issue of class certification. See Foreman v. Data Transfer, Inc., 164 F.R.D. 400 (E.D. Pa. 1995) and Kenro v. Fax Daily, Inc., 962 F. Supp 1162 (S.D. Ind. 1997).

The Court cannot conclude that the remedy provided by Congress in the TCPA is an unconstitutional deprivation of property without Due Process of Law on this record.

### 3.  FIRST AMENDMENT ISSUES

The Defendant asserts that the TCPA scheme unconstitutionally impacts on its right of free speech in the commercial setting of advertising. The main thrust of its argument is that the statute fails to withstand scrutiny under the test set out in Central Hudson Gas & Electric Corp. v. Public

Service Commission, 447 U.S. 557 (1980). The Bank posits that the content based restriction on commercial speech is not based upon a constitutionally sufficient rationale; to wit, that assuming a governmental interest is present, the prohibitions set out in the TCPA do not directly advance that interest. The Defendant also urges this Court to conclude that less restrictive alternatives could satisfy any interest identified by the Congress.

Prior to analyzing the arguments of Charter One, it is important to note that there are no allegations that any of the "unsolicited advertisements" were false, misleading or promoted illegal conduct. Hence, analysis under the Central Hudson test is proper.

Charter One's brief suggests there are two prongs to determining whether there is sufficient rationale to justify this Congressional restriction on speech. The first prong is a determination that the governmental restriction is substantial. The burden falls upon the Government to establish this factor. Edenfield v. Fane, 507 U.S. 761 (1993).

Charter One contends the legislative record consists of such anecdotal evidence that, in reality, no governmental interest was identified by the Congress. The Defendant acknowledges that the TCPA scheme was designed to prohibit the cost shifting effect of commercial advertising by telephone facsimile messages as well as the time and expense incurred when a fax machine is being used to accept and print these unsolicited transmissions. However, the Bank argues that there was insufficient evidence in the record to allow Congress to make that determination.

In support of their position, the Defendant points to Turner Broadcasting, Inc. v. FCC, 520 U.S. 180 (1997). However, it appears to this Court that a careful reading of Turner actually supports the Congressional determination of the policy espoused by the TCPA. In that decision, the Court upheld the "must carry" commercial non-cable broadcast provisions of statutes regulating the cable television industry. There, the Court analyzed the materials submitted to Congress and its

determinations. The Court noted that the question to be answered by a court in making a determination of constitutionality is not an objective determination of whether the legislative policy was the correct approach to the issue. Rather, the Court stated, the question is whether the legislative conclusion was reasonable and supported by substantial evidence in the record. Turner, 520 U.S. at 212. The Court will now turn to a discussion of the Congressional deliberations.

During the deliberations on the TCPA legislation, the Congress entertained testimony from many sources. In addition, Members related personal as well as constituent experiences and complaints concerning this practice. For example, as to the cost shifting issue, the Congress heard testimony that, in 1989, California's consumers lost between $250,000-375,000 per year in printing these unsolicited materials. Hearing before the Subcomittee on Telecomm. And Fina. Of the House Committee on Energy and Commerce, 101st Cong., 56 (1989) (statement of Prof. Ellis). This testimony also related that one company engaged in this activity had by that time assembled a database of 500,000 fax numbers and was routinely sending out 60,000 fax messages per week.

The Congress also heard testimony that this industry would steadily increase its technological capabilities and its attendant ability to transmit massive volumes of fax messages. The intervenor's brief cites to a website of a defendant in another related case to support the Congress' predictive judgment. It boasts, in 2004, of being one of more than 400 entities engaged in transmitting facsimile advertisements. The site claims that its sponsor personally sends more than one million such messages per week. (Int. Br. pp 16-17).

Finally, the Congress heard significant testimony on the disruption of business by the "seizure" effect such messages have on telephone lines and facsimile machines.

In contrast, Charter One advances no evidence as to the accuracy of the information presented to the Congressional subcommittee and presented to the Congress. Given the substantial deference

that Courts must give to the predictive judgments of Congress, indeed the Court's role is limited to assuring that, in formulating its policy, Congress has drawn reasonable inferences based on substantial evidence. Turner Broadcasting Systems, Inc. v. FCC, 512 U.S. 622, 666 (1994), this Court can reach no other conclusion but that unsolicited telephone facsimile messages disrupt business by interrupting its orderly flow and unfairly shifts advertising costs from the merchant to the consumer. These are substantial interests that Congress in its constitutional responsibility to regulate commerce can protect. Moreover, the material submitted by the Intervenor validates Congress' predictive judgment.

The Defendant next posits that, assuming protectable interests exists, the total ban of unsolicited facsimile advertisements does not directly advance the government interest asserted. Rubin v. Coors Brewing Co., 514 U.S. 476 (1995). The Bank acknowledges that Congress need not make progress on every front before it can make progress on any front. United States v. Edge Broadcasting Co., 509 U.S. 418 (1993). Nevertheless, Charter One posits there is not the reasonable fit required between the TCPA total ban on unsolicited telephone facsimile advertising and the interests advanced. The main thrust of their position focuses on the failure of Congress to ban facsimile messages that contain political, "junk" or charitable messages. These messages consume the same amount of paper and ink as the banned messages. This permitted form of speech also disrupts business by "seizing" control of the recipients business equipment.

To support its position, the Defendant cites to cases in this area such as Edenfield v. Fane, supra., and City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410 (1993). In Edenfield, the Court struck down as violative of the First Amendment Florida's total ban on client solicitation by Certified Public Accountants. The Court began its analysis by acknowledging that "solicitation is a recognized form of speech protected by the First Amendment." International Society for Krishnar Consciousness v. Lee, 501 U.S. 672, 677 (1992). It then examined the two asserted

interests the regulation was designed to protect; *i.e.* eliminating fraud or overreaching by CPA'S and maintaining the independence of the audit process. Each, the governing board advanced, would be compromised as competitors would be increasingly called upon to cut prices or be more compliant to a client's needs to obtain or retain business. The Court acknowledged the substantial nature of the governmental interest.

However, the Court found that a total ban on such solicitation did not directly advance the interests involved. In making that determination, the Court noted that 21 States place no restrictions on solicitations by CPA's, only three States besides Florida have enacted a total ban. The Court also observed the ban was enacted without any evidence, study or even anecdotes to suggest the stated interest would be served by the ban. Edenfield, 507 U.S. at 772. Indeed, the Court found the one report proffered in support of the ban actually undermined the regulator's position. *Id.* at 772-773. Nor could the ban, the Court found, be justified as prophylactic in nature. In rejecting the position that the setting of such solicitations, *i.e.*, private offices or conversations were prone to abuse and difficult to regulate, the Court emphasized the training of members of the accounting profession, and the absence of any threat of overreaching due to the emotional status of the party being solicited. The Court noted that decisions to hire an accountant are deliberate in nature and any potential for harm is minimal. This, the Court found was different from the partial ban approved on lawyer solicitations of accident victims. Ohralik v. Ohio State Bar Assn., 436 U.S. 447 (1978). In the later situation the Court acknowledges a prophylactic ban was appropriate because the harm sought to be avoided would have occurred at the outset of the solicitation. *Id.* at 777.

In Discovery Network, the Court struck down the application of an existing ordinance prohibiting the distribution of handbills to limit the placement of dispensing racks to distribute the defendant's commercial paper. In making this determination, the Court noted that the ordinance had

long been in existence before the City determined that it was a potential tool to ease the perceived blight and promote traffic safety. The Court also observed that only 62 of the offending racks were being removed while between

1, 500 and 2,000 remained in place unaffected by enforcement efforts. These racks were used to distribute "newspapers," a category not defined by the ordinance but by executive fiat. It was significant, the Court observed, what is patent to anyone who peruses our daily "newspapers," that 70% of their content is devoted to advertising the availability of goods or services. Discovery Network, 507 U.S. at 420 (fn.16). This fact, the Court determined, eliminated any distinction between the publications that were banned or permitted. In its opinion, the Court reminded the litigants that speech proposing a commercial transaction was entitled to lesser protection than other constitutionally protected expression. See Ohralik v. Ohio State Bar Assn., 436 at, 455-456. Thus, the Court recognized that a distinction has historically been drawn between commercial and non-commercial speech, but found that on the record there was no appreciable difference in content between the Defendant Discovery Network's publication and those classified as "newspapers." The Court reasoned that as a result the distinction drawn by Cincinnati bore no appreciable relationship to the restrictions imposed. The Court specifically declined to determine whether, given certain facts and under certain circumstances, differential treatment of commercial and non-commercial speech is justified. Discovery Network, 507 U.S. at 429.

It is clear to the Court that the definition of "unsolicited advertisement" found in the TCPA is consistent with the definition of a commercial transaction as defined by the Supreme Court; i.e., proposal for a commercial transaction. Board of Trustees of the State University of N.Y. v. Fox, 492 U.S. 469, 473-474 (1989). The TCPA's ban on commercial speech does have a prophylactic effect on unsolicited telephone facsimile advertising. This can be justified under Ohralik, supra., because

the harm sought to be prevented occurs at the time the transmission is made. In addition, unlike the total ban on solicitation in Edenfield, Congress recognized a significant negative impact on commerce and enacted a closely tailored statute. In contrast to the glaring absence at the state level of regulation of solicitation by CPA's, the Congress received evidence that efforts by an increasing number of states to regulate in this area were thwarted by the interstate nature of the telephone facsimile issue. Hence, this Court finds that the restriction directly advances the valid regulatory concerns identified by Congress.

Moreover, there is a clear relationship between banning commercial speech and allowing charitable and political use of this medium of communication. First, Congress received evidence that only a small number of unsolicited messages were non-commercial. In addition, the public had no serious objection to receiving such information. The Congress, as noted above, pointed to the actual damage to business owners by way of additional costs of doing business as a result of receiving commercial messages. In addition, evidence suggested the additional burdens, not easily calculable, imposed by a lack of timely access to necessary business equipment during the increasingly frequent times the unsolicited commercial telephone facsimiles are sent was adversely affecting commerce.

The cases relied on by the Defendant have for the most part, in subsequent proceedings, followed the Eighth Circuit Court of Appeals decision in Missouri ex.rel. Nixon v. American Blast Fax, Inc., 323 F3d 649 (C.A. 8th 2003), cert. den. 124 S.Ct. 1043 (2004). See Rudgayzner & Grath v. Enine, Inc., 204 N.Y. Misc. Lexis 420 (4/14/04).

Finally, the restriction chosen by the Congress is not more extensive than necessary to advance the interest at stake. The Bank recognizes that there must be a reasonable "fit" between the regulation and the interest sought to be protected. Board of Trustees v. Fox, supra. Charter One argues that at least two alternatives are less restrictive and hence a better "fit." First, the Defendant points to the

California "opt out" scheme. This allows the sender of the message to furnish the recipient with a toll free number which will prevent the recipient from receiving further facsimiles. The second is a national "do not fax" list. Anyone who does not desire to receive this type message can sign up and be placed on a list and will not receive these communications. The Defendant suggests this would better identify those individuals who welcome this information and separate those persons from consumers who desire to receive only certain types of unsolicited messages or no messages at all.

The analysis of this issue does not permit the Court to substitute its judgment for that of the Congress. Rather, the Court must examine the existing regulations on their own merit and determine whether they achieve a reasonable fit. Rubin v. Coors Brewing Co., 514 U.S. 476 (1995). The TCPA scheme does act to prevent the cost shifting goal set forth by the Congress. Moreover, the Defendant suggests an affirmative duty should be imposed upon businesses and private persons in order to protect their property and be free to conduct their businesses. Those persons who desire to enter into commercial transactions have numerous and cost effective ways of reaching customers. They can conduct direct mailings, purchase advertising in "newspapers" or other media. Indeed, they can create low cost websites that can be easily "googled." There is no reason to suggest the TCPA fails to pass muster on the fourth prong of the Central Hudson test.

Hence, the Court can find no First Amendment infirmities in the TCPA regulatory scheme.

### 4.   COUNT II – CONVERSION

The Defendant correctly sets out the elements of the tort of conversion. The gist of the Bank's argument appears to be that, by placing paper in a fax machine, an owner is parting with control, dominion or ownership of that property. By analogy, the Court surmises, if one were to leave their bicycle on the front porch for friends to see and the newspaper delivery person decided that it would be handy and takes it, there would be no theft. The Bank's argument ignores the plain fact that the

sending of unsolicited advertisements is illegal.  Everyone has the right to rely on others obeying the law.  Hence, the Plaintiff has made out a claim.

5.  **COUNT III ILLINOIS CONSUMER FRAUD AND DECEPTIVE**

   **PRACTICES ACT (ICFA)**

In Count three of the Plaintiff's complaint, it is alleged that the sending of one telephone facsimile message is a violation of the Illinois Consumer Fraud and Deceptive Practices Act. In Whiting Corporation v. MSI Marketing, 02 CH 6332, this Court extensively analyzed the requirements for a valid complaint under the Act. As the ICFA does not list a violation of the Illinois fax statute as a *per se* violation, the Plaintiff must satisfy the requirements set forth in Robinson v. Toyota Motor Credit Corporation, 201 Ill. 2d 403 (2002). A plain reading of the Plaintiff's complaint yields that the Count alleging a violation of the ICFA is legally insufficient. However, as indicated in the Whiting opinion, the Plaintiff may be able to set out a valid claim in individual cases.   Finally, the Plaintiff should analyze this issue in terms of the right of Congress to regulate interstate commerce.  Therefore, the Plaintiff is given leave to file amended Counts alleging an ICFA violation in those Class B and C category cases that are subject to the ruling entered today.

6.  **COUNT IV – PROPERTY DAMAGE**

   Property damage is to this Court's understanding an element of a form of intentional or negligent tortius conduct.  It is not an independent tort.  This Count will be dismissed with prejudice.

IV.  **ORDER**

   A. The Defendant's Motion to Dismiss Counts I & II are denied;

**B.** The Defendant's Motion to Dismiss Counts III & IV are granted, the Plaintiff

is given leave to file amended complaints alleging violations of ICFA consistent with this

Memorandum of Opinion and Order against any individual defendant;

**C.** The Class A and B cases are set for case management on July 13, 2004 at 1:00 P.M;

**D.** Any discovery stay order in Class B cases is hereby lifted.


ENTER:            _____

Judge                              1510

**EXHIBIT A**

| | |
|---|---|
| 03 CH 10966 | INSPE v. CBSK |
| 03 CH 9912 | Trout Grouse, LLC v. CBSK |
| 03 CH 10844 | Rawson v. Levin |
| 03 CH 10667 | Damas & Block v. Erogtron |
| 03 CH 12538 | Travel 100 v. Mediterranean Shping Co. |
| 03 CH 0955 | Novak v. Hotels.com |
| 03 CH 1540 | Travel 100 Grp v. Oceania Cruises, Inc. |
| 03 CH 8921 | Rawson v. McLeod USA |
| 03 CH 8477 | Telecommunications v. McLeod USA |
| 03 CH 10967 | Jos. Younes v. Impact Networking |
| 03 CH 10725 | Flexicorps v. Impact Networking |
| 03 CH 11321 | Flexicorps v. Bridge 21 |
| 03 CH 11650 | Kaufman v. Bridge 21 |
| 03 CH 10818 | Block v. Advanced Environmental Systems, Inc. |
| 03 CH 11297 | Catherine Elliott-Dunne v. Tracy's Treasures, Inc. |
| 03 CH 7666 | Brill v. Aramak Services |
| 03 CH 10667 | Damas v. Ergotron |
| 03 CH 13062 | Rawson v. Brin |
| 03 CH 14511 | Travel 100 Grp v. Bebon Office Machines |

03 CH 11114          Lustig v. First Priority Funding

03 CH 12434          Creative Fun v. Systems Management

# EXHIBIT L

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT; CHANCERY DIVISION

**ENTERED**

OCT 06 2004

JUDGE
PATRICK McGANN - 1510

| | | |
|---|---|---|
| JAMES C. ZOES | ) | |
| | ) | |
| Plaintiff, | ) | 03 CH 17879 |
| | ) | Judge Patrick E. McGann |
| vs. | ) | Calendar 6 |
| | ) | |
| NORTHAMERICAN BANCARD, INC., | ) | **This Order Applies** |
| et al. | ) | **to all cases on the Attached** |
| Defendants. | ) | **Exhibit 1** |

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court of the Defendant, North American Bancard to Dismiss the complaint filed by James C. Zoes. The Plaintiff's and Defendants in the cases listed the attached Exhibit 1 have agreed that the Motions and Briefs filed in this case will stand as Motions and Responses on the common issues in their respective cases and that this Court's ruling will apply to those issues. The Defendant's Motion is brought under 735 ILCS 5/ 2-619.1 and raises challenges to the legal sufficiency of Plaintiff's claim, as well as, asserts affirmative matter that either defeats the Plaintiff's claim or avoids its legal effect.

#### I.    Legal Standard

A section 2-615 motion attacks the legal sufficiency of the Plaintiff's claim. The motion does not raise affirmative factual defenses, but rather alleges defects only on the face of the complaint. The question presented by a section 2-615 motion to dismiss is whether the allegations of the complaint, when viewed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. A cause of action will not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved which will entitle the plaintiff to recover. Vernon v Schuster 179 Ill. 2d 338, 344 (1997); Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 86-87 (1996). This basis is only asserted as a challenge to Count III of the Complaint.

Obtained from
**TCPALAW.COM**
The leading source for TCPA research

Section 2-619 affords a means of obtaining a summary disposition of issues of law or easily proven issues of fact. Subsection (a) (9) permits dismissal where "the claim asserted is barred by other affirmative matter avoiding the legal effect of or defeating a claim."

The phrase affirmative matter encompasses any defense other than a negation of the essential allegations of the plaintiff's cause of action. For that reason, it is recognized that a 2-619 (a) (9) motion to dismiss admits the legal sufficiency of the plaintiff's cause of action much in the same way that a 2-615 motion to dismiss admits a complaint's well-pleaded facts. Kedzie & 103rd Currency Exchange v Hodge, 156 Ill. 2d 112, 115 (1993).

This basis revolves around the Defendant's challenge to the constitutionality of the Telephone Consumer Protection Act of 1991.[1] ("TCPA).

## II.    Discussion

The Defendant initially adopts the arguments made by the Defendant, Charter One Bank, in its Motion to Dismiss filed in 03 CH 10965. The Court accepts that position and enters as part of the reasoning for the ultimate ruling in this matter the Memorandum Opinion and Order entered in that case. The full text of that ruling is attached as Exhibit B to this ruling. To the extent that that ruling responds to the issues raised in this Motion, the Court will endeavor to merely reference the opinion without repeating its language.

### A. Commercial Speech Protection of the First Amendment

The Defendant asserts that the TCPA scheme results in a blanket prohibition on this form of commercial speech. Hence, it is more extensive than necessary to achieve the asserted government interest. As a result, the rights of individuals to receive unsolicited fax advertising is restricted. The Defendant points to the importance of maintaining a free and open market place of ideas so that consumers can receive as much information as desired in order to make private economic decisions. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976).

The Defendant seeks to analogize this prong of their argument to the line of decisions that prohibit restrictions on door-to-door distribution of advertising material of either a religious or commercial nature., *See, e.g. Martin v City of Strothers, Ohio,* 319 U.S. 141, 148 (1943).

---

[1] 27 U.S.C. 227 et seq.

Obtained from
**TCPALAW.COM**
The leading source for TCPA research

The Court recognizes that it is constitutionally improper to restrain an advertiser's access to those consumers who wish to learn about the product. This is not the goal or effect of the TCPA. The TCPA has two stated goals. The primary goal is to prevent the advertiser from shifting the cost of speech to the recipient. The TCPA also is designed to avoid the disruption to the orderly function of business because someone has co-opted the use of another's fax machine.

It appears to this Court that if the government can ban littering under its police power, *Turner Broadcasting v FCC*, 512 U.S. 622,682-683 (1994), it surely can prevent the speaker's use and destruction of the listener's property without permission. Recovery under the TCPA is limited to those persons who did not permit or invite the facsimile message.

This unlawful taking also undermines the second prong of the Defendant's argument of this issue. The argument suggests that the "do not call' list created by Congress for telephone marketers would be a "less restrictive" and equally effective approach to the issue. As such, the TCPA is constitutionally infirm. The Court would suggest that if Mr. Martin, the protagonist in *Martin v City of Strother,* had entered that property in Ohio and in order to proselytize, instead of ringing a door bell and speaking to the inhabitants, he wrote a message of faith on the side of their home, a successful claim for property damage would lie.

The Defendant cites to three cases in support of their argument, each is inapposite. In *Thompson v. Western States Medical Center*, 535 U. S. 357 (2002), the Court struck down a ban on advertising the availability of compound drugs.[2] The Court found that the Government could ban the use or sale of the equipment necessary to make large scale drug compounding economically feasible, prohibit the wholesale distribution of such drugs, or prevent the inventorying of such drugs in anticipation of orders. There the harm sought to be prevented was the large scale use and distribution of drugs that were not FDA approved. The practice had traditionally been done on a patient by patient basis and created no regulatory issues. The concern was that the widespread use of advertising would create a demand for drugs that were unnecessary or unsafe. This would create public safety issues. The Court found that the other readily available alternatives

---

[2] Drug compounding is the practice of altering a FDA approved drug to [illegible]

Obtained from
TCPALAW.COM
The leading source for TCPA research

would lessen the potential danger but also give physicians and their patients access to what may have been an unknown source of treatment. Here, the governmental interest is in the promotion of commerce by preventing the shifting of advertising costs to an unwary or unwilling consumer as well as, the improper disruption of commercial activity. Congress is not regulating speech by use of the TCPA. Advertisers are free to use any other available medium to reach its potential customers and can obtain permission to send facsimile advertisements.

In *Rubin v. Coors Brewing Co.,* 514 U.S. 476 (1995), the Court struck down a prohibition against advertising the alcohol content of beer on the product's label. However. brewers were free to use this information in other forms of advertising. This was found to be an irrational approach to promoting the suggested government interests. Here, the Congress was aware of the fact that technology would allow blast faxers to have a significantly greater impact on cost shifting and business disruption.

Finally, in *Lorillard Tobacco Co. v Reilly.* 533 U.S. 535 (2001), the Court struck down an almost complete ban on truthful advertising of truthful information about smokeless tobacco. This deprived tobacco merchants access to an inexpensive mode of advertising. The cost of which would be borne by the seller and not the customer.

The TCPA is a regulatory scheme that is consistent with the guarantees of the First Amendment to the United States Constitution.

## B. Strict Liability

Here, the Defendant asserts that the TCPA imposes strict liability on senders of unsolicited telephone facsimile messages. The imposition of strict liability chills the exercise of First Amendment rights. *Video Software Dealers Association v. Webster,* 968 F. 2d 684 (8th Cir. 1992). This *scienter* requirement is usually limited to criminal and quasi-criminal prosecutions in non-commercial settings. *Waters v. Churchill,* 511 U.S. 661 (1994). Here, as stated at argument *scienter* is an element of the claim. The sender must consciously make a decision to send the facsimile to an identified recipient. This act requires conscious and intentional action. The message must be selected, the recipient's number put in the machine and the message sent. Assuming the fax number is contained on a list purchased from a third party, there is no constitutional restriction on suggesting that the nature and extent of the permission be ascertained before use taken by a prudent

TCPALAW.COM
The leading source for TCPA research

4

merchant would have a claim against an unscrupulous entrepreneur who misled a good-faith purchaser of such a list.

The Court finds this argument unpersuasive.

## C.    TCPA and Vagueness

The Defendant suggests that the reasonable person cannot determine what conduct is prohibited, as a result the statute is unconstitutional. This lack of clear standard, the Defendants assert, "chills" the legitimate exercise of a constitutionally protected right. The argument suggests that because the right is freedom of speech, a stricter scrutiny must be applied.

The statute, it is asserted, does not give fair warning to those affected by its sanction. The Defendants assert that by granting a private right of action to any "person or entity,"[3] Congress has impermissively caused confusion. The application of the rule of construction that the use of a general term excludes application to a specific term creates the infirmity. As a result, it is suggested, that a reasonable person, reading the TCPA statute would find difficulty in divining its application to a corporate entity.

This problem is exacerbated by Congress' prohibition against the "use" of telephone facsimile by a person in violation of the TCPA scheme. This language, it is advanced by the Defendant, limits application to the actual sender, fails to give notice of potential liability to the actual intended beneficiary of the advertisement and at whose request the transmission was made.

"[Vagueness] challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States* v. *Mazurie*, 419 U.S. 544, 550 (1975). See *United States* v. *Powell*, 423 U.S. 87, 92-93 (1975), *United States* v. *National Dairy Products Corp.*, 372 U.S. 29, 32-33, 36 (1963). "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker* v. *Levy*, 417 U.S. 733, 756 (1974). The rationale is evident: to sustain such a challenge, the complainant must prove that the enactment is vague "'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'

---

[3] 47 U.S.C. § 227 (b) (3) (B)

Obtained from
TCPALAW.COM
The leading source for TCPA research

*Coates* v. *City of Cincinnati*, 402 U.S. 611, 614 (1971). Such a provision simply has *no core*." *Smith* v. *Goguen*, 415 U.S. 566, 578 (1974).

As the Defendants correctly state, the Court has consistently applied a higher standard where freedom of speech issues are involved. The First Amendment overbreadth doctrine, however, represents a departure from the traditional rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court. See, e.g., *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973); United States v. Raines, 362 U.S. 17, 21 (1960); *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). The reason for the special rule in First Amendment cases is apparent: An overbroad statute might serve to chill protected speech. First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the *in terrorem* effect of the statute. See *NAACP v. Button*, 371 U.S. 415, 433 (1963). Indeed, such a person might choose not to speak because of uncertainty whether his claim of privilege would prevail if challenged. The use of overbreadth analysis reflects the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted.

But the justification for the application of overbreadth analysis applies weakly, if at all, in the ordinary commercial context. As was acknowledged *in Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S., at 771 n. 24, there are "commonsense differences" between commercial speech and other varieties. See also id., at 775-781 (concurring opinion). Since advertising is linked to commercial well-being, it seems unlikely that such speech is particularly susceptible to being crushed by overbroad regulation. See id., at 771-772, n. 24. Moreover, concerns for uncertainty in determining the scope of protection are reduced; the advertiser seeks to disseminate information about a product or service to be provided, and presumably can determine more readily than others whether the proposed speech is truthful and protected. Ibid. Since overbreadth has been described by this Court as "strong medicine," which "has been employed... sparingly and only as a last resort," *Broadrick v. Oklahoma*, 413 U.S., at 613, the Court consistently declines to apply it to professional advertising, a context where it is not necessary to further its intended objective. Cf. *Bigelow v. Virginia*, 421 U.S., at 817-818.

Obtained from
TCPALAW.COM
The leading source for TCPA research

Hence, the Court must first determine whether the TCPA regulates commercial speech rights of the Defendants or others. As oft repeated in this and the prior opinions. the statute regulates not the dissemination of information, but rather. the ability of a merchandiser to shifts the cost of doing business to a potential consumer. The TCPA scheme also encourages efficiency and economy in commerce by freeing important communication devices from unwanted interference. It does so only in areas of commerce. Hence, any challenge to the statute in question for vagueness or overbreath, must necessarily be limited to the claim against the Defendants as plead in the complaint. A facial challenge is not available to the Defendants.

The claims of the alleged TCPA violations found in the instant complaints are clear and unambiguous. This defeats the Defendants assertion that the statute is vague or overbroad.

In addition, the Congress took pains to describe some of the terms complained of by the Defendants. Indeed the term "person" is defined to be co-extensive with the common understanding of the word entity.[4] This renders the use of the rule of statutory construction suggested by the Movants unnecessary. Moreover, common legal principles of *respondeat superior* and aiding and abetting give reasonable notice of potential liability to merchandisers and others seeking a commercial transaction. These rules are imputed into regulatory schemes enacted by Congress. *See, Meyer v. Holley,* 537 U.S. 280, 285 (2003).

In their reply brief, the Defendants suggest that the vagueness issue arises in the context of identifying the circumstances under which permission to receive telephone facsimile advertising messages can be discerned. In support of this argument, they point to the rather tortured manner in which the FCC has attempted to develop regulations. While history and perhaps the Code of Federal Regulations speak volumes upon volumes on the role of the federal bureaucracy in our society, this particular argument loses sight of the fact that the TCPA statute clearly defines the prohibited conduct in plain language. The telephone facsimile is not violative of the TCPA if it is sent to someone who has give prior express invitation or permission.[5]

---

[4] 47 U.S.C. § 153
[5] 47U.S.C. § 227 (a) (4)


Obtained from
TCPALAW.COM
The leading source for TCPA research

It is apparent to this Court that such terms should be given their broadest meaning. Business persons searching for opportunities to advance their profitability by reducing costs or increasing market share choose many ways to receive information from suppliers or disseminate it to customers. They also widely disseminate contact information to these entities. The circumstances surrounding the acquiring of the recipients facsimile telephone number can be explored. If an ordinary reasonable person can conclude that the information was supplied with an invitation or permission to use it for business purposes, liability under the TCPA will not attach. The Court can envision circumstances where even informal exchanges of information given under certain circumstances will be determined to grant permission or constitute an invitation to receive otherwise prohibited facsimile messages as a matter of law.

The TCPA scheme is not unconstitutionally vague.

## D.  TCPA and Constitutional Issues Related to Excessive Fines

Much of this argument is adopted from Memoranda submitted by the Defendants in the Group B Master motion. The Court has reviewed those arguments and adopts its reasoning in its decision in *Inspec Associates, Ltd. v. Charter One Bank, 03 CH 10965*. As noted above, the reasoning in that opinion is attached to this Memorandum and made a part hereof.

The more interesting argument in this area surrounds the potential aggregation of the statutory damages into massive damage awards which bear no relation to the actual harm caused. *See, e.g. State Farm Mutual Insurance Company v. Campbell.* 538 U.S. 408 (2003). The Court acknowledges that some portion of a statutory penalty is increased to encourage private enforcement of the law, thereby increasing compliance with its strictures. However, the actual impact of the aggregation cannot be measured at this time. Rather, it is suggested that such determinations are premature under the rubric of Rule 23 of the Federal Rules of Civil Procedure. *Parker v. Time Warner Entertainment Company.* 331 F. 3d 13 (2nd Cir. 2003). This appears to this Court to be the proper approach. Moreover, the concurring opinion in that case offered a solution to the dilemma posed by certifying such a class. The Defendants' brief suggests that this approach has also been taken in at least one other jurisdiction.

Obtained from
TCPALAW.COM
The leading source for TCPA research

The Court will not dismiss the claim on this basis, but will review it as part of the class certification process, if necessary.

### E. TCPA and the Tenth Amendment

This argument has, for the reasons stated in the Memorandum in *Inspec Associates, Ltd. v. Charter One Bank, 03 CH 1096*, been rejected. The Court stands on reasoning expressed in that opinion.

### F. Illinois Consumer Fraud Act (ICFA)

This claim is dismissed for the reasons stated in *Inspec Associates, Ltd. v. Charter One Bank, 03 CH 1096*. The Court adopts that reasoning in this case.[6]

---

[6]    In Robinson v Toyota Motor Credit Corporation, 201 Ill. 2d 403 (2002), the Court defined the elements of an unfair business practice. In essence, the Court adopted the three part test cited with approval in F.T.C. v. Sperry & Hutchinson Co., 405 U.S. 233 (1972). Therefore, in order to measure whether a business practice is unfair, a court must consider the following factors: 1) whether the practice offends public policy; 2) whether it is immoral, unethical, oppressive or unscrupulous; and 3) whether it causes substantial injury to consumers. Robinson, 201 Ill. 2d at 417-418. The Court also noted that all three factors need not be met. Rather, the Court adopted the reasoning of the Connecticut Supreme Court in Chesire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 106 (1992). That Court, in a case involving "loan churning" observed that all three criteria need not be satisfied in order to support of unfairness. Rather, a practice may be unfair because of the degree to which it means one of the criteria or because to a lesser extent it meets all three. Chesire, 223 Conn. at 106.

As the claim is brought under ICFA the complaint must allege with particularity and specificity the unfair business practices of the defendants. Connick v. Suzuki Motor Co., 174 Ill. 2d 482, 502 (1996). The Plaintiffs fail to recognize that in a Section 2-615 Motion, the complaint must stand on its own, thus, reference to citations issued by the FCC, reports or hearings are not relevant to the issues and will not be considered in resolving this Motion.

There is no question that transmitting unsolicited telephone facsimile advertisements violates public policy. First, the Criminal Code of 1961, as amended, prohibits this activity. See, 720 ILCS 5/26-3. Knowledge is defined by the Code in Section 5/4-5. A person acts knowingly when he is consciously aware that a result is practically certain to be caused by his conduct. 720 ILCS 5/4-5(b). There can be no question than any individual who causes a telephone facsimile transmission to occur acts knowingly. In addition, the failure of Illinois to "opt out" of the private enforcement of the TCPA suggests that is the public policy of Illinois as well.

The Plaintiffs allege the conduct is oppressive, yet they allege only one or two facsimile transactions to each Plaintiff. This, by inference, suggests minimal disruption of one's business or occupation. The exhibits to the complaint show each plaintiff had a reasonable alternative to the receipt of additional messages. They could call to remove themselves from the list. This conduct does not rise to the level of oppression envisioned by the drafters of ICFA.

The final factor requires the allegation of substantial injury to the consumer. In discussing the count alleging conversion, the Court indicated the doctrine of *de minimus non curat lex* had no application in this matter. A complete review of the movants' authorities confirms this position. No case cited involved a tort claim. They involved complaints of short redemption deposits in foreclosure cases, errors in summing damages or computing interest. The Court acknowledges that the Plaintiff's are not entitled to receive nominal or presumed damages in a claim under ICFA. Duran v. Leslie Oldsmobile, Inc., 229 Ill. App. 3d 1032, 1041 (1992). There are no facts from which the Court can determine the amount of damages incurred by the suggested class plaintiff or consumers as a whole. The same "substantial" is clear in this conclusion.

TCPALAW.COM
The leading source for TCPA research

### III.   Order

**A.** The Motion to Dismiss the Plaintiffs' claims under the Telephone Consumer Act of 1990 is Denied. The Defendants are ordered to answer said complaints within 28 days hereof;

**B.** The Motion to Dismiss the claims of violatinig the Illinois Consumer Fraud and Deceptive Practices Act is granted. No Plaintiff may re-file such a claim without prior leave of Court;

**C.** Issues relating to Discovery will be finalized on October 14, 2004 at the scheduled hearing.

Enter: _____

Judge         1510

---

Thus, evidence of only one of the <u>Robinson</u> factors are found in the Plaintiff's complaint. This Court concludes that the Plaintiff has not stated a claim under ICFA. In reaching this decision, the Court recognizes that the failure to include Illinois' prohibition against unsolicited telephone facsimile transmissions in Section 2Z of ICFA (815 ILCS 505/27, also prevents a finding of a per se violation of ICFA. <u>Illinois ex rel. Daley v. Grady</u>, 192 Ill. App. 3d 330, 332 (1989).

**TCPALAW**.COM
The leading source for TCPA research

# EXHIBIT M

1

<pre>
 1    STATE OF ILLINOIS        )
                               )  SS:
 2    COUNTY OF DU PAGE        )

 3              IN THE CIRCUIT COURT OF DU PAGE COUNTY
          FOR THE EIGHTEENTH JUDICIAL CIRCUIT OF ILLINOIS
 4

 5    CE DESIGN, LTD., an Illinois     )
      corporation, Individually and   )
 6    as representative for a class    )      ORIGINAL
      of similarly-situated persons,  )
 7                                     )
                 Plaintiff,            )
 8                                     )
                 -vs-                  )  No. 03 CH 1304
 9                                     )
      ZMC, INC., an Illinois corporation,)
10                                     )
                 Defendant.            )
11

12

13

14                 PARTIAL REPORT OF PROCEEDINGS had of the

15    above-entitled cause, before the HONORABLE EDWARD DUNCAN,

16    recorded on the DuPage County computer-based digital

17    recording system, DuPage County, Illinois, and transcribed

18    by Jeanne M. Gratzl, Certified Shorthand Official Court

19    Reporter, commencing on the 5th day of November, A.D.

20    2004.

21

22    PRESENT:

23        MR. BRIAN WANCA,

24        Appeared on behalf of the Plaintiff.
</pre>

1    PRESENT:   (CONTINUED)

2         MS. MARIA VATHIS,

3         Appeared on behalf of Defendant, Robin Levin.

4

5         MR. PETER PHIPPS,

6         Appeared on behalf of the Department of Justice.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

JEANNE M. GRATZL, CSR, OFFICIAL COURT REPORTER
LICENSE NO. 084-003606

```
 1                *    *    *    *    *

 2          THE COURT:  Going through the argument sequentially,

 3     there has been an attack brought on Count I, under Section

 4     2-619, stating that the Telephone Consumer Protection Act

 5     creates private rights of action for violation of the

 6     statute only in states that have affirmatively authorized

 7     such rights.  Illinois has not passed any legislation

 8     authorizing private rights of action under the TCPA for

 9     unsolicited fax advertising.

10          In the alternative, even if states are not required

11     to affirmatively take action to permit private rights of

12     action in state court under the TCPA, Illinois has opted

13     out of the TCPA's private action scheme.

14          Respectfully, I don't believe there's a need for

15     Illinois to affirmatively authorize such a private claim,

16     and I don't believe that a review of the actions of the

17     legislature indicate that Illinois has intentionally opted

18     out of the scheme created by Congress.

19          First of all, in the Brief filed by the plaintiff in

20     response to the Motion, on Page 7, they accurately state

21     that Article 6, Section 9, of the Illinois Constitution

22     does state that circuit court shall have original

23     jurisdiction of all justiciable matters.  Sometimes I wish

24     that the authors had given us some more somewhat narrower
```

1   task, but this is what we have. Article 6 of the U. S.

2   Constitution provides that federal law shall be the

3   supreme law of the land and the judges in every state

4   shall be bound thereby.  State court shall have inherent

5   authority and are thus presumptively competent to

6   adjudicate claims arising under the laws of the states,

7   United States, citing Tafflin versus Levitt, 493 U.S.455,

8   460 to 61.  A state court should not refuse to entertain

9   an action because it arises under federal law instead of

10  state law, citing Testa versus Katt, 330 U.S.386.

11        Unless Congress expressly provides that only federal

12  courts could enforce a particular federal law, an Illinois

13  circuit court has jurisdiction under Article 6, Section 9,

14  of the Illinois Constitution to resolve the claim, Russell

15  versus Kinny Contractors, 342 Ill.App.3d 666 at 669, Fifth

16  District, 2003.  Congress did not expressly limit a

17  private right of action for unsolicited fax advertisements

18  to the federal courts, 47 U.S.C. 227(b)(1)(C), rather it

19  created an exclusive remedy in the state courts.

20        Also I read this statement as Senator Hollings in a

21  different fashion than you do, Ms. Vathis.  In the

22  legislative history as cited at Page 8 of the Brief in

23  opposition, the substitute bill contains a private right

24  of action provision that would allow consumers to bring an

1   action in the state court against any entity that violates

2   the bill.  The bill does not because of constitutional

3   constraints dictate to the states which court in each

4   state shall be proper venue for such an action as this

5   matter is for state legislators to determine.

6       I believe that I have an antecedent determination

7   in Illinois that the circuit court is the original -- the

8   court of original jurisdiction in all justiciable matters.

9   Some states have courts of limited jurisdiction.  And that

10  I believe is what Senator Hollings was referring to in

11  that legislative history.

12      We also have the comment of the court in California,

13  Kaufman, which is 110 Cal.App.4th at 899, 2 Cal. Rptr.3rd

14  at 307 -- excuse me -- 110 Cal.App.4th at 898, permission

15  does not require any affirmative conduct on the part of

16  the state legislature nor the enactment of court rules.

17  Put another way, a person may file a TCPA action in state

18  court as long as the state has not prohibited it.  I

19  believe that that's an accurate statement.

20      Now, with regard to the argument of radical

21  disproportionality, Mr. Phipps in his Brief has cited the

22  United States Supreme Court case of St. Louis I.M.S.

23  Railway Company versus Williams, 251 U.S.63 (1919) in

24  which the Supreme Court sustained a verdict of over $100

6

1  based on an overcharge of 66 cents reasoning that the

2  power of the state to impose fines and penalties for

3  violation of its statutory requirements is co-equal with

4  government, and the mode in which they shall be enforced

5  whether at the suit of a private party or at the suit of

6  the public and what disposition shall be made of the

7  amounts collected are merely matters of legislative

8  discretion, nor does giving the penalty to the aggrieved

9  passenger require that it be confined or proportioned to

10  his loss or damages for as it is imposed as a punishment

11  for the violation of a public law the legislature may

12  adjust its amount to the public wrong rather than the

13  private injury just as if it were going to the state.

14      That remains the position of the Supreme Court of

15  the United States, and we're certainly bound by that in

16  interpreting or construing a federal statute.  I don't

17  believe that the argument of radical disproportionality is

18  appropriate or can be sustained in light of that Opinion

19  of the United States Supreme Court.

20      Next, as in the argument made that the Telephone

21  Consumer Protection Act is violative of the First

22  Amendment under the test set forth in Central Hudson Gas &

23  Electric Corporation versus Public Service Commission, 447

24  U.S. 557, 1980.  In this regard, in determining

JEANNE M. GRATZL, CSR, OFFICIAL COURT REPORTER
LICENSE NO. 084-003606

1  constitutionality, we -- of a federal statute, we look,

2  sitting here in the Heartland, first to whether the

3  Seventh Circuit has provided us with guidance.

4      Next, we would look to an Opinion of another federal

5  circuit court especially one in which certiorari has been

6  denied.  And we have that in State of Missouri ex rel.

7  Nixon versus American Blast Fax, Incorporated, 323 F.3rd

8  649, Eighth Circuit, 2003, certiorari denied, 124 Supreme

9  Court 1043, 2004.  That was a case which was taken to the

10  circuit court which is the court of review, or Appellate

11  Court, after an evidentiary hearing in the district court.

12      Here in this case before me we are deciding

13  pleadings motions brought -- a pleadings motion brought

14  under Section 2-619.  It's significant to note, and this

15  would be at Page, I believe, 654 of the -- it would be 323

16  F.3rd 649 at 654, and it would also be at Page 4 of the

17  Westlaw Opinion.

18      We do not agree with F.C. that the government must

19  produce empirical studies to show the significance of the

20  harm it seeks to remedy for the Supreme Court has pointed

21  out that it may demonstrate the substantiality of its

22  interest with anecdotes, quote, history, consensus, and

23  simple common sense, citing Florida Bar versus Went For It

24  Incorporated, 515 U.S. 618, 628.  Also it says CFM Bergen

1    versus Minnesota, 59 F.3rd 1541, 1544, Eighth Circuit

2    (1995), external evidence of harm unnecessary in case

3    involving content, neutral speech restrictions, that's in

4    parenthesis.

5        In this case the legislative record and the evidence

6    produced in the district court adequately demonstrate the

7    potential harm of unrestrained fax advertising.  I believe

8    that in a pleadings matter under Section 2-619, the court

9    can consider the legislative history presented to it.  The

10   court can consider the case law and finding of the Eighth

11   Circuit as affirmed by the United States Supreme Court and

12   hopefully exercise accurately its own simple common sense

13   to come to a proper conclusion.

14       This issue has been resolved completely, in my view,

15   by the Eighth Circuit Court of Appeals and certiorari has

16   been denied.  And that having been done, I would be, I

17   believe, acting beyond the proper scope of my duties as a

18   federal judge -- that's what Judge Darrah is, I'm here in

19   the Chancery Division, excuse me.  I'd be acting beyond

20   the proper scope of my duties as a judge sitting in the

21   Chancery Division in ignoring it.

22       I would also state that I have to follow it and if

23   that is not -- if that belief is not concurred in by the

24   Appellate Court in the State of Illinois, I would say that

1   I as a circuit court judge in the Chancery Division

2   certainly agree with and find as persuasive the reasoning

3   contained in this case and will follow it.  I don't

4   believe that there is any violation of the First

5   Amendment.

6        Now, we next have the argument that the TCPA applies

7   only to unsolicited advertisements received via a

8   stand-alone facsimile machine.  The TCPA does not apply to

9   commercial fax advertisements received by a computer via

10  e-mail.

11       The Telephone Consumer Protection Act itself states

12  that the Commission shall prescribe regulations to

13  implement the requirements of this subsection.  In

14  implementing the requirements of this subsection, the

15  Commission (a) shall consider prescribing regulations to

16  allow businesses to avoid receiving calls made using an

17  artificial or prerecorded voice to which they have not

18  given their prior express consent; (b) may rule -- may by

19  rule or order exempt from the requirements of

20  Paragraph 1(b), et cetera.

21       I think that the Commission has the power then to

22  make appropriate rules.  They did make a rule.  The FCC

23  has stated that the TCPA's definition of telephone

24  facsimile machine broadly applies to any equipment that

 1    has the capacity to send or receive text or messages.

 2    Thus faxes sent to personal computers equipped with or

 3    attached to modems and to computerized fax servers are

 4    subject to the TCPA's prohibition on unsolicited faxes,

 5    In Re:  Rules and Regulations implementing the Telephone

 6    Consumer Protection Act of 1991, Number FCC 03-153, 2003

 7    Westlaw, 21517873, 18 FCC record, 14014, 14129-30, FCC

 8    July 30th, 2003.

 9        Respectfully, I don't believe under the statute that

10    the FCC has exceeded its power in enacting such a

11    regulation.  I believe that it was explicitly given such

12    power and that it logically and reasonably enacted a

13    regulation to effect the same protected interest which

14    Congress took action to protect in the TCPA.  Therefore, I

15    believe the 2-619 Motion must fail.

16        We next go to the issue of conversion.  Here there

17    is nothing offered to support the 2-619 claim.  And with

18    regard to Section 2-615, we go to the case of Pavilon,

19    P-a-v-i-l-o-n, versus Kaferly, K-a-f-e-r-l-y, 204

20    Ill.App.3rd 235 at 247.  We find that there was sufficient

21    evidence to support the claim for conversion of Kaferly's

22    desk to prove a claim for conversion a party must show (1)

23    a right in the property; (2) a right to the immediate

24    possession of the property which is absolute and

1  unconditional; (3) a deprivation of the right by the

2  unauthorized and wrongful assumption of control, dominion,

3  or ownership by a defendant; and (4) a demand for

4  possession of the property.  I'll omit the citations.

5      Kaferly's unrebutted testimony that the desk was a

6  gift to her from Pavilon satisfies the requirements that

7  she have a right of ownership of the desk with a right to

8  its immediate possession.  A gift by definition is the

9  absolute and irrevocable transfer of title to property

10  from a donor to a donee.  Pavilon himself confirmed that

11  it was a gift when in his closing argument he stated, the

12  desk in question was a gift.  I'm being honest.  I could

13  have said, no, I don't know anything about it.  It was a

14  gift.

15      Also Kaferly's testimony that Pavilon refused to

16  permit her removal of the desk after her termination and

17  her further testimony that he admitted at his deposition

18  that he sold the desk and kept the proceeds sufficiently

19  demonstrated Pavilon's unauthorized assumption of control

20  over the desk.

21      Though Pavilon argues that the evidence is devoid of

22  proof of a demand for the return of the desk, we find the

23  unrebutted testimony that he refused to allow Kaferly to

24  remove the desk to sufficiently imply that she made a

Jan-14-05    01:38pm    From-Anderson&Anca    Case 1:08-cv-01856    Document 25-4    Filed 06/25/2008    Page 49 of 74    T-961    P.013/025    F-514

12

1       demand for it.

2               Moreover, a demand is unnecessary to establish a

3       conversion where another independent action of conversion

4       is established.   The unrebutted testimony that Pavilon

5       sold the desk for $500 would appear to constitute such an

6       independent act.

7               In this case we have got the consumption basically

8       of the paper and the ink into a form that was unwanted.

9       The demand to return the paper, the ink, would be useless

10      because you can't get them back.   So I would find that

11      there's been an independent act of conversion or,

12      alternatively, that there's been a useless -- it would be

13      a useless act to require a demand.

14              With regard to the other elements of the cause of

15      action, I believe that they're there.   So that Motion

16      under 2-615 would be denied.

17              Next, we get to the issue of consumer fraud.   We

18      have the case of Robinson versus Toyota Motor Credit

19      Corporation, which is 201 Ill.App.3d, 403 at 407 -- at 417

20      pardon me.   Section 10(a) of the Consumer Fraud Act

21      creates a remedy for persons who suffer damage as a result

22      of a violation of the Act committed by another person, 815

23      Illinois Compiled Statutes 505/10(a).

24              The elements of a claim under the Act are (1) a

Jan-14-05   01:38pm   From-Andersonmanca   Case 1:08-cv-01856   Document 25-4   Filed 06/25/2008   Page 50 of 74   T-847+060130/025   P-014/025   F-514

13

1    deceptive act or practice by the defendant; (2) the

2    defendant's intent that the plaintiff rely on the

3    deception; and (3) the occurrence of the deception during

4    a course of conduct involving trade or commerce. Recovery

5    may be had for unfair as well as deceptive conduct. I'm

6    omitting the citations.

7        In determining whether a given course of conduct or

8    act is unfair, we observe the Consumer Fraud Act mandates

9    that consideration shall be given to the interpretations

10   of the Federal Trade Commission and the federal courts

11   relating to Section 5(a) of the Federal Trade Commission

12   Act.

13       The United States Supreme Court in Federal Trade

14   Commission versus Sparey & Hutchinson Company, 405 U.S.

15   233, cited with approval the published statement of

16   factors considered by the Federal Trade Commission in

17   measuring unfairness. These factors are (1) whether the

18   practice offends public policy; (2) whether it is immoral,

19   unethical, oppressive, or unscrupulous; (3) whether it

20   causes substantial injury to consumers. And I'll skip

21   down to the bottom of the page where they cite with

22   approval the statement from the Connecticut Supreme Court.

23       All three criteria do not need to be satisfied to

24   support a finding of unfairness. A practice may be unfair

1   because of the degree to which it meets one of the

2   criteria or because to a lesser extent it meets all three.

3   We believe that Chesher (phonetic) expresses the correct

4   standard and hereby adopted as our own.

5        They also state, or restate truly, at Page 419, the

6   Complaint must state with particularity and specificity

7   the deceptive manner of defendant's acts or practices and

8   the failure to make such averments makes the dismissal --

9   requires the dismissal of the Complaint, referring to

10  Konick versus Sasuki Motor Company, requiring that a

11  Complaint for consumer fraud be pled with specificity.

12       We also have an Opinion, excuse me, an Opinion

13  written by Justice Nichols while he was in the Appellate

14  Court, Duran versus Leslie Oldsmobile Incorporated, 229

15  Ill.Ap.3d 1032 at 1040.  The Opinion states, thus although

16  a violation of the Consumer Fraud Act may occur in the

17  absence of damages, a private cause of action does not

18  arise absent a showing of both a violation and result in

19  damages.  Greenberg merely recognizes the distinction

20  between a violation absent damages which the Attorney

21  General may prosecute and a violation causing damages

22  which either the Attorney General or private party may

23  pursue.

24       Plaintiff asserts, however, that nominal damages may

Jan-14-05   01:38pm   From-AndersonWanca   Case 1:08-cv-01856   Document 25-4   Filed 06/25/2008   Page 52 of 74   8473861501   F-361   P.016/025   F-514

15

1    be presumed biased on a violation of the Consumer Fraud

2    Act.  A venerable principle of the law was the presumption

3    of damages from every infringement of a right.  However,

4    that rule has been expressly abandoned in Illinois in

5    negligence actions.  Rather, the presumption continues

6    only for intentional torts.

7        However, in expanding the application of the

8    Consumer Fraud Act to provide broader protection to

9    consumers than that found under the common law fraud, the

10   legislature eliminated the element of intent and innocent

11   misrepresentations are now actionable.  In the absence of

12   a mental state equivalent to that of an intentional tort,

13   we find damages may not be presumed under the Consumer

14   Fraud Act.

15       Respectfully, public policy would be defined by the

16   Congress of the United States under the Telephone Consumer

17   Protection Act.  And as Mr. Wanca indicated it also is

18   defined by the legislature in Illinois with regard to the

19   statements concerning the use -- unauthorized use of

20   telephones here in Illinois.  But I believe that the

21   Telephone Consumer Protection Act alone under this Chesher

22   case which we have adopted in Robinson is sufficient.

23       As one who deals with habitual sex offenders

24   committing heinous acts, as one who deals with cases

1    involving prostitution and closing -- attempts by the

2    State to close drug paraphernalia operations, it's

3    difficult for me to utilize these words immoral,

4    unethical, oppressive to the use of a fax machine, quite

5    frankly.  But that may be proven.  That may be proven.  It

6    may be proven to be unscrupulous.

7         The substantial injury, I believe, may be shown that

8    pennies are pennies, but frugality's a virtue amongst my

9    people, the Scottish people, which I wish was more

10   widespread in Springfield and Washington.  It's not, but

11   it's still a virtue.  And the pennies which we all pay in

12   taxes is six and three quarter percent or seven percent do

13   add up.  The pennies, depending on the size of the glass,

14   the number of faxes do add up.  And so the injury to the

15   glass may be substantial.

16        I would find that on public policy grounds alone

17   that there is a sufficient basis to bring a Consumer Fraud

18   Act claim.

19        Secondly, the Complaint is written in terms of

20   substantial injury under the requirements of Duran, under

21   the pleading requirements of Konick (phonetic) versus

22   Suzuki, as reiterated in Robinson, I believe that the

23   injury has to be better defined.  So to that extent the

24   damages of substantial injury or substantial damages has

1  to be repled.

2      Next, we get to the concept of injunctive relief.

3  First of all, there's no Prayer For Dismissal under 2-615

4  or 2-619, and there is a statement in the Motion itself,

5  excuse me, I knew this would happen so, there we are.

6  Plaintiff requests an injunction in its Complaint.  Should

7  the Court determine that plaintiff has an adequate remedy

8  at law under the IFCA -- ICFA, or conversion, plaintiff

9  has no right to injunctive relief.

10      On the pleadings, under the unpublished Opinion, and

11  I can't cite you the Supreme Court case, but the Satan

12  Disciples Act, Satan Disciples case clearly indicated the

13  Appellate Court case that for a statutory cause of action

14  in which an injunction is being sought there is no need to

15  plead inadequate remedy and that there is no adequate

16  remedy at law nor is there a need to plead irreparable

17  harm.

18      Moreover, I don't believe that there is an adequate

19  attack under 2-615 in this sentence to warrant striking

20  the claim for injunctive relief.  With regard to the

21  allegation concerning the existence of class allegations,

22  the inadequate allegation of a class, this is procedurally

23  for the trial courts, I believe, one of our great

24  procedural problems, which years ago when I was in the Law

 1    Division I addressed and was overruled in a case involving

 2    air pollution brought by a class of property owners, and I

 3    granted a 2-615 Motion making the specific finding that

 4    there traditionally was a belief in the law that each

 5    piece of real property was unique and that we could not

 6    have a class, hoping that we could resolve the matter

 7    before any great expense was incurred.

 8         And I was properly told by the court of review the

 9    same thing that the Appellate Court stated in Weis versus

10    Waterhouse Securities, 781 N.E.2d, 1105 at 1111, or 269

11    Illinois Decisions 915 at 921.  In our view, a

12    representative plaintiff is not required to allege all the

13    details necessary to establish that his class action is

14    maintainable pursuant to Section 2-801 in bringing a claim

15    or claims as a class action.

16         Rather, the plaintiff need only allege a viable

17    individual cause of action, indicate that the claim's

18    being brought as a class action lawsuit, and contain

19    factual allegations that are broad enough in scope to

20    establish the possible existence of a class action suit as

21    contemplated by Section 2-801.  If there is no possibility

22    that a claim can be maintained as a class action, then

23    dismissal of the class action allegations is proper

24    pursuant to Section 2-615.  On the other hand, if there is

```
 1    any possibility that a class action can be maintained for

 2    some members of a class, dismissal under Section 2-615 is

 3    not warranted.

 4         With that clear language being delivered to the

 5    trial courts by the Appellate Court, the Motion to Dismiss

 6    the Class Action is respectfully denied.

 7         So I thank you very much.  This was a very

 8    interesting exercise.  I thank you for your

 9    professionalism.  I truly do.  It took us a long time to

10    get this accomplished for which I regret, but I do thank

11    you for your professionalism.  The Briefs were excellent.

12    And if the Appellate Court disagrees with me, well, so be

13    it.  But thank you very much.  Thank you.

14         MR. WANCA:  Judge, we had previously issued a Stay

15    Order on all discovery while this Motion was pending.  Can

16    we as part of this Order today lift that Stay Order so I

17    can start propounding written discovery?

18         THE COURT:  Is there any objection to that?

19         MR. LAPINSKY:  Your Honor, as far as the discovery

20    goes, what's going on in Cook County is they are

21    propounding standard interrogatories and bringing them

22    before the Court to approve prior to going forward.  Judge

23    McGana is actually holding hearings approving certain

24    discovery because what's happening is the plaintiffs
```

JEANNE M. GRATZL, CSR, OFFICIAL COURT REPORTER
LICENSE NO. 084-003606

1   served like 350 Requests to Admit on the defendants and

2   various onerous interrogatories or Requests For

3   Production.  So what has happened is Judge McGana has

4   stepped in and is asking for standard interrogatories and

5   requests for Production and that seems to be working.

6       MR. WANCA:  I'm party to that.  No one has propounded

7   Requests to Admit against any defendant that I'm aware of

8   exceeding 100, and I don't even think they reach a

9   hundred.  So Judge McGana just did not want to deal with

10  since he has over 80 cases, 80 different Motions to

11  Compel, and he's attempted to do something like that.  I

12  don't think that's going to be a problem in this case, and

13  I think that I'd just like an opportunity to get going

14  with written discovery here.

15      THE COURT:  Please remember the directive in Supreme

16  Court Rule 213(b).  It is the duty of an attorney

17  directing interrogatories to restrict them to the subject

18  matter of the particular case to avoid undue detail and to

19  avoid the imposition of any unnecessary burden or expense

20  on the answering party.

21      I am one who does not believe in interrogatories

22  which basically ask the other side to lay out their theory

23  of the case.  I'm also one who believes that Mr.

24  Shakespeare when he said brevity remains the sole of wit

1   and wisdom was speaking to lawyers through the centuries.

2   I believe that we can operate efficiently to get the job

3   done in discovery.  And before we enter a supervisory

4   order, I want to make sure there's a problem.  Do you

5   understand what I'm saying, Mr. Lapinsky?

6       MR. LAPINSKY:  Yes, your Honor.

7       THE COURT:  If there are objections that I have to

8   take care of, so be it.  But the 201(k) process was one

9   that was initiated at the request of the late Judge

10  Nicholas Bua who was besides being a wonderful federal

11  judge he was a wonderful judge in the state system, and

12  it's one that we will observe here.  Okay.

13      MR. LAPINSKY:  Your Honor, can I ask one question,

14  please?

15      THE COURT:  Yes.

16      MR. LAPINSKY:  I think your ruling included one

17  indication that there might be some repleading necessary

18  by the plaintiff regarding damages?

19      THE COURT:  Yes.

20      MR. LAPINSKY:  Wouldn't any Order have to include

21  that that be done within a certain time and then the

22  defendants would respond?

23      THE COURT:  Thanks, John.  Can you get that done in

24  28 days?

1      MR. WANCA:  Yes, Judge.  Question for you.  Do you

2  want me just to file a repleading to that Count so that

3  they can proceed to answer the other two Counts, or how do

4  you want me to handle that?

5      THE COURT:  How efficient is your word processor and

6  your secretary, Brian?  I mean, if you can get all of this

7  out in about 14 days, you know, just to get the rest of it

8  out so that they just have to answer -- make one Answer,

9  so that when I go to try this case I can look at the one

10  Answer.  You tell me.

11      MR. WANCA:  If that's what you'd like, I'll do it

12  that way, Judge.  I don't have any problem.

13      THE COURT:  Okay.

14      MR. WANCA:  If I could just have an extra week, 21

15  days.  If I can get it done sooner, so be it.

16      THE COURT:  That's fine.

17      MR. WANCA:  If not, I will have a little flexibility

18  because I am travelling the next couple weeks for deps.

19      THE COURT:  That's fine.  21 days and 28 thereafter

20  to answer or otherwise plead.  Is that fair?

21      MR. LAPINSKY:  Fine, Judge.  Thank you.

22      THE COURT:  That would take us into the next year for

23  status.  Well, make it to the 27th of December to answer

24  or otherwise plead.  Is the 24th -- I'll be gone.  And

23

```
 1    how's status on the 14th of January at 9:00 o'clock?

 2         MR. WANCA:  That's fine, Judge.

 3         MR. LAPINSKY:  Fine, Judge.

 4         THE COURT:  Thank you.  Thank you very much.

 5         MS. VATHIS:   Thank you.

 6         THE COURT:  Thank you.

 7                     (Which were all the proceedings ordered

 8                     transcribed at this time.)

 9                        *    *    *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

24

```
 1   STATE OF ILLINOIS      )
                            ) SS:
 2   COUNTY OF DUPAGE       )

 3

 4

 5              I, JEANNE M. GRATZL, herby certify that I

 6   am a Certified Shorthand Official Court Reporter assigned

 7   to transcribe the computer-based digital recording of

 8   proceedings had of the above-entitled cause,

 9   Administrative Order No. 99-12, and Local Rule 1.01(d).  I

10   further certify that the foregoing, consisting of Pages 1

11   to 24, inclusive, is a true and accurate transcript

12   hereinabove set forth.

13

14

15

16

17

18

19

20

21

22              _____
                     Official Court Reporter
23            Eighteenth Judicial Circuit of Illinois
                         DuPage County
24
```

JEANNE M. GRATZL, CSR, OFFICIAL COURT REPORTER
LICENSE NO. 084-003606

ORDER

2116-N (Rev. 9/99)

STATE OF ILLINOIS     UNITED STATES OF AMERICA     COUNTY OF DU PAGE
IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

C E D Wign

-vs-

Z M C

CASE NUMBER

2003 CH 1304

File Stamp Here

**ORDER**

This matter coming on to be heard, the Court being fully advised in the premises and having jurisdiction of the subject matter, IT IS ORDERED HEREBY:

This cause coming to be heard on the consolidated Defendants Motions to Dismiss the court having read of the submissions and taken arguments including argument from the intervenor the United States Department of Justice,

It is hereby ordered that

1) For the reasons stated on the record the motions to Dismiss Count I are denied.

2) For the reasons stated on the record the motion to Dismiss Count II is denied

3) For the reasons stated on the record Plaintiff is ordered to replead the substantial injury sustained in Count III

4) For the reasons stated on the record the Motion to Dismiss the Class action allegations and Injunctive Relief allegations is denied.

COPY

Name: Wanca

DuPage Attorney No.: 11575

Attorney for: Plaintiff

Address: 3701 Algonquin Rd # 760

City/State/Zip: Rolling Meadows Il 60008

Telephone: (847) 368-1500

ENTER: _____

JUDGE

DATE: _____

ORDER

2116-N (Rev. 9/99)

STATE OF ILLINOIS

UNITED STATES OF AMERICA

COUNTY OF DU PAGE

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT

CE Design

-VS-

ZMC

CASE NUMBER

2003 CH 1304

2 of 2

File Stamp Here

## ORDER

This matter coming on to be heard, the Court being fully advised in the premises and having jurisdiction of the subject matter, IT IS ORDERED HEREBY:

(5) It is further ordered that Plaintiff is to replead Count III on or before Nov. 26, 2004;

(6) It is further ordered that the stay of discovery is lifted.

(7) Status is set for JAN 14, 2005 at 9:00 AM.

(8) Defendants to answer or otherwise plead on or before Dec 27, 2004.

Name: Wanca

DuPage Attorney No.: 11575

Attorney for: Plaintiff

Address: 3701 Algonquin Rd #760

City/State/Zip: Rolling Meadows

Telephone: (847) 368 1500

ENTER:

JUDGE

DATE: 11-5-04

COPY

DIARIED

# EXHIBIT N

IN THE CIRCUIT COURT FOR THE EIGHTEENTH JUDICIAL CIRCUIT
DUPAGE COUNTY, WHEATON, ILLINOIS

ROBIN HILL DEVELOPMENT      )
COMPANY, an Illinois corporation      )
On behalf of itself and on behalf of all      )
Others similarly situated,      )
      )
            Plaintiff,      )
      )
            -vs-      )      01 L 527
      )
JD&T ENTERPRISES, INC.      )
D/b/a TRAVEL TO GO,      )
A California Corporation and      )
DIANE, TROY and JEANETTE NUNEZ,      )
      )
            Defendants      )

## ORDER

The defendant has filed a motion to dismiss the above captioned case alleging that the Telephone Consumer Protection Act, 47 U.S.C., Sec. 227 (T.C.P.A.) violates U. S. Constitution.

The parties agree that this issue has been litigated in a number of jurisdictions. They also agree that the standard to be applied to this motion is the four part standard set forth in Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557 (1980).

First, the parties agree that the commercial speech is not alleged to be false or misleading.

Second, the interest in preventing the cost shifting effect of unsolicited fax advertising is substantial to protect the owners of fax machines from the cost shifting aspects inherent in this type of advertising.

Third, the T.C.P.A. naturally furthers the interest in preventing cost shifting effects that result from fax advertising even if it does not eliminate them altogether.

Finally this restriction is not more restrictive than necessary to advance the interest in preventing the cost shifting effects that result from fax advertising in actual cost and the disruption of business.

**Exhibit 5**

The T.C.P.A. need not contain a scienter element. The court accepts the reasoning set forth in Texas v. American BlastFax, Inc., 121 F.Supp.2d 1085, 10092 N10. (W.D.Tex 2000).

The T.C.P.A. sets forth the conduct it prohibits and the severity of the penalty of $500 for a single violation. The damage provision is reasonable as a means to deter unsolicited fax advertisement and creating an incentive for plaintiffs to sue.

Now therefore, the court finds that the T.C.P.A. does not violate the Constitution and the motion to dismiss is denied.

Date: _Oct 3, 2002_

ENTER: _____

# EXHIBIT O

Case 1:08-cv-01856   Document 25-4   Filed 06/25/2008   Page 68 of 74
Kubiesa, Spiroff, Gosselar, Acker & Kern, P.C. v. Tier One Telecom. Mgmt. Group, Inc. Page 1 of 3
Case 1:06-cv-04566   Document 19   Filed 12/06/2006   Page 59 of 69

IN THE CIRCUIT COURT FOR THE EIGHTEENTH JUDICIAL CIRCUIT

DU PAGE COUNTY, WHEATON, ILLINOIS

**KUBIESA, SPIROFF, GOSSELAR, ACKER & KERN, P.C., an Illinois Professional Corporation and on behalf of all others similarly situated. Plaintiff,**

vs.

**TIER ONE TELECOMMUNICATIONS MANAGEMENT GROUP., INC. an Illinois Corporation, and VISION LAB TELECOMMUNICATIONS INC., a Florida Corporation., Defendant.**

**NO.03 L 425**

**August 4, 2004**

NOTICE: The rules of some jurisdictions may impose limitations on the use of materials not designated for publication in certain officially sanctioned reporters. Consult the rules of the applicable jurisdiction regarding use and citation of this opinion.

**DISPOSITION:**

Defendants' motion to dismiss denied.

**SYNOPSIS:**

Plaintiff in a putative class action brought suit under the Telephone Consumer Protection Act for transmission of an unsolicited fax advertisement. Defendant sought to dismiss the action on grounds that the state of Illinois had not "opted-in" to the statutory enforcement scheme and that the statute violated the 1st, 5th, 8th and 14th Amendments to the U.S. Constitution. The court rejected defendant's arguments and held that 1) state courts had jurisdiction to hear TCPA claims, 2) that the statute was a permissible regulation of commercial speech, 3) the statutory damages did not violate due process, and 4) the 8th Amendment Excessive Cines Clause did not apply to statutory damages paid to a plaintiff.

**SUBSEQUENT HISTORY:**

**PRIOR HISTORY:**

**CITED BY:**

**APPEARANCES:**

**JUDGES:**

**HOLDINGS:**

**[☞1] Opt-in/Opt-out**

The statutory language "if otherwise permitted by the laws or rules of court of a State" merely leaves to the various states the freedom to enact appropriate procedural rules to effectively accommodate these claims.

**[☞2] Constitution: First Amendment**

The TCPA arguably regulates commercial speech and, therefore, must survive the four-part analysis of its 1st Amendment constitutionality set forth in Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 566 (1980).

**Exhibit 8**

Case 1:08-cv-01856    Document 25-4    Filed 06/25/2008    Page 69 of 74
Kubiesa, Spiroff, Gosselar, Acker & Kern v. Tier One Telecomm. Mgmt. Group, Inc.    Page 2 of 3
Case 1:08-cv-01868    Document 19    Filed 12/08/2006    Page 60 of 69

[☞3] **Constitution: First Amendment**

The government has a substantial interest in preventing the cost shifting of this fax advertising and the unwanted disruption of economic activity.

[☞4] **Constitution: First Amendment**

This statute does directly advance the governmental interest because it prevents advertisers from appropriating the property of others without their consent. Therefore, the TCPA directly relates to the expenses and burdens incurred by fax recipients.

[☞5] **Constitution: First Amendment**

This statute does not completely prohibit fax advertising, but merely limits its use to advertisers who first obtain consent from proposed recipients to the use of their time and money to receive the commercial messages.

[☞6] **Constitution: Due Process / Excessive Fines**

The TCPA provides a remedy that serves both to discourage the prohibited conduct and encourage victims to bring suit to address violations.

[☞7] **Constitution: Due Process / Excessive Fines**

The 8th Amendment is not implicated by the statutory damage clause of the TCPA because such damages are not paid to a sovereign.

**OPINION:**

MEMORANDUM OPINION AND ORDER

[*1] Defendant Tier One Telecommunications Management Group, Inc. moves to dismiss Plaintiff Kubiesa, Spiroff, Gosselar, Acker & Kern's Amended Class Action Complaint pursuant to 735 ILCS 5/2-619. This complaint alleges that Tier One transmitted an unsolicited fax advertisement to Plaintiff law firm on January 21, 2002, and in so doing, violated the Telephone Communications Protection Act ("TCPA"). Defendant contends that the sole count of this complaint should be dismissed because:

1. State courts lack jurisdiction over a private right of action under the TCPA, and

2. Even if jurisdiction exists, the TCPA is unconstitutional because it violates the 1st, 5th, 8th and 14th Amendments to the U.S. Constitution.

[*2] This Court has considered the memoranda and case law submitted by the parties and the Intervener United States as well as the oral argument made by all counsel, and finds as follows:

Jurisdiction

The plain language of the TCPA authorizing a private right of action in state court for alleged violations of its provisions does not require states to explicitly "opt-out" or to enact enabling legislation to "opt-in" to avail private parties the opportunity to seek relief. [☞1] The statutory language "if otherwise permitted by the laws or rules of court of a State" merely leaves to the various states the freedom to enact appropriate procedural rules to effectively accommodate these claims. Neither a consideration of the TCPA's legislative history, nor a plain reading of the statute as a whole with the specific "permitted" language construed in context, support this Defendant's jurisdictional argument.

This state court is one of general jurisdiction and, under the Supremacy Clause of the U.S. Constitution, cannot refuse to enforce federal rights except under limited circumstances not present here. *Howlett v. Rose*, 496 U.S. 356, 367 (1990). In the absence of a statutory provision limiting jurisdiction to the federal courts, Illinois has a constitutional obligation to resolve federal claims. Congress created an exclusive remedy in the state court for a private right of action for violation of the TCPA.

State courts have wide latitude in establishing the structure and jurisdiction within their own court system. *Howlett v. Rose*, 496 U.S. at 372. However, once a state court has made itself available to similar claims (*Id.* at 376), there is a presumption that the court must enforce federal rights unless the exceptions set forth below exist. Illinois state trial courts have previously been open to similar claims, although there is yet no appellate [*3] precedent confirming such jurisdiction for TCPA cases. Accordingly, a presumption exists that Illinois state courts must enforce this federal private right of action absent an explicit statutory directive to the contrary, an unmistakable implication of a lack of state court jurisdiction, or an incompatibility between state court jurisdiction and federal interest. *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477-478 (1981).

This Court is not persuaded by Defendant's argument that the "if otherwise permitted" language of the TCPA is an explicit

Kubiesa, et al. v. Tier One Telecommunications Management Group, Inc. Page 3 of 3
Case 1:08-cv-01858-ef al. Document 25-4 Filed 06/25/2008 Page 70 of 74
Case 1:06-cv-04968 Document 19 Filed 12/06/2006 Page 61 of 69

statutory directive limiting jurisdiction of the state courts. There is nothing explicit about this language. The word "permitted" has both an active and passive legal definition. It can mean to expressly assent or agree, or it can also mean to acquiesce by failing to prevent. Black's Law Dictionary (6th Edition 1990). Further, there is no unmistakable implication of a lack of state court jurisdiction, or an incompatibility between state court jurisdiction and federal interests. The legislative history indicates that the TCPA was enacted to assist the states in prohibiting unsolicited fax advertisements across state lines. Therefore, there is a presumption that this Illinois state court must enforce the TCPA federal private right of action.

Accordingly, the Defendant's Motion to Dismiss Count I on jurisdictional grounds is denied.

### Constitutionality

#### A. 1st Amendment

[☞2]    The TCPA arguably regulates commercial speech and, therefore, must survive the four-part analysis of its 1st Amendment constitutionality set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980):

[*4] 1. Does the speech (unsolicited fax advertisement) come within the protection of the 1st Amendment? The fax at issue involves lawful commercial activity and is not alleged to be misleading. Therefore, it is protected.

2. Is there a substantial governmental interest in regulating this speech? [☞3] In considering the legislative history of the TCPA and the fact that numerous states, including Illinois, have enacted similar bans on unsolicited fax advertisements, this Court finds that the government has a substantial interest in preventing the cost shifting of this fax advertising and the unwanted disruption of economic activity.

3. Does the TCPA directly advance the substantial governmental interest identified above? [☞4] This statute does directly advance the governmental interest because it prevents advertisers from appropriating the property of others without their consent. Therefore, the TCPA directly relates to the expenses and burdens incurred by fax recipients.

4. Is there a reasonable fit between the legislative ends and the means selected to accomplish those ends? This Court finds that the TCPA does not burden substantially more speech than necessary in furthering the government's legitimate interests. [☞5] This statute does not completely prohibit fax advertising, but merely limits its use to advertisers who first obtain consent from proposed recipients to the use of their time and money to receive the commercial messages. Accordingly, the scope of the statute is in proportion to the interest served.

#### B. 5th, 8th, and 14th Amendments

The proper standard for evaluating statutory damages under the due process clause is to evaluate whether the penalty is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, Iron Mountain & Southern R.R. v. Williams*, 251 US. 63, 67 (1919). The TCPA subjects violators to statutory damages of $500 per fax or $1500 per fax if the violation is willful. This damage scheme fully and specifically advises civil defendants of the potential penalty for violation. [☞6] It provides a remedy that serves both to discourage the prohibited conduct and encourage victims to bring suit to address violations. The statutory penalty is not so severe or oppressive so as to be wholly disproportional to the offense. The penalty is not obviously unreasonable. For all of these reasons, the statutory damages set forth in the TCPA comply with the standard found in *St. Louis, Iron Mountain & Southern R.R. v. Williams, supra*. Standards involving punitive damages are not applicable here. Accordingly, the TCPA statutory damage provision does not violate the due process provisions of the 5th and 14th Amendments to the U.S. Constitution.

The 8th Amendment to the U.S. Constitution prohibits excessive fines. The term "fine" in this constitutional context has been defined by the U.S. Supreme Court to mean "a payment to a sovereign as a punishment for some offense." *United States v. Bajakaiian*, 524 U.S. 321, 327-328 (1998). [☞7] The 8th Amendment is not implicated by the statutory damage clause of the TCPA because such damages are not paid to a sovereign. Accordingly, the TCPA statutory damage provision does not violate the excessive fine prohibition in the 8th Amendment to the U.S. Constitution.

#### [*5] ORDER

For the reasons set forth above, Defendant Tier One Telecommunications Management Group, Inc.'s Motion to Dismiss Count I of the Amended Class Action Complaint is denied.

ENTER:

*/s/ Judge Hollis L. Webster*

August 4, 2004

### # # #

# EXHIBIT P

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
McHENRY COUNTY, ILLINOIS

STONECRAFTERS, INC. an Illinois )
Corporation, Individually and as the )
Representative for a Class of Similarly- )
Situated Persons, )
        )
            Plaintiff )
        )
        vs. )          CASE NO.      03 CH 435
        )
WHOLESALE LIFE INSURANCE )
BROKERAGE, INC. )
        )
            Defendant )

FILED
McHENRY COUNTY, ILLINOIS

JUL 2 8 2004

VERNON W. KAYS, JR.
CLERK OF THE CIRCUIT COURT

ORDER ON MOTION TO DISMISS, TO STRIKE AND/OR
FOR JUDGMENT ON THE PLEADINGS

This cause is under advisement by this Court on the Motion to Dismiss, To Strike and/or for

Judgment on the Pleadings filed by Defendant, Wholesale Life Insurance Brokerage, Inc., on February 5,

2004, pursuant to 735 ILCS 5/2-615 and 5/2-619, concerning the Class Action Complaint filed by the

Plaintiff, Stonecrafters, Inc., etc., on July 12, 2003.

The Court has reviewed all of the written materials submitted by the parties, heard oral arguments

and considered the case law and statutory citations of authority presented by the parties.

A review of the Defendant's Motion indicates the following:

1.      The stated bases for the 2-615 portion of the Motion are:

    a.      720 ILCS 5/26-3 cannot be the basis of a cause of action.

    b.      There is no cause of action for a failure to disclose information on the
            facsimile.

    c.      Plaintiff improperly attempts to shift the burden of proof in paragraph 18 of the
            Complaint.

    d.      The request for an injunction is unnecessary.

**Exhibit 7**

e.   All references to 47 U.S.C. Section 227 should be stricken as no state law in Illinois permits a cause of action to be brought as required by 47 U.S.C. Section 227.

f.   The claim for Conversion in Count II fails to allege sufficient facts to state a cause of action.

g.   Count III fails to allege sufficient and specific facts to state a cause of action under the Consumer Fraud Act and damages *de minimus*.

h.   720 ILCS 5/26-3 is unconstitutionally vague.   *one MDS 7/27/04*

2.   The stated bases for the 2-619 portion of the Motion are:

a.   The claim for conversion in Count II should be dismissed because the damages are *de minimus*.

b.   Allowing this law suit to proceed under any count would violate the Defendant's right to free speech as guaranteed by the First Amendment to the United States Constitution.

c.   47 U.S.C. Section 227 violates the due process clause of the Fifth and Fourteenth Amendments of the United States Constitution and would also violate the prohibition against excess fines in the Eighth Amendment of the United States Constitution.

d.   Count I should be dismissed because 47 U.S.C. Section 227 is unconstitutionally vague.

e.   The Plaintiff has no standing to sue under 47 U.S.C. Section 227 as the cause of action is only for persons and not entities.

The Court will not attempt to recite or restate the arguments of the parties as these are fully stated in the written materials.

The Court finds that the written materials and oral arguments on behalf of the Plaintiff, Stonecrafters, Inc., and the intervenor, United States of America, to be persuasive on all matters at contest in this Motion.   *MDS 4/27/04*

The Court will deny the Motion on all bases.

THEREFORE, IT IS ORDERED THAT the Motion to Dismiss, to Strike and/or for Judgment on the Pleadings filed on February 5, 2004, pursuant to 735 ILCS 5/2-615 and 5/2-619 is denied on all bases and further that Defendant is granted 28 days to answer the Plaintiff's Complaint.

2

IT IS FURTHER ORDERED THAT this case is continued for status and case management to

Friday, September 3, 2004 at 9:00 a.m. without further notice.

ENTERED _July 28, 2004_

FILED
McHENRY COUNTY, ILLINOIS
JUL 2 8 2004
VERNON W. KAYS, JR.
CLERK OF THE CIRCUIT COURT

ENTER _____

MICHAEL J. SULLIVAN
CIRCUIT COURT JUDGE

DISTRIBUTION TO:

Brian J. Wanca
Anderson & Wanca
3701 Algonquin Rd
Suite 760
Rolling Meadows, IL   60008
Fax No.   847-368-1501

James F. Best
Best, Vanderlaan & Harrington
25 E. Washington St.
Suite 210
Chicago, IL   60602
Fax No.   312-819-8062

Michael Q. Hyde
Trial Attorney
Federal Programs Branch
United States Department of Justice
Civil Division
20 Massachusetts, N.W.
Washington, D.C.   20530
Fax No.   202-616-8460

PROOF OF SERVICE
The undersigned certifies that the foregoing instrument was served
upon all parties to the above cause by depositing a copy thereof in the
U.S. Mail, postage prepaid, in envelopes addressed to each of the
attorneys of record herein at their respective addresses disclosed on the
pleadings on _July 28_, 19 _2004_

_____